## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

EMMA JANE PROSPERO,

  Plaintiff,

v.

DEPUTY RYAN SULLIVAN,
LT. RUSSELL PRESCOTT,
and JANE OR JOHN DOES,
all former or current employees of the
Camden County Sheriff's Office who
are sued in their individual capacities,

  Defendants.

**JURY TRIAL DEMANDED**

Case No.: 2:20-cv-110

## <u>COMPLAINT</u>

Plaintiff Emma Jane Prospero brings this action against Camden County

Sheriff's Deputy Ryan Sullivan, Lt. Russell Prescott, and Jane or John Doe

defendants under 42 U.S.C. § 1983, the First and Fourth Amendments of the

United States Constitution, and Georgia law.  Plaintiff seeks declaratory and

equitable relief and damages.

## INTRODUCTION

1.     On Thanksgiving Day 2018, Plaintiff Emma Jane Prospero -- a then 55-
year-old retiree -- called Camden County 911 to report repeated, loud gun
shots being fired near her home in Woodbine, Georgia, after having first
called the Camden County Sheriff's Office non-emergency number.
Mrs. Prospero's 911 call lasted approximately two and a half (2 ½)
minutes.  In retaliation for Mrs. Prospero's registering her good-faith
concerns about safety and a potential noise ordinance violation due to the
gun shots, Camden County Sheriff Deputy Ryan Sullivan obtained a
warrant for Mrs. Prospero's arrest based on misrepresentations that she
had interfered with 911 services in violation of O.C.G.A. § 16-11-39.2.

2.     Two months later, on January 28, 2019, Mrs. Prospero was publicly
arrested in a Wal-Mart parking lot.  She was detained for over 36 hours
in the Camden County Jail under health-harming and degrading
conditions, was required to post $2,500 bond for a first-time
misdemeanor arrest, and spent more than nine months facing a criminal
prosecution until the District Attorney's Office declined to prosecute and
dismissed the charge.

3.     Mrs. Prospero asserts that the individual defendants named in this action
displayed malice and reckless disregard for her constitutional rights by

subjecting her to unlawful seizure and initiation of criminal charges without probable cause, resulting in her being detained for two nights under punitive conditions, all in retaliation for her having exercised her First Amendment right to make a good-faith call for assistance. As a result, Mrs. Prospero is now afraid to seek help or protection from Camden County Sheriff's Office or Camden County 911.

4.    This case is brought to establish accountability for the violation of Mrs. Prospero's constitutional rights.

5.    When a community resident is punished for seeking the aid of law enforcement, this erodes public trust and confidence in law enforcement's ability to serve and protect, compromising effective policing and the securing of public safety.

6.    The retaliatory arrest of Mrs. Prospero – a retiree whose only crime was desiring a peaceful holiday—severely degrades public trust and confidence in the Camden County Sheriff's Office to the detriment, not only of Mrs. Prospero, but of the whole of Camden County.

<u>PARTIES</u>

7.    Plaintiff Emma Jane Prospero ("Plaintiff" or "Mrs. Prospero") is a United States citizen, a resident of Woodbine in Camden County, Georgia, and competent to bring this lawsuit.

8.    Defendant Camden County Sheriff's Deputy Ryan Sullivan ("Deputy Sullivan") is sued in his individual capacity. At all times relevant to this complaint, Deputy Sullivan acted under the color of law.

9.    Defendant Camden County Lieutenant Russell Prescott ("Lt. Prescott") is sued in his individual capacity. At all times relevant to this complaint, Lt. Prescott acted under the color of law.

10.    Defendants Jane or John Does are employees of the Camden County Sheriff's Office sued in their individual capacities who at all times relevant to this complaint acted under color of law.

<u>JURISDICTION AND VENUE</u>

11.    This action arises under the First and Fourth Amendments to the U.S. Constitution, 42 U.S.C. § 1983, and Georgia law.

12.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

14.    This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

15.    Venue in this Court is proper under 28 U.S.C. § 1391 because the events

        giving rise to Plaintiff's claims arose in this district and division, and

        because Camden County is located within this district and division.

<u>FACTS GIVING RISE TO PLAINTIFF'S CLAIMS</u>

*Events of Thanksgiving Day, November 22, 2018*

16.    Mrs. Prospero and her husband, Mr. Joseph Prospero, moved to

        Woodbine, Georgia in Camden County almost a decade ago, seeking a

        peaceful and quiet retirement.

17.    On the afternoon of Thanksgiving Day, November 22, 2018, the

        Prosperos were at home when they began to hear a barrage of gunshots

        outside their house.

18.    The gunshots were coming from the vicinity of a nearby Chevron gas

        station located behind the Prosperos' house.

19.    The close-range gunfire caused the Prosperos to fear for the safety of

        themselves and their neighbors.

20.    The Prosperos also reasonably believed that the loud, persistent gunshots

        violated noise and firearm ordinances of the City of Woodbine.

21.    Specifically, Woodbine Code of Ordinances §§ 24-2; 24-52 make it

        unlawful to "discharge any gun, pistol, or other firearm within 50 yards

        of any street, alley, or building, or at any point upon the land of another

person without the express consent of the owner or occupant thereof" or "make or continue to make any loud, unnecessary or unusual noise, or any noise which either annoys, disturbs, or injures, or endangers the comfort, repose, health, peace, or safety of others in the city."

22.     In the past, when the Prosperos had heard close-range gunfire near their home, they had called the Camden County Sheriff's Office and the shooting was stopped.

23.     Indeed, in 2012, Camden County Sheriff's Office Captain Chuck Byerly had provided a letter to the Prosperos explaining the various Georgia statutes and local ordinances that may render gunfire near their home unlawful.

24.     When the gunfire on Thanksgiving Day, November 22, 2018, failed to cease, Mrs. Prospero believed, based on her past experience and the letter from then-Captain Byerly, that the appropriate response was to call the Camden County Sheriff's Office.

25.     Therefore, at or about 2:42 p.m. on November 22, 2018, Mrs. Prospero called the Sheriff's Office's non-emergency line (912-510-5100) to make a report.

26.   The answering officer forwarded the call to the Camden County

Emergency Dispatch Center ("Dispatch Center"), where Dispatcher John

Archibald ("Dispatcher Archibald") received the forwarded call.

27.   Mrs. Prospero stated to Dispatcher Archibald that she could hear "a ton

of shots…for about ten minutes and they're not stopping." Mrs. Prospero

further explained that the gunshots were coming "too close to neighbors"

and that she wanted "the shooting to stop. I'm trying to enjoy my

Thanksgiving."

28.   Dispatcher Archibald informed Mrs. Prospero that they would "get

somebody out there." Mrs. Prospero thanked Dispatcher Archibald and

they hung up.

29.   Several minutes later, as the shooting was continuing, Mrs. Prospero's

husband, Mr. Joseph Prospero, called the Camden County Sheriff's

Office's non-emergency line (912-510-5100) at or about 2:46 p.m.

30.   Mr. Prospero was transferred to the Dispatch Center and spoke with

Dispatcher Archibald.

31.   Mr. Prospero informed Dispatcher Archibald that the shooting had

continued and the gunshots were coming "too close to the neighbor."

32.   Dispatcher Archibald stated that the shooting was taking place at a

hunting club located on private property and asked Mr. Prospero if he

wanted to speak to a deputy about the situation. Mr. Prospero declined, explaining that all he wanted was for the shooting to stop and that it had been stopped in the past when the Prosperos had called.

33. After Mrs. and Mr. Prospero's respective calls to the Camden County Sheriff Office's non-emergency line, defendant Sheriff's Deputy Ryan Sullivan called the Dispatch Center at or about 2:48 p.m. to complain about the Prosperos' calls.

34. Deputy Sullivan spoke to a woman at the Dispatch Center named "Nicky."

35. During Deputy Sullivan's conversation with "Nicky," he stated, "What . . . do people [not] have anything better to do than to bitch about somebody shooting on private property?"

36. Deputy Sullivan further stated, "Yeah those motherfuckers…I ain't goin' out there to talk to Robert about, 'hey man, you can't shoot on your private property 'cause you're disturbing people'"

37. Deputy Sullivan further referred to the Prosperos as "stupid motherfuckers."

38. Deputy Sullivan continued, "Yeah…let 'em leave their fuckin' address or somethin' or request contact…I'll let 'em know how stupid they are."

39. Deputy Sullivan then requested that "Nicky" "ping [the Prosperos']

phone so I can go talk to 'em."

40.    "Nicky" responded that "they live on Magna Carta." Deputy Sullivan stated that he was going to "ride through there."

41.    Meanwhile, the shooting near the Prosperos' home continued, so, at or about 2:58 p.m. -- some minutes after the foregoing call between Deputy Sullivan and "Nicky" -- Mrs. Prospero called 911 directly.

42.    This was the first and only time Mrs. Prospero called 911 that day.

43.    Mrs. Prospero understood 911 to be the appropriate number to call since her earlier call to the Sheriff Office's non-emergency line had been transferred to the Emergency Dispatch Center.

44.    Mrs. Prospero spoke again with Dispatcher Archibald, informing him that there were "tons of shots and they keep going and going and going." Mrs. Prospero emphasized that the shots were coming "too close to the neighborhood" and violating noise ordinances.

45.    Dispatcher Archibald told Mrs. Prospero that the shots were coming from a "private property hunting club" and asked Mrs. Prospero if she wanted to see a deputy.

46.    Mrs. Prospero stated that she did not, explaining again that she "just want[ed] [the shooting] stopped" and that the police had stopped the shooting when the Prosperos had called in the past.

47.   Dispatcher Archibald told Mrs. Prospero that an officer was not going to be sent to the location of the shooting.

48.   Sergeant Susan Flowers ("Sgt. Flowers") then spoke with Mrs. Prospero, informing her that the deputy advised that the shooting was taking place at a hunting club on private property and that the shooters were "well within their rights to shoot on that property."

49.   Mrs. Prospero explained to Sgt. Flowers that she believed the gunshots were violating noise ordinances and "coming too close to people's homes."

50.   Sgt. Flowers informed Mrs. Prospero that a deputy was in route to the Prosperos' home to explain the situation to them in person.

51.   Mrs. Prospero replied, "I don't want anybody at our house here, it's Thanksgiving and we don't want, we have, we don't want anybody at our home. . . we're not the ones doing anything wrong . . . people don't want shots next to their homes."

52.   Sgt. Flowers explained that the deputy was already on his way to the Prosperos' residence.

53.   Mrs. Prospero stated, "I'm not answering the door. We're leaving. Good-bye . . .We'll call the TV stations." She then ended the call.

54. According to the Camden County Sheriff Office's "Call For Service Detail Report – CFS 391," Mrs. Prospero's single direct call to 911 started at or about 2:58 p.m. and ended by or about 3:05 p.m., which would have been a duration of approximately seven (7) minutes.

55. However, based on the audio recording of the call, its duration was only approximately two and a half (2 ½) minutes.

56. During this call, neither Dispatcher Archibald nor Sgt. Flowers told Mrs. Prospero that she should have called the Sheriff Office's non-emergency line instead of 911 or expressed concern that she was interfering with 911 services.

57. Following Mrs. Prospero's one direct call to 911, Deputy Sullivan arrived at the Prosperos' home at or about 3:15 p.m.

58. When he knocked, the Prosperos did not answer, as Mrs. Prospero had stated during the 911 call would be their response if a deputy came to their residence.

59. Deputy Sullivan asked the Dispatch Center to call Mrs. Prospero and tell her to answer the door.

60. The Dispatch Center called twice, at or about 3:18 p.m. and 3:19 p.m., but Mrs. Prospero did not answer.

61.    Deputy Sullivan reported that he did not hear any gunfire while at the

Prosperos' address.

62.    Deputy Sullivan left the Prosperos' residence by approximately 3:27 p.m.

63.    At or about 3:36 p.m., Deputy Sullivan requested that a "CH" (criminal

history) be run on Mrs. Prospero.

64.    At or about 4:00 p.m., Deputy Sullivan called the Dispatch Center and

again spoke with "Nicky." He asked, "Hey did uh…did Ms. Prospero

curse at anybody? Or use offensive or obscene language?"

65.    "Nicky" replied, "She didn't use offensive language or curse...She was

just not a happy camper and she wanted all to get it taken care of (sic)."

66.    At or about 4:12 p.m., Deputy Sullivan called back and spoke to "Nicky"

again asking, "Did [Ms. Prospero] call in…two times or three times?"

67.    "Nicky" responded, "We spoke to her twice. The husband called one

time. They called in on the non-emergency line two different times, and

they called 911 once."

68.    Deputy Sullivan then prepared an affidavit in support of an arrest warrant

for Mrs. Prospero for the misdemeanor offense of Unlawful Conduct

during a 911 Call (O.C.G.A. 16-11-39.2).

69.    In relevant part, O.C.G.A. § 16-11-39.2 prohibits calling 911 and

"[w]ithout provocation, us[ing] obscene, vulgar, or profane language

with the intent to intimidate or harass a 9-1-1 communications officer" or "[c]all[ing] or otherwise contact[ing] 9-1-1, whether or not conversation ensues, for the purpose of annoying, harassing, or molesting a 9-1-1 communications officer or for the purpose of interfering with or disrupting emergency telephone service." (O.C.G.A. 16-11-39.2).

70.    In Deputy Sullivan's affidavit seeking an arrest warrant for Mrs. Prospero, he stated that the crime occurred "during 911 call on November 22, 2018 at 2:58 p.m. to November 22, 2018 at 3:30 p.m.," creating the false impression that Mrs. Prospero had spent thirty-two (32) minutes on the phone with 911.

71.    In fact, however, Mrs. Prospero's single call to 911 lasted only about two and a half (2 ½) minutes.

72.    Deputy Sullivan further stated in his arrest-warrant affidavit that Mrs. Prospero had called 911 in reference to an incident that was not a true emergency.

73.    However, O.C.G.A. § 16-11-39.2 does not prohibit contacting 911 for a non-emergency.

74.    Deputy Sullivan's arrest-warrant affidavit further stated that Mrs. Prospero had called 911 "for the purpose of interfering or disrupting an emergency telephone service."

75.    Deputy Sullivan had no evidence to support this statement.  Indeed, the evidence known to Deputy Sullivan at the time contradicted this statement as "Nicky" had explained to him that Mrs. Prospero had called 911 only once and that her purpose for calling was that "she wanted all to get it [i.e., the gun shots] taken care of."

76.    Thus, Deputy Sullivan's sworn affidavit to the court in support of a warrant for Mrs. Prospero's arrest misrepresented the facts as they were known to him at the time and contained conclusory statements that were unsupported and contradicted by the evidence Deputy Sullivan possessed, all in a malicious attempt to establish probable cause for Mrs. Prospero's arrest.

77.    Upon information and belief, Deputy Sullivan's decision to seek a warrant for Mrs. Prospero's arrest, and the submission of his misrepresentative and unsupported affidavit in pursuit thereof, were: (1) undertaken with the supervision and full knowledge of defendant Lt. Russell Prescott and Jane or John Doe defendants employed by the Camden County Sheriff's Office; and/or (2) subsequently reviewed and ratified by defendant Lt. Russell Prescott and/or Jane or John Doe defendants employed by the Camden County Sheriff's Office.

78. Based on Deputy Sullivan's misleading and misrepresentative affidavit, a warrant for Mrs. Prospero's arrest was issued on November 22, 2018.

79. According to the Camden County Sheriff's Office records, attempts were made to serve the warrant at Mrs. Prospero's home on November 22, 2018 and on November 26, 2018, but no contact was made.

80. Upon information and belief, no written notice was left at Mrs. Prospero's residence asking her to contact the Sheriff's Office, nor was she notified of the arrest warrant by other means.

81. Mrs. Prospero therefore remained unaware of an outstanding warrant for her arrest.

*Mrs. Prospero's Arrest*

82. More than two months later, on the night of January 28, 2019, Sergeant Billington of the Camden County Sheriff's Office was off-duty at the Wal-Mart in St. Mary's, Georgia when he saw and apparently recognized Mrs. Prospero.

83. Sgt. Billington confirmed with Camden County Dispatch that there was an active warrant for Mrs. Prospero's arrest.

84. Camden County Dispatch sent Sheriff's Deputy Shana Manning to Wal-Mart to meet with Sgt. Billington, and he positively identified Mrs. Prospero to her.

85.  Deputy Manning was joined by Sheriff's Deputy [First Name Unknown] Casey.

86.  Deputies Manning and Casey, now joined by Sheriff's Deputy [First Name Unknown] Sheets, waited in the parking lot for Mrs. Prospero to exit the Wal-Mart.

87.  Rather than asking Mrs. Prospero to turn herself in, or serving the warrant at her home, the three deputies -- now joined by other officers in multiple law enforcement vehicles -- arrested Mrs. Prospero in the Wal-Mart parking lot, with Deputy Shana Manning handcuffing Mrs. Prospero and transporting her to the Camden County Jail.

88.  This public arrest without probable cause needlessly humiliated and embarrassed Mrs. Prospero, making it appear as if she had been caught shoplifting.

89.  Camden County Sheriff's records state that Mrs. Prospero's arrest occurred at 10:42 p.m.  However, Mrs. Prospero's receipts for her Wal-Mart purchases that night indicate her arrest occurred closer to midnight.

*Mrs. Prospero's Detention*

90.  As a result of Mrs. Prospero's false arrest, she spent over thirty-six (36) hours in custody and was not released until around noon or later on January 30, 2019.

91.    Mrs. Prospero was told by one of the officers who booked her, Officer [First Name Unknown] Eason[1], that she could expect to see a judge and be released sometime on the morning or early afternoon of January 29, 2020.

92.    Indeed, on the morning of January 29, 2020, a female officer in the Camden County Jail stated words to the effect that she needed to get Mrs. Prospero "ready to go over there now," by which Mrs. Prospero understood the officer to mean: get her ready to go see a judge.

93.    But other jail personnel who were present objected on the grounds that Mrs. Prospero had a Transcutaneous Electrical Nerve Stimulation (TENS) machine attached to her back with skin adhesive tape.[2]  Mrs. Prospero informed those present that she could easily remove the TENS machine, but her statement was ignored and she was not taken to see a judge.

---

[1] "Officer" is used hereinafter to refer to individuals working in the Camden County Jail as to whom plaintiff is unaware of their precise titles.

[2] A TENS machine is a low-cost apparatus that emits a periodic electrical current that helps relieve muscle pain, and in Mrs. Prospero's case, back pain.  Mrs. Prospero was wearing her TENS machine when arrested on the night of January 28, 2019 due to having been out and about, running errands all day.

94.    Upon information and belief, other arrestees being held in the Camden County Jail were arraigned on January 29, 2020, but Mrs. Prospero was not.

95.    When Officer Eason observed that Mrs. Prospero was still in custody by the latter part of the day on January 29, 2020, she stated words to the effect that Mrs. Prospero was supposed to have been released.

96.    Mrs. Prospero was not taken to see a judge until January 30, 2020.

97.    While in custody, Mrs. Prospero repeatedly asked if she could contact a lawyer and also talk to Camden County Sheriff Jim Proctor.  She was told that the Sheriff would be in later and that she could only call her husband, Mr. Joseph Prospero – which she was allowed to do a total of approximately two or three times while being detained.

98.     Mrs. Prospero's more than thirty-six (36) hours in custody pursuant to her arrest without probable cause was humiliating and health-harming for the following reasons.

<u>Prison Jumpsuit</u>

99.    As a retiree who had never before been arrested or detained, she was required, upon being booked, to undress and change into a one-piece prison jumpsuit which closed with snaps down the front from the collar to the groin.

18

100.   Mrs. Prospero was denied socks, a bra, or underwear, despite the fact that while in custody she overheard nearby male detainees being offered clean socks and underwear.

<u>No Contact Lens Supplies</u>

101.   Mrs. Prospero was denied contact lens supplies throughout her more than 36 hours in custody, notwithstanding that she requested such supplies multiple times.

102.   Her husband, Mr. Joseph Prospero, received permission to deliver -- and did, in fact, deliver -- a sealed contact lens solution bottle and an empty contact case to the jail on the morning of Tuesday, January 29, 2019.  But Mrs. Prospero never received these supplies.

103.   Mrs. Prospero's contact lens are non-disposable, daily-wear lenses that would be expensive to replace.  Without supplies, Mrs. Prospero was forced to choose between continuing to wearing her contacts, or incurring their replacement cost.

104.   Perpetually maintaining the hope that she would soon be released, Mrs. Prospero wore her contacts throughout the duration of her detention, which spanned two nights.  This was in addition to already having worn her contacts for the full day of January 28, 2019, prior to her arrest that night.

105.    Such extended wear of her contact lenses caused Mrs. Prospero pain

while she was being detained and made it difficult for her to sleep or to

see as the lenses became increasingly dried out.

106.    For some time after Mrs. Prospero's release from custody, and after she

was able to remove and salvage her contact lenses, she continued to

experience discomfort and irritation in both eyes.[3]

Lack of Food

107.    Mrs. Prospero was largely denied food that she could eat during the more

than thirty-six (36) hours that she was in custody.

108.    Mrs. Prospero is vegan and experiences anaphylactic symptoms such as

difficulty breathing and light headedness when she eats meat or lactose.

109.    Mrs. Prospero communicated her dietary restrictions while being booked

at the Camden County Jail on the night of January 28-29, 2019, and again

when she was interviewed by a male nurse – first name "Mike" -- on the

morning of January 29, 2019.  However, throughout her time in custody,

---

[3] While Mrs. Prospero did not have to replace her contact lenses, she did have to replace a pair of prescription eye-glasses that she was carrying with her in a partially-open glasses case when she was booked, along with a second pair of glasses in the same case.  The eye-glasses in question were broken when one of the booking officers closed the glasses case, crushing the two pairs together and consequently breaking one of them.

most of the food provided to Mrs. Prospero contained meat and/or lactose.

110.  As a result, Mrs. Prospero was only able to eat the bread from a sandwich that was provided on January 29, 2019 and a hard-boiled egg (which she would not normally eat on account of being vegan) that was provided on the morning of January 30, 2019.

111.  Mrs. Prospero does not recall receiving any evening meal at all on January 29, 2019.

<u>Effective Denial of Restroom Facilities</u>

112.  Mrs. Prospero was effectively denied restroom facilities -- both while being held in the first room ("Room 1") where she was detained on the night of January 28-29, 2019, and while being held in the second room ("Room 2") where she was detained from January 29-30, 2019.

113.  First, during Mrs. Prospero's first night in custody in Room 1, when she asked an older African American officer who was walking past Room 1 if she could use the bathroom, he told her words to the effect of, "I'm busy," and walked away.

114.  Second, on January 29, 2019, Mrs. Prospero was moved to Room 2 which contained a toilet that was visibly dirty and was monitored by a security camera inside the room.

115.    A Caucasian male officer wearing a light green shirt and who had the habit of frequently clearing his throat was stationed outside of Room 2. This male officer could see into Room 2, including the area where the toilet was located, when he looked through the window in Room 2's single door.

116.    In order to use the toilet in Room 2, Mrs. Prospero would have had to unsnap and fold down the top half of her one-piece prison jumpsuit, under which she had been allowed no underclothing.  This meant that while using the toilet, she would have been undressed -- with no underclothing -- down to her knees, if not her ankles, and visible through the window in the door to the male officer stationed outside.

117.    When Mrs. Prospero asked the male officer stationed outside of Room 2 if she could use a different toilet, or be guarded by a female officer, the male officer instructed her words to the effect of, "just use that one," referring to the toilet in Room 2, and looked in at Mrs. Prospero through the window in the door.

118.    Deeply uncomfortable with the presence of the security camera in the room and the fact that the male officer posted outside could see into the room, Mrs. Prospero did not undress to use the toilet and instead attempted to hold in her urine.

119.    However, due to the fullness of her bladder, Mrs. Prospero found that

when she laid down to rest on the thin mattress in Room 2, she

involuntarily leaked urine onto herself.

120.    Mrs. Prospero was therefore forced to cope with the lack of private

restroom facilities by facing away from the door of Room 2 so that her

back was to the male officer stationed outside the door, undoing a few of

the lower snaps of her jump suit, and urinating on toilet paper that she

held between her legs.

121.    The toilet paper was too thin to absorb the urine, so Mrs. Prospero was

forced to replace the toilet paper with the single small hand towel she had

been provided.

122.    Mrs. Prospero held the hand towel between her legs, urinated on it to the

point of saturation, and then wrung the towel out in the sink.

123.    Even though she repeated this process several times, she was not able to

fully empty her bladder.

124.    As a result of the foregoing lack of access to a private restroom facility

while in Room 2, Mrs. Prospero became constipated and developed what

she believes to have been a urinary tract infection, the symptoms of

which she experienced after she was released from custody.

Environmental Toxins

125. Rooms 1 and 2 in which Mrs. Prospero was detained were both
unsanitary.

126. In Room 2, where Mrs. Prospero was held from January 29-30, 2019,
there was a noxious chemical smell and the walls were covered with an
unknown liquid that Mrs. Prospero was initially concerned may have
been urine, but which she came to believe was a chemical because of the
smell.

127. While Mrs. Prospero was being held in Room 2 on January 29, 2019, she
witnessed a blue and white garden-sized hose looped under the closed
door of Room 2 and heard a tapping or clicking noise emanating from the
exterior side of the door. Contemporaneously, she heard a female voice
believed to be that of Officer Eason ask the Caucasian male officer in the
light green shirt stationed outside the door of Room 2, "What are you
doing?" The male officer responded, "What I should have done a long
time ago." The female voice, believed to be Officer Eason, replied in an
alarmed tone, "Why are you doing that?"

128. Mrs. Prospero does not know the meaning of this verbal exchange that
she overheard, nor the purpose of the hose that was looped under the door
of Room 2.  However, this sequence of events – coupled with the

chemical smell in the room and the cough Mrs. Prospero developed while in custody – has caused her anxiety and concern that she was exposed to environmental toxins.

Unreasonably Cold Temperature

129. The temperature in Room 1 and in Room 2 was also unreasonably cold throughout the duration of Mrs. Prospero's detention.

130. Particularly, in Room 2 cold air was continuously blowing from a vent in the ceiling notwithstanding that it was the month of January.

131. What appeared to be a paper towel had been taped over the ceiling vent in Room 2, perhaps by a former occupant of the room, but the paper had come loose.

132. Mrs. Prospero had little protection against the cold temperature as she had no undergarments under her prison jump suit for warmth and the small blanket provided to her was thin to the point of translucence.

*Release on Bond & Eventual Dismissal of the Charge*

133. On January 30, 2019, Mrs. Prospero was finally taken before Magistrate Judge Jennifer Lewis via video-conference where her bond was set at $2,500.

134. While Mrs. Prospero was waiting in the video-conference room prior to Judge Lewis' appearance, Sheriff Proctor looked into the room, made eye

contact with Mrs. Prospero, and then quickly ducked away.  Through the door of the video-conference room Mrs. Prospero could also see now-Major Byerly.

135.   Upon information and belief, $2,500 was an unusually high bond amount for a first-time arrestee with no prior criminal history charged with a misdemeanor.  Indeed, while Mrs. Prospero was in custody on January 29, 2020, a jail employee told her that, as a first-time arrestee, her bond should have been in the range of $100.

136.   Mrs. Prospero's appearance bond states that it was "attested and approved" by Sheriff Proctor, and bears his signature.

137.   Mr. Joseph Prospero arranged with the AAA Bond Agency to pay Mrs. Prospero's bond and she was released on the afternoon of January 30, 2019.

138.   At the time of her release Mrs. Prospero was suffering a cough, mentioned above, and head pain, neither of which she had been experiencing prior to her arrest, as well as the aforementioned pain and irritation to her eyes, urinary discomfort, and hunger.

139.   Mrs. Prospero continued to face a criminal charge until November 12, 2019 when the Assistant District Attorney for the Brunswick Judicial District dismissed the warrant against her, declining to prosecute.

140.   While the charge was pending, and pursuant to the conditions of her

bond, Mrs. Prospero's ability to travel was restricted.  As a result, Mrs.

Prospero was unable to attend the out-of-state funeral of her mother, who

passed away on March 31, 2019.

141.   Mrs. Prospero also incurred approximately $6,000 in attorneys' fees and

costs related to the defense of the criminal charge against her, prior to its

dismissal.

*Continuing Effects of Mrs. Prospero's Arrest and Detention*

142.   Since Mrs. Prospero's arrest and detention in January 2019, she has

experienced continuing physical and psychological effects of the

degrading, frightening, and ultimately traumatic incident of being

publicly seized and then imprisoned for over 36 hours without probable

cause under the above-described conditions, and then having to engage

an attorney and wait more than nine months for the criminal charge

against her to be dismissed.

143.   Mrs. Prospero did not leave her house for some time following her

release from custody on January 30, 2019 due to the severe emotional

distress caused by her prosecution, arrest, and resulting detention.

Continuing to the present, Mrs. Prospero is fearful of going out of the

house other than for necessary errands due to her concern that she will

again be falsely accused of unlawful conduct by the Sheriff's Office. Accordingly, since her arrest, she has limited her recreational activities such as going to restaurants or movie theatres in order to minimize being out in public.

144. Mrs. Prospero reports that since her arrest, she has also experienced, without limitation, increased high blood pressure and anxiety.

145. Mrs. Prospero reports that prior to her arrest, she had experienced a transient ischemic attack (TIA) every few years.

146. A TIA is a temporary episode with symptoms similar to a stroke that typically lasts for a period of minutes but does not cause permanent damage.

147. Mrs. Prospero reports that within several days of her release from custody on January 30, 2019 she experienced a TIA that temporarily impaired the mobility on the left side of her body. Since then, Mrs. Prospero has experienced TIAs with increased frequency as compared to before her arrest, undergoing well more than two, and as many as five or six, since her release.

148. Mrs. Prospero believes that her increased frequency of experiencing TIAs is related to the lingering stress effects, including increased high blood pressure, of her January 2019 arrest, detention, and prosecution.

149. Mrs. Prospero reports that the acute symptoms of these TIAs (e.g., tightened muscles in her face, a crackly sensation on one side of her brain, the inability to talk properly, and a slowed thought process) last for approximately 20 to 40 minutes but leave her drained and recuperating for more than a day afterwards.

150. Since Mrs. Prospero's January 2019 arrest, she has been afraid to contact the Camden County Sheriff's Office or 911 for assistance or protection, including when she has experienced vandalism to her property.

## CLAIMS FOR RELIEF

### Count I
### *Deprivation of First Amendment Rights*
(Against all Defendants in their individual capacities)

151. Paragraphs 1-150 are incorporated as if fully set forth herein.

152. Mrs. Prospero engaged in constitutionally-protected, First Amendment activity when she called 911 to make a good faith complaint about loud, persistent gunfire near her home on Thanksgiving Day 2018.

153. There was no probable cause for Mrs. Prospero's arrest or for initiating criminal charges against her.

154. Defendants' initiation of the seizure and prosecution of Mrs. Prospero without probable cause -- or even arguable probable cause -- constituted adverse action taken against her in retaliation for her protected speech.

155.  This adverse action directly and foreseeably resulted in Mrs. Prospero being detained for over thirty-six (36) hours in health-harming and degrading conditions, also without probable cause.

156.  Defendants' adverse action taken against Mrs. Prospero, and the direct and foreseeable detention and damages that resulted therefrom, has chilled Mrs. Prospero from engaging in future protected speech in the form of contacting the Camden County Sheriff's Office or 911 for help or assistance.

157.  A person of ordinary or reasonable firmness in Mrs. Prospero's same position would likewise be chilled from engaging in protected speech in the form of contacting the Camden County Sheriff's Office or 911 for help or assistance.

158.  Defendants therefore violated Mrs. Prospero's First Amendment rights.

## Count II
### *Unlawful Seizure/Arrest under Fourth Amendment*
(Against all Defendants in their individual capacities)

159.  Paragraphs 1-150 are incorporated as if fully set forth herein.

160.  Defendants acted with malice and reckless disregard for Mrs. Prospero's Fourth Amendment rights in seeking an arrest warrant without probable cause.

161.  This directly and foreseeably resulted in Mrs. Prospero being seized and detained, also without probable cause.

162.  The facts within defendants' knowledge on November 22, 2018 were not sufficient to establish even arguable probable cause that Mrs. Prospero had committed the crime of unlawful conduct during a 911 call or any other criminal offense.

163.  Nonetheless, Deputy Sullivan sought and obtained an arrest warrant for Mrs. Prospero based on his sworn affidavit that misrepresented the facts known to him at the time and contained conclusory statements for which he had no supporting evidence and that were, in fact, contradicted by the information he possessed.

164.  Upon information and belief, Deputy Sullivan's decision to seek a warrant for Mrs. Prospero's arrest, and the submission of his misleading and unsupported affidavit in pursuit thereof, were: (1) undertaken with the supervision and full knowledge of defendant Lt. Russell Prescott and Jane or John Doe defendants employed by the Camden County Sheriff's Office; and/or (2) were subsequently reviewed and ratified by defendant Lt. Russell Prescott and/or Jane or John Doe defendants employed by the Camden County Sheriff's Office.

165.  Defendants' actions were the proximate cause of Mrs. Prospero's unlawful arrest and seizure, and the detention and other damages arising therefrom.

## Count III
### Malicious Prosecution under Fourth Amendment
(Against all Defendants in their individual capacities)

166.  Paragraphs 1-150 are incorporated as if fully set forth herein.

167.  Although Deputy Sullivan lacked probable cause to do so, he initiated a formal prosecution of Mrs. Prospero on November 22, 2018 by seeking a warrant for her arrest based on a sworn affidavit that misrepresented the facts known to him at the time and contained conclusory statements for which he had no supporting evidence and that were, in fact, contradicted by the information he possessed.

168.  Upon information and belief, Deputy Sullivan's initiating a formal prosecution of Mrs. Prospero without probable cause based on a misleading and unsupported affidavit was: (1) undertaken with the supervision and the full knowledge of defendant Lt. Russell Prescott and Jane or John Doe defendants employed by the Camden County Sheriff's Office; and/or (2) was subsequently reviewed and ratified by defendant Lt. Russell Prescott and/or Jane or John Doe defendants employed by the Camden County Sheriff's Office.

169.  Mrs. Prospero's prosecution terminated in her favor when the criminal charge against her was dismissed on November 12, 2019 by the Camden County Assistant District Attorney, who declined to prosecute.

170.  Defendants' actions were the proximate cause of Mrs. Prospero's malicious prosecution and the detention and damages arising therefrom.

## Count IV
### *Intentional Infliction of Emotional Distress*
(Against all Defendants in their individual capacities)

171.  Paragraphs 1-170 are incorporated as if fully set forth herein.

172.  Lacking probable cause or even arguable probable cause to arrest or prosecute Mrs. Prospero, Deputy Sullivan misrepresented the facts known to him at the time and made conclusory statements for which he had no evidentiary support -- and which were, in fact, contradicted by the information he then possessed -- in order to obtain a warrant for Mrs. Prospero's arrest to punish her for her constitutionally-protected speech.

173.  Upon information and belief, Deputy Sullivan's initiating a formal prosecution of Mrs. Prospero without probable cause based on a misleading and unsupported affidavit was: (1) taken with the supervision and full knowledge of defendant Lt. Russell Prescott and Jane or John Doe defendants employed by the Camden County Sheriff's Office; and/or (2) was subsequently reviewed and ratified by defendant Lt.

Russell Prescott and/or Jane or John Doe defendants employed by the Camden County Sheriff's Office.

174. Defendants' actions resulted in Mrs. Prospero's unlawful arrest, seizure, prosecution, and lengthy detention under degrading and health-harming conditions.

175. Defendants' actions were extreme, intentional, and in reckless disregard of Mrs. Prospero's First and Fourth Amendment rights.

176. Defendants' actions would naturally humiliate, embarrass, frighten, and outrage Mrs. Prospero.

177. Defendants' actions, carried out with malice, were the proximate cause of Mrs. Prospero's severe emotional distress, mental suffering, and damages arising from her January 2019 arrest and detention.

## REQUEST FOR RELIEF

WHEREFORE, on the basis of the foregoing, Mrs. Prospero respectfully prays that this Court:

a) Assume jurisdiction over this action;

b) Hold a trial by jury on all issues so triable;

c) Award declaratory relief that Plaintiff's constitutional rights were violated and require equitable relief in the form of First Amendment training for Camden County Sheriff law enforcement officers at all ranks;

34

d) Award nominal, compensatory, and other damages to Plaintiff in an amount to be determined by the enlightened conscience of fair and impartial jurors;

e) Award punitive damages against the individual Defendants;

f) Award reasonable attorney's fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

g) Award such other and further relief as this Court deems just and proper.

Respectfully submitted this 15th day of October 2020.

/s/Clare Norins
Clare Norins
Georgia Bar No. 575364
cnorins@uga.edu
FIRST AMENDMENT CLINIC[4]
University of Georgia School of Law
Post Office Box 388
Athens, Georgia 30603
(706) 542-1419 (phone)
(706) 227-5440 (fax)

/s/Kimberly Cofer Butler
Kimberly Cofer Butler
Georgia Bar No. 172950
kbutler@epra-law.com
ELLIS, PAINTER, RATTERREE
& ADAMS LLP
2 East Bryan Street, 10th Floor
Post Office Box 9946 (31412)
Savannah, Georgia 31401
(912) 233-9700 (phone)
(912) 233-2281 (fax)

*Attorneys for Plaintiff Emma Jane Prospero*

[4] This Complaint was prepared, in part, by law students Janay Alexander, Henry Helton, and Jeffrey Murphy.