## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

EMMA JANE PROSPERO,

      Plaintiff,

v.

DEPUTY RYAN SULLIVAN,
LT. RUSSELL PRESCOTT, and
SHERIFF JAMES PROCTOR,
current employees of the
Camden County Sheriff's Office who
are sued in their individual capacities,


      Defendants.

**JURY TRIAL DEMANDED**

Case No.:  2:20-cv-110

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff Emma Jane Prospero brings this action against Camden County

Sheriff's Deputy Ryan Sullivan, Lt. Russell Prescott, and Sheriff James Proctor

under 42 U.S.C. § 1983, the First and Fourth Amendments of the United States

Constitution, and Georgia law.  Plaintiff seeks declaratory and equitable relief and

damages.

## <u>INTRODUCTION</u>

1.    On Thanksgiving Day 2018, Plaintiff Emma Jane Prospero—a then 55-

year-old retiree—called Camden County 911 to report repeated, loud gun

shots being fired near her home in Woodbine, Georgia, after having first

called the Camden County Sheriff's Office non-emergency number.

Mrs. Prospero's 911 call lasted approximately two and a half (2 ½)

minutes.  In retaliation for Mrs. Prospero's registering her good-faith

concerns about safety and a potential noise ordinance violation due to the

gun shots, Camden County Sheriff Deputy Ryan Sullivan, acting in

consultation with Camden County Sheriff's Lieutenant Russell Prescott,

obtained a warrant for Mrs. Prospero's arrest based on misrepresentations

that she had called for the purpose of interfering or disrupting an

emergency telephone service in violation of O.C.G.A. § 16-11-39.2.

2. Prior to Deputy Sullivan's being hired by the Camden County Sheriff's

Office on the authority of Sheriff Proctor, and upon information and

belief Chief Deputy Charles Byerly, Sullivan had been employed with

the nearby Brunswick Police Department (BPD). He was terminated from

the BPD for, among other misconduct, arresting and attempting to arrest

members of the public without probable cause, the same harm he

subsequently visited on Mrs. Prospero.

3. On January 28, 2019, two months after Defendant Sullivan obtained an

arrest warrant for Mrs. Prospero without probable cause, she was publicly

arrested in St. Mary's, Georgia Wal-Mart parking lot.  She was detained

for over 36 hours in the Camden County Jail under health-harming and degrading conditions, was required to post $2,500 bond for a first-time misdemeanor arrest, and spent more than nine months facing a criminal prosecution until the District Attorney's Office declined to prosecute and dismissed the charge.

4.      Mrs. Prospero asserts that Defendants Sullivan and Prescott displayed malice and reckless disregard for her constitutional rights by subjecting her to unlawful seizure and initiation of criminal charges without probable cause, resulting in her being detained for two nights under punitive conditions, all in retaliation for her having exercised her First Amendment right to make a good-faith call for assistance and petition the government for grievances.  As a result, Mrs. Prospero is now afraid to seek help or protection from Camden County Sheriff's Office or Camden County 911.

5.      Mrs. Prospero further asserts that Defendant Proctor knew of Deputy Sullivan's termination from the BPD, knew or should have known of his propensity to make and attempt to make arrests and initiate criminal prosecution without probable cause, and was therefore negligent in hiring and retaining Sullivan as a Camden County Sheriff's Deputy.

6.      This case is brought to establish accountability for the violation of Mrs. Prospero's constitutional and state law rights.

7.      When a community resident is punished for seeking the aid of law enforcement, this erodes public trust and confidence in law enforcement's ability to serve and protect, compromising effective policing and the securing of public safety.

8.      The retaliatory arrest of Mrs. Prospero—a retiree whose only crime was desiring a peaceful holiday—severely degrades public trust and confidence in the Camden County Sheriff's Office to the detriment, not only of Mrs. Prospero, but of the whole of Camden County.

<u>PARTIES</u>

9.      Plaintiff Emma Jane Prospero ("Plaintiff" or "Mrs. Prospero") is a United States citizen, a resident of Woodbine in Camden County, Georgia, and competent to bring this lawsuit.

10.     Defendant Camden County Sheriff's Deputy Ryan Sullivan is sued in his individual capacity. At all times relevant to this complaint, Deputy Sullivan acted under the color of law.

11.     Defendant Camden County Sheriff's Lieutenant Russell Prescott is sued in his individual capacity. At all times relevant to this complaint, Lt. Prescott acted under the color of law.

12.   Defendant Camden County Sheriff James Proctor is sued in his

individual capacity. At all times relevant to this complaint, Sheriff

Proctor acted under the color of law.

## JURISDICTION AND VENUE

13.   This action arises under the First and Fourth Amendments to the U.S.

Constitution, 42 U.S.C. § 1983, and Georgia law.

14.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

1343.

15.   This Court has supplemental jurisdiction over Plaintiff's state law claims

under 28 U.S.C. § 1367.

16.   This Court has jurisdiction to grant declaratory and injunctive relief

pursuant to 28 U.S.C. §§ 2201 and 2202.

17.   Venue in this Court is proper under 28 U.S.C. § 1391 because the events

giving rise to Plaintiff's claims arose in this district and division, and

because Camden County is located within this district and division.

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

*Events of Thanksgiving Day, November 22, 2018*

18.   Mrs. Prospero and her husband, Mr. Joseph Prospero, moved to

Woodbine, Georgia in Camden County almost a decade ago, seeking a

peaceful and quiet retirement.

19.   On the afternoon of Thanksgiving Day, November 22, 2018, the
      Prosperos were at home when they began to hear a barrage of gunshots
      outside their house.

20.   The gunshots were coming from the vicinity of a nearby Chevron gas
      station located behind the Prosperos' house.

21.   Although unknown to the Prosperos at the time, in 2018 and continuing
      to the present, Sheriff Proctor owns land located in between the Chevron
      gas station and the Prosperos' home which the Sheriff allows
      acquaintances to use for purposes of an informal hunting club.

22.   The close-range gunfire the Prosperos heard behind their home on
      Thanksgiving Day 2018 caused them to fear for the safety of themselves
      and their neighbors.

23.   The Prosperos also reasonably believed that the loud, persistent gunshots
      violated local noise ordinances.

24.   Specifically, Woodbine Code of Ordinances §§ 24-2; 24-52 make it
      unlawful to "discharge any gun, pistol, or other firearm within 50 yards
      of any street, alley, or building, or at any point upon the land of another
      person without the express consent of the owner or occupant thereof" or
      "make or continue to make any loud, unnecessary or unusual noise, or

any noise which either annoys, disturbs, or injures, or endangers the comfort, repose, health, peace, or safety of others in the city."

25. Additionally, Article 8 of the Camden County Ordinance prohibits property owners from allowing nuisances on their property, with "nuisances" defined in § 802(2) to include "sounds . . . that interfere with the peace or comfort or disturb the quiet of the county."

26. In the past, when the Prosperos had heard close-range gunfire near their home, they had called the Camden County Sheriff's Office and the shooting was stopped or a deputy was dispatched to investigate.

27. Indeed, in 2012, Chief Deputy Byerly had provided a letter to the Prosperos explaining the various Georgia Code provisions and the Camden County nuisance ordinance that may render gunfire near their home unlawful.

28. Further, in 2017, Sheriff Proctor had provided a letter to the Prosperos stating that if they felt threatened or had an emergency they should call 911 and if they had a concern, they should call the Camden County Emergency Dispatch Center ("Dispatch Center")'s non-emergency number.

29. When the gunfire behind their home on Thanksgiving Day, November 22, 2018, failed to cease, Mrs. Prospero believed, based on her past

experience and the letters from Chief Deputy Byerly and Sheriff Proctor, that the appropriate response was to call the Camden County Sheriff's Office.

30.   Therefore, at or about 2:42 p.m. on November 22, 2018, Mrs. Prospero called the Sheriff's Office's administrative, non-emergency line (912-510-5100) to make a report.

31.   The individual who answered the line forwarded the call to the Dispatch Center, where Dispatcher John Archibald ("Dispatcher Archibald") answered.

32.   Mrs. Prospero stated to Dispatcher Archibald, "there's a ton of shots behind the Chevron station over there," and "they've been shooting for about ten minutes and they're not stopping. Can you get somebody over there to tell them to stop shooting? It's too close to neighbors here." She reiterated that she wanted the shooting to stop and was trying to enjoy her Thanksgiving.

33.   Dispatcher Archibald informed Mrs. Prospero, "I understand. We'll get somebody out there, okay?" Mrs. Prospero thanked Dispatcher Archibald and they hung up.

34.   Several minutes later, as the shooting was continuing, Mrs. Prospero's husband, Mr. Joseph Prospero, called the Camden County Sheriff's

Office's administrative, non-emergency line (912-510-5100) at or about 2:46 p.m.

35.    The individual who answered the line transferred Mr. Prospero to the Dispatch Center and he spoke with Dispatcher Archibald.

36.    Mr. Prospero informed Dispatcher Archibald that the shooting had continued and the gunshots were coming "too close to the neighbor."

37.    This time, Dispatcher Archibald stated that the shooting was taking place at a hunting club located on private property.

38.    Dispatcher Archibald reports that defendant Deputy Sullivan, who had been contacted by the Dispatch Center after Mrs. Prospero's 2:42 p.m. call, was the source for the information that the gun shots were coming from a hunting club located on private property.

39.    However, Dispatch Center records and audio-recordings show that at this time Deputy Sullivan was in another part of Camden County from where the Prosperos reported the gunshots were occurring, and was not within distance to hear or see where the gunshots were coming from.

40.    Dispatcher Archibald asked Mr. Prospero if he wanted to speak to a deputy about the situation and Mr. Prospero declined, explaining that all he wanted was for the shooting to stop and that it had been stopped in the past when the Prosperos had called.

*Deputy Sullivan Expresses Animus Towards the Prosperos*
*Based on Their Speech Before Mrs. Prospero Calls 911*

41.   After Mrs. and Mr. Prospero's respective calls to the Camden County

Sheriff Office's administrative, non-emergency line, defendant Deputy

Ryan Sullivan called the Dispatch Center at or about 2:48 p.m. and

complained to Sgt. Susan "Nikki" Flowers about the Prosperos' calls.

42.   Deputy Sullivan was still in another part of Camden County from where

the Prosperos reported the gunshots were occurring when he spoke with

Sgt. Flowers.

43.   Deputy Sullivan stated to Sgt. Flowers, "What? Do -- people don't have

anything better to do than to bitch about somebody shooting on private

property?"

44.   Deputy Sullivan further stated, "Yeah those motherfuckers. I ain't goin'

out there to talk to Robert [Paulk] about -- 'Hey man, you can't shoot on

your private property 'cause you're disturbing people.'"

45.   Robert Paulk owns three parcels of land that directly border and surround

on three sides the pond or small lake on which the Prosperos' house is

located.

46.   Deputy Sullivan further referred to the Prosperos as "stupid

motherfuckers."

47. Deputy Sullivan continued, "Yeah, let 'em leave their fuckin' address or somethin' or request contact. I'll let 'em know how stupid they are."

48. Deputy Sullivan then requested that Sgt. Flowers "ping [the Prosperos'] phone so I can go talk to 'em."

49. Sgt. Flowers responded that "they live on Magna Carta." Deputy Sullivan stated that he was going to "ride through there."

*Mrs. Prospero's 2 ½ Minute Call to 911*

50. Meanwhile, the shooting near the Prosperos' home continued, so, at or about 2:58 p.m.—some minutes after the foregoing call between Deputy Sullivan and Sgt. Flowers—Mrs. Prospero called 911 directly.

51. This was the first and only time Mrs. Prospero called 911 that day.

52. Mrs. Prospero understood 911 to be the appropriate number to call since her earlier call to the Sheriff Office's non-emergency line—and also her husband's call to the non-emergency line—had both been transferred to the Emergency Dispatch Center.

53. Mrs. Prospero spoke again with Dispatcher Archibald, informing him that there were "tons of shots and they keep going and going and going around the Chevron station." Mrs. Prospero emphasized that the shots were coming "too close" and mentioned noise ordinances.

54.   Dispatcher Archibald told Mrs. Prospero that the shots were coming from a "private property hunting club" and that an officer was "not going to go out there." He asked Mrs. Prospero if she wanted to see a deputy.

55.   Mrs. Prospero stated that she did not, explaining again that she "just want[ed] [the shooting] stopped," that the police had stopped the shooting when the Prosperos had called in the past, and asking, "Why is this different today?"

56.   Sergeant Susan Flowers then spoke with Mrs. Prospero, informing her that the deputy (i.e., Deputy Sullivan) had advised that the shooting was taking place at a hunting club on private property and that the shooters were "well within their rights to shoot on that property."

57.   Mrs. Prospero again mentioned noise ordinances and explained to Sgt. Flowers, "the shots are coming too close to people's homes."

58.   Sgt. Flowers informed Mrs. Prospero that a deputy was in route to the Prosperos' home to explain the situation to them in person.

59.   Mrs. Prospero replied, "I don't want anybody at our house here, it's Thanksgiving and we don't want -- we have -- we don't want anybody at our home. We're not the ones doing anything wrong . . . People don't want shots next to their houses."

60.     Sgt. Flowers explained that the deputy was already on his way to the
        Prosperos' residence.

61.     Mrs. Prospero stated, "I'm not answering the door. We're leaving. Good-
        bye . . .We'll call the TV station." She then ended the call.

62.     According to the Camden County Sheriff Office's "Call For Service
        Detail Report – CFS 391," Mrs. Prospero's single direct call to 911
        started at or about 2:58 p.m. and ended by or about 3:05 p.m., which
        would have been a duration of approximately seven (7) minutes.

63.     However, based on the audio recording of the call, its duration was only
        approximately two and a half (2 ½) minutes.

64.     During this call, neither Dispatcher Archibald nor Sgt. Flowers told Mrs.
        Prospero that she should have called the Sheriff Office's non-emergency
        line instead of 911 or expressed concern that she was interfering with or
        disrupting 911 services.

        *Deputy Sullivan Obtains Arrest Warrant Without Probable Cause*

65.     Following Mrs. Prospero's one call to 911, Deputy Sullivan arrived at the
        Prosperos' home at or about 3:15 p.m.

66.     No Sheriff's Office policy or procedure required Deputy Sullivan to go to
        the Prosperos' home after they had both said they did not want contact.

67.  When Deputy Sullivan knocked, the Prosperos did not answer, as Mrs. Prospero had stated would be their response if a deputy came to their residence.

68.  Deputy Sullivan asked the Dispatch Center to call Mrs. Prospero and tell her to answer the door.

69.  The Dispatch Center called twice, at or about 3:18 p.m. and 3:19 p.m., but Mrs. Prospero did not answer.

70.  Deputy Sullivan reported that he did not hear any gunfire while at the Prosperos' address.

71.  Deputy Sullivan left the Prosperos' residence by approximately 3:27 p.m.

72.  At or about 3:36 p.m., Deputy Sullivan requested that a "CH" (criminal history) be run on Mrs. Prospero.

73.  At or about 4:00 p.m., Deputy Sullivan called the Dispatch Center and spoke with Dispatcher Mary Hess. He asked, "did Ms. Prospero curse at anybody or use offensive or obscene language?"

74.  Dispatcher Hess replied, "She didn't use offensive language or curse. [Sullivan responds, "Okay."] Is what Nikki [Flowers] said. She was just not a happy camper and she wanted it all -- to get it taken care of."

75. At or about 4:12 p.m., Deputy Sullivan called back and spoke to Sgt. Flowers again asking, "Did she [Ms. Prospero] call in one time? I mean two times or three times?"

76. Sgt. Flowers responded, "We spoke to her twice. The husband called one time. They called in on the non-emergency line two different times, and they called 911 once."

77. Deputy Sullivan asked Sgt. Flowers for the times of each of the three calls, and declined her offer to pull the audio-recordings to get the exact time of the second call.

78. While Deputy Sullivan and Sgt. Flowers were talking, Lt. Russell Prescott also called the Dispatch Center at around 4:13 p.m. and spoke to Dispatcher Mary Hess.

79. Lt. Prescott stated, "I'm sitting over here with Ryan [Sullivan]," and, "We're trying to get our time frame down so we can actually charge her," referring to Mrs. Prospero.

80. Dispatcher Hess told Lt. Prescott, "If y'all want to know something, come listen to the damn tape," referring to the audio-recordings of the calls from Mrs. and Mr. Prospero.

81.  Neither Lt. Prescott nor Deputy Sullivan listened to the audio-recordings
     of the Prosperos' November 22, 2018 calls prior to seeking a warrant for
     Mrs. Prospero's arrest.

82.  That same afternoon of November 22, 2018, Deputy Sullivan prepared an
     affidavit in support of an arrest warrant for Mrs. Prospero for the alleged
     misdemeanor offense of Unlawful Conduct during a 911 Call (O.C.G.A.
     16-11-39.2).

83.  In relevant part, O.C.G.A. § 16-11-39.2 prohibits calling 911 and
     "[w]ithout provocation, us[ing] obscene, vulgar, or profane language
     with the intent to intimidate or harass a 9-1-1 communications officer" or
     "[c]all[ing] or otherwise contact[ing] 9-1-1, whether or not conversation
     ensues, for the purpose of annoying, harassing, or molesting a 9-1-1
     communications officer or for the purpose of interfering with or
     disrupting emergency telephone service." (O.C.G.A. 16-11-39.2).

84.  In Deputy Sullivan's affidavit seeking an arrest warrant for Mrs.
     Prospero, he stated that the crime occurred "during 911 call on November
     22, 2018 at 2:58 p.m. to November 22, 2018 at 3:30 p.m.," creating the
     false impression that Mrs. Prospero had spent thirty-two (32) minutes on
     the phone with 911.

85.   In fact, however, Mrs. Prospero's single call to 911 lasted only about two and a half (2 ½) minutes.

86.   Deputy Sullivan further stated in his arrest-warrant affidavit that Mrs. Prospero had called 911 in reference to an incident that was not a true emergency.

87.   However, O.C.G.A. § 16-11-39.2 does not prohibit contacting 911 for a non-emergency.

88.   Deputy Sullivan's arrest-warrant affidavit further stated that Mrs. Prospero had called 911 "for the purpose of interfering or disrupting an emergency telephone service."

89.   Deputy Sullivan had no evidence to support this statement.  Indeed, the evidence known to Deputy Sullivan at the time he submitted his affidavit to the Court contradicted this statement as Sgt. Flowers and Dispatcher Mary Hess had explained to Deputy Sullivan that Mrs. Prospero had called 911 only once and that her purpose for calling was that "she wanted it all -- to get it [i.e., the gun shots] taken care of."

90.   Thus, Deputy Sullivan's sworn affidavit in support of a warrant for Mrs. Prospero's arrest misrepresented the facts as they were known to him at the time and contained conclusory statements that were unsupported and contradicted by the evidence Deputy Sullivan possessed, all in a

malicious attempt to establish probable cause for Mrs. Prospero's arrest because, as he had stated to Sgt Flowers, he considered her to be a "stupid motherfucker" on account of her complaining about someone shooting on private property and he wanted to "let [her and her husband] know how stupid they are."

91.   Based on Deputy Sullivan's misleading and misrepresentative affidavit, a warrant for Mrs. Prospero's arrest was issued shortly after 5 p.m. on November 22, 2018.

92.   Upon information and belief, Deputy Sullivan's decision to seek a warrant for Mrs. Prospero's arrest despite lacking probable cause that she had violated O.C.G.A. § 16-11-39.2 was undertaken with the supervision and full knowledge of Lt. Prescott.

93.   Lt. Prescott also subsequently reviewed and ratified Deputy Sullivan's actions when on November 23, 2018 he reviewed the Case Report, including Deputy Sullivan's narrative, and, upon information and belief, did not take any action to stop the continued prosecution and unlawful arrest of Mrs. Prospero.

94.   According to the Camden County Sheriff's Office records, attempts were made to serve the arrest warrant at Mrs. Prospero's home on November 22, 2018 and on November 26, 2018, but no contact was made.

95. Upon information and belief, no written notice was left at Mrs. Prospero's residence asking her to contact the Sheriff's Office, nor was she notified of the arrest warrant by other means.

96. Mrs. Prospero therefore remained unaware of an outstanding warrant for her arrest.

*Mrs. Prospero's Arrest*

97. More than two months later, on the night of January 28, 2019, Sergeant Billington of the Camden County Sheriff's Office was off-duty at the Wal-Mart in St. Mary's, Georgia when he saw and recognized Mrs. Prospero based, upon information and belief, on Mrs. and Mr. Prospero's contacts with the Sheriff's Office prior to November 22, 2018.

98. Sgt. Billington confirmed with Camden County Dispatch that there was an active warrant for Mrs. Prospero's arrest and Chief Deputy Byerly authorized the custodial arrest of Mrs. Prospero at the Wal-Mart.

99. Camden County Dispatch sent Sheriff's Deputy Shana Manning to Wal-Mart to meet with Sgt. Billington. They entered the Wal-Mart and Sgt. Billington positively identified Mrs. Prospero to Deputy Manning.

100. They then returned to the parking lot to wait for Mrs. Prospero to exit the Wal-Mart.

101.   Sheriff's Deputy Downy Casey and Sheriff's Deputy J. Sheets, who had each arrived in a separate Sheriff's vehicle, joined Sgt. Billington and Deputy Manning in the parking lot.

102.   Rather than asking Mrs. Prospero to turn herself in, or serving the warrant at her home, the three deputies arrested Mrs. Prospero in the Wal-Mart parking lot, with Deputy Shana Manning handcuffing Mrs. Prospero and transporting her to the Camden County Jail.

103.   This public arrest without probable cause needlessly humiliated and embarrassed Mrs. Prospero, making it appear as if she had been caught shoplifting.

104.   Camden County Sheriff's records state that Mrs. Prospero's arrest occurred at 10:42 p.m.  However, Mrs. Prospero's receipts for her Wal-Mart purchases that night indicate, and Deputy Manning confirms, that her arrest occurred around midnight.

*Mrs. Prospero's Detention*

105.   As a result of Mrs. Prospero's false arrest, she spent over thirty-six (36) hours in custody and was not released until around noon or later on January 30, 2019.

106.   At the Camden County Jail, Mrs. Prospero was told by one of the officers who booked her, Officer Samantha Eason, that she could expect to see a

judge and be released sometime on the morning or early afternoon of January 29, 2019.

107. Indeed, on the morning of January 29, 2019, a female officer in the Camden County Jail stated words to the effect that she needed to get Mrs. Prospero "ready to go over there now," by which Mrs. Prospero understood the officer to mean: get her ready to go see a judge.

108. But other jail personnel who were present objected on the grounds that Mrs. Prospero had a Transcutaneous Electrical Nerve Stimulation (TENS) machine attached to her back with skin adhesive tape.[1]  Mrs. Prospero informed those present that she could easily remove the TENS machine, but her statement was ignored and she was not taken to see a judge.

109. Upon information and belief, other arrestees being held in the Camden County Jail were arraigned on January 29, 2020, but Mrs. Prospero was not.

---

[1] A TENS machine is a low-cost apparatus that emits a periodic electrical current that helps relieve muscle pain, and in Mrs. Prospero's case, back pain.  Mrs. Prospero was wearing her TENS machine when arrested on the night of January 28, 2019 due to having been out and about, running errands all day.

110.   When Officer Eason observed that Mrs. Prospero was still in custody by the latter part of the day on January 29, 2020, she stated words to the effect that Mrs. Prospero was supposed to have been released by then.

111.   Mrs. Prospero was not taken to see a judge until January 30, 2020.

112.   While in custody, Mrs. Prospero repeatedly asked if she could contact a lawyer and also talk to Camden County Sheriff Jim Proctor.  She was told that the Sheriff would be in later and that she could only call her husband, Mr. Joseph Prospero, which she was allowed to do a total of approximately two or three times while detained.

113.    Mrs. Prospero's more than thirty-six (36) hours in custody pursuant to her arrest without probable cause was humiliating and health-harming for the following reasons.

<u>Prison Jumpsuit</u>

114.   As a retiree who had never before been arrested or detained, she was required, upon being booked, to undress and change into a one-piece prison jumpsuit which closed with snaps down the front from the collar to the groin.

115.   Mrs. Prospero was denied socks, a bra, or underwear, despite the fact that while in custody she overheard nearby male detainees being offered clean socks and underwear.

## No Contact Lens Supplies

116.   Mrs. Prospero was denied contact lens supplies throughout her more than
36 hours in custody, notwithstanding that she requested such supplies
multiple times.

117.   Her husband, Mr. Joseph Prospero, received permission to deliver—and
did, in fact, deliver—a sealed contact lens solution bottle and an empty
contact case to the jail on the morning of Tuesday, January 29, 2019.  But
Mrs. Prospero never received these supplies.

118.   Mrs. Prospero's contact lenses are non-disposable, daily-wear lenses that
would be expensive to replace.  Without supplies to take the lenses out
and store them, Mrs. Prospero was forced to choose between continuing
to wearing her contacts, or incurring their replacement cost.

119.   Perpetually maintaining the hope that she would soon be released, Mrs.
Prospero wore her contacts throughout the duration of her detention,
which spanned two nights.  This was in addition to already having worn
her contacts for the full day of January 28, 2019, prior to her arrest at
around midnight that night.

120.   Such extended wear of her contact lenses caused Mrs. Prospero pain
while she was being detained and made it difficult for her to sleep or to
see as the lenses became increasingly dried out.

121. For some time after Mrs. Prospero's release from custody, and after she was able to remove and salvage her contact lenses, she continued to experience discomfort and irritation in both eyes.[2]

<u>Lack of Food</u>

122. Mrs. Prospero was largely denied food that she could eat during the more than thirty-six (36) hours that she was in custody.

123. Mrs. Prospero is vegan and experiences anaphylactic symptoms such as difficulty breathing and light headedness when she eats meat or lactose.

124. Mrs. Prospero communicated her dietary restrictions while being booked at the Camden County Jail on the night of January 28-29, 2019, and again when she was interviewed by a male nurse named "Mike" on the morning of January 29, 2019.  However, throughout her time in custody, most of the food provided to Mrs. Prospero contained meat and/or lactose.

125. As a result, Mrs. Prospero was only able to eat the bread from a sandwich that was provided on January 29, 2019 and a hard-boiled egg (which she

---

[2] While Mrs. Prospero did not have to replace her contact lenses, she did have to replace a pair of prescription eye-glasses that she was carrying with her in a partially-open glasses case when she was booked, along with a second pair of glasses in the same case.  The eye-glasses in question were broken when one of the booking officers who was not Officer Eason closed the glasses case, crushing the two pairs together and breaking one of them.

would not normally eat on account of being vegan) that was provided on the morning of January 30, 2019.

126.  Mrs. Prospero does not recall receiving any evening meal at all on January 29, 2019.

<u>Effective Denial of Restroom Facilities</u>

127.  Mrs. Prospero was effectively denied restroom facilities—both when held in the first room (Cell H6) where she was detained on the night of January 28-29, 2019, and when held in the second room ("Room 2") where she was detained from January 29-30, 2019.

128.  During Mrs. Prospero's first night in custody in Cell H6, when she asked an older African American officer who was walking past the cell if she could use the bathroom, he told her words to the effect of, "I'm busy," and walked away.

129.  On January 29, 2019, Mrs. Prospero was moved to Room 2 which contained a toilet that was visibly dirty and was monitored by a security camera inside the room.

130.  A Caucasian male officer wearing a light green shirt and who had the habit of frequently clearing his throat was stationed outside of Room 2. This male officer could see into Room 2, including the area where the

toilet was located, when he looked through the window in Room 2's single door.

131. In order to use the toilet in Room 2, Mrs. Prospero would have had to unsnap and fold down the top half of her one-piece prison jumpsuit, under which she had been allowed no underclothing.  This meant that while using the toilet, she would have been undressed—with no underclothing—down to her knees, if not her ankles, and visible through the window in the door to the male officer stationed outside.

132. When Mrs. Prospero asked the male officer stationed outside of Room 2 if she could use a different toilet, or be guarded by a female officer, the male officer instructed her words to the effect of, "just use that one," referring to the toilet in Room 2, and looked in at Mrs. Prospero through the window in the door.

133. Deeply uncomfortable with the presence of the security camera in the room and the fact that the male officer posted outside could see into the room, Mrs. Prospero did not undress to use the toilet and instead attempted to hold in her urine.

134. However, due to the fullness of her bladder, Mrs. Prospero found that when she laid down to rest on the thin mattress in Room 2, she involuntarily leaked urine onto herself.

135. Mrs. Prospero was therefore forced to cope with the lack of private restroom facilities by facing away from the door of Room 2 so that her back was to the male officer stationed outside the door, undoing a few of the lower snaps of her jump suit, and urinating on toilet paper that she held between her legs.

136. The toilet paper was too thin to absorb the urine, so Mrs. Prospero was forced to replace the toilet paper with the single small hand towel she had been provided.

137. Mrs. Prospero held the hand towel between her legs, urinated on it to the point of saturation, and then wrung the towel out in the sink.

138. Even though she repeated this process several times, she was not able to fully empty her bladder.

139. As a result of the foregoing lack of access to a private restroom facility while in Room 2, Mrs. Prospero became constipated and developed what she believes to have been a urinary tract infection, the symptoms of which she experienced after she was released from custody.

140. Following her release from custody, Mrs. Prospero also suffered incontinence which she had not experienced prior to her arrest.

Environmental Toxins

141.   Cell H6 and Room 2 in which Mrs. Prospero was detained were both

unsanitary.

142.   In Room 2, where Mrs. Prospero was held from January 29-30, 2019,

there was a noxious chemical smell and the walls were covered with an

unknown liquid that Mrs. Prospero was initially concerned may have

been urine, but which she came to believe was a chemical because of the

smell.

143.   While Mrs. Prospero was being held in Room 2 on January 29, 2019, she

witnessed a blue and white garden-sized hose looped under the closed

door of Room 2 and heard a tapping or clicking noise emanating from the

exterior side of the door. Contemporaneously, she heard a female voice

believed to be that of Officer Eason ask the Caucasian male officer in the

light green shirt stationed outside the door of Room 2, "What are you

doing?" The male officer responded, "What I should have done a long

time ago." The female voice, believed to be Officer Eason, replied in an

alarmed tone, "Why are you doing that?"

144.   Mrs. Prospero does not know the meaning of this verbal exchange that

she overheard, nor the purpose of the hose that was looped under the door

of Room 2.  However, this sequence of events—coupled with the

chemical smell in the room, the cough Mrs. Prospero developed while in

custody, and her persistent respiratory illness since her detention—has

caused her anxiety and concern that she was exposed to environmental

toxins in the Camden County jail.

<u>Unreasonably Cold Temperature</u>

145.   The temperature in Cell H6 and in Room 2 was also unreasonably cold

throughout the duration of Mrs. Prospero's detention.

146.   Particularly in Room 2, cold air was continuously blowing from a vent in

the ceiling notwithstanding that it was the month of January.

147.   What appeared to be a paper towel had been taped over the ceiling vent

in Room 2, perhaps by a former occupant of the room, but the paper had

come loose.

148.   Mrs. Prospero had little protection against the cold temperature as she

had no undergarments under her prison jump suit for warmth and the

small blanket provided to her was thin to the point of translucence.

*Release on Bond & Eventual Dismissal of the Charge*

149.   On January 30, 2019, Mrs. Prospero was finally taken before Chief

Magistrate Judge Jennifer Lewis via video-conference where her bond

was set at $2,500.

150. While Mrs. Prospero was waiting in the video-conference room prior to Judge Lewis' appearance, an officer spoke to Mrs. Prospero and two other arrestees in the room.

151. The officer discouraged Mrs. Prospero and the other arrestees from requesting a lawyer when they spoke to the judge, stating that this would delay their release.

152. Also, while Mrs. Prospero was waiting in the video-conference room to see the judge, Sheriff Proctor looked into the room, made eye contact with Mrs. Prospero, and then quickly ducked away.

153. Through the door of the video-conference room Mrs. Prospero also saw Chief Deputy Byerly, who testified that his office is located near to the room where Mrs. Prospero would have been waiting for her video-conferenced bond hearing.

154. Both Sheriff Proctor and Major Byerly were familiar with Mrs. Prospero based on her contacts with the Camden County Sheriff's Office prior to November 22, 2018.

155. Upon information and belief, Mrs. Prospero's $2,500 bond was an unusually high bond amount for a first-time arrestee with no prior criminal history charged with a misdemeanor.  Indeed, while Mrs. Prospero was in custody on January 29, 2020, a jail employee told her

that, as a first-time arrestee, her bond should have been in the range of $100.

156. Mrs. Prospero's appearance bond states that it was "attested and approved" by Sheriff Proctor, and bears his signature.

157. Mr. Joseph Prospero arranged with the AAA Bond Agency to pay Mrs. Prospero's bond and she was released on the afternoon of January 30, 2019.

158. Mrs. Prospero continued to face a criminal charge until November 12, 2019 when the Assistant District Attorney for the Brunswick Judicial District dismissed the warrant against her, declining to prosecute.

159. While the charge was pending, and pursuant to the conditions of her bond, Mrs. Prospero's ability to travel was restricted.  As a result, Mrs. Prospero was unable to attend the out-of-state funeral of her mother, who passed away on March 31, 2019.

160. Mrs. Prospero also incurred approximately $6,000 in attorneys' fees and costs related to the defense of the criminal charge against her, prior to its dismissal.

*Continuing Effects of Mrs. Prospero's Arrest and Detention*

161.   Following Mrs. Prospero's January 30, 2019 release from the Camden County Jail, she was ill in bed for several days and did not leave her home again until on or about February 6, 2019.

162.   Since Mrs. Prospero's January 2019 arrest and detention, she has experienced continuing physical and psychological effects of the degrading, frightening, health-harming, and ultimately traumatic incident of being publicly seized and then imprisoned for over 36 hours without probable cause under the above-described conditions, and then having to engage an attorney and wait more than nine months for the criminal charge against her to be dismissed.

163.   Because of Mrs. Prospero's arrest, she now has a criminal record of having been arrested, when she had no arrest record before. Her name and other information regarding her arrest have been publicly displayed on Mugshots.com.

164.   Since Mrs. Prospero's arrest and detention, she has been afraid to contact the Sheriff's Office for assistance or to report damage to or interference with her property, or gun shots near her home.

165.   Since Mrs. Prospero's arrest and detention, she does not feel safe in her neighborhood, city, or county for fear of further retaliation by members

of the Sheriff's Office, including again be falsely accused of unlawful

conduct by the Sheriff's Office.  For this reason, Mrs. Prospero has

limited her recreational activities such as going to restaurants or movie

theatres in order to minimize being out in public. This was true prior to

the onset of the 2020-2021 COVID-19 pandemic.

166.  During the pandemic, Mrs. Prospero has also socially isolated because of

her poor respiratory health since her arrest that places her at greater risk

for severe illness or fatality should she contract the coronavirus.

167.  Because of Mrs. Prospero poor health since her arrest and detention in the

Camden County Jail, she has not been able to engage in physical or

outdoor recreation that she enjoys, including without limitation roller

skating, jumping on her trampoline, hiking, biking, gardening, and

working in her yard. Mrs. Prospero, who before her retirement had played

piano professionally, also cannot play the piano or sing well since her

arrest. Her poor health has also made it difficult and slow for her to make

jewelry which she previously produced at a high volume.

168.  Mrs. Prospero reports that since her arrest, she has also experienced,

without limitation, increased high blood pressure and anxiety.

169.  Mrs. Prospero reports that prior to her arrest, she had experienced a

transient ischemic attack (TIA) every few years.

170. A TIA is a temporary episode with symptoms similar to a stroke that typically lasts for a period of minutes but does not cause permanent damage.

171. Mrs. Prospero reports that within several days of her release from custody on January 30, 2019 she experienced a TIA that temporarily impaired the mobility on the left side of her body. Since then, Mrs. Prospero has experienced TIAs with increased frequency as compared to before her arrest, undergoing well more than two, and as many as five or six, since her release from jail.

172. Mrs. Prospero believes that her increased frequency of experiencing TIAs is related to the lingering stress effects, including increased high blood pressure, of her January 2019 arrest, detention, and prosecution.

173. Mrs. Prospero reports that the acute symptoms of these TIAs (e.g., tightened muscles in her face, a crackly sensation on one side of her brain, the inability to talk properly, and a slowed thought process) last for approximately 20 to 40 minutes but leave her drained and recuperating for more than a day afterwards.

174. The foregoing account is not exhaustive of Mrs. Prospero's physical and emotional injuries resulting from her prosecution, arrest, and detention.

*Negligent Hiring/Retention of Defendant Ryan Sullivan*

175.  Prior to being hired as a Camden County Sheriff's Deputy by Sheriff Proctor, Defendant Ryan Sullivan was employed as an officer with the nearby Brunswick Police Department (BPD) from 2012 to 2014.

176.  During his employment with the BPD, Defendant Sullivan faced progressive disciplinary action, culminating in his termination in May of 2014.

177.  Conduct for which Deputy Sullivan was disciplined included attempting to initiate criminal prosecution and arresting members of the public, both without probable cause.

178.  Indeed, in a 5-month period—October 2013 through March 2014—Deputy Sullivan was documented on separate occasions regarding attempting to initiate a criminal prosecution without probable cause, making an arrest without probable cause, and four different stops effected without articulable suspicion.

179.  Defendant Sullivan's superior officer warned that Deputy Sullivan would face remedial training if he "continues to make borderline cases, or cases that are clear violations of a person's right."

180.  Moreover, as further documented in his disciplinary files, Sullivan demonstrated obstinate disregard for the law when, upon being counseled

by his supervisors on U.S. Supreme Court precedent regarding probable-cause-for-arrest standards, Sullivan had responded, "I disagree with that."

181. This evidences that Deputy Sullivan clearly had tendencies or propensities that could cause the type of harm sustained by Plaintiff Emma Jane Prospero in this case.

182. Sheriff Proctor was aware of Sullivan's termination from the BPD and either knew or reasonably should have known of Sullivan's propensity to prosecute and arrest without probable cause, yet acted with deliberate indifference when he hired him into a position of authority and public trust.

183. Sheriff Proctor knew of Sullivan's termination based on Sullivan's employment application and Georgia Peace Officer Safety & Training (POST) Council records, but wrote on Sullivan's application, "I want to give him a chance."

184. Once aware of Sullivan's termination, Sheriff Proctor requested, or in the exercise of ordinary care should have requested, Sullivan's BPD disciplinary records, either as a courtesy from the BPD or through a Georgia Open Records Act request.

185. Recognizing that a law enforcement officer "wields enormous power and intimidation over those vulnerable citizens an officer is sworn to protect,"

Defendant Proctor owed "a higher duty to protect citizens from abuse of that power, a duty which private employers do not share." *Harper v. City of East Point,* 237 Ga. App. 375, 378 (1999), *overruled in other part by Munroe v. Universal Health Servs., Inc.,* 277 Ga. 861, 863–864 (2004) (rejecting "a restrictive and inflexible approach" to foreseeability in negligent hiring/retention cases). "Even security employers are expected to exercise greater care in employment decisions. Those responsible for clothing citizens with police power must be even more vigilant." *Id*.

186. Thus, requesting and reviewing Sullivan's BPD disciplinary records is consistent with the exercise of ordinary care in the context of hiring a law enforcement officer and doing so would have led the reasonable hiring authority to conclude that initiation of criminal prosecution and arrest without probable cause would be a consequence of hiring Sullivan.

187. Sheriff Proctor's hiring and retaining Defendant Sullivan either without reviewing his disciplinary history or despite knowledge of his disciplinary history constituted negligence and deliberate indifference.

<u>CLAIMS FOR RELIEF</u>

## **Count I**
### ***Deprivation of First Amendment Rights***
(Against Defendants Sullivan and Prescott)

188. Paragraphs 18-174 are incorporated as if fully set forth herein.

189. Mrs. Prospero engaged in constitutionally-protected First Amendment activity (freedom of speech and the right to petition the government for grievances) when she contacted the Camden County Sheriff's Office and 911 to make a good faith complaint about loud, persistent gunfire near her home on Thanksgiving Day 2018. Plaintiff also engaged in First Amendment-protected activity (freedom of speech and the right to petition the government for grievances) on occasions prior to Thanksgiving Day 2018 when she had contacted the Sheriff's Office, Camden County Dispatch, or other government offices.

190. There was no probable cause for initiating criminal charges against Mrs. Prospero pursuant to O.C.G.A. § 16-11-39.2 on November 22, 2018, or for arresting her on January 28, 2019.

191. Defendants' initiation of the prosecution and seizure of Mrs. Prospero without probable cause -- or even arguable probable cause -- constituted adverse action taken against her in retaliation for her protected speech and petition activity.

192. This adverse action directly and foreseeably resulted in Mrs. Prospero being detained for over thirty-six (36) hours in health-harming and degrading conditions, also without probable cause.

193.   Defendants' adverse action taken against Mrs. Prospero, and the direct and foreseeable detention and damages that resulted therefrom, chilled Mrs. Prospero from engaging in future protected speech or petitioning the government for grievances in that she is afraid to contact the Camden County Sheriff's Office or 911 for help or assistance and has not done so since her January 28, 2019 arrest.

194.   A person of ordinary or reasonable firmness in Mrs. Prospero's same position would likewise be chilled from engaging in protected speech or petition in the form of contacting the Camden County Sheriff's Office or 911 for help or assistance.

195.   Defendants therefore violated Mrs. Prospero's First Amendment rights.

### Count II
***Unlawful Seizure/Arrest under Fourth Amendment***
(Against Defendants Sullivan and Prescott)

196.   Paragraphs 18-174 are incorporated as if fully set forth herein.

197.   Defendants acted with malice and reckless disregard for Mrs. Prospero's Fourth Amendment rights in seeking an arrest warrant without probable cause pursuant to O.C.G.A. § 16-11-39.2.

198.   Defendants' actions directly and foreseeably resulted in Mrs. Prospero being seized and detained, also without probable cause.

199. The facts within defendants' knowledge on November 22, 2018 were not sufficient to establish even arguable probable cause that Mrs. Prospero had committed the crime of unlawful conduct during a 911 call or any other criminal offense.

200. Nonetheless, Deputy Sullivan sought and obtained an arrest warrant for Mrs. Prospero pursuant to O.C.G.A. § 16-11-39.2 based on his sworn affidavit that misrepresented the facts known to him at the time and contained conclusory statements for which he had no supporting evidence and that were, in fact, contradicted by the information he possessed.

201. Upon information and belief, Deputy Sullivan's decision to seek a warrant for Mrs. Prospero's arrest despite lacking probable cause that she had violated O.C.G.A. § 16-11-39.2 was undertaken with the supervision and full knowledge of Lt. Prescott.

202. Lt. Prescott also subsequently reviewed and ratified Deputy Sullivan's actions when on November 23, 2018 he reviewed the Case Report, including Deputy Sullivan's narrative, and, upon information and belief, did not take any action to stop the unlawful arrest and prosecution of Mrs. Prospero.

203.  Defendants' actions were the proximate cause of Mrs. Prospero's

unlawful arrest and seizure, and the detention and other damages arising

therefrom.

**<u>Count III</u>**
*Malicious Prosecution under Fourth Amendment*
(Against Defendants Sullivan and Prescott)

204.  Paragraphs 18-174 are incorporated as if fully set forth herein.

205.  Although Deputy Sullivan lacked probable cause to do so, he initiated a

formal prosecution of Mrs. Prospero on November 22, 2018 pursuant to

O.C.G.A. § 16-11-39.2 by seeking a warrant for her arrest based on a sworn

affidavit that misrepresented the facts known to him at the time and

contained conclusory statements for which he had no supporting evidence

and that were, in fact, contradicted by the information he possessed.

206.  Upon information and belief, Deputy Sullivan's decision to seek a

warrant for Mrs. Prospero's arrest despite lacking probable cause that she

had violated O.C.G.A. § 16-11-39.2 was undertaken with the supervision

and full knowledge of Lt. Prescott.

207.  Lt. Prescott also subsequently reviewed and ratified Deputy Sullivan's

actions when on November 23, 2018 he reviewed the Case Report,

including Deputy Sullivan's narrative, and, upon information and belief,

did not take any action to stop the unlawful arrest and prosecution of Mrs. Prospero.

208.   Mrs. Prospero's prosecution terminated in her favor when the criminal charge against her was dismissed on November 12, 2019 by the Camden County Assistant District Attorney, who declined to prosecute.

209.   Defendants' actions were the proximate cause of Mrs. Prospero's malicious prosecution and the detention and damages arising therefrom.

**Count IV**
***Intentional Infliction of Emotional Distress***
(Against Defendants Sullivan and Prescott)

210.   Paragraphs 18-174 and 188-209 are incorporated as if fully set forth herein.

211.   Lacking probable cause or even arguable probable cause to prosecute or arrest Mrs. Prospero pursuant to O.C.G.A. § 16-11-39.2, Deputy Sullivan misrepresented the facts known to him at the time and made conclusory statements for which he had no evidentiary support -- and which were, in fact, contradicted by the information he then possessed -- in order to obtain a warrant for Mrs. Prospero's arrest to punish her for her constitutionally-protected speech and petition activity.

212.   Upon information and belief, Deputy Sullivan's decision to seek a warrant for Mrs. Prospero's arrest despite lacking probable cause that she

had violated O.C.G.A. § 16-11-39.2 was undertaken with the supervision and full knowledge of Lt. Prescott.

213.   Lt. Prescott also subsequently reviewed and ratified Deputy Sullivan's actions when on November 23, 2018 he reviewed the Case Report, including Deputy Sullivan's narrative, and, upon information and belief, did not take any action to stop the unlawful arrest and prosecution of Mrs. Prospero.

214.   Defendants' actions resulted in Mrs. Prospero's unlawful arrest, seizure, prosecution, and lengthy detention under degrading and health-harming conditions.

215.   Defendants' actions were extreme, intentional, and in reckless disregard of Mrs. Prospero's First and Fourth Amendment rights.

216.   Defendants' actions would naturally humiliate, embarrass, frighten, and outrage Mrs. Prospero.

217.   Defendants' actions, carried out with malice, were the proximate cause of Mrs. Prospero's severe emotional distress, mental suffering, and damages arising from her January 2019 arrest and detention.

## Count V
### Negligent Hiring/Retention
(Against Defendant Proctor in his individual capacities)

218.   Paragraphs 175-187 are incorporated as if fully set forth herein.

219.   Defendant Proctor was aware, via Defendant Sullivan's employment
application and POST Council records, of his termination from the
Brunswick Police Department.

220.   This awareness triggered a duty of ordinary care in the context of law
enforcement employment to review Defendant Sullivan's disciplinary
records before hiring or retaining him. *See Harper v. City of East Point,*
237 Ga. App. 375, 378 (1999) ("Even security employers are expected to
exercise greater care in employment decisions [than other employers].
Those responsible for clothing citizens with police power must be even
more vigilant."), *overruled in other part by Munroe v. Universal Health
Servs., Inc.,* 277 Ga. 861, 863–864 (2004) (rejecting "a restrictive and
inflexible approach" to foreseeability in negligent hiring/retention cases).

221.   Adequate scrutiny of Defendant Sullivan's disciplinary records would
have put Defendant Proctor on notice of Sullivan's propensity to initiate
criminal prosecutions and make arrests without probable cause and would
have led the reasonable hiring authority to conclude that the obvious
consequence of hiring Sullivan would be the deprivation of a third party
such as Mrs. Prospero's protected rights.

222. Defendant Proctor was therefore negligent and deliberately indifferent in hiring and retaining Defendant Sullivan as a Sheriff's Deputy.

<u>REQUEST FOR RELIEF</u>

WHEREFORE, on the basis of the foregoing, Mrs. Prospero respectfully prays that this Court:

a) Assume jurisdiction over this action;

b) Hold a trial by jury on all issues so triable;

c) Award declaratory relief that Plaintiff's constitutional and state law rights were violated and require equitable relief in the form of First Amendment training for Camden County Sheriff law enforcement officers at all ranks;

d) Award nominal, compensatory, and other damages to Plaintiff in an amount to be determined by the enlightened conscience of fair and impartial jurors;

e) Award punitive damages against the individual Defendants;

f) Award reasonable attorney's fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

g) Award such other and further relief as this Court deems just and proper.

Respectfully submitted this 4th day of October 2021.

/s/Clare Norins
Clare Norins
Georgia Bar No.  575364
cnorins@uga.edu
FIRST AMENDMENT CLINIC[3]
University of Georgia School of
Law
Post Office Box 388
Athens, Georgia 30603
(706) 542-1419 (phone)
(706) 227-5440 (fax)

*Attorney for Plaintiff Emma Jane Prospero*

---

[3] This Second Amended Complaint was prepared with the assistance of law student Kirstiana Perryman and legal fellow Samantha Hamilton.