**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

EMMA JANE PROSPERO,

    Plaintiff,

      v.

DEPUTY RYAN SULLIVAN,
LT. RUSSELL PRESCOTT, and
SHERIFF JAMES PROCTOR,
current employees of the
Camden County Sheriff's Office who
are sued in their individual capacities,


    Defendants.

**JURY TRIAL DEMANDED**

Case No.:  2:20-cv-110

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff Emma Jane Prospero ("Plaintiff" or "Mrs. Prospero") submits this Memorandum of

Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint.

**FACTUAL STATEMENT**

On the afternoon of Thanksgiving Day 2018, at around 2:42 p.m., Plaintiff Emma Jane

Prospero—a retired resident of Woodbine, Georgia—called the Camden County Sheriff's Office

("CCSO" or "Sheriff's Office") to report a barrage of gunshots coming from across the small lake

behind her home, causing her and her husband to fear for the safety of themselves and their

neighbors. *Dkt. No. 53 - Second Amended Complaint (SAC)* ¶¶ 18-20, 22. Mrs. Prospero dialed the

1

CCSO's administrative, non-emergency number (912-510-5100) to report the gunshots and was transferred to the Camden County Dispatch Center ("Dispatch Center"). *Id*. ¶¶ 30-31. Mrs. Prospero described to the dispatcher the location of the persistent shots, stating "they've been shooting for about ten minutes and they're not stopping. Can you get somebody over there to tell them to stop shooting? It's too close to neighbors here." *Id*. ¶ 32. The dispatcher responded, "I understand. We'll get somebody out there, okay?" Mrs. Prospero thanked him, and they hung up. *Id*. ¶ 33. *See also Dkt Nos. 54-1 & 54-2* (recording and transcript of 2:42 p.m. call).

Several minutes later, as the gunshots were continuing, Mrs. Prospero's husband, Joseph Prospero, called the CCSO's same non-emergency number at around 2:46 p.m. and was also transferred to the Dispatch Center. *SAC* ¶¶ 34-35. Like his wife, Mr. Prospero also expressed a safety concern that the shots were coming "too close to the neighbor." *Id*. ¶ 36. He was told that the shots were coming from a hunting club located on private property. *Id*. ¶ 37. Defendant Sheriff's Deputy Ryan Sullivan, who had been contacted in regards to Mrs. Prospero's initial call, had relayed this alleged information to the Dispatch Center about the gunshots originating from a hunting club. However, Sullivan was in another part of Camden County at the time, and was not within distance to hear or see where the gunshots were coming from or what distance or direction they were traveling. *Id*. ¶¶ 38-39. The dispatcher asked if Mr. Prospero wanted to speak with a deputy. He declined, emphasizing that all he wanted was for the shooting to be stopped, as it had been when the Prosperos had called in the past. *Id*. ¶ 40; *see also Dkt Nos. 54-3 & 54-4* (recording and transcript of 2:46 p.m. call).

About two minutes after Mr. Joseph Prospero's call, at around 2:48 p.m. Defendant Sullivan called the Dispatch Center and complained about the Prosperos' reports of the gunshots. *SAC* ¶¶ 41-47. Defendant Sullivan referred to the Prosperos as "stupid motherfuckers," stating:

> • "What? Do -- people don't have anything better to do than to bitch about somebody shooting on private property?"

- "Yeah those motherfuckers. I ain't goin' out there to talk to Robert[1] about -- 'Hey man, you can't shoot on your private property 'cause you're disturbing people.'"

- "Yeah, let 'em leave their fuckin' address or somethin' or request contact. I'll let 'em know how stupid they are."

*Id*. ¶¶ 43, 44, 46, 47.

About ten minutes later at around 2:58 p.m., as the gunshots were continuing and still coming too close, Mrs. Prospero for the first time that day called 9-1-1. *SAC* ¶¶ 50-51. Her call rang directly to the Dispatch Center, where the Prosperos' two prior calls had been transferred. *Id*. ¶ 52. Mrs. Prospero twice expressed her safety concern ("[I]t's too close to the neighborhood. The shots are coming too close," and then later, "the shots are coming too close to people's homes"). *Id*. ¶¶ 53, 57; *Dkt Nos. 54-5 & 54-6* (recording and transcript of 2:58 p.m. call). After she was told that a deputy was "not going to go out there," she mentioned noise ordinances and questioned why the gunshots were not being stopped as they had been in the past when she and her husband had called. *SAC* ¶¶ 54, 55, 57. The Dispatch Center told her that a deputy was on his way to her house to explain the situation. *Id*. ¶ 58. Mrs. Prospero responded that she did not want to see a deputy and that she would not answer her door because "[w]e're not the ones doing anything wrong . . . People don't want shots next to their houses." *Id*. ¶ 59. The Dispatch Center reiterated that a deputy was already on his way. Mrs. Prospero explained, "I'm not answering the door. We're leaving. Good-bye . . . We'll call the TV station." She then ended the call. *Id*. ¶¶ 60-61. Mrs. Prospero's 9-1-1 call lasted about 2½ minutes. *Id*. ¶¶ 63, 85. Sullivan arrived at the Prosperos' home at around 3:15 p.m. No one answered the door and their phone rang to voicemail. *Id*. ¶¶ 65-69; *Dkt No. 54-7* (Sullivan warrant affidavit).

Later that same day, Defendant Sullivan, with the knowledge and approval of his supervisor Defendant Russell Prescott, obtained a warrant for Mrs. Prospero's arrest on the false charge that she

---

[1] "Robert" refers to Robert Paulk who owns three parcels of land that directly border, and surround on three sides, the small lake on which Mrs. Prospero's house is located. *SAC* ¶ 45.

had unlawfully called 9-1-1 "for the purpose of interfering or disrupting an emergency telephone service." *SAC* ⁋⁋ 82, 88; O.C.G.A. § 16-11-39.2(b)(2) (Unlawful Conduct During a 9-1-1 Call (hereafter "9-1-1 Statute")). There was no actual or arguable probable cause to arrest or charge Mrs. Prospero for this alleged offense. *SAC* ⁋⁋ 3, 90-93, 196-202, 205-208. Defendant Sullivan therefore manufactured probable cause by submitting an arrest warrant affidavit to the court that contained intentional and material misrepresentations and omissions of fact. Sullivan did so to retaliate against Mrs. Prospero for her protected speech and petition activity in reporting the gunshots. *Id.* ⁋⁋ 4, 90-93, 189-195; *Dkt No. 54-7.*

First, Sullivan's affidavit omitted that the Dispatch Center had informed him that Mrs. Prospero's purpose for calling 9-1-1 was "to get it [i.e., the gunshots] taken care of." This exculpatory information contradicted Sullivan's sworn statement that her purpose in calling was to interfere and disrupt. *SAC* ⁋⁋ 73-74, 88-89. Second, although Sullivan's affidavit purports to recount in detail the substance and particular verbal exchanges of each of Mr. and Mrs. Prosperos' calls, he omitted that they had repeatedly expressed safety concerns about the gunshots coming too close to people's homes. He instead characterized their concern as a "non-emergency," claiming that this must mean Mrs. Prospero's purpose was to interfere or disrupt 9-1-1 telephone services. *Id.* ⁋⁋ 86, 90.[2] However, nowhere in the 9-1-1 Statute, nor in any other Georgia Code provision, does the law prohibit calling 9-1-1 for a non-emergency. *Id.* ⁋ 87. *See* O.C.G.A. § 16-11-39.2. Third, Sullivan

---

[2] Sullivan's affidavit states:

> "For the said Emma Jane Prospero did violate O.C.G.A. 16-11-39.2 when he/she unlawfully contacted 9-1-1, an emergency telephone service *in reference to an incident that was not a true emergency* for the purpose of interfering or disrupting an emergency telephone service." Defts' Ex. G (emphasis added).

> "Ms. Prospero disrupted an emergency telephone service *for service that was not an emergency.*" Id. (emphasis added).

*Dkt No. 54-7.*

falsely stated that Plaintiff's 9-1-1 call lasted 32 minutes from "November 22, 2018 at 2:58 PM to November 22, 2018 at 3:30 PM," when the call, in fact, only lasted 2½ minutes. *SAC* ¶¶ 84-85. Overstating the duration of Plaintiff's call by 29 ½ minutes further contributed to Sullivan's false portrayal of Plaintiff as intending to interfere or disrupt.

Additionally, Sullivan's affidavit falsely portrayed Mrs. Prospero as being rude and uncooperative during her initial call to the Sheriff's non-emergency number (i.e., "advised dispatchers that she did not want contact from law enforcement," and "ended the phone call by hanging up after refusing to give any further information"). *Dkt No. 54-7*; *see* SAC ¶¶ 90-91. However, Mrs. Prospero was not asked and did not say during this initial call whether she wanted contact with a deputy. Additionally, her exchange with the dispatcher during this initial call was polite and provided him all of the information that he needed to be able to send an officer to the location of the reported gunshots. *SAC* ¶¶ 30-33.

Finally, Sullivan's affidavit falsely claimed that Mrs. Prospero's 9-1-1 call required him to go to her residence, creating the misimpression that she somehow interfered with or disrupted his time. *Id.* ¶¶ 65, 67-69, 90-91; *Dkt No. 54-7*. However, no Sheriff's Office policy or procedure required Sullivan to go to the Prosperos' home after they had both stated they did not want contact. *SAC* ¶ 66. Moreover, Sullivan is a field officer who is not covered or contemplated by the 9-1-1 Statute's prohibition on interference or disruption of an emergency telephone service. *See* O.C.G.A. § 16-11-39.

The factual misrepresentations and omissions in Sullivan's affidavit resulted in a warrant being issued for Mrs. Prospero's arrest. *SAC* ¶¶ 90-91. Defendant Prescott subsequently reviewed and ratified Sullivan's affidavit and the resulting warrant, and took no action to stop Mrs. Prospero's unlawful prosecution and arrest. *Id.* ¶¶ 92-93. Two months later, in January 2019, Mrs. Prospero was arrested and jailed for more than 36 hours. *Id.* ¶¶ 97, 102, 105. The District

Attorney's Office declined to prosecute and dismissed the charge in November 2019. *Id*. ⁋ 158.

Prior to being hired by the Camden County Sheriff's Office, Defendant Sullivan had been terminated after less than two years of employment as patrol officer with the Brunswick Police Department (BPD). *Id.* ¶¶ 175-76. While employed at the BPD, Sullivan was counseled on multiple occasions for attempting to initiate criminal prosecution and arrest individuals without probable cause, and for making stops without articulable suspicion. *Id.* ¶¶ 177-179. Sullivan's disciplinary records reflect that his response to being re-instructed by his superior officers on the legal standards for Fourth Amendment seizures was, "I disagree with that." *Id.* ¶ 180. Sheriff Proctor, the ultimate CCSO hiring authority, was aware of Sullivan's termination from the BPD. *Id.* ¶¶ 182-183. Review of Sullivan's BPD disciplinary records would have put the reasonable hiring authority in Sheriff Proctor's position on notice of the high likelihood that Sullivan would again engage in unconstitutional Fourth Amendment seizures, as proved to be the case with Mrs. Prospero. *Id.* ¶¶ 184-186. But Sheriff Proctor failed to request Sullivan's BPD employment records or review his full disciplinary file, instead looking only at his Georgia Peace Officer Safety & Training (POST) Council records.  *Id.* ¶¶ 183, 187. Sheriff Proctor therefore acted with deliberate indifference in hiring Sullivan. *Id.* ¶¶ 219-222.

## STANDARD OF REVIEW FOR MOTION TO DISMISS

A motion to dismiss must be denied if the plaintiff states a claim, plausible on its face, for which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Facial plausibility exists where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss, the court must "accept as true the facts alleged in the complaint, drawing all reasonable inferences in [the] plaintiff's favor." *Est. of Cummings v. Davenport*, 906 F.3d 934, 937 (11th Cir. 2018) (quoting *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016)). *See also Jumbo v. Alabama State Univ.*, 229 F. Supp. 3d 1266, 1269

(M.D. Ala. 2017) ("A Rule 12(b)(6) motion tests the sufficiency of a complaint; it is not a vehicle to litigate questions of fact.").

## ARGUMENT

Defendants move to dismiss Plaintiff's First and Fourth Amendment claims on the grounds that probable cause existed for her arrest and prosecution, and that, in the alternative, Defendant Sullivan is entitled to qualified immunity for mistakenly believing there was probable cause. Defendants move to dismiss Plaintiff's deliberate-indifference hiring claim on the grounds of futility and qualified immunity.[3] Defendants' motion fails for the following reasons.

**I.      Plaintiff has sufficiently pled lack of probable cause to arrest or prosecute**

Plaintiff's First and Fourth Amendment claims require showing a lack of probable cause for her prosecution and arrest. *Hartman v. Moore*, 547 U.S. 250, 256-257 (2006); *Grider v. City of Auburn,* 618 F.3d 1240, 1256 (11th Cir. 2010).  Taking the facts alleged in the Second Amended Complaint as true, and drawing all inferences in favor of Plaintiff, there was no probable cause to believe that Plaintiff called 9-1-1 for the purpose of interfering with or disrupting an emergency telephone service, as Sullivan falsely charged in his arrest warrant affidavit. O.C.G.A. § 16-11-39.2(b)(2).[4]

---

[3] Defendants purport to adopt and incorporate by reference their prior briefing in support of their motion for judgment on the pleadings and in opposition to Plaintiff's motion to add a deliberate-indifference hiring claim, notwithstanding that this court has already disposed of those two earlier motions. *Dkt. No. 54 at p. 2.* To the extent the court is inclined to consider prior briefing on motions that have already been resolved, Plaintiff adopts and incorporates by reference her arguments presented in Docket Nos. 22, 32, 36, and 40, including exhibits.

[4] Defendants previously argued that probable cause existed to believe Plaintiff violated other, uncharged provisions of the 9-1-1 Statute, such as calling "for the purpose of annoying, harassing, or molesting a 9-1-1 communications officer." *See Dkt. No. 23 at pp. 18, 21.* Defendants have since conceded that in a malicious prosecution case such as this, where an arrest was affected pursuant to a warrant, the probable-cause inquiry is limited to the offense(s) actually charged in the warrant. *See Dkt. No. 42 at p. 1* ("Plaintiff relies on the recent decision in *Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020), to make the point that the "any-crime" rule does not apply to a probable-cause or arguable-cause analysis in reference to Plaintiff's malicious prosecution claim. *This is correct.*") (emphasis added). Thus, the probable-cause

Specifically, Plaintiff stated to the dispatcher her purpose for calling 9-1-1: that there was active shooting taking place ("tons of [gun]shots and they keep going and going and going"); the shots were loud and were coming "too close" to people's homes; and she "just want[ed] [the shooting] stopped." *SAC* ¶¶ 53, 55, 57. The dispatchers who interacted with Plaintiff during her 9-1-1 call and later provided information to Sullivan about the call accurately relayed to him Plaintiff's purpose for calling 9-1-1: "She didn't use offensive language or curse . . . Is what Nikki [dispatch supervisor] said. She was just not a happy camper and she wanted it all -- to get it taken care of." *Id.* ¶ 74. Based on these undisputed facts, no reasonable officer could have believed, even mistakenly, that Plaintiff's purpose for calling was anything other than to get the shooting stopped. *See, e.g.*, *Tuggle v. Clayton County Sheriff*, 1:06-CV-00272-ODE, 2007 WL 9672388, at *5 (N.D. Ga. July 16, 2007) (finding no probable cause to believe Tuggle, who had called the sheriff's office twice in a three-minute time period, was calling for the purpose of harassing the sheriff when Tuggle had stated during each call that his purpose in calling was to speak or meet with the sheriff).

Defendants point to five inferential reasons why they claim arguable probable cause existed to believe that Plaintiff called 9-1-1 for the purpose of interfering with or disrupting the phone service, notwithstanding that both Plaintiff and the dispatchers who spoke with her stated that her purpose in calling was to get the gunshots stopped. As further explained below, these five proposed inferences are not reasonable in light of the facts pled in the Second Amended Complaint. Additionally, none of these proposed inferences can be drawn in Defendants' favor because, on a motion to dismiss, all reasonable inferences must flow in favor of Plaintiff. *See Estate of Cummings*, 906 F.3d at 937.

> 1.   *Calling 9-1-1 after she and her husband had each called the non-emergency line*

Defendants argue that Plaintiff's calling 9-1-1 after she and her husband had each called the

---

inquiry in this case is limited to the single charged offense of calling 9-1-1 for the purpose of interfering or disrupting an emergency telephone service.

CCSO non-emergency line to report the same complaint about gunshots gives rise to an inference that Plaintiff's intent was to interfere or disrupt 9-1-1 telephone services. The far more plausible inference, and the one that must be drawn here, is that Plaintiff and her husband only called 9-1-1 as a last resort after first trying to conserve emergency resources by using the alternative non-emergency line. Had Mrs. Prospero's intent been to interfere or disrupt 9-1-1, she would have called 9-1-1 all three times.

2.      *"Debating and arguing" with the dispatch operator*

Defendants argue that Plaintiff's verbally advocating during her 9-1-1 call for law enforcement assistance, and questioning law enforcement's refusal to respond, gives rise to an inference that her intent was to interfere with or disrupt the 9-1-1 telephone service. This is not a reasonable inference to draw based on the knowledge Sullivan possessed at the time he submitted his warrant affidavit.

Specifically, Sullivan knew that, prior to Plaintiff's 9-1-1 call, he had refused to respond to her initial call for service and to her husband's follow-up call for service. *SAC* ¶¶ 41-47. He also knew, or was reasonably expected to know, that Mrs. Prospero had a clearly-established First Amendment right to question his refusal to investigate. This is because the First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Skop v. City of Atlanta*, 485 F.3d 1130, 1139 (11th Cir. 2007) (quoting *Houston v. Hill*, 482 U.S. 451, 461-63 (1987)). No reasonable officer in Sullivan's position could have believed that Plaintiff created probable cause for her arrest by briefly questioning and challenging Sullivan's refusal to investigate her gunshot concerns while she was speaking to the dispatchers. *Cf. Davis v. Williams,* 451 F.3d 759, 767 (11th Cir. 2006) (no arguable probable cause existed to arrest plaintiff for obstruction where he was "attempt[ing] to bring a dangerous situation to the officer's attention" and

asked to speak to the officer's superior).

     3.     *Declining to give her name or speak with a deputy*

Again, Defendants' proposed inferences are not reasonable in light of the facts. First, the information about the gunshots that Plaintiff provided to the dispatcher during her first call to the non-emergency number was sufficient for Camden County Dispatch to send a deputy to the scene to investigate. Hence, the dispatcher told Plaintiff, "I understand. We'll get somebody out there." *SAC* ¶ 33. Thus, Plaintiff's decision not to provide her name had no impact on 9-1-1's services or response, and in no way suggests Plaintiff intended to interfere or disrupt emergency phone services.

Second, contrary to what Sullivan's affidavit avers, Plaintiff never declined to speak with a deputy during her first call to the non-emergency number because the topic never came up during that call. *Id.* ¶¶ 330-33. This is an affirmative misrepresentation made by Sullivan. *Dkt. No. 54-7.* Mrs. Prospero only declined to speak to a deputy during her 9-1-1 call *after* the dispatchers had confirmed that the deputy (i.e., Sullivan) was dismissing her and her husband's concerns and refusing to investigate. *SAC* ¶¶ 53-54. Far from suggesting an intent to interfere with or disrupt 9-1-1 services, Mrs. Prospero's declining to speak to a deputy reflected her efficient decision not to take up any more of law enforcement's time that day since they were not going to help her.

     4.     *Saying she would call the TV station*

At the very end of Plaintiff's 9-1-1 call, having been told that the deputy (i.e., Sullivan) was not going to address the gunshots but was instead coming to her home, against her wishes, Mrs. Prospero stated to the Dispatch Center supervisor that she would call the TV station. *Id.* ¶¶ 57-61. No reasonable officer would infer from this statement that Plaintiff had called 9-1-1 with a purpose to interfere with or disrupt. Plaintiff was simply expressing her intent to exercise her First Amendment right to speak with the press given her frustration with the Sheriff's Office lack of

assistance.[5] It is troubling that Defendants seek to suggest that by Plaintiff's stating her intent to engage in constitutionally-protected conduct, she created probable cause for her arrest.

   5.   *911 Center's calls go to voicemail*

About thirteen minutes after Plaintiff's 9-1-1 call had ended, Defendant Sullivan asked the dispatchers to call Plaintiff back and their calls rang to voicemail. *Id.* ¶¶ 63-64, 70; *Dkt. No. 54-7.* No reasonable officer would interpret this as evidence of Mrs. Prospero's intent to interfere with or disrupt 9-1-1. Instead, the more plausible inference that can, and must for purposes of this motion, be drawn is that Mrs. Prospero had accepted that the Sheriff's Office was not going to assist her and had moved on.

In sum, none of Defendants' inferential arguments suffice to show that Plaintiff has failed to state a claim that Sullivan lacked probable cause for her arrest. Finally, Defendants attempt to rely on *Al-Hakim v. Roberts*, No. 8:08–cv–01370, 2009 WL 2147062 (M.D. Fla. Jul. 13, 2009), to support their claim of probable cause. But *Al-Hakim* is readily distinguishable on both its law and its facts. The Florida statute at issue in *Al-Hakim* expressly prohibited calling 9-1-1 for any reason other than "emergency communication" used to "obtain[] public safety assistance." F.S. § 365.171(13). In contrast, the Georgia 9-1-1 Statute under which Mrs. Prospero was charged does not prohibit calling 9-1-1 for a non-emergency or for a purpose other than requesting public safety assistance. Moreover, the *Al-Hakim* plaintiff admitted that he called 9-1-1 for an unauthorized purpose under the statute. 2009 WL 2147062, at *2. In other words, there was no dispute of fact between the parties that Al-Hakim had violated the Florida statute when he called 9-1-1. Here, in contrast, Plaintiff called 9-1-1 because she "just want[ed] [the shooting] stopped." SAC ¶ 55. Nothing in the Georgia 9-1-1 Statute decrees this to be an impermissible reason for Plaintiff to contact 9-1-1. *See* O.C.G.A. § 16-11-39.2 And, unlike the plaintiff in *Al-Hakim*, Plaintiff does not admit -- in fact, she vehemently denies --

---

[5] Plaintiff's in-the-background comment about calling the Governor made during her husband's call to the non-emergency line expressed the same sentiment.

that she violated any statute by calling 9-1-1. Thus, at the end of the day, both the law and the facts

are so different in *Al-Hakim* as compared to the instant case that *Al-Hakim* is of no utility.

## II.   Qualified immunity is not available because Plaintiff sufficiently pleads that Sullivan violated clearly established Fourth Amendment law

### A.   The law is clearly established

Qualified immunity does not extend to government officials performing discretionary

functions if their conduct violates "clearly established statutory or constitutional rights." *Vinyard v.*

*Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)). Both Supreme Court and Eleventh Circuit case law clearly establish a Fourth

Amendment right to be free from prosecution and arrest based on intentional misrepresentations or

omissions of fact, where correction of those misstatements and omissions would negate probable

cause. *Franks v. Delaware*, 438 U.S. 154 (1978) (intentional or reckless material misstatement in

search warrant affidavit violates Fourth Amendment); *United States v. Martin*, 615 F.2d 318, 329

(5th Cir. 1980) (extending the rule in *Franks* to omissions in arrest warrants); *Madiwale v. Savaiko*,

117 F.3d 1321, 1326-27 (11th Cir. 1997) ("reasoning in *Franks* also applies to information omitted

from warrant affidavits"). This well-established constitutional rule applies with obvious clarity to

Sullivan's alleged conduct in seeking a warrant for Plaintiff's arrest. *See Gates v. Khokhar*, 884 F.3d

1290, 1296 (11th Cir. 2018) ("Authoritative judicial decisions may establish broad principles of law

that are clearly applicable to the conduct at issue."). Accordingly, Plaintiff need not point to a case

factually on all fours regarding the particular misrepresentations and omissions made by Sullivan

given the clear applicability of the general rule against falsified warrant applications. *See Holloman*

*ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004).

Additionally, the fact that a magistrate judge signed the warrant for Plaintiff's arrest does not

insulate Sullivan from liability. *See Holland v. City of Auburn*, 657 F. App'x 899, 903 (11th Cir.

2016) ("deliberate or reckless false statements in the affidavit and/or omissions in the affidavit

remove the presumption of validity accompanying the warrant"); *Correa v. Torres*, 2012 WL 1206369 at *4 (M.D. Fla. Apr. 11, 2012) (holding that a magistrate's issuance of a warrant will not shield an officer when the underlying affidavit includes intentional and reckless misstatements and omissions) (internal quotation and citations omitted). In cases involving a judge-signed warrant, the Eleventh Circuit still denies qualified immunity if there is evidence that the warrant contained intentional misrepresentations of fact by the affiant. *See, e.g.*, *Holmes v. Kucynda*, 321 F.3d 1069, 1083-84 (11th Cir. 2003) (officer not entitled to qualified immunity where, viewed in the light most favorable to plaintiff, the arrest warrant affidavit contained false statements about plaintiff being a joint tenant of the apartment and sleeping in the room where drugs were found); *Kelly v. Curtis*, 21 F.3d 1544, 1554-1555 (11th Cir. 1994) (qualified immunity denied where evidence existed that officer falsely swore in her affidavit to plaintiff's possession of cocaine, despite knowing that the forensic lab report had determined the substance in question was not cocaine). Thus, regardless of the judge's signature on Plaintiff's arrest warrant, clearly-established Fourth Amendment law prohibited Sullivan from basing probable cause on intentional and material misstatements and omissions of fact in his warrant application. Both Sullivan, and Prescott who approved Sullivan's conduct, would reasonably have been aware of this longstanding Fourth Amendment rule at the time Sullivan submitted his affidavit.

    **B.**    **Sullivan's affidavit contained misstatements and omissions of facts that, if corrected, would defeat probable cause.**

    Factual deficiencies in a warrant affidavit are material when "probable cause would be negated if the offending statement was removed or the omitted information included." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). Plaintiff has sufficiently pled that Sullivan made factual misrepresentations and omissions in his arrest warrant affidavit that, if corrected, would defeat probable cause to believe that Plaintiff called 9-1-1 for the purpose of interfering with or disrupting an emergency telephone service.

    First, Sullivan omitted the fact that dispatchers specifically told him that Plaintiff called

because she just "wanted it all -- to get it [i.e., the gun shots] taken care of." *SAC ¶¶* 73-74. This information from the individuals who spoke to Plaintiff during her 9-1-1 call and therefore were the proverbial "eyewitnesses" to the alleged offense, directly contradicts Sullivan's assertion that Plaintiff called "for the purpose of interfering with or disrupting" an emergency telephone service.

Defendants argue that Sullivan is not required to show affirmative evidence of Plaintiff's intent in order to establish probable cause. *Dkt No. 54 at p. 15 & n.6.* This may be, but Sullivan was not permitted to *exclude exculpatory evidence* of Plaintiff's lack of intent that was provided to him by people with first-hand knowledge of her conduct. *See Navarro v. City of South Gate*, 81 Fed.Appx. 192, 195 & n.3 (9th Cir. 2003) ("[a] lack of evidence on a particular element . . . is quite a different matter from the presence of evidence that affirmatively suggests that an element cannot be met"); *Kuehl v. Burtis,* 173 F.3d 646, 651 (8th Cir. 1999) ("[The officer] ignored plainly exculpatory evidence that negated the intent required for simple assault."); *Cohen v. McGuire*, No. 3:15-CV-133-J-34JRK, 2016 WL 3188889, at *7 (M.D. Fla. June 8, 2016) (denying summary judgement in false arrest/malicious prosecution case where there was affirmative evidence that plaintiff lacked the requisite intent to commit the charged crimes of official misconduct or grand theft).

Remedying Sullivan's omission of exculpatory evidence by inserting into his affidavit the dispatcher's statement that Plaintiff just called to get the gunshots "taken care of" would defeat probable cause to believe that Plaintiff called for the purpose of interfering or disrupting 9-1-1 telephone services. *See Cozzi v. City of Birmingham*, 892 F.3d 1288, 1297 (11th Cir. 1998) ("officer may not turn a blind eye to evidence suggesting that a suspect is innocent by 'choos[ing] to ignore information that has been offered to him or her'") (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1229, n.10 (11th Cir. 2004)).

Second, Sullivan's affidavit omits Plaintiff's and her husband's repeated statements that the gun shots were coming too close to people's homes. Given the affidavit's detailed accounting of the substance and particular verbal exchanges during each of Mrs. and Mr. Prosperos' calls on November 22, 2018, *see Dkt No. 54-7* (Sullivan warrant affidavit), it can and must be inferred for

purposes of a motion to dismiss that Sullivan was also aware of Plaintiff's and her husband's multiple statements about the gunshots coming too close.[6] However, Sullivan omitted this highly relevant information in order to make his logically flawed argument that Plaintiff was calling for a "non-emergency," and therefore had the purpose of interfering with or disrupting 9-1-1 telephone services.[7] Remedying this omission by including in the affidavit Plaintiff's and her husband's reports about the gunshots coming too close to people's homes would further defeat probable cause that Plaintiff's purpose in calling to report the gunshots was to interfere with or disrupt 9-1-1. Any reasonable person would agree that gunshots coming too close to people's homes presents a safety concern of a nature that is appropriate to report to law enforcement.

Third, Sullivan affirmatively misrepresented in his affidavit that Plaintiff's 9-1-1 call lasted 32 minutes, from 2:58 p.m. to 3:30 p.m., when it only lasted 2 ½ minutes. This is another material misrepresentation because the longer Plaintiff's call, the more plausible that her purpose was, as Sullivan falsely alleged, to interfere or disrupt the emergency telephone service. A 2 ½-minute call does not suggest disruptive intent, whereas a 32-minute call does.

Defendants' assertion that Sullivan's misstatement about the length of the call is immaterial is belied by the fact that the misstatement appears in the first descriptive sentence of the affidavit that provides the narrative frame for everything that comes after. Thus, the reasonable person reading the affidavit views all subsequent facts set forth in the affidavit through the lense of thinking there was a

---

[6] To the extent Sullivan purports not to have been aware of these statements this creates a question of fact that cannot be resolved on a motion to dismiss. For instance, there is no recording of the dispatchers' initial communications to Sullivan after Plaintiff's initial report of gunshots at 2:42 p.m. *See SAC* ¶¶ 30-39. What information was transmitted to Sullivan during that initial communication must therefore be explored through discovery.

[7] Sullivan's professed logic that calling 9-1-1 for a non-emergency reason evidences an intent to interfere or disrupt is erroneous for two reasons. First, someone who calls for a non-emergency reason is still calling for a purpose other than to interfere or disrupt -- namely, they are calling to get their non-emergency situation addressed. Second, the 9-1-1 Statute, O.C.G.A. § 16-11-39.2, does not prohibit calling 9-1-1 for a non-emergency reason, and hence does not suggest that a non-emergency call should be presumed to have the purpose of interfering or disrupting.

32-minute 9-1-1 call. *See, e.g., Tuggle*, 2007 WL 9672388, at *6 (where the plaintiff had been wrongfully charged with making harassing phone calls, the court found that the warrant application's misstatement of the chronology of the calls -- i.e., suggesting the calls were made on two separate days, rather than minutes apart on the same day -- was material to probable cause).

Defendants attempt to dismiss Sullivan's false report that Plaintiff's 9-1-1 call lasted 32 minutes (from 2:59 p.m. to 3:30 p.m.) by pointing to the latter portion of Sullivan's affidavit which states he arrived at Plaintiff's house at 3:15 p.m. and sometime thereafter instructed the Dispatch Center to call Plaintiff back. *Dkt No. 54-7.* Defendants argue that it can be inferred from this that Plaintiff's 9-1-1 call had ended before 3:30 p.m. To the contrary, however, no such inference can be drawn because the affidavit does not tell the reader how long Sullivan remained at Plaintiff's house or what time the Dispatch Center tried to call Plaintiff back. The call-backs could well have been after 3:30 p.m.

In contrast, the most logical inference to draw based on the latter part of the affidavit's narrative is that, after Sullivan arrived at 3:15 p.m. the two call-back attempts rang to voicemail because Plaintiff was still on the line with 9-1-1, consistent with the earlier statement in the affidavit that Plaintiff's call lasted until 3:30 p.m. Thus, the latter portion of Sullivan's affidavit never corrects his false report that Plaintiff's 9-1-1 call lasted 32 minutes.

Finally, if the court were to find that reasonable people could disagree about whether the latter portion of Sullivan's affidavit cures or does not cure Sullivan's false statement about the length of Plaintiff's call, that presents a question of fact for the jury to resolve. *See Brown v. Gill*, 792 Fed.Appx. 716, 720-21 (11th Cir. 2019) (summary judgment and qualified immunity denied where question of fact existed as to whether officer made a willful misrepresentation of the facts when obtaining the warrants in question).

Fourth, Sullivan's affidavit misrepresents that Plaintiff was rude and uncooperative during her initial call to the Sheriff's non-emergency number by declining contact with a deputy and "hanging up after refusing to give any further information." *Dkt No. 54-7* (Sullivan arrest warrant

affidavit); *SAC ¶¶* 90-91. However, Plaintiff cooperatively provided information about where the shooting was coming from and the dispatcher responded, "I understand. We'll get somebody out there, okay?" Mrs. Prospero thanked him, and they ended the call. *SAC ¶¶* 32-33. There was nothing rude or uncooperative about this interaction as Sullivan falsely portrays, nor did Plaintiff refuse to speak to a deputy during this call, as Sullivan falsely claims. While perhaps not material on its own, this falsely negative characterization of Plaintiff's conduct during her initial call, when coupled with Sullivan's other misstatement of facts and omissions in his affidavit, contributed to his overall misleading and false portrayal of Plaintiff as having the purpose of interfering or disrupting 9-1-1.

Finally, Sullivan's affidavit continues to mislead on the interfering-and-disrupting front by falsely claiming he was required to go to her house when, in fact, no CCSO policy required this. *Dkt No. 54-7; SAC ¶¶* 65-66, 90-91. Sullivan's affidavit then describes at length the actions he took while outside of Plaintiff's house, in order to create an impression of interference and disruption. *Dkt No. 54-7; SAC ¶¶* 67-69, 90-91. However, the 9-1-1 Statute provision that Plaintiff was charged with violating is only concerned with interference or disruption of emergency telephone services; it does not cover or contemplate a field officer like Defenant Sullivan. *See* O.C.G.A. § 16-11-39.2(b)(2). Again, while perhaps not material on its own, the irrelevant last third of Sullivan's affidavit that focuses on what he did after Plaintiff called 9-1-1 contributed to his overall misleading and false portrayal of Plaintiff as having the purpose of interfering or disrupting.

In sum, the factual misrepresentations and omissions contained in Sullivan's affidavit are either individually or collectively material, and if all were corrected would certainly negate probable cause to believe, or even mistakenly believe, that probable cause existed for Plaintiff's arrest.

## C.   Fact-finder could readily conclude that Sullivan's misrepresentations and omissions were intentional

Plaintiff has sufficiently pled facts that support a finding that Sullivan intentionally omitted and misrepresented the above-described material facts in order to manufacture probable cause for Plaintiff's arrest. *See Franks*, 438 U.S. 154, 155 (Fourth Amendment violation arises if "false

statement was included in the affidavit by the affiant knowingly and intentionally, or with reckless disregard for the truth, and the false statement was necessary to the finding of probable cause"); *Paez*, 915 F.3d at 1287 ("to determine whether a misstatement in an officer's warrant affidavit amounts to a violation of the Fourth Amendment . . . we ask whether there was an intentional or reckless misstatement or omission").

Specifically, the Second Amended Complaint contains allegations, based on undisputed audio-recordings, that before Plaintiff contacted 9-1-1, Defendant Sullivan expressed animus toward her and a desire to punish her for calling the CCSO to report gunshots near her home. *See* SAC ¶¶ 41, 43-48. When speaking to the dispatch supervisor about 10 minutes prior to Plaintiff's 9-1-1 call, Sullivan complained, "What? Do -- people don't have anything better to do than to bitch about somebody shooting on private property?" *Id.* ¶ 43. He continued, "Yeah, those motherfuckers. I ain't goin' out there to talk to Robert about -- 'Hey man, you can't shoot on your private property 'cause you're disturbing people.'" *Id.* ¶ 44. He proceeded to refer to Plaintiff and her husband as "stupid motherfuckers" and taunted, "Yeah, let 'em leave their fuckin' address or somethin' or request contact. I'll let 'em know how stupid they are." *Id.* ¶¶ 46-47.

Given these comments, a finder of fact could readily conclude that Sullivan disliked and wanted to punish Plaintiff for her protected speech and petition activity in reporting the gunshots and asking that they be stopped. A fact finder could further conclude that this animus led Sullivan to misrepresent the facts and omit exculpatory evidence in his affidavit in order to manufacture probable cause to charge Plaintiff. Under such circumstances, qualified immunity is not available. *See Williams v. Aguirre*, 965 F.3d 1147, 1169-70 (11th Cir. 2020) (qualified immunity does not extend to malicious prosecution claims where "a reasonable jury could find that the officer's accusations were intentionally false.").[8]

---

[8] In addition to Sullivan's omissions being intentional, recklessness can also be inferred from the fact that he omitted highly relevant and exculpatory information -- *i.e.*, the dispatchers' statement that Plaintiff called 9-1-1 to "get [the gunshots] taken care of," and Plaintiff and her husband's

### III.     Plaintiff's deliberate-indifference hiring claim survives dismissal

As discussed above, Plaintiff's First and Fourth Amendment claims are sufficiently pled and

therefore provide a foundation for a deliberate-indifference hiring claim against Defendant Sheriff

James Proctor. Defendants' motion to dismiss this claim constitutes an improper request for

reconsideration of this court's recent decision to allow Plaintiff to amend her complaint to add this

very claim. And even if the court were inclined to reconsider, the claim is sufficiently pled.

#### A.     Defendants can show no grounds for reconsideration of the court's recent decision to allow Plaintiff to add this claim.

On September 8, 2021, this court granted Plaintiff leave to amend her complaint to add a

deliberate-indifference hiring claim against Defendant Proctor. *See Dkt. Nos. 43 & 44.* In so ruling,

this court necessarily considered whether the proposed new claim would be futile, which is the same

as inquiring whether the claim would survive a motion to dismiss. *Christman v. Walsh*, 416

Fed.Appx. 841, 844 (11th Cir. 2011) ("A district court may deny leave to amend a complaint if it

concludes that the proposed amendment would be futile, meaning that the amended complaint would

not survive a motion to dismiss."); *Bazemore v. U.S. Bank, N.A.*, 167 F.Supp.3d 1346, 1354–55

(N.D. Ga. 2016) ("Futility means that the amended complaint would fail to state a claim upon which

relief could be granted. Thus, the same standard of legal sufficiency as applied under a motion to

dismiss for failure to state a claim pursuant to Rule 12(b)(6) is used to determine futility.") (internal

citation omitted); *Bill Salter Adver., Inc. v. City of Brewton, AL*, 2007 WL 2409819, at *2 (S.D. Ala.

Aug. 23, 2007) ("The futility threshold is akin to that for a motion to dismiss; thus, if the amended

complaint could not survive Rule 12(b)(6) scrutiny, then the amendment is futile and leave to amend

---

repeated statements that the gunshots were coming too close to people's homes. *See Smith v.
Sheriff, Clay Cty.*, 506 F. App'x 894, 898 (11th Cir. 2013) (holding that plaintiff "can raise an
inference of recklessness by pointing to facts omitted from the affidavit [that] are clearly critical
to a finding of probable cause"); *Madiwale*, 117 F.3d at 1327 (finding that when an affidavit
omits facts that "are clearly critical to a finding of probable cause[,] the fact of recklessness may
be inferred from proof of the omission itself") (internal quotation and citation omitted).

is properly denied."). Accordingly, when this court granted Plaintiff leave to amend, it found that the deliberate-indifference hiring claim was strong enough to survive a motion to dismiss. Defendants' current motion is essentially asking the court to reconsider this earlier ruling.

As a general principle, a motion for reconsideration is only warranted under three limited circumstances: "an intervening change in controlling law, the availability of new evidence, and the need to correct clear error or prevent manifest injustice." *Delaware Valley Floral Group, lnc., v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1383 (11th Cir. 2010). None of these circumstances exist here. Since September 8, 2021, when Plaintiff was granted leave to amend to add the deliberate-indifference hiring claim, there has been no change in controlling law and no new evidence has uncovered. Instead, Defendants simply recycle the same arguments and evidence they presented in opposing the motion to amend. Additionally, there is no clear error or manifest injustice in the court's having granted the motion to amend, nor do Defendants argue such. Thus, Defendants' motion to dismiss the deliberate-indifference hiring claim, which amounts to an unfounded motion for reconsideration, should be denied. *See Stanton v. McIntosh Cty., Georgia*, No. CV 209-092, 2011 WL 13193116, at *1 (S.D. Ga. Jan. 26, 2011) (this court noting that a motion for reconsideration should not be used to present "arguments already heard and dismissed or to repackage familiar arguments to test whether the court will change its mind") (internal quotations omitted).

**B.     The hiring claim is sufficiently pled**

Plaintiff has sufficiently pled that Sheriff Proctor was deliberately indifferent to a "highly predictable consequence" that hiring Sullivan would result in a Fourth Amendment seizure violation, which is the particular constitutional injury that Plaintiff suffered here.

*Bd. of Cty. Comm'rs of Bryan Cty., Okl.v. Brown*, 520 US 397 (1997) sets forth the legal standard for claims of deliberately indifferent hiring. Under this standard, a plaintiff must show that the defendant officer "was highly likely to inflict" the injury suffered by the plaintiff. "The connection between the background of the particular applicant and the specific constitutional violation alleged

must be strong." *Id.* at 412. In *Brown*, the respondent alleged deliberate indifference by a sheriff who hired the defendant officer accused of using excessive force against the respondent. *See id.* at 400. The Supreme Court stated that "to test the link between [the sheriff's] hiring decision and the respondent's injury, we must ask whether a full review of [the officer's] record reveals that [the sheriff] should have concluded that [the officer's] use of excessive force would be a plainly obvious consequence of the hiring decision." *Id.* at 412-13.

In *Brown*, the officer's prior misconduct amounted to "a record of driving infractions… and other misdemeanors, including assault and battery, resisting arrest, and public drunkenness," with the latter three all arising from a fight on a college campus when the officer was a student. *Id.* at 401, 413. The Court found that had the sheriff known of this information from a sufficient review of the officer's history, the information was too disconnected from the allegation of excessive force to lead the reasonable hiring authority to conclude that Fourth Amendment force violations would be a likely consequence of hiring the officer. *See id.* at 414. However, in the instant case, Plaintiff has sufficiently pled that, had Sheriff Proctor obtained and reviewed Defendant Sullivan's prior employment records, Proctor would have been on notice that Sullivan was highly likely to engage in unconstitutional Fourth Amendment seizures. Specifically, the Second Amended Complaint asserts that In a period of 5 months – October 2013 through March 2014 – Defendant Sullivan was documented on separate occasions regarding attempting to initiate a criminal prosecution without probable cause, making an arrest without probable cause, and making multiple stops without articulable suspicion. *SAC* ¶ 178. It is further pled that on March 6, 2014, Sullivan was counseled by his BPD supervisors about his making "borderline cases, or cases that are clear violations of a person's right," and that when his supervisors tried to educate him on controlling Supreme Court precedent governing Fourth Amendment seizures, Sullivan responded, "I disagree with that." *Id.* ¶¶ 178-181.

The Second Amended Complaint further pleads that Sheriff Proctor knew that Defendant

21

Sullivan was terminated from his position with the BPD and that any reasonable hiring authority in Proctor's position would have requested and reviewed Sullivan's BPD employment file prior to extending Sullivan an offer of employment. *Id.* ¶¶ 182-186. Because Proctor failed to do so, a finder-of-fact could readily conclude that Proctor acted with deliberate-indifference to the likely consequence that Sullivan would again engage in unconstitutional Fourth Amendment seizures. *Id.* ¶¶ 186-187. And this is precisely the type of injury Plaintiff suffered when Sullivan obtained a warrant for her arrest without probable cause. *Id.* ¶ 181.

Defendants characterize the "particular constitutional violation alleged in this action" as Sullivan "submitting a false affidavit to secure an arrest warrant." *Dkt. No. 54 at 19*. However, Defendants' framing of the applicable violation is deliberately too narrow. A more accurate description of the constitutional violation suffered by Plaintiff is simply: arrest pursuant to a warrant without probable cause. In other words, an unconstitutional Fourth Amendment seizure. Sullivan's misstatement and omission-riddled arrest warrant affidavit, while most relevant to this case, was simply the tool used to carry out the Fourth Amendment violation. It is not necessary for Plaintiff to plead that Sullivan had a history of committing Fourth Amendment seizure violations in precisely this same way in order to show the "strong connection" between Sullivan's past history and Plaintiff's current injury that is required by *Brown*. Rather, Plaintiff need only plead, as she has done, that Sullivan had a history of making the same type or genre of constitutional violation as what she recently experienced. *See, e.g.*, *Raby v. Baptist Medical Center*, 21 F.Supp.2d 1341 (M.D. AL. 1998) (holding that evidence showing an officer used excessive force in the past - including evidence of counseling on this issue - was sufficient to establish a strong connection to the plaintiff's constitutional injury of excessive force); *Perez v. Miami-Dade County*, 168 Fed.Appx. 338, 340 (11th Cir. 2006) (finding that summary judgment on deliberate-indifference claim was not appropriate where the plaintiff submitted evidence that created a "genuine issue of material fact" as to whether the County had a custom of using excessive force).

Defendants erroneously rely on *Perrins v. The City of Elberton*, 2005 WL 1563530, No. 3:03-CV-106 (M.D. Ga. Jul. 1, 2005), which is clearly distinguishable from this case. In *Perrins*, the court found that an officer's prior use of excessive force was not strongly connected to the constitutional injury alleged by the plaintiff -- namely, that the officer had arrested the plaintiff pursuant to an unsigned arrest warrant. *Id*. at 11. Put another way, the court found that past acts of excessive force are not strong indicators of future unconstitutional seizures. Here, in contrast, Sullivan's past unconstitutional seizures *did* make it "highly likely" that he again would engage in an unconstitutional seizure in the future. And this is precisely what occurred when he obtained a warrant for Plaintiff's arrest without probable cause. Had Sheriff Proctor or his designees conducted a review of Sullivan's BPD disciplinary records rather than only looking at the POST records for the last offense for which Sullivan was fired from the BPD, Proctor would have been on notice of the high likelihood of such a recurrence. *SAC* ¶¶ 184-187. Sullivan's prior misconduct and his constitutional violation of Plaintiff's rights are strongly enough connected to meet *Brown*'s standards.

Defendants cite numerous other cases from district courts within the Eleventh Circuit. Each of these cases is distinguishable, involving prior conduct entirely distinct from the constitutional violation at issue in the case. For instance, in *Breland v. City of Centerville*, 2008 WL 2233595, No. 5:07-CV-27 (M.D. Ga. May 28, 2008), an officer sexually assaulted the plaintiff. The court noted, however, that the plaintiff could not prevail on her hiring action because the officer's prior misconduct was largely based in not following procedures – and had nothing to do with sexual assault. *See id.* at *4. Defendants also cite to *Hankins v. Davis*, 2015 WL 71437, No. 1:13-CV-01365, (N.D. Ga. Jan. 5, 2015) in which the court found that the officer's prior "minor policy violations" were not sufficiently connected to plaintiff's excessive force claim. *Id.* at *9.  Further, in *Collins v. Ensley*, 2011 WL 13176425, No. 2:09-CV-00204 (N.D. Ga. Sept. 15, 2011), the court found that when an officer's record entirely lacks constitutional violations, the plaintiff cannot adequately connect their injury to any prior misconduct. Finally, in *Humbert v. City of College Park*,

2008 WL 11404481, No. 1:05-CV-02740 (N.D. Ga. Mar. 31, 2008), the court found that prior disciplinary action taken against an officer for intimidating a co-worker was not sufficiently connected to false arrests. *See id.* at *9. Thus, while Defendants cite to cases in which district courts in this circuit have found a lack of a "strong connection," the cases Defendants reference involve situations in which there is essentially *no connection* between an officer's prior misconduct and the relevant injury in the case. Thus, these cases do not support Defendants' motion for reconsideration masquerading as a motion to dismiss.

Defendants attempt to distinguish the case at hand from *Raby v. Baptist Medical Center*, 21 F.Supp.2d 1341 (M.D. Ala. 1998) by arguing that *Raby* involved a stronger connection between the defendant officer's past misconduct and the current constitutional injury than exists here. *Dkt. No. 54 at 25.* First, it should be noted that *Raby* was decided at the summary judgment stage after full discovery on the hiring claim, whereas we are just at the pleading stage. Second, there are strong parallels between *Raby* and the instant case. As in this case, the defendant in *Raby* was terminated from a prior law enforcement agency where he had been counseled at the prior agency about complaints of the same type of constitutional violation as the *Raby* plaintiff had suffered -- namely, "overly aggressive behavior." *See id*. at 1352-1353. The court in *Raby* found that evidence of complaints against the officer (even if unsubstantiated) and counseling on use of excessive force was sufficient to meet the burden of showing a causal connection for the purposes of summary judgment. *See id.* at 1352, 1354. Similarly, in this case, Plaintiff has pled that Sullivan was counseled about concerns of unconstitutional Fourth Amendment seizures, similar in nature to Plaintiff's injury. Finally, as is the case with Defendants Proctor and Sullivan, the new hiring authority in *Raby* failed to request or review the officer's prior employment file, despite it being readily obtainable. *See id.* at 1353, 1354.

### C.  Deliberate-indifference claim not barred by qualified immunity

As to the Defendants' qualified immunity argument, courts in this circuit are required to

"assess whether the facts of the instant case fall within statements of general principle from our precedents," rather than identify a case that is factually indistinguishable. *Holloman ex. rel Holloman*, 370 F.3d at 1278. Precedents from both the Supreme Court and Eleventh Circuit put Defendant Proctor on notice that his failure to adequately investigate an applicant's prior negative employment history could result in a finding of deliberate indifference. *See Brown*, 520 U.S. at 411-415; *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1314 (11th Cir. 2001) (finding a hiring authority deliberately indifferent to the risk that an employee would engage in sexual harassment in the workplace where a cursory check of the employee's employment history would have revealed prior sexual harassment complaints); *Romero v. City of Clanton*, 220 F.Supp.2d 1313, 1318 (M.D. Ala. 2002) (denying motion to dismiss deliberate indifference hiring claim where plaintiff alleged that defendant had been dismissed from another police department for similar misconduct allegations).  In sum, the law is clearly established that Proctor had a duty to review Sullivan's BPD records, which he failed to do.

**CONCLUSION**

Plaintiff's Second Amended Complaint alleges facts sufficient to plausibly plead First and Fourth Amendment claims against Defendants Sullivan and Proctor, as well as deliberate-indifference in hiring by Defendant Proctor. Defendants' motion to dismiss should be denied.


Respectfully submitted this 22nd day of October, 2021.


[Signature on next page]

/s/Clare Norins
Clare Norins
Georgia Bar No.  575364
cnorins@uga.edu
FIRST AMENDMENT CLINIC*
University of Georgia School of Law
Post Office Box 388
Athens, Georgia 30603
(706) 542-1419 (phone)
(706) 227-5440 (fax)

*Attorney for Plaintiff Emma Jane Prospero*

*Thanks to First Amendment Clinic students Paige Medley, Jack Mahon, and Brianna Yates for their contributions to this brief.