# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

EMMA JANE PROSPERO,

    Plaintiff,

    v.

DEPUTY RYAN SULLIVAN,
LT. RUSSELL PRESCOTT, and
SHERIFF JAMES PROCTOR,
in their individual
capacities,

    Defendants.

2:20-CV-110

## ORDER

In this case, Plaintiff Emma Jane Prospero alleges that she was arrested and detained in retaliation for calling police to complain about gunshots on neighboring property. The case is before the Court on Defendants' motion to dismiss. Dkt. No. 54. For the reasons given below, the motion is **GRANTED in part** and **DENIED in part.**

## BACKGROUND[1]

### A. Factual Background

On Thanksgiving Day 2018, Plaintiff called Camden County

---

[1] At this stage, the Court is to "accept all factual allegations in a complaint as true[,] and take them in the light most favorable to [the] plaintiff[.]" Dusek v. JPMorgan Chase & Co., 832 F.3d 1243, 1246 (11th Cir. 2016).

police to report gunshots near her home. Dkt. No. 53 ¶¶ 1, 19. The gunshots apparently came from land between a gas station and the Prospero's home that Defendant Sheriff Proctor owns. Id. ¶¶ 20-21. The Sheriff allows friends to use this property for an informal hunting club. Id. The Prosperos were frightened by the gunfire, feared for their safety, and believed the persistent gunshots violated local noise ordinances. Id. ¶¶ 22-23; see also id. ¶¶ 24-28. When Plaintiff had called Police about these sorts of incidents in the past, the Sheriff's office dispatched someone to investigate. Id. ¶ 26.

Plaintiff first called the Sheriff's office non-emergency line. Id. ¶¶ 1, 30. She had a brief call with a Dispatcher named John Archibald, telling him "there's a ton of shots behind the Chevron station over there . . . they've been shooting for about ten minutes and they're not stopping." Id. ¶ 32. "Can you get somebody over there to tell them to stop shooting?" she asked, "It's too close to neighbors here." Id. Archibald said he would, and the call ended. Id. ¶ 33.

A few minutes later, the shooting had not stopped—so Plaintiff's husband called the non-emergency line. Id. ¶¶ 34-35. After being transferred to Dispatcher Archibald, Mr. Prospero explained that the gunshots had not stopped and that they were coming "too close to the neighbor[s]." Id. ¶ 36. This time,

Archibald responded that the shooting "was taking place at a hunting club located on private property"—which is apparently what Defendant Ryan Sullivan, a deputy with the Sheriff's office, told him between the first and second calls. Id. ¶¶ 37-38. Archibald asked Mr. Prospero if he wanted to speak to a deputy about the situation, but Mr. Prospero declined, saying that he just wanted the shooting to stop. Id. ¶ 40.

After that, Sullivan apparently called into Dispatch to complain about the Prosperos' calls. Id. ¶ 41 (placing the call "at or about 2:48 p.m."). "What?" he said, "people don't have anything better to do than to bitch about somebody shooting on private property?" Id. ¶ 43. "[T]hose motherfuckers[,]" he continued, "I ain't goin' out there to talk to [the Prosperos' neighboring landowner, Robert Paulk] about—'Hey man, you can't shoot on your private property 'cause you're disturbing people.'" Id. ¶ 44-45; see also id. ¶ 46 ("Deputy Sullivan further referred to the Prosperos as 'stupid motherfuckers.'"). "[L]et 'em leave their fuckin' address or somethin' or request contact. I'll let 'em know how stupid they are." Id. ¶ 47. Sullivan even asked the Dispatch Officer to "ping [their] phone" so he could "go talk to 'em." Id. ¶ 48.

The shooting persisted for another ten minutes or so before Plaintiff called 911 directly—the only time she would call 911

that day. Id. ¶¶ 50-51. She thought this was the number to call, she says, because her and her husband's earlier calls had been transferred to the Emergency Dispatch Center. Id. ¶ 52. There were "tons of shots" she told Archibald, "and they keep going and going and going around the Chevron station." Id. ¶ 53. She reiterated that the shots were coming "too close" and again mentioned noise ordinances. Id. Archibald repeated what he had said to Mr. Prospero, that the shots were coming from a hunting club on private property, and he explained that he would not be sending an officer to stop the shooting. Id. ¶ 54. And like he had with Mr. Prospero, he asked Plaintiff if she wanted to see a deputy. Id. She did not, she said, she "just want[ed] [the shooting] stopped[.]" Id. ¶ 55. The police had stopped the shooting when the Prosperos had called in the past, so "[w]hy is this different today?" Id.

Archibald transferred the call to Sergeant Susan Flowers. Id. ¶ 56. Flowers told Plaintiff that (according to Deputy Sullivan) the shooting was taking place at a hunting club on private property so the hunters were "well within their rights to shoot on that property." Id. Plaintiff mentioned noise ordinances again and repeated that "the shots are coming too close to people's homes." Id. ¶ 57. Flowers told Plaintiff that "a deputy was in route to [her] home to explain the situation in person." Id. ¶ 58. "I don't want anybody at our house here," Plaintiff replied, "it's

Thanksgiving and we don't want . . . anybody at our home. We're not the ones doing anything wrong . . . People don't want shots next to their houses." Id. ¶ 59. When Flowers said the Deputy was already on his way, Plaintiff said "I'm not answering the door. We're leaving. Good-bye . . . We'll call the TV station," and ended the call. Id. ¶¶ 60-61.

According to Plaintiff, the total duration of the 911 call was "approximately two and a half (2 ½) minutes." Id. ¶ 63. But see ¶ 62 (noting that Sheriff Office's Call-For-Service Detail Report indicates the call was approximately seven minutes long).

Just as Flowers said he would, Sullivan arrived at the Prosperos' home a few minutes later. Id. ¶ 65. And just as Plaintiff said, no one answered his knock on the door. Id. ¶ 67. Sullivan waited about twelve minutes before leaving, id. ¶¶ 65, 71, at which point he requested a criminal history report on Plaintiff, id. ¶ 72.

Then Sullivan called Dispatch again. Id. ¶ 73. "[D]id Ms. Prospero curse at anybody or use offensive or obscene language?" Id. "She didn't use offensive language or curse [according to Flowers,]" the dispatcher responded, "[s]he was just not a happy camper and she wanted . . . to get it taken care of." Id. ¶ 74. A little over ten minutes later, Sullivan called back: "[d]id she call in one time? I mean two times or three times?" Id. ¶ 75

(alterations omitted). "We spoke to her twice," Flowers told him, "[t]he husband called one time. They called in on the non-emergency line two different times, and they called 911 once." Id. ¶ 76 (internal quotation marks omitted). Sullivan asked for the time of each of the calls but declined Flowers's offer to pull the audio recordings to get the exact time of the second call. Id. ¶ 77. Sullivan did not listen to the audio recordings of the calls before seeking a warrant for Plaintiff's arrest. Id. ¶ 81.

Plaintiff contends the affidavit Sullivan submitted to obtain the arrest warrant was a sham. First, Sullivan wrote that the crime (unlawful conduct during a 911 call) occurred "during [a] 911 call on November 22, 2018 at 2:58 p.m. to November 22, 2018 at 3:30 p.m." Id. ¶ 84. He did that, Plaintiff alleges, to "creat[e] the false impression that Mrs. Prospero had spent thirty-two (32) minutes on the phone with 911." Id. Again: Plaintiff contends the 911 call lasted only "about two and a half (2 ½) minutes." Id. ¶ 85. Second, "Deputy Sullivan further stated [in the affidavit] . . . that Mrs. Prospero had called 911 in reference to an incident that was not a true emergency" even though the statute in question "does not prohibit contacting 911 for a non-emergency." Id. ¶¶ 86-87. Third, Plaintiff alleges that Sullivan knew she "had called 911 only once and that her purpose for calling was that she 'wanted it all,'" meaning the gun shots, "'taken care of.'" Id. ¶ 89. In

total, Plaintiff alleges, "the evidence known to Deputy Sullivan at the time he submitted his [arrest warrant] affidavit" contradicted his statement that she had called 911 "for the purpose of interfering or disrupting an emergency telephone service." Id. ¶¶ 88-89. Thus, she alleges, Sullivan "misrepresented the facts as they were known to him . . . in a malicious attempt to manufacture probable cause" for her arrest, because of personal animus. Id. ¶ 90. Plaintiff alleges that Defendant Prescott "subsequently reviewed and ratified" Sullivan's actions and "did not take any action to stop the continued prosecution and unlawful arrest[.]" Id. ¶ 93.[2]

Plaintiff also alleges that the police department should have known Sullivan would do something like this. Id. ¶¶ 2, 5. Sullivan had been fired from the nearby Brunswick Police Department ("BPD") for "among other misconduct, at least five incidents of unconstitutional Fourth Amendment seizures, including seeking to initiate prosecution against and arresting members of the public without probable cause." Id. ¶¶ 2, 5, 182; see also id. ¶¶ 176-77. In a five-month period with BPD, Sullivan was written up for "attempting to initiate a criminal prosecution without probable

---

[2] Plaintiff was publicly arrested in a Wal-Mart parking lot a full two months later. Id. ¶¶ 3; 97, 102. Because the issues here revolve around the facts leading up to the warrant, the Court does not recount the allegations regarding Ms. Prospero's arrest, dkt no. 45 ¶¶ 97-104, or her detention, id. ¶¶ 105-187.

cause, making an arrest without probable cause, and [making] four different stops [ ] without articulable suspicion." Id. ¶ 178. Sullivan's superior officer at BPD warned him that if he "continue[d] to make borderline cases, or cases that are clear violations of a person's right[s]," he "would face remedial training." Id. ¶ 179. Plaintiff alleges that Sullivan's disciplinary file reflected "disregard for the law" in other ways, as well, including an incident where, during counseling about precedent dealing with probable-cause standards, Sullivan responded "I disagree with that." Id. ¶ 180. As a result, Plaintiff alleges that Sullivan "clearly had tendencies or propensities" to engage in the type of conduct at issue here, and therefore Sheriff Proctor "either knew or reasonably should have known of Sullivan's propensity to prosecute and arrest without probable cause[.]" Id. ¶¶ 181-82. In failing to review the BPD Records before hiring Sullivan, despite knowing that Sullivan had been terminated from BPD, Plaintiff alleges that "Sheriff Proctor acted with deliberate indifference[.]" Id. ¶¶ 182-84; see also id. ¶¶ 190-92.

**B. Procedural Background**

Plaintiff filed this lawsuit in October 2020, originally suing only Deputy Sullivan and Lieutenant Prescott. Dkt. No. 1. Those Defendants answered, dkt. no. 11, and the Court granted (in part) Plaintiff's motion to expedite discovery, dkt. no. 10. In

February, Plaintiff sought and obtained leave to amend her complaint to clarify the scope of her First Amendment claims and remove references to "John/Jane Doe" defendants. Dkt. Nos. 16-18.

Just over a month later, and within two days of each other, Plaintiff sought leave to amend again (this time seeking to add a claim for negligent hiring against Sheriff Proctor), and Defendants moved for judgment on the pleadings. Dkt. Nos. 22-23. The Court granted the motion to amend, emphasizing that Defendants could re-urge the arguments contained in their motion for judgment on the pleadings once the second amended complaint was docketed. Dkt. Nos. 43-44.

After a brief dispute about what, exactly, Plaintiff had leave to add to her pleadings, dkt. no. 49-50, 58, Plaintiff filed her second amended complaint, dkt. no. 53. She now asserts five claims against Deputy Sullivan, Lieutenant Prescott, and Sheriff Proctor, as follows:

- Count 1 alleges retaliation in violation of the First Amendment, id. ¶¶ 188-95;

- Count 2 alleges unlawful arrest in violation of the Fourth Amendment, id. ¶¶ 196-203;

- Count 3 alleges "Malicious Prosecution" in violation of the Fourth Amendment, id. ¶¶ 204-09;

- Count 4 alleges a state law claim for intentional infliction

of emotional distress, id. ¶¶ 210-17; and

- Count 5 alleges a state law claim for negligent hiring, id.
  ¶¶ 218-22.

Defendants renewed their arguments in the form of a motion to dismiss, dkt. no. 54, and this Court granted the parties' motion to stay discovery pending its resolution, dkt. no. 60.

### LEGAL STANDARDS

### A. Motion to Dismiss Under Rule 12(b)(6)

A plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility," in turn, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016). But the Court should not accept allegations as true if they merely recite the elements of the claim and declare that they are met; the Court should disregard such legal conclusions unless they are supported by factual allegations. Iqbal, 556 U.S. at 678-79.

So viewed, a complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. Proc. 8(a)(2)).[3]

---

[3] Despite styling their motion as a "motion to dismiss," Defendants attached seven exhibits and urge the Court to "convert this motion to dismiss to a motion for summary judgment." Dkt. No. 54 at 3 n.2. But their briefing only occasionally references those exhibits or the summary judgment standard, often referencing and attacking the pleadings themselves. See generally id.

Rule 12(d) gives federal courts "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings" in this context. Charles A. Wright & Arthur R. Miller, 5C Federal Practice & Procedure § 1366 (3d Ed. Apr. 2021 Update); cf. Harper v. Lawrence Cnty., 584 F.3d 1030, 1034 (11th Cir. 2009) superseded on other grounds, 584 F.3d 1227 (11th Cir. 2010). That discretion is generally guided by "whether or not . . . conversion from the Rule 12(b)(6) to Rule 56 procedure [ ] is likely to facilitate the disposition of the action," such as "[w]hen the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion[.]" Id.

Considering those factors, the Court is not inclined to convert Defendants' motion to dismiss into a motion for summary judgment. First, as Defendants' inconsistent use of these exhibits shows, the exhibits deal with only some issues involved in some claims. Next, Defendants offer no reason to suggest that the exhibits are "comprehensive" in the sense that they represent the full body of evidence on the issues they *do* concern, so there is no obvious

**B. Qualified Immunity**

"Government officials performing discretionary functions generally are shielded from liability or suit for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Est. of Cummings v. Davenport, 906 F.3d 934, 939 (11th Cir. 2018) (alterations accepted) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Where it applies, it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Courts in this Circuit "use[ ] a two-step analysis to determine whether qualified immunity is available. First, the defendant must show that she acted within the scope of her discretionary authority. Once the defendant has so shown, the plaintiff must show that the defendant violated the plaintiff's clearly established statutory or constitutional rights." Lenz v. Winburn,

---

reason to skip over the sufficiency of the pleadings and decide summary judgment without discovery. Finally, the parties have not submitted statements of material fact, see LR 56.1, meaning the central question of what facts are "undisputed" would not be properly tested by the adversarial process. Considering these materials would hinder—not facilitate—a cogent decision-making process. The Court therefore **excludes** these extra-record materials and declines to convert the motion to dismiss into a motion for summary judgment.

This will not foreclose the parties from filing an actual motion for summary judgment following discovery.

51 F.3d 1540, 1545 (11th Cir. 1995) (citations omitted); cf. Echols v. Lawton, 913 F.3d 1313, 1324 (11th Cir. 2019).

"Under the clearly established prong, the dispositive question is whether the law at the time of the challenged conduct gave the government official fair warning that his conduct was unconstitutional." Wade v. United States, 13 F.4th 1217, 1225 (11th Cir. 2021); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002). "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019). "[P]reexisting law [must] dictate[ ], that is, truly compel[ ], the conclusion for all reasonable, similarly situated public officials[,] that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." Wade, 13 F.4th at 1225 (quoting Evans v. Stephens, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc)); cf. District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018). Thus, the Eleventh Circuit instructs, courts must consider what "[an] objectively reasonable official must have known at the pertinent time and place" and ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation the defendant officer confronted." Id. at 1226 (emphasis omitted) (quoting Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010)). This means

"consider[ing] the official's conduct in 'the specific context of the case,' not as [a] 'broad general proposition.'" <u>Echols</u>, 913 F.3d at 1323-24 (quoting <u>Bailey</u>, 843 F.3d at 484) (alteration omitted).

## DISCUSSION

Defendants ask the Court to dismiss the second amended complaint in its entirety. As discussed below, Plaintiff's False Arrest claim is subject to dismissal, but the remainder of her claims are viable.[4]

## I.  **Plaintiff's false arrest claim fails because she was arrested pursuant to a warrant.**

First things first: Defendants argue, and the Court agrees, that "the fact that a judge issued a warrant in this case extinguishes Plaintiff's false arrest claim." Dkt. No. 54 at 5 (citing <u>Spinnenweber v. Williams</u>, 825 F. App'x 730, 733 (11th Cir. 2020)); <u>see also</u> Dkt. No. 53 ¶ 1 (Defendants Sullivan and Prescott "obtained a warrant for Mrs. Prospero's arrest based on misrepresentations").

---

[4] A note on the scope of the arguments for dismissal here. The second amended complaint does not precisely delineate which claims are asserted against which defendants. <u>See</u> <u>generally</u> dkt. no. 53. But Defendants assert each of their arguments here across the board—that is, they do not make different arguments for different claims. <u>See</u> <u>generally</u> dkt. no. 54, 61. The Court, therefore, considers their arguments on these terms.

"A claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as *warrantless* arrests." Williams v. Aguirre, 965 F.3d 1147, 1158 (11th Cir. 2020) (emphasis added). As a result, the issuance of a warrant "extinguishes" a false arrest claim, and "[a]ny objection [Plaintiff has] must necessarily be towards the [validity of the] legal process" itself. Spinnenweber, 825 F. App'x at 733; cf. Carter v. Gore, 557 F. App'x 904, 906 (11th Cir. 2014) and Landau v. City of Daytona Beach, No. 6:19-cv-495, 2021 WL 3878220, at *3 (M.D. Fla. Jan. 11, 2021).

Plaintiff does not appear to defend this claim in her response brief, arguing instead that she has met her burden to show a "lack of probable cause to arrest or prosecute" for purposes of her "First and Fourth Amendment claims[.]" Dkt. No. 57 at 7; see also id. at 8-12. To the extent that is meant as a response to Defendants' argument on this score, it does not answer the concern. So the Court is left with the fact that Defendants "characterize [Prospero's second count] as a false arrest claim," and Plaintiff "[does] not dispute this characterization]." Spinnenweber, 825 F. App'x at 732. Count Two, therefore, is **dismissed.**

**II.   Plaintiff's First and Fourteenth Amendment claims are viable at this stage.**

42 U.S.C. § 1983 "creates a species of tort liability for the deprivation of any rights, privileges, or immunities secured by the Constitution." Manuel v. City of Joliet, 137 S. Ct. 911, 916 (2017) (citations and internal quotation marks omitted). The core of Plaintiff's case is that her arrest and detention violated two such rights. First, she alleges a violation of her "freedom of speech," guaranteed by the First Amendment, which "'[a]s a general matter . . . prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)). And second, she asserts a claim under the Fourth Amendment's prohibition on unreasonable searches and seizures, which protects the public from being "detained—which is to say, 'seized,' . . . based solely on false evidence, rather than [accusations] supported by probable cause." Manuel, 137 S. Ct. at 917.

In broad strokes, Defendants advance three arguments to dismiss Plaintiff's claims. First, they argue that Plaintiff cannot state a claim under either theory because there was probable cause to arrest her for unlawful conduct during a 911 call and Sullivan's affidavit did not contain any misstatements necessary

to obtain the arrest warrant. Dkt. No. 54 at 5-8. Next, and relatedly, they argue that even if there were some issue with the warrant application process, Plaintiff's claims still fail because her arrest would have been justified anyway. Id. at 8-11. Third, and in all events, Defendants argue that Plaintiff's First and Fourteenth Amendment claims are barred by qualified immunity. Id. at 11-17.

As explained more fully below, the Court rejects each of those contentions at this stage. Defendants' first and third arguments largely overlap, so the Court addresses them together, then turns to the second argument. Folding in the underlying constitutional claims and qualified immunity, the analytical framework reduces to this: *First,* Plaintiff must show that Sullivan made intentionally false statements or material omissions which were necessary to secure the warrant; *then*, she must show that her arrest would not have been (even arguably) justified as a warrantless arrest. Reviewing the allegations here, the Court agrees that Plaintiff alleges at least one material misstatement and one material omission. And for related reasons, Plaintiff has plausibly alleged that her arrest would not have been justified without the warrant. Thus, her First and Fourth Amendment claims are viable at this stage.

### A. The Doctrinal Backdrop

Both of Plaintiff's claims here "require[ ] that [she] plead and prove the absence of probable cause for the underlying criminal charge." Nieves, 139 S. Ct. at 1723 (First Amendment claims); Manuel, 137 S. Ct. at 917 (Fourth Amendment claims). That's so because, on the one hand, a plaintiff asserting a First Amendment claim "must establish a 'causal connection' between the defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury,'" Nieves, 139 S. Ct. at 1722 (quoting Hartman, 547 U.S. at 259); and because, on the other, "the general rule is that Fourth Amendment seizures are 'reasonable' only if *based on* probable cause," Manuel, 137 S. Ct. at 917 (quoting Bailey v. United States, 568 U.S. 186, 192 (2013)) (emphasis added) (alteration accepted).

"Probable cause exists when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Llorente v. Demings, No. 6:15-cv-1844, 2016 WL 11455983, at *5 (M.D. Fla. May 16, 2016) (quoting Wilkerson v. Seymour, 736 F.3d 974, 978 (11th Cir. 2013)). This standard "is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances." Coleman v. Hillsborough Cnty., No. 8:18-cv-1678,

2020 WL 6481332, at *7 (M.D. Fla. Sept. 30, 2020) (quoting Skop v. City of Atlanta, 485 F.3d 1130, 1137-38 (11th Cir. 2007)). Because Plaintiff was arrested pursuant to a warrant, the focus is there, not on whether the arresting officer had probable cause in the abstract. Williams, 965 F.3d at 1162.[5]

Normally, a magistrate's decision to sign a warrant is powerful evidence that—even if the officer was ultimately mistaken about the objective existence of probable cause—he acted reasonably and in good faith. Messerschmidt v. Millender, 565 U.S. 535, 546 (2012); see also Malley, 475 U.S. at 346 n.9 ("[I]t goes without saying that where a magistrate acts mistakenly in issuing a warrant[,] but within the range of professional competence[,] . . . the officer who requested the warrant cannot be held liable"); Williams, 965 F.3d at 1162 ("an officer ordinarily does not violate the Fourth Amendment when he executes a facially valid arrest warrant, regardless of whether the facts known to [him] support probable cause").

But of course, the plaintiff may still show a probable-cause problem "if the affidavit supporting the warrant contain[ed] deliberate falsity or reckless disregard for the truth[.]" Dahl v.

---

[5] Williams makes this clear in the context of a Fourth Amendment claim. 965 F.3d at 1162. The parties appear to assume that this framework also applies to a First Amendment claim here—and the Court does the same.

*Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002), abrogated on other grounds by Lozman v. City of Riviera Beach, Fla., 138 S. Ct. 1945 (2018); see also Williams, 965 F.3d at 1158 ("A Fourth Amendment violation . . . occurs 'when legal process itself goes wrong— [like], for example, [when] a judge's probable-cause determination is predicated solely on a police officer's false statements'" (quoting Manuel, 137 S. Ct. at 918)); Madiwale v. Savaiko, 117 F.3d 1321, 1326 (11th Cir. 1997) (explaining that the same rule also applies "to information omitted from warrant affidavits").[6]

---

[6] To be clear: lies in a supporting affidavit are not the only way that a duly issued warrant might fail to satisfy the Constitution. There is always a backdrop question about whether "a reasonably well-trained officer in [the defendant's] position would have known that his affidavit failed to establish probable cause and that he [therefore] should not have applied for the warrant." Malley, 475 U.S. at 346; see also Williams, 965 F.3d at 1165. If the answer to that question is yes, then "the officer's application for a warrant was not objectively reasonable[] because it created the unnecessary danger of unlawful arrest." Malley, 475 U.S. at 345. Ideally, of course, "an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate . . . will fail to perform as [he] should." Id. at 345-46. So while "it goes without saying that where a magistrate acts mistakenly in issuing a warrant[,] but within the range of professional competence[,] . . . the officer who requested the warrant cannot be held liable," things "[are] different if no officer of reasonable competence would have requested the warrant." Id. at 346 n.9. In that case, if the magistrate issues the warrant, "his action is not just a reasonable mistake, but [instead] an unacceptable error." Id. Thus, the officer in that case "cannot excuse his own default by pointing to the greater incompetence of the magistrate." Id.; see also, e.g., Garmon v. Lumpkin Cnty., 878 F.2d 1406, 1410 (11th Cir. 1989) (finding no reasonable officer could have believed a wholly conclusory warrant application showed probable cause); Kelly v. Kurtis, 21 F.3d 1544, 1555 (11th Cir. 1994) (same).

So here, "[Plaintiff] can prove that [her] arrest warrant was constitutionally infirm if [s]he establishes . . . that [Sullivan] . . . intentionally or recklessly made misstatements or omissions necessary to support the warrant[.]" Williams, 965 F.3d at 1165 (citations omitted). And even then, "[s]he will prevail only if [her] seizure would not have been constitutional without legal process." Id. That is the underlying merits inquiry here.

But as Defendants point out, they are entitled to qualified immunity if they had even *arguable* probable cause. Dkt. No. 54 at 11 (citing Grider v. City of Auburn, 618 F.3d 1240, 1256 (11th Cir. 2010)). Probable cause is "arguable" if "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest [the suspect]." Taylor v. Taylor, 649 F. App'x 737, 743 (11th Cir. 2016) (quoting Grider, 618 F.3d at 1257); see also id. ("[i]n other words, qualified immunity still applies if the officer reasonably but mistakenly believed that probable cause was present"). This is an objective standard and it "does not depend on the subjective beliefs or intent of the arresting officer." Id. And here as well, the magistrate's sign-off is "significant," id. at 744, but "false statements . . . and . . . omissions in the affidavit remove the presumption of validity[.]" Holland v. City

of Auburn, 657 F. App'x 899, 903 (11th Cir. 2016) (citing Franks v. Delaware, 438 U.S. 154, 171 (1978)).

And the qualified immunity defense adds another wrinkle. Unlike the baseline question of a Fourth Amendment violation, false statements and omissions must be *intentional*—not merely reckless— to negate qualified immunity. Carter, 557 F. App'x at 908 (citing Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir. 1994)). The reason for that is "the blurry line between reckless misstatements, which violate [the Fourth Amendment], and negligent misstatements, which do not[.]" Id. That vague line is a problem for the "clearly established" inquiry, rendering the law "insufficiently clear to defeat qualified immunity." Id.; cf. Johnson v. Shannon, 484 F. Supp. 3d 1344 (N.D. Ga. Aug. 28, 2020).

So, for all that, the analysis here boils down to two steps. First, Plaintiff "bears the burden of [plausibly alleging that] [A] the officers' accusation against [her] was intentionally false and not, for example, a mistaken belief on [their] part," Williams, 965 F.3d at 1165; and [B] those misstatements were "necessary to establish probable cause." Id. at 1166-67. Second, she must show her arrest and detention "would not have been constitutional without legal process," i.e., that they "could not be justified as a warrantless arrest." Williams, 965 F.3d at 1165, 1167.

## B. Misstatements in Sullivan's Warrant Affidavit

Plaintiff plausibly alleges at least one such falsehood and at least one such omission.[7] First, Plaintiff alleges that Sullivan's affidavit indicated that the 911 call lasted thirty-two minutes—from 2:58-3:30 p.m.—when, in reality, it was two and a half minutes. Dkt. No. 53 ¶ 84. At this stage, the Court must credit that inference—not parse whether that is what the affidavit really means. Contra Dkt. No. 54 at 14. Second, Plaintiff alleges that Sullivan knew, but did not say in his affidavit, that Plaintiff told dispatchers that she "wanted [the gun shots] . . . taken care of," dkt. no. 53 ¶¶ 73-74; see also id. ¶¶ 32, 36, 53, 57 (alleging that Plaintiff and her husband told dispatchers numerous times the gunshots were "too close" to the neighbors' homes).

### i. Intentionality

It is plausible that both of those misstatements were intentional. Based on the facts alleged, Sullivan knew that there were three phone calls—two of them to the non-emergency line—not one thirty-two minute call. Dkt. No. 53 ¶¶ 76-77 (indicating that Sergeant Flowers told Sullivan there were three calls and that

---

[7] Here too, Defendants rely heavily on exhibits and Plaintiffs respond—at least to those arguments—on those terms. See Dkt. No. 54 at 13-16; Dkt. No. 57 at 13-17. So the Court notes here, as well, that it declines to consider outside evidence and convert this motion into a motion for summary judgment. See supra note 3.

Sullivan asked for the time of each call). And, as alleged, dispatch explicitly told Sullivan Plaintiff's stated purpose for her call. Add to that Plaintiff's allegations that Sullivan bore her ill-will, dkt. no. 53 ¶¶ 41, 43-48—i.e., had a motive to lie—and it is plausible that Sullivan made these misstatements intentionally.

Defendants suggest that Sullivan's alleged animosity has nothing to do with arguable probable cause, and thus can have no bearing on the qualified immunity analysis, dkt. no. 54 at 11—but that stretches the principle too far. On this point, Grider stands for the proposition that an officer might have arguable probable cause (and thus qualified immunity) where his assessment is reasonable, but mistaken. 618 F.3d at 1256. Probable cause is an objective standard, so subjective intent and belief are beside the point. Id. That is certainly true, and it makes good sense so far as it goes, but it does not mean that subjective intent is out of bounds altogether. Here, for example, intent is irrelevant on probable cause itself, but Plaintiff must *also* allege that Sullivan *intended* to mislead the magistrate. For that purpose, any motive to lie (like, say, animosity toward the suspect) is clearly relevant. Grider does not place that off limits. See id.

*ii.   Materiality*

So too, it is *at least* plausible that a magistrate with the right information would not have issued the warrant. The question here is whether, if the alleged misstatements were deleted, the warrant affidavit would still show probable cause. <u>Williams</u>, 965 F.3d at 1169; <u>Dahl</u>, 312 F.3d at 1235. And because qualified immunity is in play, Plaintiff must show that "every reasonable law officer would have known" that making these misstatements "would lead to a [seizure] in violation of federal law." <u>Haygood v. Johnson</u>, 70 F.3d 92, 95 (11th Cir. 1995). The Court finds Plaintiff has made those showings here.

Sullivan's warrant affidavit accused Plaintiff of violating a Georgia statute which prohibits unlawful conduct during a 911 call ("the 911 statute"), dkt. no. 53 ¶¶ 82-83, 91, so the analysis begins there. <u>Tuggle v. Clayton Cnty. Sheriff</u>, No. 1:06-cv-272, 2007 WL 9672388, at *5 (N.D. Ga. July 16, 2007) ("Whether a law enforcement officer has either probable cause or arguable probable cause is determined by the elements of the alleged crime and the specific facts of the case."). That statute provides, in relevant part, that "[a] person commits the offense of unlawful conduct during a 9-1-1 telephone call if he or she . . . [c]alls or otherwise contacts 9-1-1 . . . for the purpose of annoying, harassing, or molesting a 9-1-1 communications officer[,] or for

25

the purpose of interfering with or disrupting emergency telephone service[.]" O.C.G.A. § 16-11-39.2(b).

Taking the second amended complaint on its own terms, Plaintiff plausibly alleges that the misstatements here were necessary to establish probable cause and obtain a warrant. On the misstatement about the length of the calls: twenty-nine and a half minutes is obviously a big difference in the scheme of a phone call, particularly when the implication is supposed to be that the caller meant to disrupt emergency service. The case for intent to disrupt emergency service is—at a minimum—*far* stronger when the length of the call is 12.8 times greater. See Tuggle, 2007 WL 9672388, at *6 (finding a warrant application's misstatement of the chronology of allegedly-harassing phone calls, suggesting the calls were made on two separate days rather than minutes apart on the same day, was material to probable cause). Add to that the omission about the stated purpose of Plaintiff's call, which suggested an intent *other* than disrupting 911 service, and the case for probable cause is fairly suspect. See id. at *6-7 ("Tuggle . . . was attempting to engage in a conversation with an elected public official about that official's actions . . . . not attempting to harass, annoy, or molest Sheriff Hill.").

After all, the accusation here is that Plaintiff called 911 for the purpose of disrupting emergency service. But viewing the

facts in her favor, she herself called 911 just one time, for a total of two and a half minutes, complaining about noisy gunfire and asking the police to make it stop. True, she called the police department two other times, but the administrative line is not 911 (even if she was ultimately transferred to a dispatcher)—and nothing in those calls suggests that the 911 call Plaintiff *did* make was for any purpose other than resolving her noise complaint. Drawing those inferences in her favor, any reasonable officer would have known these were material misstatements.

Defendants suggest that all this is beside the point because "the intent element of a criminal statute is not required to be satisfied in order to establish probable cause." Dkt. No. 54 at 15 & n.6 (collecting cases). That is true, but it doesn't cover the problem here.

To be sure, the fact that "officers ha[ve] no *specific evidence*" as to the intent element of a crime typically "[does] not prevent them from having probable cause to make the arrest." Short v. City of Montgomery, 267 F. Supp. 2d 1124, 1129 (M.D. Ala. Mar. 10, 2003) (emphasis added) (quoting Dahl, 312 F.3d at 1234). That is because, in the usual case, an act or series of actions will often make it "objectively reasonable" to believe a crime involving intent has been committed "based on the totality of the circumstances." Id. (confirming that arresting a man for

harassment was reasonable, even if there had not been evidence of specific intent "to harass, annoy, or alarm," based on evidence that the defendant had caused physical injury to the victim during a domestic incident); see also In re Extradition of Nunez-Garrido, 829 F. Supp. 2d 1277, 1285 (S.D. Fla. 2011) ("[I]n at least some contexts, probable cause that a person has committed a crime requiring proof of intent may exist absent any evidence of criminal intent *other than the suspect's commission of the underlying prohibited conduct*") (emphasis omitted and added); Brimage-Nesmith v. Bay Credit Union, No. 5:17-cv-104, 2017 WL 3567975, at *1 (N.D. Fla. Aug. 17, 2017) (discussing examples like transporting drugs, possessing a stolen item, driving with a suspended license).

But of course, that is not invariably true. Here, for example—and unlike transporting drugs, or possessing stolen goods, or driving without a license—there is no obvious reason why the mere fact of these phone calls would make it "objectively reasonable" to believe that a crime had been committed without some evidence of the forbidden intent. Defendants never explain what that reason might be. Again: all three calls (i.e., even counting two calls which were *not* made to 911) advanced facially legitimate complaints, were relatively short, and were not made in a manner that would contextually suggest the forbidden intent.

And what's more, "[a] *lack* of evidence on a particular element," like intent, "is quite a different matter from the *presence* of evidence that affirmatively suggests that an element *cannot* be met." Navarro v. City of South Gate, 81 F. App'x 192, 195 & n.3 (9th Cir. 2003) (emphasis added); see also Kuehl v. Burtis, 173 F.3d 646, 651 (8th Cir. 1999) ("[The officer] ignored plainly exculpatory evidence that negated the intent required for simple assault"); Cohen v. Mcghure, No. 3:15-cv-133, 2016 WL 3188889, at *7 (M.D. Fla. June 8, 2016) (denying summary judgment based on evidence that the plaintiff lacked the necessary intent to be guilty of official misconduct or grand theft). "Defendants have cited no authority for the proposition that officers may ignore exculpatory evidence on an element of the offense in making probable cause determinations." Id. Put differently: an officer may not need *specific* evidence of intent in the usual case, but (even if this case were like those others) that does not mean he has probable cause *despite* evidence proving the suspect *did not* have the prohibited intent.

Plaintiff has, in short, plausibly alleged that Sullivan made intentional misstatements which were necessary to secure the warrant.

**C. Justification Without Legal Process**

For many of these same reasons, "[Plaintiff's] detention also could not be justified as a warrantless arrest." Williams, 965 F.3d at 1167; contra Dkt. No. 54 at 8-11, 17.

As discussed above, Plaintiff alleges that she called 911 for a facially legitimate purpose. She says that she and her husband called the dispatcher to complain about gunshots ringing out nearby, stating "they keep going and going and going" and were coming "too close" to people homes, and that she "just want[ed] [the shooting] stopped." Dkt. No. 53 ¶¶ 53, 55, 57, 89. Sullivan was apparently in regular contact with Dispatch regarding these calls and commented on the substance of the Prosperos' complaints each time, id. ¶¶ 38, 41, so it is reasonable to infer that he knew about the content of each call. Going by Plaintiff's version, therefore—which the Court must do at this stage—a reasonable officer in Sullivan's position simply could not have believed that Plaintiff called 911 in order to "annoy[], harass[], or molest[] a 9-1-1 communications officer[,]" or "for the purpose of . . . disrupting emergency telephone service[.]" O.C.G.A. § 16-11-39.2(b)(2).

Plaintiff also alleges that Sullivan knew that she conveyed her complaints in a way that could not suggest she called 911 for prohibited reasons. Dispatchers told Sullivan that Plaintiff only

30

ever called 911—the subject of the statute, after all—one time.
Dkt. No. 53 ¶ 76. The same paragraph alleges that Sullivan knew
there were only ever three total calls: the other two having been
made to "the non-emergency line" (i.e., *not* 911), and that
Plaintiff herself (i.e., the person he accused of the crime) placed
only one of those. Id. As to the length of the 911 call: it is not
clear from the pleadings whether Sullivan knew the actual duration
of the lone 911 call, but again, he was in contact with the
dispatcher who spoke to the Prosperos, dkt. no. 53 ¶¶ 38, 41, 73,
so it is reasonable to infer he knew the calls were not continuous.
And, of course, the dispatchers who spoke with her told Sullivan
that "[s]he didn't use offensive language or curse," explaining
instead that "[s]he was just not a happy camper and she wanted it
all [ ] to get [ ] taken care of." Dkt. No. 53 ¶ 74.

Defendants contest each of these allegations and inferences
at length, dkt. no. 61 at 1-6, but, for purposes of the
plausibility analysis, the Court is required to make these
inferences in Plaintiff's favor. Estate of Cummings, 906 F.3d at
937. Doing that, it is certainly plausible that Sullivan had no
cause—objective or arguable—to believe that Plaintiff called for
unlawful purposes like "annoying, harassing, or molesting a 9-1-1
communications officer" or "for the purpose of interfering with or

disrupting emergency telephone service[.]" O.C.G.A. § 16-11-39.2(b)(2).

And to repeat: Defendants may not have to present specific evidence of intent in a warrant application, but that hardly means that they can lay claim to probable cause when the evidence they *do* have negates intent. See <u>Navarro</u>, 81 F. App'x at 195 n.3; <u>see also</u> *supra* at 26-28.

Thus, even setting the warrant aside, the second amended complaint plausibly alleges that there was no probable cause to arrest Plaintiff for violating the 911 statute, and her seizure "could not [have been] justified as a warrantless arrest." <u>Williams</u>, 965 F.3d at 1167.[8]

* * *

In sum, each of Defendants' arguments to dismiss Counts One and Three fail. Because Sullivan "had no arguable probable cause to believe that" Plaintiff called 911 to disrupt emergency service and "falsely claimed otherwise," Plaintiff's claims are viable,

---

[8] Even if there had been actual or arguable probable cause, Defendants never explain why this was an arrest that *could* have been made without a warrant. After all, the general rule under the Fourth Amendment is that "a warrant must *generally* be secured . . . subject to certain reasonable exceptions." <u>Kentucky v. King</u>, 563 U.S. 452, 459 (2011) (emphasis added). The severity for some crimes no doubt justifies a warrantless arrest based on exceptions like exigency or the need to preserve evidence—but Defendants have not advanced any reason why the mere presence of probable cause would justify a warrantless arrest here.

and Sullivan "is not entitled to qualified immunity[.]" <u>Coleman</u>, 2020 WL 6481332, at *7. Defendants' motion to dismiss Counts One and Three is **DENIED.**

**III.  Plaintiff's IIED claim plausibly alleges that Sullivan's actions were intentional, extreme, and outrageous.**

In Georgia, intentional infliction of emotion distress ("IIED") requires a showing (here, plausible allegation) of four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe." <u>Bridges v. Winn-Dixie Atlanta, Inc.</u>, 335 S.E.2d 445, 447-48 (Ga. Ct. App. 1985) (internal quotation and citation omitted); <u>accord</u> <u>Steed v. Fed. Nat'l Mortg. Corp.</u>, 689 S.E.2d 843, 852 (Ga. Ct. App. 2009).

Defendants ask the Court to dismiss this claim, incorporating wholesale their arguments from an earlier motion to dismiss.[9] <u>See</u> Dkt. No. 54 at 25 (referencing dkt. no. 23 at 24-25). They have two arguments to that end: First, Defendants deny both that there are any misstatements in the affidavit and that any alleged misstatements were material to the magistrate's finding of probable cause. Dkt. No. 23 at 25. Second, they argue that

---

[9] In the interest of resolving the motion here and preventing further delay in this case, the Court has considered the parties' prior briefing on the IIED issue.

"generally '[f]alse arrest itself does not rise to the level of outrageous and extreme behavior necessary to state a cause of action for IIED.'" Dkt. No. 23 at 25 (citing <u>Williams v. Allen</u>, No. 6:17-cv-00242, 2017 WL 1653744, at *6 (M.D. Fla. May 2, 2017)). Both arguments lack merit.

The first argument fails for reasons already discussed. Plaintiff has alleged specific facts suggesting (1) that Sullivan misstated and omitted facts in his affidavit, <u>supra</u> at 22-23, and (2) that Sullivan had malice or antipathy towards her, <u>id.</u> at 2, 23. Putting those facts together, it is plausible that these alleged misstatements were intentional. So too, it is at least plausible that Sullivan made the misstatements because he knew he did not otherwise have probable cause, and that (absent the alleged misstatements in the affidavit) the magistrate would have known it as well. <u>See</u> <u>id.</u>

The second argument draws too clean a line. True, there are examples of failed IIED claims in false arrest or malicious prosecution cases—but the question is context specific; there is no categorical rule. <u>Compare</u> <u>Tillman v. Orange Cnty., Fla.</u>, No. 12-11520, 2013 WL 2126468, at *1, *3 (11th Cir. May 17, 2013) ("Because this allegation—that police officers falsified charging documents in order to convict a man of a nonexistent crime—is the type of extreme conduct considered to be intolerable in a civilized

society, we remand this claim for reconsideration.") and Barmapov-Segev v. City of Miami, No. 19-23742, 2019 WL 6170332, at *1, *6 (S.D. Fla. Nov. 20, 2019) (denying a motion to dismiss similar claims where the plaintiff alleged that the officer "made false accusations against the plaintiff to 'punish' her, which led to her arrest and malicious prosecution") (record citations omitted) with Pierce v. Clayton Cnty., Ga., No. 1:16-cv-779, 2016 WL 10537013, at *6 (N.D. Ga. Oct. 11, 2016) (dismissing an intentional infliction of emotional distress claim based on alleged malicious prosecution where there was no allegation that the officers intended to cause severe emotional distress, and the arrest was allegedly the result of a misunderstanding about the purchase of a thought-to-be stolen vehicle) and Frias v. Demings, 823 F. Supp. 2d 1279, 1289 (M.D. Fla. 2011) ("In this case, Frias has not established a claim for intentional infliction of emotion distress because she has not shown that Deputy Cavis's conduct was beyond all possible bounds of decency or that she suffered severe distress"(internal quotation marks omitted)).

To the extent Defendants suggest Williams v. Allen identifies such a line, dkt. no. 23 at 25, they overread that case. Williams dealt with an alleged false arrest based on the false premise that the Plaintiff had been driving with a suspended license. 2017 WL 1653744, at *1, *6. In context, therefore, the Court's statement

that "[f]alse arrest itself does not rise to the level of outrageous and extreme behavior necessary to state a cause of action for IIED" is best read to mean that the mere *fact* of false arrest, without more, is not enough for an IIED claim. Id. at *6 (citing Davis v. City of Apopka, No. 6:15-cv-1631, 2016 WL 3571018, at *9 (M.D. Fla. July 1, 2016) (explaining that "simple allegations of false arrest, do not, as a matter of law, give rise to a claim for IIED")).

Ultimately, the allegations in this case are much more like Tilman and Barmapov than Pierce and Frias. Here, as in Tillman, Plaintiff alleges that Sullivan "falsified . . . documents" in order to see her arrested and prosecuted for a "nonexistent crime." 519 F. App'x at 637; see also Dkt. No. 53 ¶¶ 1, 82-90. And here, just like in Barmapov, Plaintiff alleges that Sullivan did all that to "punish her." 2019 WL 6170332, at *6; see also Dkt. No. 53 ¶¶ 1, 90 (accusing Deputy Sullivan of "retaliation" and "a malicious attempt to establish probable cause for [her] arrest because . . . of her complaining about someone shooting on private property"). If these allegations are true—and the Court must presume that they are at this stage—it seems uncontroversial to say that this is "the type of extreme conduct considered to be intolerable in a civilized society." Tillman, 519 F. App'x at 637.

Thus, Plaintiff plausibly alleges intentional, outrageous conduct, and Defendants' motion to dismiss the IIED claim is **DENIED.**

**IV. Defendants' arguments to dismiss Plaintiff's negligent hiring claim fail at this stage because they depend on extrinsic evidence.**

"In cases where a plaintiff presents a § 1983 claim based on a hiring decision and inadequate screening," the plaintiff "must demonstrate that the [sheriff] disregarded a known or obvious consequence of hiring the applicant." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1313 (11th Cir. 2001); see also Williams v. Dekalb Cnty., 327 F. App'x 156, 162 (11th Cir. 2009) ("To support a conclusion that [the] 'isolated decision to hire [an officer] without adequate screening' is sufficient to subject the [defendant] to § 1983 liability, a plaintiff must demonstrate 'that [the] decision reflected a conscious disregard for a high risk that [the officer] would [violate the particular] . . . federally protected right.'" (quoting Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 415-16 (1997))). "It is not sufficient under this standard that a municipal actor's inadequate screening of an applicant's record reflects an 'indifference' to the applicant's background. Rather, a plaintiff must demonstrate that the municipal hiring decision reflects deliberate indifference to the

risk that a violation of a particular constitutional or statutory right will follow the decision." <u>Griffin</u>, 261 F.3d at 1313 (citing <u>Bd. of Comm'rs of Bryan Cnty.</u>, 520 U.S. at 411 (Deliberate indifference exists "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire [them] would be the deprivation of a third party's federally protected right[.]")).

Defendants' arguments in this regard seem to be almost entirely based on evidentiary support. Dkt. No. 54 at 18-20 (discussing the contents of the POST records), 20-23 (discussing Sullivan's disciplinary records at BPD); <u>see also</u> <u>id.</u> at 24 (distinguishing a case that defendants anticipated Plaintiff would cite). As discussed above, the Court declines to consider these exhibits (and thus these arguments) because doing so would convert this motion to dismiss into a motion for summary judgment.[10]

Defendants' motion to dismiss Plaintiff's negligent hiring claim is **DENIED.**

---

[10] Defendants also argue that the negligent hiring/retention claim is necessarily derivative of the other constitutional claims here, so it fails if they fail. Dkt. No. 54 at 17-18 (citing, e.g., <u>Morris v. Bouchard</u>, No.1:06-CV-2535-GGB, 2007 WL 1100465, *9 (N.D. Ga. Apr. 7, 2007)). That is true on its own terms—but of course, the other constitutional claims here are viable, so that argument does not change the outcome here.

**CONCLUSION**

For these reasons, the motion to dismiss, dkt. no. 54, is **GRANTED in part** and **DENIED** in part. The motion is **GRANTED** as to Plaintiff's False Arrest Claim (Count 2), and that claim is **dismissed**. The motion is **DENIED** as to Plaintiff's remaining claims.

**SO ORDERED** this 11th day of March, 2022.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA