308

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

BRUNSWICK DIVISION

EMMA JANE PROSPERO,            )
                               )
         Plaintiff,            ) CIVIL ACTION FILE
                               )
     vs.                       ) NO.:  2:20-cv-110
                               )
DEPUTY RYAN SULLIVAN and       )
LT. RUSSELL PRESCOTT,          )
current employees of the       )
Camden County Sheriff's        )
Office who are sued in         )
their individual               )
capacities,                    )
                               )
         Defendants.           )

EXHIBIT A

VOLUME 2

DEPOSITION OF

EMMA JANE PROSPERO

9:34 a.m.

Thursday, June 16, 2022

Gilbert Harrell Sumerford & Martin
777 Gloucester Street
Brunswick, Georgia

Annette Pacheco, RPR, RMR, CCR-B-2153

**Gilbert & Jones**
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

gilbertandjones1@gmail.com
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

329

```
1     "Good, you're dead" in response to a conversation
2     about signing a medical authorization form; true?
3          A.    True.
4          Q.    Okay.  Do you know Mike's last name?
5          A.    I don't think so.
6          Q.    And as I understand it -- and I don't need
7     an explanation.  I just need to know do you believe
8     that that statement caused you emotional trauma and
9     injury?
10         A.    Yes.  Definitely.  Yes.
11         Q.    You've also said that somebody was talking
12    to you about needing to get a mental health
13    evaluation.  Was that Mike?
14         A.    He was trying to trick me to sign the
15    papers.  There was one paper here.
16         Q.    That's not my what I'm asking.
17         A.    Okay.
18         Q.    I'm asking about you've alleged that
19    somebody --
20         A.    It was more than one person.
21         Q.    Okay.  And can you identify those people
22    that were telling you you needed to get a mental
23    health evaluation?
24         A.    They came in and cornered me in the jail
25    right before I was to see --
```

330

1  Q. I just need you to identify those people.
2  A. It was just two people came and cornered
3  me in the -- and they said I've been randomly
4  selected --
5  MS. NORINS: He just wants to know do you
6  know who they were, their names.
7  A. I don't know their names.
8  Q. (By Mr. Watkins) Okay. Thank you.
9  A. Okay.
10 Q. And did that experience cause you
11 emotional trauma and injury?
12 A. Yes. It scared me to death.
13 Q. Okay. You've identified Jim Kelly as the
14 person that you believe intentionally tried to poison
15 you; is that correct?
16 A. I said that he was outside and clicking
17 and spraying the door. I don't know who did the
18 room. I don't know who did the -- all the chemicals
19 coming all over the room that I looked up to the
20 right and saw.
21 Q. Okay. Thank you. So there were -- you
22 believe that there were two separate incidents that
23 may have led you to have some injury. One, the
24 spraying of the room; is that right? And, two, the
25 pumping of stuff into the room?

GILBERT & JONES

331

1     A.    It wasn't just two.  I was falsely
2 arrested and taken against my will.  So it was many,
3 many things.
4     Q.    Okay.  Let me redirect you.  I'm only
5 talking about this allegation of the chemicals being
6 put into the cell.  That's all I'm asking about.
7     A.    Okay.
8     Q.    I just want to understand who was involved
9 in this.  You've alleged that you believe Jim Kelly
10 was involved in that; correct?
11     A.    He -- I saw him face-to-face.
12     Q.    So is that a "yes" then?
13     A.    Involved in what?  Because you said "in
14 that."  So . . .
15     Q.    Well, no.  I said in putting chemicals in
16 the room that caused you some injury.
17     A.    All I know is he was standing at the door
18 and he was there when the blue and white hose was,
19 and I heard the clicking and the spraying.  So I
20 don't know if he did the inside, but he was standing
21 there right with the blue hose.  And when the blue
22 hose was looped under my door, and I saw the silver
23 machine.
24     Q.    Yes or no, do you believe he was
25 responsible in some way for putting some chemicals

332

1 into your cell?
2     A.    There was something at my -- he was the
3 one that was doing it at the door when the girl came
4 up and said, "What are you doing and why are you
5 doing that?"
6     Q.    Sure. Okay. He was the one doing it at
7 the door. Do you know the identity of anybody else
8 involved in putting chemicals into your cell?
9     A.    All I know is the little girl with the
10 ponytail took me to the -- after they said -- after
11 Mike clapped his hands and good -- he goes, "Good,
12 you're dead" and rolled his chair back like he
13 wouldn't help me and resuscitate me if I had a
14 problem in there, when I --
15     MR. WATKINS: Okay. I'm going to object
16     to the responsiveness of the question.
17     A.    Okay.
18     Q.    (By Mr. Watkins) I'm just asking you
19 simply do you know anyone else other than
20 Jim Kelly --
21     A.    Right.
22     Q.    -- who was responsible for putting
23 chemicals into your cell?
24     A.    Right. I don't know the people's names
25 that were there.

333

1  Q.    That's all I was asking.
2  A.    Okay.  Can I -- I do want to --
3        MS. NORINS:  No.  Just wait for a
4  question.
5        THE WITNESS:  Okay.
6  Q.    (By Mr. Watkins)  You do allege that the
7  putting of chemicals in your cell caused you serious
8  physical and emotional injury; is that fair?
9  A.    Yes.
10 Q.    Okay.  You've alleged that an Officer
11 Doe --
12 A.    Doe.
13 Q.    -- and this is in Dr. Chapman's report,
14 but there's a reference to Officer Doe or Deputy Doe
15 broke some glasses of yours.
16 A.    I never said Officer Doe.
17       MS. NORINS:  No.  Let me explain or I can.
18 So Doe is just a placeholder if you don't know
19 someone's name.
20       THE WITNESS:  Oh, you.  Okay.  Got it.
21 Got it.
22       MR. WATKINS:  Okay.
23       THE WITNESS:  Okay.
24 Q.    (By Mr. Watkins)  So it's alleged that
25 there was a mean person at the jail?

334

1	A.	It was a lady.
2	Q.	A lady. And that she broke glasses and
3	wouldn't give you contact solution; is that correct?
4	A.	There was several people that wouldn't
5	give me any. But when they were booking me, she
6	broke my $916 glasses.
7	Q.	Okay. But my only question is do you know
8	the identity of that person?
9	A.	No. She was standing by Eason.
10	Q.	Okay. And you're alleging that that issue
11	with not getting contact solution and breaking your
12	glasses caused you emotional and physical injury?
13	A.	Of course. I can't see without my
14	glasses. I can't even see the big "E" on the eye
15	test without my glasses or contacts. And they
16	wouldn't let me take out my contacts. I begged. I
17	said I can't leave my contacts in.
18	Q.	You've also alleged that some person told
19	you when you were at your bail hearing that if you
20	were to get a lawyer, then the hearing would be
21	postponed. Do you recall that allegation?
22	     MS. NORINS: Objection to the form. I
23	  don't think that's quite how it was phrased,
24	  but . . .
25	A.	Go ahead.

```
                                                              376
 1    typed it?
 2         A.    Correct.
 3         Q.    Okay.  You're asking in this lawsuit to be
 4    awarded money damages.  You know that; right?
 5         A.    I could -- I didn't know if I could get
 6    people arrested and out of their positions.  And,
 7    yes.  Yes.
 8         Q.    Okay.  And what are you asking the jury --
 9    what amount are you asking the jury to award you in
10    this case?
11         A.    A fair amount that covers my health issues
12    now that I can't work like I used to did -- or I used
13    to do.
14         Q.    Okay.  What amount is that?
15         A.    I've seen like -- I don't know.  I mean,
16    just -- it would be a lot of money to take care of me
17    over the years now that my -- I can't work like I
18    used to.
19         Q.    Over --
20         A.    I mean --
21         Q.    Over $50,000?
22         A.    Oh, yeah.  I mean, I couldn't live on
23    $50,000 for years.
24         Q.    Over a hundred thousand dollars?
25         A.    I don't know.  Like the Louis case.  I
```

377

```
1    mean, it goes way up to even he said 22 million.
2         Q.   You would be okay with being awarded
3    $22 million?
4         A.   Of course.  I'd give it to charity.  I
5    give some -- I could give to people and help people.
6    That's what I love doing.
7         Q.   Okay.
8         A.   But I would save some for me this time.  I
9    would save some for me for my health.
10        Q.   How much would you save for yourself?
11        A.   More than what I've done in the past.  I
12   give everything away.
13        Q.   Okay.  When you were talking with the
14   social security disability folks, do you recall
15   explaining to them that you were desperately in need
16   of money?
17        A.   Yes, because I give too much to people.
18        Q.   Okay.  Because you give too much to
19   people?
20        A.   Because I'm sick now and I can't work my
21   jobs.
22        Q.   Who was the last -- do we need to go off
23   the record?
24        A.   No.
25        Q.   Who was the last charity that you gave
```