IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

BRUNSWICK DIVISION

| | | |
|---|---|---|
| EMMA JANE PROSPERO, | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO.: 2:20-cv-110 |
| | ) | |
| DEPUTY RYAN SULLIVAN and | ) | |
| LT. RUSSELL PRESCOTT, | ) | |
| | ) | |
| Defendants. | ) | |

VIDEOCONFERENCE DEPOSITION OF

SHERIFF JIM PROCTOR

10:01 a.m.

March 10, 2021

Brown Readdick Bumgartner Carter Strickland & Watkins
5 Glynn Avenue
Brunswick, Georgia

Annette Pacheco, RPR, RMR, CCR-B-2153

**Gilbert & Jones**

Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

gilbertandjones1@gmail.com
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

1                    APPEARANCES OF COUNSEL

2    On behalf of the Plaintiff:

3         CLARE NORINS, Esq. (By videoconference)
          UNIVERSITY OF GEORGIA SCHOOL OF LAW
4         FIRST AMENDMENT CLINIC
          P.O. Box 388
5         Athens, Georgia  30603
          706-542-1419
6         cnorins@uga.edu

7
     On behalf of the Defendants:
8
          BRADLEY J. WATKINS, Esq. (By videoconference)
9         BROWN READDICK BUMGARTNER CARTER STRICKLAND &
               WATKINS
10        Five Glynn Avenue
          Brunswick, Georgia  31521
11        912-264-8544
          bwatkins@brbcsw.com
12

13
     Also Present:  Kirstiana Perryman
14                  Sam Hamilton

15

16
                         - - -
17

18

19

20

21

22

23

24

25


                    GILBERT & JONES

## INDEX TO EXAMINATIONS

| Examination | Page |
| --- | --- |
| Examination by Ms. Norins | 5 |
| Examination by Mr. Watkins | 136 |

- - -

## INDEX TO EXHIBITS

Plaintiff's
| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 35 | Letter dated May 10, 2017, to Mr. and Mrs. Joseph Prospero from James K. Proctor | 24 |
| Exhibit 36 | Section 16-11-39.2 Unlawful conduct during a 9-1-1- call | 74 |
| Exhibit 37 | Map | 117 |
| Exhibit 38 | Call Log Report | 130 |

(Original Exhibits 35 through 38 have been attached to the original transcript.)

---

1    (Reporter disclosure made pursuant to
2  Article 10.B of the Rules and Regulations of the
3  Board of Court Reporting of the Judicial Council
4  of Georgia.)
5    MS. NORINS:  Good morning,
6  Sheriff Proctor.  Thank you for spending some
7  time with us this morning.  My name is
8  Clare Norins.  I direct the First Amendment
9  Legal Clinic at the University of Georgia School
10  of Law in Athens.  And the Clinic, along with
11  Kim Butler, who's not here today, we represent
12  the plaintiff in this matter,
13  Mrs. Emma Jane Prospero.
14    And I just want to introduce the other
15  folks who you may see on your screen.
16  Sam Hamilton is the legal fellow with the
17  clinic.  Kirstiana Perryman and
18  Janay Alexander are both students in the clinic
19  working on this case.
20    Okay.  Well, let me let Annette go ahead
21  and swear you.
22    SHERIFF JAMES PROCTOR,
23  having been first duly sworn, was examined and
24  testified as follows:
25    EXAMINATION

---

1  BY MS. NORINS:
2    Q.  Okay.  So Sheriff Proctor, have you ever
3  been deposed before?
4    A.  Yes, ma'am.
5    Q.  How many times?
6    A.  Once.
7    Q.  And when was that?
8    A.  It would have been 25 to 30 years ago.
9    Q.  Okay.  I'm going to ask you to speak up
10  because you're very soft.
11    A.  Sorry.
12    MR. WATKINS:  Scoot up if you need to and
13  adjust any of that.
14    A.  It would have been about 25 to 30 years
15  ago.
16    Q.  (By Ms. Norins) And was that deposition
17  taken in your capacity as a law enforcement official
18  or in your personal capacity?
19    A.  Law enforcement.
20    Q.  And were you a party in that lawsuit, a
21  plaintiff or defendant?
22    A.  No, ma'am.
23    Q.  You were just a --
24    A.  Yes, ma'am.
25    THE COURT REPORTER:  I'm sorry.  You were?

---

1    MS. NORINS:  Just a witness.
2    THE WITNESS:  A witness.
3    THE COURT REPORTER:  Say that again.  I'm
4  sorry, Ms. Norins.
5    THE WITNESS:  A witness.
6    THE COURT REPORT:  Okay.  I need the
7  question.  I'm sorry.
8    THE WITNESS:  Oh, I'm sorry.
9    Q.  (By Ms. Norins) You were a witness in the
10  case you were deposed in 25 or 30 years ago?
11    A.  Yes, ma'am.
12    Q.  Have you ever testified under oath in any
13  other context other than the deposition?
14    A.  Yes, ma'am.
15    Q.  What context have you testified under
16  oath?
17    A.  As a law enforcement officer, as the
18  affiant in warrants and a couple of civil lawsuits as
19  a witness.
20    Q.  Okay.  Were you a party in any of those
21  other civil lawsuits?
22    A.  No, ma'am.
23    Q.  About how many times in your lifetime have
24  you testified under oath approximately?
25    A.  I have no idea.

---

1    Q.    Many times; is that fair to say?
2    A.    Yes, ma'am.
3    Q.    So I know you're experienced with it, but
4  just to lay some ground rules so that we all are on
5  the same page.  You are here as a witness in this
6  case.  There's no claim against you individually.
7  We're just trying to understand, you know, a little
8  bit better what happened with Mrs. Prospero and her
9  arrest.
10       It is important that you answer the
11  questions verbally so that the court reporter can
12  take down your answers and that, you know, speak
13  loudly enough so that she can hear you.  I know it's
14  not ideal being on Zoom, but we're doing our best
15  here.
16       If you don't understand one of my
17  questions, please let me know and I'm happy to
18  rephrase.  It is important that you let me finish the
19  question even if you know what the question is going
20  to be because, for the record, we need the complete
21  question and the complete answer on the transcript.
22  And it's hard if we talk over each other.
23       If you need a break at any time, please
24  let me know, and that's fine.  I'll just ask that you
25  answer any pending question before we take the break.

1       And Mr. Watkins may object to some of my
2  questions for the record, but you would still answer
3  them unless he directs you not to answer.
4       Do you have any questions about those
5  parameters?
6    A.    No, ma'am.
7    Q.    Okay.  How are you feeling today?
8    A.    I'm feeling okay.
9    Q.    Okay.  Are you sick in any way?
10    A.    No, ma'am.
11    Q.    All right.  Have you consumed any drugs or
12  alcohol within the last eight hours that would affect
13  your ability to testify today?
14    A.    No, ma'am.
15    Q.    Is there anything affecting your memory
16  today?
17    A.    My wife would say so, but no, ma'am.
18    Q.    Okay.  Is there anything going on with you
19  today that would inhibit or impair your ability to
20  give truthful and accurate testimony?
21    A.    No, ma'am.
22    Q.    Do you have a general understanding of
23  what this case is about?
24    A.    I believe so, yes, ma'am.
25    Q.    What is your understanding?

1    A.    Is that Ms. Prospero is alleging that she
2  was wrongfully arrested for an offense that she
3  committed.
4    Q.    Okay.  And do you understand who the
5  parties in this case are, the plaintiff and the
6  defendant?
7    A.    Two of my deputies and Mr. and
8  Mrs. Prospero.
9    Q.    Okay.  And other than the claim that she
10  was wrongfully arrested, are you aware of any other
11  claims that Mrs. Prospero is alleging in this
12  lawsuit?
13    A.    I'm sorry.  No, ma'am.
14    Q.    Okay.  What did you do to prepare for
15  today's deposition?
16    A.    I spoke with my attorney and we went over
17  a letter that I had written that I'm glad he reminded
18  me of because I honestly don't remember having
19  written it, and the code section dealing with the
20  offense.
21    Q.    And when you say your attorney, who are
22  you referring to?
23    A.    Mr. Watkins.
24    Q.    Do you have a retainer agreement with him?
25    A.    No, ma'am.  He's retained by the insurance

1  company that represents us.
2    Q.    Okay.  Do you have an oral agreement with
3  Mr. Watkins that he'll represent you today at this
4  deposition?
5    A.    Yes, ma'am.
6    Q.    And how long did you meet with Mr. Watkins
7  for?
8    A.    We've been sitting and visiting.  So the
9  actual meeting portion, a few minutes.
10    Q.    And that was this morning before we got
11  started?
12    A.    Yes, ma'am.
13    Q.    Did you speak with anyone else besides
14  Mr. Watkins to prepare for today's deposition?
15    A.    No, ma'am.
16    Q.    Are you aware that other members of the
17  sheriff's office have been deposed in this case?
18    A.    Yes, ma'am.
19    Q.    Who are you aware have already been
20  deposed?
21    A.    One of my 911 operators as well as my
22  chief deputy and my jail administrator.
23    Q.    Have you spoken with any of the folks
24  already deposed about what happened in their
25  depositions?

1    A.    Yes, ma'am.

2    Q.    And who have you spoken with about their

3    depositions?

4    A.    Major Mastroianni and Colonel Byerly.

5    Q.    When did you speak with Major Mastroianni

6    about his deposition?

7    A.    Yesterday and the day before.

8    Q.    Okay.  So the day before would have been

9    the first conversation with Mastroianni about his

10    deposition?

11    A.    Yes, ma'am.

12    Q.    And what was the substance of that

13    conversation that you had with Mastroianni?

14    A.    The length of the deposition.  Some of the

15    content.  That was pretty much -- we didn't go into a

16    whole lot of depth as to what -- what he was

17    questioned about or anything.

18    Q.    What did he tell you about the content of

19    his deposition?

20    A.    He -- he said there were a lot of what-if

21    questions and, of course, Major Byerly said the same

22    thing.  I really can't remember any specifics that he

23    told me.

24    Q.    Okay.  And in your conversation with

25    Mastroianni yesterday about his deposition, what was

1    the content of that conversation?

2    A.    It was very brief.  It was basically about

3    the time and pretty much it.

4    Q.    The time meaning how long the deposition

5    was?

6    A.    Yes, ma'am.

7    Q.    And you said you also spoke with

8    Colonel Byerly about his deposition; right?

9    A.    Yes, ma'am.

10    Q.    And when did you speak to him?

11    A.    Ma'am?

12    Q.    When did you speak to Byerly about his

13    deposition?

14    A.    Yesterday afternoon.

15    Q.    And what was the content of that

16    conversation?

17    A.    He told -- it was about what-if questions,

18    the time, the amount, how long the deposition took,

19    that it was like what-if they were shooting downrange

20    but they turned around and shot in a different

21    direction.

22    The fact that there's a hunting club

23    behind the -- the community.  I can't even remember

24    the name of the little neighborhood.  I -- I can't

25    remember much on the specifics beyond that.

1    Q.    Did Byerly give you any advice about how

2    to answer questions during the deposition?

3    A.    No, ma'am.

4    Q.    Did Mastroianni give you any advice about

5    how to answer questions during your deposition?

6    A.    No, ma'am.

7    Q.    Have you reviewed any audio recordings in

8    preparation for this deposition?

9    A.    No, ma'am.

10    Q.    Have you reviewed any transcripts?

11    A.    No, ma'am.

12    Q.    Anything else that you did to prepare for

13    today's deposition that we haven't already discussed?

14    A.    No, ma'am.

15    Q.    So when did you first become sheriff of

16    Camden County?

17    A.    I was elected in 2012 and seated January

18    2013.

19    Q.    And was that your first term as sheriff?

20    A.    Yes, ma'am.

21    Q.    And are you now in your second term, third

22    term?

23    A.    I'm in my third term, starting my third

24    term.

25    Q.    Okay.  And what are your general duties

1    and responsibilities as sheriff?

2    A.    Enforce the laws of the state of Georgia

3    and to uphold the morals of the community, to run the

4    county jail, and to act as the arm and the sword of

5    the court.

6    Q.    Do all of the employees of the Camden

7    County Sheriff's Office ultimately report to you?

8    A.    When you say report to me, what do you

9    mean?

10    Q.    Are you at the top of the organizational

11    chart?  Does everybody report up to you?

12    A.    Yes, ma'am.

13    Q.    And before you were elected sheriff in

14    2012, were you already employed by the Camden County

15    Sheriff's Office?

16    A.    Yes, ma'am.

17    Q.    And when did you first start your

18    employment with the Camden County Sheriff's Office?

19    A.    I believe it was in 1987.  It may have

20    been '88.

21    Q.    Can you just walk me through the different

22    positions that you've held up until the time you were

23    elected sheriff.

24    A.    I started out as a jailer; went to

25    dispatch; from dispatch to court security; court

1 security to patrol. While on patrol, I decided to
2 run for public office. I was -- I had to resign my
3 deputy's commission.
4          As a civilian, I was put in as the
5 assistant jail administrator. It was the only open
6 position at the time. From there to jail
7 administrator, and I sat in that position for 14
8 years until such time as my predecessor was elected.
9          I was stripped of my rank and my pay cut
10 in half and sent across the street as a bailiff. I
11 stayed for three years. It was a hostile work
12 environment. So I resigned and went to work for
13 Brunswick Police Department as a patrol officer. At
14 which time I decided that I would run for sheriff.
15 And ran and was elected and back at the Camden County
16 Sheriff's Office. I was gone for approximately nine
17 months.
18    Q.    Okay. So when you were the jail
19 administrator, you said that was for 14 years?
20    A.    Yes, ma'am.
21    Q.    And what were those years? From when to
22 when?
23    A.    I don't know.
24    Q.    Approximately.
25    A.    Let's see. Tommy would have been -- so

1 I'm -- 2008, back 14 years.
2    Q.    Okay.
3    A.    And that's a guesstimation.
4    Q.    Okay. So 2008 was when you were, I guess,
5 demoted to bailiff?
6    A.    Yes, ma'am.
7    Q.    And during what period of time were you
8 working for the Brunswick Police Department? You
9 said it was about nine months. But what years?
10    A.    March of -- March of 2012 and was elected
11 in November of 2012. Seated in January of '13.
12    Q.    As sheriff --
13    A.    Yes, ma'am.
14    Q.    -- of Camden County?
15    A.    Yes, ma'am.
16    Q.    Okay. And either working for the Camden
17 County Sheriff's Office or for the Brunswick Police
18 Department, have you ever had any disciplinary action
19 against you?
20    A.    Not at Brunswick. At Camden County
21 Sheriff's Office, it would have been 25 years ago or
22 so, I'm guessing. There was a policy that had been
23 put in place that before you can call an
24 investigator, you had to ask your supervisor. I was
25 written up for that, but it was later removed because

1 the investigator showed up. I didn't call him. And
2 it was on a suicide.
3    Q.    Other than that incident, which was, you
4 said, removed from your file, your record; is that
5 right?
6    A.    I -- I believe that it was.
7    Q.    Other than that incident, have you had any
8 other disciplinary action against you while working
9 for the Camden County Sheriff's Office?
10    A.    No, ma'am.
11    Q.    All right.
12    A.    Excuse me.
13    Q.    Is one of the policies of the Camden
14 County Sheriff's Office to serve and protect the
15 residents of Camden County?
16    A.    Yes, ma'am.
17    Q.    And as part of that responsibility of the
18 sheriff's office, is it important that the sheriff's
19 deputies treat the members of the community with
20 respect?
21    A.    Yes, ma'am.
22    Q.    And why is that important?
23    A.    Because it's the right thing to do.
24    Q.    Treating community members with respect,
25 does that assist the sheriff's office in any way in

1 performing its functions?
2    A.    I don't understand.
3    Q.    Is the sheriff's office better able to
4 perform its functions if it treats community members
5 with respect?
6    A.    Yes, ma'am. It usually elicits better
7 cooperation.
8    Q.    From the members of the community?
9    A.    Yes, ma'am.
10    Q.    Is it important that members of the
11 community feel a sense of trust in the sheriff's
12 office?
13    A.    Absolutely. Yes.
14    Q.    And why is that?
15    A.    Without trust, there's no foundation.
16    Q.    When you say "no foundation," what do you
17 mean?
18    A.    Our standing in the community as
19 professional law enforcement.
20    Q.    Is it difficult for the sheriff's office
21 to do its job if the members of the community don't
22 trust the sheriff's office?
23    A.    I believe that it would be. Fortunately,
24 we don't have that problem.
25    Q.    Is it important that members of the

1    community feel that they can safely contact the
2    sheriff's office for help?
3       A.    Absolutely.
4       Q.    And why is that important?
5       A.    It's back to the trust issue.  They have
6    to be able to trust us and feel comfortable to reach
7    out to us.
8       Q.    And if community members are afraid to
9    contact the sheriff's office, how does that impair
10   your office's ability to perform its functions?
11       A.    I honestly don't know because we don't
12   have that problem.
13       Q.    But do you believe it would impair your
14   functioning if the members of the community didn't
15   trust the sheriff's office?
16       A.    I believe that it would.
17       How long have you been aware of
18   Mrs. Emma Jane Prospero as a resident of Woodbine,
19   Georgia?
20       A.    I think my first contact with her would
21   have been not long after I was seated as sheriff.
22       Q.    So sometime in 2013?
23       A.    I'm guessing.
24       Q.    Okay.  So before becoming sheriff, have
25   you had any interactions or knowledge of her?

1       A.    No.
2       Q.    And what do you recall being your first
3    sort of introduction to her?
4       A.    I honestly don't remember.
5       Q.    Sorry.  You're getting quiet.
6       A.    I'm sorry.  I honestly don't remember what
7    the first contact was.  Whether it was a phone call
8    or -- I don't know.  I don't remember.
9       Q.    Okay.  So since 2013 and the present, how
10   many times would you estimate that you've interacted
11   with Mrs. Prospero?
12       A.    I'm going to guess a couple of times on
13   the phone.  She and her husband came to my office one
14   time that I can remember.  And I went to their
15   residence one time.
16       Q.    Okay.  So the couple of times that you've
17   interacted with her over the phone, can you tell me
18   when the last time was?
19       A.    I have no idea.  I can't remember.
20       Q.    Can you give me an estimate of how long
21   ago it was?
22       A.    I'm going to say it's been more than a
23   year ago.
24       Q.    Was it prior to her arrest?
25       A.    Oh, yes, ma'am.

1       Q.    Okay.  So she was arrested in January of
2    2019, which was more than two years ago.  So would
3    your last contact with her on the phone have been
4    more than two years ago?
5       A.    Yes, ma'am.
6       Q.    And what was your last contact on the
7    phone with her about?
8       A.    I don't remember.
9       Q.    Do you remember any of like general nature
10   of what it was about?
11       A.    I'm sure it was either about the
12   ornamental ducks in the pond or else gunshots.
13       Q.    And why do you say you're sure it was
14   about one of those two topics?
15       A.    Because those were the topics discussed
16   whenever we would talk.
17       Q.    Okay.  And the times on the phone with her
18   prior to this last time, there was some time years
19   ago, what were those earlier phone contacts about?
20       A.    They would be the ducks or the gunshots.
21       Q.    And you said Mrs. Prospero and her husband
22   came to your office on one occasion; is that right?
23       A.    Yes, ma'am.
24       Q.    And approximately when was that?
25       A.    I'm going to guess somewhere in either

1    2013 or '14.  And like I say, I'm guessing.
2       Q.    I understand.  And so that would have been
3    pretty early on in your tenure as sheriff?
4       A.    Yes, ma'am.
5       Q.    And when the Prosperos came to your
6    office, what was the subject of the meeting?
7       A.    Gunshots in the neighborhood, in the
8    surrounding wooded area, about -- I can't remember
9    the neighbor's name that had built a range in his
10   backyard.
11       Q.    And this in-person meeting in your office,
12   did it cover any other topic areas besides gunshots
13   and the neighbor who built the target range?
14       A.    Not that I can recollect.
15       Q.    Did it involve the concerns that
16   Mrs. Prospero had with her neighbor Stacy Hamilton?
17       A.    I don't recall that being part of when
18   they came by.  When I paid a visit to their
19   residence, her name was brought up and she was
20   discussed.
21       Mrs. Hamilton was discussed?
22       A.    Yes, ma'am.
23       Q.    Okay.
24       A.    I believe that's her last name.  I just --
25   I remember Stacy.

1    Q.    Okay.  So sticking for a minute with the
2  meeting in your office, what was the outcome of that
3  meeting with the Prosperos?
4    A.    It was a very long meeting.  She -- "she"
5  being Mrs. Prospero -- talked quite a bit.  I just --
6  I remember the gunshots being a major topic.
7    Q.    And how did you leave it with them at the
8  end of that meeting?
9    A.    I honestly don't remember.
10   Q.    Had you invited them for that meeting or
11 how did that meeting come about?
12   A.    I think they called my assistant and made
13 an appointment to come by.
14   Q.    Is that something that you do as part of
15 your duties as sheriff?  You meet with community
16 members who want to see you?
17   A.    Yes, ma'am.
18   Q.    And that meeting in your office, was that
19 before or after the letter that you wrote to them
20 that you reviewed today?
21   A.    It would have been before.
22   Q.    And so that letter -- let's go ahead and
23 mark that as Plaintiff's Exhibit 35.  This is Bates
24 No. P52.
25

1         (Plaintiff's Exhibit 35 was marked for
2         identification.)
3    Q.    (By Ms. Norins) And just for the record,
4  the letter is dated May 10th, 2017.
5    A.    Yes, ma'am.
6    Q.    So your in-person meeting with the
7  Prosperos in your office would have been before that
8  date?
9    A.    Yes, ma'am.
10   Q.    Okay.  And then the time that you went to
11 the Prospero's home to meet with them, when was that
12 approximately?
13   A.    It would have been before this letter was
14 written.
15   Q.    Before May 10th, 2017?
16   A.    Yes, ma'am.
17   Q.    And did the meeting with them at their
18 home happen before or after the meeting in your
19 office?
20   A.    After.
21   Q.    And what was the subject of the meeting
22 where you went to their home?
23   A.    It initiated that there was, I believe,
24 that there was a gunshot that -- or a bullet that
25 broke one of the windows in the house.

1    Q.    And did you go out to look at the window?
2    A.    I did.
3    Q.    What did you observe?
4    A.    It was a window facing the pond behind the
5  house.  It was a double-pane window.  The interior
6  pane was broken but the exterior pane was intact.  So
7  it had to have been broken from the inside, not a
8  gunshot from the outside.
9    Q.    Okay.  And did you go alone to meet with
10 the Prosperos or was anyone from the sheriff's office
11 with you?
12   A.    I was by myself.
13   Q.    Do you recall an incident where the
14 Prosperos reported a window on one of their
15 outbuildings being broken by a bullet or shattered by
16 a bullet?
17   A.    No.  I don't recall that.  Excuse me.
18   Q.    And you said that the neighbor Stacy was
19 also a subject of this meeting at your -- or at the
20 home of the Prosperos; is that right?
21   A.    Yes, ma'am.
22   Q.    And what did you discuss with them
23 regarding the neighbor Stacy?
24   A.    Mrs. Prospero -- well, Mr. Prospero was
25 there with us, but Mrs. Prospero was complaining

1  about the ornamental ducks in the community pond
2  defecating on her dock, and that Stacy was somehow
3  harboring these ducks.  That they would come to her
4  in the evening and she would release them back in the
5  morning and -- excuse me.
6         And she was complaining about some of the
7  yard art that Stacy had in her backyard, like a
8  mirror or something, that basically the Prosperos
9  didn't like it.
10   Q.    Okay.  Did the Prosperos or Mrs. Prospero
11 ever speak to you about Stacy assaulting her?
12   A.    No, ma'am.  She had made mention that when
13 the -- they first moved there, that they were
14 friends.  But for some reason, they became not
15 friends.  But I don't know any of the details.
16   Q.    Did Mrs. Prospero mention anything about
17 Stacy's mother who also, I guess, lived next door,
18 assaulting her, meaning assaulting Mrs. Prospero?
19   A.    No, ma'am.  Not that I recollect.
20   Q.    And it's my understanding that the
21 Prosperos and this neighbor, Stacy, had reciprocal
22 stay-away orders.  I don't know what it's called
23 technically in Camden County, but stay-away orders
24 from each other.  Were you involved in any of that?
25   A.    No, ma'am.  I don't know anything about

1   it.
2       Q.   Okay.  Sorry?  You're getting really soft.
3       A.   I'm sorry.  No, ma'am.  I don't know
4   anything about it.
5       Q.   Okay.
6       A.   I'm sorry.
7       Q.   Oh, I think they're called good behavior
8   bonds.  Does that sound right?
9       A.   Yes, ma'am.  Good behavior bonds do exist.
10      Q.   And what is a good behavior bond?
11      A.   It would be where a magistrate orders them
12  to stay away from each other, to basically behave.
13  They put up a bond.  And if they violate it, they
14  forfeit the bond and would have to put up another
15  one, is my understanding.
16      Q.   Okay.  And do you recall anything about
17  the Prosperos and this neighbor Stacy having good
18  behavior bonds against each other?
19      A.   No, ma'am.  I don't know anything about
20  that.
21      Q.   Okay.  What was the outcome of your
22  meeting with the Prosperos at their home?
23      A.   I -- I -- when you say "the outcome,"
24  what -- what do you mean?
25      Q.   What was the resolution of the meeting or

1   the results of the meeting?
2       A.   Well, they -- they discussed the
3   ornamental ducks.  They didn't like some of the yard
4   art in Stacy's backyard.  They allege that another
5   neighbor had killed their ornamental fish in their
6   fish pond.  That somebody had put a fence across the
7   property line onto their property.
8            I basically listened to their complaints,
9   but nothing was done on my behalf afterwards.
10      Q.   Did you interview any of these neighbors
11  that they reported having issues with?
12      A.   No, ma'am.  From my determination, it was
13  all frivolous.
14      Q.   And how did you determine that?
15      A.   Just by being there.  I mean, the window
16  being broken from the inside, not the outside, and
17  them alleging that it was shot with a firearm.
18           The ornamental ducks that are in the
19  community pond that they're a part of is just -- the
20  ducks were pooping on their dock, and they didn't
21  like that.  But they wanted, for some reason, law
22  enforcement to remove the ducks.  It just -- it's
23  very frivolous.
24      Q.   Who --
25      A.   Those are not law enforcement concerns.

1       Q.   You've called these ducks ornamental.
2       A.   They're not wild ducks.
3       Q.   Okay.  So somebody put them there on the
4   pond?
5       A.   Yes, ma'am.
6       Q.   And who was that?
7       A.   I have no idea.
8       Q.   So it was possibly the neighbor Stacy who
9   put them there?
10      A.   I have no idea.
11      Q.   And the allegation about the Prosperos --
12  withdrawn.
13           The Prospero's allegation about their fish
14  being killed, what led you to believe that was
15  frivolous?
16      A.   There was nothing to substantiate it other
17  than an allegation.
18      Q.   Did you speak to the person they made the
19  allegation against?
20      A.   No, ma'am.  I chose not to.
21      Q.   If someone comes on somebody else's
22  property and kills animals on the person's property,
23  is that a law enforcement issue?
24      A.   Allegation of it or if it actually
25  happened?

1       Q.   Well, is that an alleged crime?  If I
2   report someone came on my property and killed my
3   animals on my property, would I be alleging a crime?
4       A.   Yes, you would be alleging a crime.
5       Q.   And would it be a kind of crime that the
6   sheriff's office has jurisdiction to look into?
7       A.   Sure.
8       Q.   And so why did you not look into
9   Mrs. Prospero's allegation of that sort of crime?
10      A.   I looked at the fish pond and there were
11  fish in there.  They weren't dead.
12      Q.   Had they replaced the fish that had been
13  killed or allegedly been killed?
14      A.   I have no idea.
15      Q.   And the allegation about the neighbor
16  having put a fence onto their property, the
17  Prospero's property, is that kind of allegation
18  something the sheriff's office has jurisdiction to
19  look into?
20      A.   That would be a civil matter.
21      Q.   Would that be considered any sort of
22  trespass if you put a fence on someone else's
23  property?
24      A.   I wouldn't consider it a trespass.
25      Q.   And so if it's a civil matter, who would

1  you refer the Prosperos to to address that issue of
2  the fence put on their property?
3      A.    I'm sorry.  They would need to hire an
4  attorney.
5      Q.    Okay.  So to sum up, when you met with
6  them at their house, you listened to their concerns
7  and you took no further action?
8      A.    Correct.
9      Q.    Okay.  So we've talked about a couple of
10  phone calls that you had with the Prosperos, a
11  meeting at your office and a meeting at their home.
12  Any other contacts that you had with Mrs. Prospero?
13      A.    No, not that I can recall.
14           Well, would you consider writing the
15  letter a contact?
16      Q.    Well, let's talk about the letter.  What
17  prompted you to write this letter that's dated May
18  10th, 2017, that we've marked as Plaintiff's Exhibit
19  35, and is Bates No. P52?
20      A.    After multiple phone calls to my office,
21  the 911 center, the dispatch, multiple, multiple
22  phone calls, and it always seemed as though they were
23  targeting the neighbors for various things, either
24  the ornamental ducks, a lot about the shooting.
25           It seemed as though she was trying to use

GILBERT & JONES

1  my office to further her interests in the
2  neighborhood.  Such as the shooting, she was
3  apparently very opposed to anybody shooting anywhere
4  in the neighborhood, even in the adjoining wooded
5  lands.
6           And I was trying to impress upon her the
7  fact that the 911 center, you know, this is for
8  emergencies.  This other number's for nonemergencies.
9      Q.    Okay.  So looking at the letter, it starts
10  out:  "Mr. and Mrs. Prospero, I have assigned Chief
11  Deputy Charles Byerly to your case."  And so when you
12  say "your case," what were you referring to?
13      A.    Well, there wasn't a formal case number
14  assigned, as far as I knew.  But just to their
15  concerns, their complaints, I had asked Chuck, the
16  chief deputy, to look into them.  And that when they
17  called, if there was a complaint, they need to ask
18  for him and go with him with it.
19      Q.    Okay.  And then the letter continues:  "He
20  will be handling any questions and concerns you may
21  have."  And then you continue:  "We have addressed
22  the duck situation."
23           So what did you mean by "we have addressed
24  the duck situation"?
25      A.    I told them that they were ornamental

GILBERT & JONES

1  ducks.  That if they wanted to have them removed,
2  they would have to capture them on their property and
3  then have them removed.  They couldn't go on the
4  other people's property to do that.
5      Q.    And how would they have them removed?
6      A.    Call animal control.
7      Q.    Okay.  And then the letter continues in
8  the second paragraph:  "In your e-mail, you've stated
9  I've made promises about protecting you from your
10  neighbor Stacy."  So what e-mail are you referring
11  to?
12      A.    Apparently she sent an e-mail to my office
13  or to me.  I don't recall what her e-mail said.
14           MS. NORINS:  We would call for production
15      of the e-mail that is referenced in the
16      Sheriff's May 10th, 2017, letter to
17      Mrs. Prospero.
18      Q.    (By Ms. Norins)  And then the letter
19  continues:  "However, I've told you if you feel
20  threatened to call 911 and a deputy will be
21  dispatched to your location."
22           So what did you mean by the term
23  "threatened," "if you feel threatened"?
24      A.    That's what it says, "if you feel
25  threatened."

GILBERT & JONES

1      Q.    And would that include any -- any kind of
2  threat?  Verbal?  Physical?  Written?
3      A.    Sure.
4      Q.    And would that same advice to call 911 if
5  you feel threatened apply if the source of the threat
6  was something other than the neighbor,
7  Stacy Hamilton?
8      A.    Sure.  Any threat.
9      Q.    So if the Prosperos felt that their safety
10  was threatened, would it be appropriate for them to
11  contact the sheriff's office?
12      A.    Yes, ma'am.
13      Q.    And if the Prosperos felt their safety was
14  threatened, would it be appropriate for them to
15  contact 911?
16      A.    Sure.
17      Q.    Then your letter continues:  "I will not
18  allow you or anyone else to use my office to further
19  your personal agendas.  If you have an emergency,
20  call our 911 center."
21           And so how do you define emergency as you
22  used it in the context of your letter to the
23  Prosperos?
24      A.    I don't know what you're looking for.  I
25  don't understand your question.

GILBERT & JONES

1    Q.    How do you define the term "emergency"?
2    A.    An emergent situation. I mean --
3    Q.    Emergent means developing. So that's a
4  little bit different than emergency. How would you
5  define the term emergency?
6          MR. WATKINS: I'm going to object to form,
7          Clare. He just gave you an answer and you
8          didn't like it, and then you asked the same
9          question because you redefined the word he gave
10         you.
11   Q.    (By Ms. Norins) So your definition of
12  emergency is an emerging situation?
13   A.    An emergent situation. It's an emergency.
14  I mean, I don't understand how you want me to define
15  an emergency. I'd have to get a dictionary.
16   Q.    Well, in your role as the sheriff, do you
17  have to make determinations about what is an
18  emergency and what isn't in order to allocate your
19  resources?
20   A.    Occasionally, yes, ma'am.
21   Q.    And so how do you define emergency for
22  such purposes?
23   A.    If it's an emergency, something that needs
24  immediate attention.
25   Q.    Is the term emergency a somewhat

1  someone is standing too close to your home or the
2  bullets are coming too close to your home and
3  shooting, could that be considered an emergency?
4          MR. WATKINS: Object to form. Compound
5          question.
6    A.    If the bullets are -- if they're aiming at
7  your home and shooting, that could be an emergency.
8  But if they're just shooting a gun and the sound
9  bothers you, that's not an emergency.
10   Q.    (By Ms. Norins) Okay. When folks call 911
11  in Camden County -- well, withdrawn.
12         Is there any expectation that people
13  living in Camden County be able to determine for
14  themselves whether a situation is an emergency or not
15  before contacting the sheriff's office?
16   A.    Yeah. Could you rephrase it. I don't
17  understand what you're saying -- what you're asking.
18   Q.    Well, are -- are citizens or residents of
19  the county expected to be able to determine what is
20  an emergency versus what is not an emergency before
21  they contact the sheriff's office?
22   A.    Yeah. Yes, ma'am, I believe so.
23   Q.    Okay. And how are they expected to
24  determine what is an emergency versus what is not an
25  emergency?

1  subjective word? Can it mean different things to
2  different people?
3    A.    Yes, ma'am.
4    Q.    So a situation that one person perceives
5  to be an emergency to someone else may not seem like
6  an emergency; is that fair?
7    A.    I suppose so. Yes, ma'am.
8    Q.    Could gunshots coming too close to your
9  home be legitimately considered an emergency?
10   A.    Gunshots coming too close to your home,
11  are you referring to the sound?
12   Q.    If someone is shooting a gun too close to
13  your home, could that legitimately be considered an
14  emergency?
15         MR. WATKINS: Object to form. The witness
16         is confused as to what you're asking. He's
17         asked for a clarification. You haven't provided
18         it.
19         MS. NORINS: I believe I just did. Could
20         you read back the last question, Annette.
21         (The record was read by the reporter as
22         requested.)
23   A.    Again, are you talking about sound or
24  bullets?
25   Q.    (By Ms. Norins) I'm talking about if

1    A.    Common sense.
2    Q.    And if a resident has a good-faith belief
3  that something is an emergency and calls 911, and the
4  sheriff's office disagrees and says, no, that's not
5  an emergency, would that constitute any kind of
6  unlawful conduct by the citizen for having called
7  911?
8    A.    Single phone call or harassing phone
9  calls?
10   Q.    If they call 911 because they believe
11  there's an emergency and the sheriff's office's
12  disagrees and says, no, that's not an emergency,
13  would that constitute any unlawful conduct by the
14  person who made the call?
15   A.    Again, a single phone call or multiple
16  harassing phone calls?
17   Q.    This question is proposing a single phone
18  call. If they call and it's -- they think it's an
19  emergency but the sheriff's office says, no, it's
20  not, is there anything unlawful about their having
21  called 911?
22   A.    It still could be.
23   Q.    It still could be what?
24   A.    I'm going to have to ask you to ask your
25  question again.

1    MS. NORINS:  Annette, can you just read
2  back the last question.
3        (The record was read by the reporter as
4  requested.)
5    A.    It could be.  It could be unlawful and
6  harassing.
7    Q.    (By Ms. Norins) Based on a single phone
8  call?
9    A.    It's possible, yes, ma'am.
10   Q.    And under what circumstance would that
11 single phone call be unlawful?
12   A.    If it's harassing, interrupting,
13 disturbing the 911 center and its normal operation.
14   Q.    What do you mean by "harassing"?
15   MR. WATKINS:  Objection again to form.  I
16   mean, these are plain English words that you
17   you're continually asking him to redefine.  You
18   can answer as best you can.
19   A.    Harassing is exactly what I said, and
20 that's what it means.  Harassing.  Common sense.
21   Q.    (By Ms. Norins) So you're not able to
22 explain any further what harassing means?
23   A.    It's harassing.
24   Q.    Okay.  So someone who calls 911 one time
25 and says it's an emergency and the sheriff's office

1  says, no, it's not, you would consider that
2  harassing?
3        MR. WATKINS:  Object to form.  That
4    mischaracterizes his testimony.  His testimony
5    was that a single phone call could, in a
6    hypothetical situation, be construed as
7    harassing.
8    Q.    (By Ms. Norins) And so I've asked what do
9  you mean by harassing in that context?  How could the
10 one phone call be harassing?
11       MR. WATKINS:  The witness said if it were
12   correct.
13       THE COURT REPORTER:  I'm sorry,
14   Mr. Watkins.  Could you repeat that.  I couldn't
15   hear you.
16       MR. WATKINS:  I said the witness did as
17   best as he could and said in the circumstances
18   that it would be harassing.  The same question's
19   been asked and answered and -- and Clare, you
20   mischaracterized his testimony in restating the
21   question.
22   Q.    (By Ms. Norins) Sheriff Proctor, can you
23 give me an example of what you mean by a single phone
24 call to 911 could be harassing?
25   A.    Not off the top of my head.

1    Q.    Okay.  So referring back to your letter of
2  May 10th, 2017, that's marked as Plaintiff's Exhibit
3  35, you said to the Prosperos, "If you have an
4  emergency, call our 911 center, or if you have a
5  concern, feel free to call the nonemergency number,
6  912-729-1442."  Did I read that correctly?
7    A.    Yes, ma'am.
8    Q.    And what is that 1442 number?  Where does
9  that call into?
10   A.    It's a nonemergency line into 911.
11   Q.    And you said to the Prosperos, "Call that
12 number if you have a concern."  And what did you mean
13 by "a concern" in the context of that letter?
14   A.    If it's not an emergency.
15   Q.    So any concern that's not an emergency,
16 they should call the 1442 number.  Is that what you
17 meant?
18   A.    Yes.  That's what I meant.  That's exactly
19 what the letter says.
20   Q.    Okay.  So if they had a concern about
21 gunshots and it wasn't an emergency, should they call
22 the 1442 number?
23   A.    They could.
24   Q.    Would that be consistent with what your
25 letter advised them to do?

1    A.    Sure.  If it -- a legitimate concern.
2    Q.    And the sheriff's office also has a
3  general number that's on the letter.  It's up at the
4  top part of the letterhead, the 912-510-5110 number?
5    A.    Yes, ma'am.
6    Q.    And where does that number ring to?
7    A.    The front office.
8    Q.    Of the sheriff's office?
9    A.    Yes, ma'am.
10   Q.    And is that also a number that community
11 members can call if they have a concern?
12   A.    Yes, ma'am.
13   Q.    How was this letter, this May 10th, 2017,
14 letter delivered to the Prosperos?
15   A.    I'm assuming via U.S. mail, but I honestly
16 don't know.
17   Q.    Okay.  Do you recall if you personally
18 handed it to them or brought it to them?
19   A.    No, ma'am.  Excuse me.
20   Q.    All right.  I want to refer you to an
21 exhibit that we marked yesterday.  Hold on one
22 second.  I have to find it.  This was previously
23 marked as Plaintiff's Exhibit 24.  It's Bates No. 40
24 through 42.
25       MR. WATKINS:  Clare, these are the

1  sheriff's office communications call log?
2      MS. NORINS: No. It's the Congressman
3  Jack Kingston complaint.
4      MR. WATKINS: It's Bates No. 42?
5      MS. NORINS: 40 through 42.
6      MR. WATKINS: Gotcha. Okay. I've just
7  opened it up.
8      Q.    (By Ms. Norins) Okay. So I'm referring --
9  sorry. Do you have it?
10      MR. WATKINS: Yeah. Do you want to give
11  him a second to look at it or --
12      MS. NORINS: Yeah. If you could just look
13  at the handwritten complaint that starts on the
14  second half of page 40 and continues on to the
15  top half of page 41. Just let me know when
16  you've had a chance to read the handwritten
17  complaint.
18      MR. WATKINS: Take your time.
19      Okay.
20      Q.    (By Ms. Norins) Okay. Have you had a
21  chance to read the handwritten complaint from
22  Mrs. Prospero?
23      A.    It's difficult to read, but, yes, ma'am.
24      Q.    So, again, for the record, this is
25  Exhibit, Plaintiff's Exhibit 24, and it's on pages

1  Bates numbered 40 through 41, a handwritten complaint
2  from the Prosperos to Congressman Jack Kingston.
3      I'm referring you to page -- the top of
4  page 41: The complaint says: "We live in Runnymeade
5  neighborhood." Is that a neighborhood in Woodbine,
6  Georgia?
7      A.    It's outside the city limits of Woodbine,
8  but, yes, ma'am. It's considered Woodbine. It has a
9  Woodbine mailing address.
10      Q.    And does that refresh your recollection
11  that that's the neighborhood where the Prosperos
12  live?
13      A.    Yes, ma'am.
14      Q.    And the complaint continues: "Several
15  neighbors here have been firing guns all the time
16  here. The sheriff's office has been to our home many
17  times after we have called hundreds of times."
18      Is that accurate that she had called
19  hundreds of times or that the Prosperos collectively
20  have called hundreds of times?
21      A.    I don't know.
22      Q.    She said: "We have had two windows
23  broken. Even a neighbor that has two small children
24  said that a bullet came right down in front of her.
25  The sheriff's office just keeps saying that they are

1  trying to get this stopped. And that is crazy. It
2  has been two and-a-half years and they keep telling
3  us to call each time to document it."
4      So in any of your dealings or your
5  deputies' dealings with the Prosperos, have you told
6  them to call to document if they had concerns about
7  gunshots or shootings?
8      A.    I never told them that.
9      Q.    Do you know if your deputies or your chief
10  deputy had told them that?
11      A.    I have no idea.
12      Q.    Okay. And then it continues their
13  concern, they're scared about the gunshots.
14      Were you aware of this complaint when it
15  was forwarded to the sheriff's office, this complaint
16  to Congressman Kingston?
17      A.    It rings a bell, yes, ma'am.
18      Q.    It looks like Chuck Byerly maybe addressed
19  it according to the first page of this exhibit?
20      A.    Quite possibly so, yes, ma'am.
21      Q.    Okay. Do you recall having any -- any
22  interactions with anyone from Congressman Kingston's
23  office about this complaint?
24      A.    No, ma'am.
25      Q.    And it looks like on page 41, there's also

1  a letter from Congressman Kingston to the Governor of
2  Georgia at the time, who was Nathan Deal. Do you
3  know why that was sent to the sheriff's office?
4      A.    No, ma'am.
5      Q.    Do you recall having any interactions with
6  anyone from the governor's office about the
7  Prosperos?
8      A.    It seems like I remember something being
9  sent from the governor's office to refer to our
10  office.
11      Q.    And did you have any personal dealings
12  with that?
13      A.    No, ma'am.
14      Q.    Would that have been handled by
15  Colonel Byerly?
16      A.    Probably.
17      Q.    At any point have you ever encouraged the
18  Prosperos to call the sheriff's office when they have
19  concerns other than the letter that we looked at from
20  May 10, 2017?
21      A.    Not that I recall.
22      Q.    So that letter was the only time you
23  communicated with them about when and how they should
24  call the sheriff's office?
25      A.    Yes, ma'am, to the best of my knowledge.

1    Q.    Did you ever use a phrase with
2 Mrs. Prospero the squeaky wheel gets the oil or the
3 squeaky wheel gets the grease?
4    A.    No, ma'am.
5    Q.    Is it legal in Camden County for someone
6 to shoot a gun on their own property?
7    A.    Yes, ma'am.
8    Q.    Are there any limitations on that right to
9 shoot a gun on your own property?
10    A.    As long as it's inside the scope of the
11 law. I mean, Georgia law says that you have to be so
12 far from a public road or it has to be done in a safe
13 manner. I mean, as long as it's within the
14 limitations.
15    Q.    So there are some limitations on shooting
16 a gun on your own private property?
17    A.    As long as it's done safely.
18         MR. WATKINS:  Do you need to take that
19 call?
20         THE WITNESS:  It's Sheriff Welcher in
21 Savannah.
22         MR. WATKINS:  Do you want to take that?
23         THE WITNESS:  No.  I'll call him back.
24         MR. WATKINS:  Clare, we've got -- the
25 sheriff has his phone and may get important

GILBERT & JONES

1    A.    No, ma'am.  It's a Georgia Code section
2 and I don't know it off the top of my head.
3    Q.    Would the roads in the Runnymeade
4 neighborhood be considered public roads?
5    A.    I don't know.  I don't know if they're
6 private -- if they were ever deeded to the county or
7 if they're still property of the subdivision.  I
8 don't know.
9    Q.    So if someone, say the Prosperos, was
10 making a complaint about gunshots in the
11 neighborhood, would that be relevant to look into to
12 whether the roads in that neighborhood are public
13 roads for purposes of the Georgia Code section?
14    A.    I would think that the deputies probably
15 did.
16    Q.    Does Camden County have an ordinance on
17 nuisances?
18    A.    Yes, ma'am.
19    Q.    And does that ordinance define noise as a
20 nuisance that can violate the ordinance?
21    A.    I guess.  I've never looked at it.
22    Q.    Okay.  You've never looked at the Camden
23 County ordinances?
24         MR. WATKINS:  Object to form.
25    A.    I've looked at some of them.  I've never

GILBERT & JONES

1 calls.  He has other sheriffs calling him.  So
2 if we need to pause, I'll just let you know.
3 Okay?
4         MS. NORINS:  Okay.  Yeah, that's no
5 problem, Sheriff, if you need to take a call or
6 something.
7    Q.    (By Ms. Norins) Okay.  So you said there
8 are requirements that shooting on your own property
9 be done safely; is that fair to say?
10    A.    Sure.  Yes, ma'am.
11    Q.    And so what are those safety requirements
12 for shooting on your own property?
13    A.    It has to be done safely.  I mean, you
14 can't put someone's life at danger -- in danger.
15    Q.    Are you allowed to stand on your own
16 property and shoot a gun over onto someone else's
17 property?
18    A.    Not without the other person's permission,
19 I wouldn't believe.
20    Q.    And you made reference to you can't shoot
21 within a certain distance of a public road or
22 highway?
23    A.    Yes, ma'am.
24    Q.    Can you tell me more about that
25 requirement?

GILBERT & JONES

1 looked at the noise ordinance.
2    Q.    (By Ms. Norins) Okay.  So Section 802
3 Subsection (2)(a) of the Camden County nuisance
4 ordinance says:  "The following are declared to be
5 nuisances.  Things interfering with peace or comfort,
6 sounds, animals or things that interfere with the
7 peace or comfort or disturb the quiet of the county."
8         THE COURT REPORTER:  I'm sorry,
9 Mr. Watkins.  I can't hear you.
10         MR. WATKINS:  Is this ordinance marked as
11 an exhibit?
12         MS. NORINS:  Well, we can refer to
13 Colonel Byerly's letter that was marked
14 yesterday that contains this section of the
15 county ordinance.
16         MR. WATKINS:  If you're going to ask the
17 witness about it, about the content of it, I'd
18 like him to have it in front of him.  If you
19 could give me --
20         MS. NORINS:  Let me just find that
21 exhibit.  Hold on.  Sorry.  Too many exhibits.
22 Hold on.
23         Okay.  It's Exhibit 27, and it's Bates No.
24 P39 through 51.  And the Camden County nuisance
25 ordinance appears on the second page of the

GILBERT & JONES

1   letter, P40.
2           MR. WATKINS:  Okay.  Give me a second.
3       Okay.  We've got it in front of us.
4       Q.      (By Ms. Norins) Okay.  So if you see down
5   in the bottom third of that page, P40, it says:
6   "Section 802, enumeration of nuisances."  And then
7   Subsection 2:  "The following are declared to be
8   nuisances.  (A), Things interfering with peace or
9   comfort, sounds, animals or things that interfere
10  with the peace or comfort or disturb the quiet of the
11  county."
12          Do you see that there?
13      A.      Yes, ma'am.  I see that.
14      Q.      And would this ordinance, which is a
15  county ordinance, apply in the Runnymeade
16  neighborhood?
17      A.      Sure.
18      Q.      And would this ordinance be a limitation
19  on the right to shoot a gun on your own private
20  property?
21      A.      Not necessarily.
22      Q.      Would you have to be in compliance with
23  this ordinance if you were shooting on your own
24  private property?
25      A.      I guess.

1       Q.      So is it possible that shooting on your
2   own property could still disturb the quiet of the
3   county such as would violate this ordinance?
4       A.      Of the general public or an individual?
5       Q.      Of anyone.
6       A.      I don't believe that the general public
7   was complaining.  An individual was complaining.
8   None of the neighbors were.
9       Q.      And I'm not speaking about the Prosperos
10  in particular.  I'm speaking in general.  Is it a
11  general limitation on shooting on your own private
12  property that you cannot violate the Camden County
13  ordinance on nuisances?
14      A.      Not necessarily.
15      Q.      So it's okay to shoot on private property
16  even if it's in violation of the Camden County
17  nuisance ordinance?
18          MR. WATKINS:  That's a different question.
19      I'm going to object to form.  You're asking the
20      witness to assume that whatever's happening with
21      shooting is a violation of this ordinance?
22          MS. NORINS:  I'm asking is this ordinance
23      a limitation on the right to shoot on your own
24      private property.  Do you still have to comply
25      with the ordinance even if you have a right to

1   shoot on your property?
2           MR. WATKINS:  He answered that question.
3       He said, "Not necessarily."
4       Q.      (By Ms. Norins) I don't understand.  When
5   you say "not necessarily," that means you don't
6   always have to comply with this Camden County
7   ordinance on nuisances?  That it's optional whether
8   you comply with it?
9           MR. WATKINS:  I'm going to object to form.
10      A.      I just don't understand your question.  I
11  mean, I don't -- I don't know how to answer that.
12      Q.      (By Ms. Norins) So you don't know how this
13  Camden County ordinance interacts with the right to
14  shoot on your own private property?
15          MR. WATKINS:  You haven't -- you haven't
16      defined the situation you're asking the witness
17      about.  You're perfectly within your right to
18      ask him any hypothetical, but give him the facts
19      of the hypothetical.
20          He told you in general that shooting does
21      not necessarily violate this ordinance.  So if
22      you want to drill down on that with any
23      hypothetical, feel free to.  But you're not
24      giving him any facts for a hypothetical.
25      Q.      (By Ms. Norins) This is not a hypothetical

1   question.  The question is:  If you have a right to
2   shoot on your own property, do you still have to also
3   comply with this county ordinance that prohibits
4   noise violations?
5           MR. WATKINS:  I'm going to object to form
6       because that's not what the ordinance says.
7       A.      Just because you're shooting on your
8   property doesn't mean that it's a noise violation.
9       Q.      (By Ms. Norins) I understand.  Not every
10  time you shoot on your property is going to be a
11  noise violation.
12      A.      Well, what are you referring to?
13      Q.      But are you still bound by this ordinance
14  when you're shooting on your own private property?
15  Do you still have to --
16      A.      Is it --
17          THE COURT REPORTER:  Wait a minute.  You
18      talked over each other?  Do you still have to?
19      Q.      (By Ms. Norins) Comply with the county
20  ordinance that prohibits nuisances?
21      A.      Is it a public nuisance?  I mean, or is it
22  just bothering somebody?  I don't understand.  Has --
23  has it been declared that somebody shooting on their
24  property, is that a public nuisance?  Because if
25  then, the ordinance would come into play.

1   But who's declared it a public nuisance?
2   That I don't understand. I don't know how to answer
3   that.
4       Q.   Okay. I think we're ships passing each
5   other in the night here.
6       Does this ordinance on nuisances in Camden
7   County, does that apply throughout the county?
8       A.   I would believe so, yes, ma'am.
9       Q.   Okay. And if you're creating noise by
10  shooting on your own private property, is there any
11  situation where that could rise to the level of
12  constituting a nuisance under this Camden County
13  ordinance?
14      A.   Probably, yes.
15      Q.   Okay. Can you give me an example of where
16  shooting on your private property would create noise
17  that would rise to the level of violating the Camden
18  County nuisance ordinance?
19      A.   "The annoyance of the public in general or
20  as manifestly injurious to the public, health, safety
21  and welfare of the citizens of Camden County." That
22  would be --
23      Q.   And you're reading from the --
24      A.   I'm sorry. Yes, ma'am. I'm reading from
25  the code section.

1       Q.   That appears on P40, which is the second
2   page of Plaintiff's Exhibit 27?
3       A.   Yes, ma'am.
4       Q.   Okay. In your experience as sheriff or
5   as, you know, a deputy prior to being sheriff, have
6   you ever encountered a situation where gunshots fired
7   on private property violated the Camden County
8   nuisance ordinance?
9       A.   Not to the best of my knowledge.
10      Q.   At any time did you discuss the Camden
11  County nuisance ordinance with the Prosperos as it
12  relates to their complaints about gunshots?
13      A.   No, ma'am.
14      Q.   Okay. And are you aware that on
15  Thanksgiving Day of 2018, Deputy Ryan Sullivan
16  obtained a warrant for the arrest of Mrs. Prospero?
17      A.   Am I aware that it occurred now or was I
18  aware of it at the time?
19      Q.   Are you aware of that now?
20      A.   Yes, ma'am.
21      Q.   And when did you first become aware that
22  Deputy Sullivan had obtained an arrest warrant for
23  Mrs. Prospero?
24      A.   It was sometime after the warrant was
25  done. I'm guessing that she was already out of jail

1   when I found out, but I don't know specifically when
2   it was.
3       Q.   Were -- were -- excuse me. Were you
4   consulted before the arrest warrant for Mrs. Prospero
5   was obtained?
6       A.   No, ma'am.
7       Q.   So it was obtained Thanksgiving Day of
8   2018. Then she was arrested about two months later
9   on January 28th, 29th of 2019. In between the
10  warrant being obtained and her arrest, were you aware
11  that there was a warrant for her?
12      A.   Not that I recall.
13      Q.   Did you believe you first learned that
14  there had been a warrant for her arrest after it had
15  been executed and she had been arrested?
16      A.   I believe so.
17      Q.   And how do you recall learning that?
18      A.   I don't recall how I learned it. It was
19  probably in conversation with either one of my
20  deputies or part of my office staff.
21      Q.   Okay. Have you reviewed the affidavit for
22  the arrest warrant for Mrs. Prospero?
23      A.   Yes, ma'am.
24      Q.   When did you first review it?
25      A.   Today.

1       Q.   Today? In preparation for your
2   deposition?
3       A.   Yes, ma'am.
4       Q.   Have you seen it before then?
5       A.   No, ma'am.
6       Q.   So let's look at the warrant. Or it's the
7   affidavit that is also the warrant. And this
8   is Exhibit --
9       MR. WATKINS: We've been going about an
10  hour and a half or so. Are we at a -- it sounds
11  like we're about to get into another area that's
12  going to take some time. Are we at a point we
13  can take a break?
14      MS. NORINS: Why don't we finish this and
15  then we can take a break, finish this exhibit,
16  if that's okay.
17      MR. WATKINS: What exhibit? What Bates
18  number is it?
19      MS. NORINS: It's Plaintiff's Exhibit 13,
20  Bates No. 157 to 158.
21      Q.   (By Ms. Norins) Do you need a chance to
22  read it again, Sheriff?
23      A.   I glanced at it. I just -- I haven't read
24  it in depth yet.
25      Q.   Do you want to take a moment and read it

1   and then we can talk about it?
2        MR. WATKINS:  Do you want him to read the
3   entire two pages of the affidavit?
4        MS. NORINS:  Well, I want him to be
5   familiar with it because I'm going to ask him
6   some questions about it.  If he feels like he
7   doesn't need to read it, that's fine.  But I'm
8   giving him the opportunity to do so if he wants
9   to.
10       MR. WATKINS:  Take your time.  It's going
11  to be a few minutes.
12       Clare, I'm going to step out for a second.
13  It's probably going to take the witness several
14  minutes to read this.
15       MS. NORINS:  Okay.  Is Brad back?  I can't
16  see.
17       THE WITNESS:  Yes, ma'am.
18       MR. WATKINS:  I'm back.
19    Q.   (By Ms. Norins) Okay.  So based on your
20  years of experience as sheriff and working for the
21  Camden County Sheriff's Office, are you familiar with
22  the concept of an officer's affidavit seeking an
23  arrest warrant?
24    A.   Yes, ma'am.
25    Q.   And who is an arrest warrant affidavit

1   intended to be read by?
2    A.   To get the warrant issued?
3    Q.   Correct.  Who is it intended to be read
4  by?
5    A.   A judge.
6    Q.   Okay.  And that judge will be deciding
7  whether there's probable cause to issue the warrant?
8    A.   Yes, ma'am.
9    Q.   Does the judge receive any other
10  information apart from the warrant affidavit?
11    A.   Occasionally a judge will take oral
12  testimony from the officer.
13    Q.   And would that be indicated on the warrant
14  if that were the case?
15    A.   I've seen it indicated on the warrant in
16  other instances.
17    Q.   Okay.  So looking at Exhibit 13, which is
18  the warrant for Mrs. Prospero's arrest, is there any
19  indication there that the judge took oral testimony
20  from the --
21    A.   I don't see anything.
22       THE COURT REPORTER:  I'm sorry.  From?
23       MS. NORINS:  Took oral testimony from the
24  officer.
25       THE COURT REPORTER:  Thank you.

1       MS. NORINS:  And you got the answer?
2       THE COURT REPORTER:  Yes, ma'am.
3    Q.   (By Ms. Norins) So would the judge
4  reviewing the warrant see any of the underlying
5  documentation, the incident report or recordings of
6  911 calls or anything like that?
7    A.   It's possible.
8    Q.   Would that be the normal procedure or
9  would it just be the affidavit that the judge would
10  look at?
11    A.   I believe the way they currently do it is
12  just the affidavit that they would look at.
13    Q.   And was that true in 2018 as well?
14    A.   I believe so.  I mean, you'd have to ask
15  the magistrate judge that question.
16    Q.   Is an affidavit seeking an arrest warrant
17  a sworn statement?
18    A.   Yes, ma'am.
19    Q.   So it's made under oath?
20    A.   Yes, ma'am.
21    Q.   Is it important for all the statements in
22  an arrest warrant affidavit to be truthful?
23    A.   They need to be as accurate and truthful
24  as possible.
25    Q.   And is that based on what's known to the

1   swearing officer at the time of the affidavit?
2    A.   Yes, ma'am.
3    Q.   Is it important that the arrest warrant
4  affidavit describe the evidence that supports each of
5  the elements of the charged crime?
6    A.   I believe so.  Yes, ma'am.
7    Q.   Should an arrest warrant affidavit be
8  written in such a way that the judge has to guess
9  about what happened?
10    A.   No, ma'am.
11    Q.   Should an arrest warrant affidavit be
12  written in such a way that the judge has to make
13  inferences about what happened?
14       THE COURT REPORTER:  I'm sorry.  Was there
15  an objection?
16       MR. WATKINS:  Yes.  Object to form.
17       THE COURT REPORTER:  Thank you.
18       MR. WATKINS:  The witness can answer as
19  best he can.
20    Q.   Would you like the question read back?
21    A.   Please.
22       MS. NORINS:  All right, Annette.  Could
23  you read it back.
24       (The record was read by the reporter as
25  requested.)

1    MR. WATKINS:  Objection.
2    A.    I don't believe that it should be.
3    Q.    (By Ms. Norins) Is it okay for an arrest
4  warrant affidavit to present facts in a way that are
5  misleading to the judge?
6    A.    No, ma'am.
7    Q.    Is it okay for an arrest warrant affidavit
8  to present facts in a way that misrepresents what
9  happened?
10    A.    No, ma'am.
11    Q.    All right.  So looking at Plaintiff's
12  Exhibit 13, which is the warrant for -- or the
13  affidavit and the warrant, I guess, for
14  Mrs. Prospero's arrest, there were two months that
15  elapsed between the warrant being obtained -- about
16  two months that elapsed between the warrant being
17  obtained and the warrant being executed.
18    Is there any time at which a warrant would
19  expire if it's not executed?
20    A.    I don't -- I don't know.
21    Q.    Okay.
22    A.    I don't believe so.
23    Q.    Okay.  So your understanding is that the
24  warrant could be executed even years after it was
25  obtained?

1    A.    I've seen that happen in the past.
2    Q.    Okay.  So based on your review of the
3  affidavit for the warrant and the warrant itself, is
4  the probable cause or alleged probable cause in this
5  case based only on events that occurred Thanksgiving
6  Day 2018?
7    A.    If November 22nd was Thanksgiving Day,
8  then, yes, ma'am.
9    Q.    Okay.  So this warrant just concerns the
10  events of November 22nd, 2018, and not prior events;
11  is that correct?
12    A.    I believe that's correct.
13    Q.    And so this was an affidavit that alleged
14  Mrs. Prospero had engaged in unlawful conduct during
15  a 911 call on November 22nd, 2018.  Is that fair to
16  say?
17    A.    It appears to me that it's multiple calls,
18  not just single call.
19    Q.    Okay.  So with regard to -- it's
20  undisputed by the parties that Mrs. Prospero called
21  911 one time on November 22nd, 2018.  Can you tell
22  from this affidavit how long that 911 call lasted?
23    MR. WATKINS:  You're referring to the
24    third contact?
25    Q.    (By Ms. Norins) I'm just asking based on

1  the affidavit, can you tell how long Mrs. Prospero's
2  911 call lasted?
3    A.    Not -- no, ma'am, not necessarily.  I -- I
4  can't determine how long the -- each call lasted.
5    Q.    Okay.  So do you see down at the bottom of
6  the first page, which is Bates No. 157, it says:  "At
7  1458 hours, Mrs. Prospero contacted 911 stating that
8  she wanted the shooting from the hunting club to
9  stop."  Do you see that sentence?
10    A.    Yes, ma'am.
11    Q.    So does that tell us when the 911 call
12  started?
13    A.    I believe so.  Yes, ma'am.
14    Q.    Okay.  And is there any statement in the
15  warrant of when that call ended?
16    A.    No, ma'am.  I don't see anything.  It
17  would have ended prior to 3:15 because that's when
18  the deputy was at the residence.
19    Q.    Okay.  Do 911 operators sometimes stay on
20  the line with a caller until the officer arrives at
21  the location?
22    A.    Depending on the situation, yes, ma'am.
23    Q.    That does happen sometimes?
24    A.    It has happened, yes, ma'am.
25    Q.    Okay.  So the fact that the officer had

1  arrived at the Prospero's residence at 3:15, does
2  that establish that the call had ended by 3:15?
3    A.    Not necessarily.  I would -- I would
4  assume that it was -- the phone call had been over
5  because it says that 911 attempted to call them back,
6  and that they wouldn't answer the phone.
7    Q.    But we don't know from the affidavit when
8  the 911 call -- 911 call actually ended.  You're
9  making an assumption about that.  Is that fair to
10  say?
11    A.    From what I'm reading, yes, ma'am.  I
12  mean, it -- it states what time the deputy's there
13  and he asked 911 to call.
14    Q.    So you're assuming from that that the 911
15  call had ended at that time?
16    A.    Yes.  It ended prior to that because at
17  that time he was asking 911 to call them.
18    Q.    Does it say how long the deputy was at the
19  residence?
20    A.    No, ma'am.
21    Q.    Okay.  So looking at the beginning of the
22  affidavit where it says:  "Unlawful conduct" -- this
23  is in the very first little paragraph -- "unlawful
24  conduct during 911 call on November 22nd, 2018, at
25  2:58 p.m., to November 22nd, 2018, at 3:30 p.m. in

1   Camden County, Georgia."
2           And what -- what do you understand that
3   time period to encompass between 2:58 p.m. and 3:30
4   p.m.?
5       A.    I would say that that time frame is when
6   she violated the law.
7       Q.    Okay.
8       A.    That was when she had made multiple phone
9   calls.
10      Q.    Well, it is undisputed that she made the
11  one phone call to 911.
12          MR. WATKINS:  Object.  I'm going to
13      object.  I'm going to object because you're
14      representing that we have made a stipulation
15      that is at the heart of the case and is such a
16      finesse point about a call versus a contact.
17      You're asking the witness to look at this
18      affidavit that talks about other communications
19      with dispatch, and then you're telling the
20      witness we've stipulated that there's one call.
21      Well --
22          MS. NORINS:  Well, one call to 911.
23          MR. WATKINS:  I just think that's a little
24      bit misleading how you're phrasing that,
25      but . . .

1           MS. NORINS:  Okay.
2           MR. WATKINS:  I'm going to object to form.
3           MS. NORINS:  I understand the objection.
4       Q.    (By Ms. Norins) So, Sheriff, with respect
5   to this time period of 2:58 p.m. on November 22nd,
6   2018, to 3:30 p.m., do you understand that to be the
7   time of the call to 911?
8       A.    No.
9       Q.    So what do you understand that time period
10  to describe?
11      A.    That time frame shows that Ms. Prospero
12  violated the law by making multiple contacts with the
13  911 center.  That's the time frame when the
14  violations occurred.
15      Q.    And so you understand those contacts to
16  have started at 2:58 p.m. and to have lasted until
17  3:30 p.m.?
18      A.    I would, from reading the body of the
19  warrant, I would say that the violations, the first
20  contact was at 2:42.
21      Q.    Okay.  So you think that time period up at
22  the top is wrong?  It should start at 2:42 p.m., not
23  2:58 p.m.?
24      A.    If I wrote the warrant, yes, ma'am, that's
25  the way I would write it.

1       Q.    And then where does the 3:30 p.m. come
2   from?
3       A.    I don't know.  You'd have to ask
4   Deputy Sullivan.
5       Q.    Well, if he's specifying that's the time
6   frame when the offense ended, shouldn't that be
7   stated in the body of the affidavit what that 3:30
8   time signifies?
9       A.    No, ma'am.
10      Q.    That shouldn't be included?
11      A.    I -- it -- no.  No, ma'am.
12      Q.    So how is the judge to know what that 3:30
13  p.m. time signifies if it's not stated in the body of
14  the affidavit what it signifies?
15      A.    You'd have to ask the magistrate judge.  I
16  don't know.
17      Q.    But as you sit here reading it, you don't
18  know what that 3:30 p.m. time refers to?
19      A.    No, I don't.  No, ma'am, I don't.
20      Q.    Okay.  So this has been stipulated, I
21  think we can agree, the 911 call that Mrs. Prospero
22  made on November 22nd, 2018, lasted about two and a
23  half minutes.  Can you tell that from reading this
24  arrest warrant affidavit?
25      A.    I don't see that written anywhere in here.

1       Q.    Would that be relevant to include if
2   you're charging someone with unlawful conduct during
3   a 911 call?
4       A.    No, ma'am.
5       Q.    So the duration of the call would not be
6   relevant, you're saying?
7       A.    Not necessarily.
8       Q.    Why wouldn't it be relevant?
9       A.    If you called the 911 center and hang up,
10  the duration of the call has nothing to do if you do
11  it multiple times.
12      Q.    Okay.  So this charges Ms. Prospero, if
13  you see the second paragraph of the affidavit, which
14  is on page 157, it says:  "Said events being
15  described as 16-11-39.2 misdemeanor unlawful conduct
16  during a 911 call."
17          And it says:  "For the said Emma Jane
18  Prospero did violate O.C.G.A. 16-11-39.2 when he/she
19  unlawfully contacted 911, an emergency telephone
20  service, in reference to an incident that was not a
21  true emergency for the purpose of interfering or
22  disrupting an emergency telephone service."
23          Did I read that correctly?
24      A.    Yes, ma'am.
25      Q.    She's been charged with calling for the

1  purpose of interfering or disrupting an emergency
2  telephone service; correct?
3      A.    That's what the warrant says.
4      Q.    Okay.  And so your testimony is that the
5  duration of the call to 911 would have no relevance
6  to the charge?
7      A.    Not necessarily.
8      Q.    And in this case, do you think it has any
9  relevance to the charge?
10     A.    No, ma'am.
11     Q.    And why not?
12     A.    It's the multiple contacts with the 911
13 center of a harassing nature.
14     Q.    And what is -- when you say "harassing
15 nature," can you tell me what you mean by that?
16     A.    It's -- it's explained in the warrant.
17     Q.    Can you tell me where in the warrant,
18 point to the language in the warrant?
19     A.    Read -- read the entire body of the
20 warrant.  That explains it.  You can't -- you can't
21 take bits and pieces of it.  You have to read the
22 entire body, which is what the judge would do.  She
23 would read the entire warrant and make a
24 determination whether or not there's probable cause.
25     Q.    But the paragraph we looked at where it

GILBERT & JONES

1  says what she's actually charged with, that second
2  paragraph, does that say anything about harassing?
3      A.    It's -- it's -- it's -- I'm using the word
4  harassing.  It's the unlawful conduct.  I'm saying
5  harassing because I believe that she's harassing the
6  911 center.
7      Q.    Okay.
8      A.    Those are my words.
9      Q.    Understand.  But does the warrant allege
10 that she was harassing -- or the affidavit to the
11 warrant, does it allege that she was harassing the
12 911 operators?
13     A.    Well, it's citing the code section.  And
14 if you look up the code section, it talks about
15 harassing.
16     Q.    But that's a separate code section than
17 what she was actually charged with.
18           MR. WATKINS:  Object to form.
19     A.    I'd have to get a code section out and
20 look at it.
21     Q.    (By Ms. Norins) Okay.  We'll look at that
22 in a little bit.  But do you agree with me that that
23 second paragraph where it states the offense that
24 she's being charged with does not say that she was
25 harassing?

GILBERT & JONES

1            MR. WATKINS:  It doesn't have that word,
2      if that's what you're asking.
3      A.    It does not have that word.
4      Q.    (By Ms. Norins) Okay.  In fact, it just
5  says that she was calling for the purpose of
6  interfering or disrupting an emergency telephone
7  service; correct?
8      A.    That's what the warrant says.
9            MS. NORINS:  All right.  Do you want to
10     take a break?
11           MR. WATKINS:  I think so.  We've been
12     going close to two hours.
13           MS. NORINS:  Okay.  Let's take a break.
14     10 minutes?  Longer?  I don't know.  Tell me
15     what you --
16           MR. WATKINS:  We'll take 10 minutes.  Are
17     we getting close or no?
18           MS. NORINS:  I'm not sure.
19           MR. WATKINS:  Okay.  All right.  We'll be
20     back in 10 minutes.
21           (Recess from 11:45 a.m. to 12:04 p.m.)
22     Q.    (By Ms. Norins) So in discussing
23 the warrants for Ms. Prospero's arrest, you used the
24 word "harassing" a number of times.  So I wanted to
25 talk a little bit about the definition of harassing

GILBERT & JONES

1  under the unlawful conduct statute.
2            So let's go ahead and mark as Plaintiff's
3  Exhibit 36 the copy of the statute that I e-mailed
4  last night.  Do you have that, Brad?
5            MR. WATKINS:  Okay.
6            (Plaintiff's Exhibit 36 was marked for
7      identification.)
8      Q.    (By Ms. Norins) Okay.  So Plaintiff's
9  Exhibit 36 is not Bates numbered, but it's the text
10 of Georgia Code Section 16-11-39.2, unlawful conduct
11 during a 911 call.  Do you have that in front of you,
12 Sheriff?
13     A.    Yes, ma'am.
14     Q.    And do you see under Section (a)(4), it
15 talks about harassing, and it gives a definition?
16           MR. WATKINS:  Sorry.  My computer's making
17     noises here.
18           MS. NORINS:  I'm looking at (a)(4)
19     "Harassing."
20           MR. WATKINS:  Oh, harassing.  I'm sorry.
21     Q.    (By Ms. Norins) Do you see where it says:
22 "Harassing means a willful use of opprobrious and
23 abusive language which has no legitimate purpose in
24 relation to imparting information relevant to an
25 emergency call"?

GILBERT & JONES

1   A.   Okay.
2   Q.   Okay.  And is there anything in the body
3  of the affidavit, the arrest warrant affidavit for
4  Mrs. Prospero that talks about her use of opprobrious
5  and abusive language?
6   A.   No, ma'am.
7   Q.   So is it fair to say that the arrest
8  warrant affidavit does not accuse Mrs. Prospero as
9  harassing when she was contacting 911?
10          MR. WATKINS:  Under this definition I
11       presume you're asking.
12   Q.   (By Ms. Norins) Under the definition
13  contained in this statute under which she was
14  charged.
15   A.   Correct.
16   Q.   So looking at -- we're just going to keep
17  looking at the statute itself.  In Section (b), it
18  says:  "A person commits the offense of unlawful
19  conduct during a 911 call if he or she," and then it
20  lists various types of conduct.  Do you see where I'm
21  referring to?
22   A.   Yes, ma'am.
23   Q.   Is it fair to say that the statute is
24  concerned with the conduct during the 911 call?
25   A.   As well as the call itself.  It says when

1  they contact the 911 center.
2   Q.   So this statute's concerned with the
3  contact to 911 and what happens during the call
4  itself.  Is that fair to say?
5   A.   It says whether or not conversation
6  ensues.  The contact is for the purpose of annoying,
7  harassing, disrupting.  It doesn't -- I'm sorry.
8   Q.   My question is:  Is the statute concerned
9  with the conduct, whether it involves talking or not,
10  during the 911 call?
11   A.   It says whether or not conversation
12  ensues.  That's what the statute says.
13          MS. NORINS:  Could you read back the
14       question.  You're not answering the question,
15       sir.
16          MR. WATKINS:  Object to that statement.
17          (The record was read by the reporter as
18       requested.)
19   A.   Yes, that's what the statute says.
20   Q.   (By Ms. Norins) Does the statute make
21  reference to conduct occurring outside of the 911
22  call?
23   A.   I don't understand the question.  Is it
24  about the call itself?
25          MS. NORINS:  Can you read back the

1  question, Annette.
2          (The record was read by the reporter as
3       requested.)
4   A.   Not that I can determine.  I'm not an
5  attorney.
6   Q.   (By Ms. Norins) As part of your duties as
7  sheriff, do you have to interpret and apply Georgia
8  Code statutes?
9   A.   Sure.
10   Q.   So looking at (b)(1), it says -- this is
11  talking about conduct that could be unlawful during a
12  911 call -- it says:  "Without provocation uses
13  obscene, vulgar or profane language with the intent
14  to intimidate or harass a 911 communications
15  officer."  Did I read that correctly?
16   A.   Yes, ma'am.
17   Q.   So is it fair to say that that provision
18  of the statute is concerned with the caller's intent?
19   A.   Yes, ma'am.
20   Q.   In looking at (b)(2), it says you can also
21  violate this statute by calling or otherwise
22  contacting 911, whether or not a conversation ensues,
23  for the purpose of annoying, harassing or molesting a
24  911 communications officer.
25          So is it fair to say that provision is

1  concerned with the purpose for which the caller
2  contacts 911?
3   A.   Yes, ma'am.
4   Q.   And that provision -- that provision
5  continues:  "Or for the purpose of interfering with
6  or disrupting emergency telephone services."  Did I
7  read that correctly?
8          MR. WATKINS:  Read it again, if you would,
9       please.
10   Q.   (By Ms. Norins) "For the purpose of
11  interfering with or disrupting emergency telephone
12  service."
13   A.   Yes, ma'am.
14   Q.   That's what it says; right?
15   A.   (Nods head affirmatively.)
16   Q.   And is it fair to say that that part of
17  (b)(2) is concerned with the caller's purpose for
18  contacting 911?
19   A.   Yes, ma'am.
20   Q.   And then (b)(3) says you could violate the
21  statute by calling or otherwise contacting 911 and
22  failing to hang up or disengage the connection for
23  the intended purpose of interfering with or
24  disrupting emergency service.
25          So is it fair to say that that Subsection

1  (b)(3) is concerned with the intent of the caller in
2  contacting 911?
3      A.    Yes, ma'am.
4      Q.    Okay.  And then (b)(4) says you can also
5  violate the statute if you call or otherwise contact
6  911 with the intention to harass a communications
7  officer.
8            And is it fair to say that that section,
9  (b)(4), is concerned with the intent of the caller in
10 contacting 911?
11     A.    Yes, ma'am.
12     Q.    So is it fair to say that all of these
13 provisions, (b)(1), (b)(2), (b)(3) and (b)(4) are
14 concerned with the intent as opposed to the effect of
15 the caller?
16     A.    Yes, ma'am.
17     Q.    And in (b)(2) where it refers to emergency
18 telephone service, what does that mean, emergency
19 telephone service?
20     A.    The 911 center.
21     Q.    Okay.  And then Camden County, the
22 emergency telephone service is the Camden County 911
23 dispatch center and the operators who answer the
24 calls there; correct?
25     A.    Yes, ma'am.

1      Q.    And so when it says in (b)(2) that it
2  violates the statute to contact 911 for the purpose
3  of interfering with or disrupting emergency telephone
4  service, that would mean for the purpose of
5  interfering with or disrupting the 911 center or the
6  operators who work there.  Is that fair to say?
7      A.    Yes, ma'am.
8      Q.    All right.  So turning to the calls that
9  the Prosperos made on November 22nd, 2018, I'm going
10 to refer you first to what we marked as Exhibit 32,
11 which is the transcript from calls on November 22nd,
12 2018.
13           I'm sorry.  That's the wrong exhibit
14 number.  It's Exhibit 31, not 32.
15           MR. WATKINS:  Okay.
16     Q.    (By Ms. Norins) Okay.  So I'll ask you to
17 read the first call that's in this transcript.  It
18 starts on page 2 at 2:42 p.m.  And it's just that one
19 page.  So you can read that and let me know when
20 you're done.
21     A.    Okay.
22     Q.    Okay.  So this was a call that
23 Mrs. Prospero made by contacting the sheriff office's
24 5100 number, and then she was transferred to the
25 dispatch center.  Do you have any reason to

1  disbelieve that that's what occurred?
2      A.    There's nothing written here to indicate
3  where the number came in.
4      Q.    Right.  I understand you can't tell from
5  the transcript, but the testimony in this case so
6  far -- well, withdrawn.
7            Mrs. Prospero reports that she called the
8  5100 number and was transferred to the Camden County
9  dispatch center.  Do you have any reason to
10 disbelieve that that's how this call was initiated?
11           MR. WATKINS:  He doesn't know.  Just get
12     him to assume that's the case and we can move
13     past it, if you don't mind.
14     Q.    (By Ms. Norins) Well, no, I just want to
15 know if he has any reason to doubt that that's what
16 occurred.
17     A.    Not by what I'm reading here.  It doesn't
18 indicate in any way.
19     Q.    And does that sound like the right
20 procedure that if someone contacted the 5100 number
21 of the sheriff's office and had a complaint or
22 concern about something in the community, that they
23 would then be transferred to the dispatch center?
24     A.    Probably, yes, ma'am.
25     Q.    Okay.  And that would be done at the

1  discretion of the person answering the 5100 number?
2      A.    It depends.  If it's a holiday or the
3  weekends when the front office is closed, it rings
4  over to the jail.  The jail would transfer it to the
5  911 center.
6      Q.    Okay.  All right.  So looking at the
7  transcript, Mrs. Prospero states:  "Yes.  There's a
8  ton of shots behind the Chevron station over here.
9  They've been shooting for about 10 minutes and
10 they're not stopping.  Can you get somebody over
11 there to tell them to stop shooting?  It's too close
12 to neighborhoods here."
13           So what do you understand her to be
14 communicating in those sentences?
15           MR. WATKINS:  I'm going to object to form.
16     It just calls for speculation.
17           MS. NORINS:  I disagree it calls for him
18     to --
19           MR. WATKINS:  It does, but you can answer
20     as best you can answer.
21     Q.    (By Ms. Norins) Based on the words written
22 on the page, what was she communicating?
23     A.    She's complaining about the noise --
24     Q.    And --
25     A.    -- from people shooting.

1    Q.    From the shooting.  Right.  And when she
2    says it's too close to neighborhoods here, what is
3    she indicating there?
4         MR. WATKINS:  Same objection.
5    A.    And I have no idea what she's trying to
6    communicate there.
7    Q.    (By Ms. Norins) Is it possible -- is it
8    possible -- sorry.  I'm getting a block on my sound.
9         Is it possible she's communicating a
10   safety concern when she says it's too close to
11   neighborhoods here?
12   A.    That's not the way I interpret it.
13   Q.    Is it possible that that was her intent to
14   communicate a safety concern?
15   A.    I don't know.
16        MR. WATKINS:  Object to form.
17   Q.    (By Ms. Norins) And then the operator,
18   John Archibald, says: "Which Chevron, ma'am?"
19        She says: "Right off Exit 14."
20        So is it fair to say she's provided the
21   general location of where the shots are coming from?
22   A.    That's a pretty large area, but general, I
23   guess.
24   Q.    Okay.  And would that area that she's
25   described, would that allow an officer to know where

1    to go to see that there's shots and where they're
2    coming from?
3    A.    Not based off of what I see here, no,
4    ma'am.
5    Q.    Okay.  Do you know where the Chevron is
6    off of Exit 14?
7    A.    Yes, ma'am.
8    Q.    Is that in the general proximity of the
9    Runnymeade neighborhood where Mrs. Prospero lives?
10   A.    I'd say it's a couple of miles away.
11   Q.    Okay.  Are you sure it's miles?
12   A.    It might be a mile, mile and a half, two
13   miles.  I don't know.  I've never measured it.
14   Q.    Okay.  And then a little bit later on at
15   the end of the call, the operator says:  "I
16   understand.  We will get somebody out there."
17        And then Mrs. Prospero says:  "Thank you."
18        And the operator says:  "Bye bye."
19        Was that an appropriate response by the
20   operator to say we'll get somebody out there?
21   A.    Meaning that he would advise the patrol
22   division, the deputy assigned of the complaint.
23   Q.    That's what you think he meant by that?
24        THE COURT REPORTER:  I'm sorry.
25   Mr. Watkins, I didn't hear you.

1         MR. WATKINS:  Objection to form.
2    A.    That's -- that's my interpretation.
3    Q.    (By Ms. Norins) And was that the
4    appropriate thing to do based on the call?
5         MR. WATKINS:  What specifically, Clare?
6    Q.    (By Ms. Norins) Was notifying a deputy of
7    the complaint the appropriate thing to do based on
8    the call?
9    A.    Sure.
10   Q.    So based on this call, at this point was
11   there anything harassing about this call?
12   A.    I don't know.  I don't -- I would say no.
13   Q.    So going to the next call that starts on
14   page 3 at 2:46 p.m.  If you could read the transcript
15   of that call, and it goes on to page 4, and let me
16   know when you're finished.
17   A.    Okay.
18   Q.    So this is a call that Mr. Prospero placed
19   to the sheriff's office.  Again, the Prosperos report
20   they called or Mr. Prospero called the 5100 number
21   and they were transferred again to the dispatch
22   center.  Do you have any reason to disbelieve that
23   that's how the call was initiated?
24   A.    Nor do I have any reason to believe that
25   that's the way it's done.  It's not indicated on the

1    paper here in front of me.
2    Q.    Okay.  You don't know one way or the
3    other?
4    A.    No, ma'am.
5    Q.    And so Mr. Prospero says -- and I'm at
6    line 3 through 5 of page 3 -- "Listen, they have been
7    shooting around here now for the last 20 or 25
8    minutes."
9         So what sort of complaint is he
10   communicating there?
11   A.    Noise complaint.  But there's four minutes
12   between the first call and the second call.  The
13   first one says they've been shooting for 10 minutes.
14   The second call 20 to 25 minutes.  That's -- that
15   doesn't add up.
16   Q.    So in your experience when talking with,
17   you know, members in the community who are reporting
18   incidents or concerns, is everybody really accurate
19   in being able to estimate how long things have taken?
20        MR. WATKINS:  Object to form.
21   A.    I would imagine that they would try to be
22   truthful.
23   Q.    (By Ms. Norins) But in your experience, is
24   it often that people have a different sense of how
25   long something's gone on or how long something's

1  taken than it actually did go on or take?
2      A.      Are you asking me if they blow it out of
3  proportion and misrepresent?
4      Q.      No. I'm asking you if people, even when
5  they're doing their best to give an accurate account,
6  may not have an exact timer of how long something has
7  taken or how long something has gone on?
8      A.      That's possible, yes, ma'am.
9      Q.      And it's not because they're intentionally
10  misrepresenting. It's just because as humans, unless
11  we have a watch and we look at how long something's
12  happened, it's hard to guesstimate; right?
13      A.      Yes, ma'am. Sure.
14      Q.      So then Mr. Prospero, again, identifies
15  where the shooting is coming from. This is at line 7
16  through 8. He says: "It's right behind the Chevron,
17  Exit 14."
18          And then the dispatcher says: "Yes, it's
19  a hunting club back there." That's at lines 11
20  through 12. Do you see that?
21      A.      Yes, ma'am.
22      Q.      Are you familiar with the hunting club in
23  the area of the Chevron off of Exit 14?
24      A.      Yes, ma'am. I'm pretty sure that's a
25  hunting club area.

1      Q.      Okay. And what's the name of the hunting
2  club?
3      A.      That I don't know.
4      Q.      And who's the proprietor of the hunting
5  club?
6      A.      Well, there are multiple hunting clubs. I
7  don't know which one they're referring to.
8      Q.      And when you say you're familiar with the
9  hunting club in that area, do you mean a business or
10  a collection of individuals or something else?
11      A.      I don't know. I mean, I'm assuming a
12  collection of individuals.
13      Q.      Okay. And who are the individuals that
14  you know of who are part of a hunting club in that
15  vicinity of the Chevron off of Exit 14?
16          MR. WATKINS: Clare, are you asking the
17  members of the -- of the people that shoot in
18  that area?
19          MS. NORINS: Can you read back the
20  question, please, Annette.
21          (The record was read by the reporter as
22  requested.)
23      A.      Do you want to know members of the hunting
24  club?
25      Q.      (By Ms. Norins) I want to know the

1  individuals that you believe constitute a hunting
2  club in that area?
3      A.      I don't know how to answer that. I mean,
4  are you asking if I know who hunts in that area? Or
5  who's a member --
6      Q.      You said there's a hunting club and that
7  it consists of individuals as opposed to being a
8  business. And so I'm asking you who are those
9  individuals.
10          MR. WATKINS: Answer if you can.
11      A.      I know that Scott Henning hunts in that
12  area. The Paulks, I believe, hunt in that area. I
13  believe that Shane Gentry hunts in that area.
14      Q.      (By Ms. Norins) And did those individuals,
15  Scott Henning, the Paulks, Shane Gentry, do they own
16  the property where they hunt?
17      A.      The Paulks do, I believe.
18      Q.      And what about Mr. Henning and Mr. Gentry?
19  Do they own the area where the hunting club is?
20      A.      No, not to the best of my knowledge.
21  Well, I take that back. The Hennings own a portion
22  of property that's in that general area.
23      Q.      Okay. So then this is the same call that
24  we've been looking at. At the top of page 4,
25  Mr. Prospero says: "It's too close to the neighbor.

1  They need to tell them to stop."
2          What do you understand him to be
3  communicating there?
4      A.      That the sound is too close.
5      Q.      Okay. Could Mr. Prospero also be
6  communicating a safety concern about the shots being
7  too close to the neighbor?
8      A.      I -- I don't know. I would assume it's
9  sound.
10      Q.      Okay. If Mr. Prospero had said the
11  bullets are too close to the neighbor, would that
12  have communicated a safety concern?
13      A.      Possibly the operator would ask further
14  questions, but that's not indicated in here.
15      Q.      I'm just trying to figure out if he had
16  said it's the bullets coming too close to the
17  neighbor, would that have communicated a safety
18  concern?
19          MR. WATKINS: Objection as to form.
20          That's the exact same question you just asked
21          and answered.
22      A.      I'm -- it, to me, it indicates sound. If
23  he had said the bullets were too close, then the
24  operator would have gotten further information.
25  That's not indicated here.

1  Q.   (By Ms. Norins) But if you just replace
2  it's with the bullets in that sentence, would that
3  communicate a safety concern?
4      MR. WATKINS:  Objection.  Asked and
5  answered.  You can try again.
6  A.   It indicates sound, s-o-u-n-d, sound, not
7  bullets.  If he had said bullets, the operator would
8  have questioned him further and gotten more
9  information.  That is not indicated here.
10 Q.   (By Ms. Norins) And why would the operator
11 have questioned him further if he said bullets?
12 A.   Because you need more information.
13 Bullets could be a safety issue but this is sound,
14 not bullets.
15 Q.   Okay.  All right.  So in terms of the
16 second call that we just looked at between
17 Mr. Prospero and the operator, John Archibald, is
18 there anything harassing about that call in your
19 view?
20 A.   Between the time of the calls, they never
21 had the opportunity to get a deputy there.  It says
22 they don't want to speak to a deputy.  They don't --
23 if it was something dangerous, they would want to see
24 a deputy.  They even threatened to call the
25 governor's office.  I mean, yes, ma'am, it's becoming

1  harassing and disruptive to the service.  Absolutely.
2  Q.   And during this call, was there any
3  appropriate and abusive language used?
4  A.   Other than the harassing to call the
5  governor's office, there was no -- no cuss words or
6  anything like that.
7  Q.   Okay.  When you say to call the governor's
8  office, is that something you would consider to be
9  abusive language?
10 A.   The way it's used.  When Mrs. Prospero
11 said that she was going to call the -- do we need to
12 call the governor's office, that's threats, which is
13 harassing.
14 Q.   So is it your position that if
15 Mrs. Prospero has a grievance that's not being
16 addressed by local law enforcement, that she doesn't
17 have a right to contact the governor's office?
18 A.   She has a right to -- she has a right to
19 contact the governor's office, of course.  But to --
20 they're not even allowing them to address the
21 situation before making the second call.
22 Q.   Do you agree that she does have the right
23 to contact the governor's office; correct?
24 A.   That's what I just said, yes, ma'am.
25 Q.   So going on to the next call in the

1  transcript, which starts on page 5, and it continues
2  on to page -- bottom of page 7.  If you can read that
3  and let me know when you're done.
4  A.   2:46.
5      MR. WATKINS:  This is between the officer
6  and dispatch.
7      THE WITNESS:  Oh, okay.
8      MR. WATKINS:  He's going -- he's going to
9  read it now.
10 Q.   (By Ms. Norins) Okay.  I want to just go
11 back a minute to Mr. Prospero's call on page 3 of the
12 transcript.  At line 19, Mr. Prospero says:  "I want
13 the shooting stopped."  And in that statement, is he
14 communicating his purpose for calling the sheriff's
15 office?
16     MR. WATKINS:  Where are you pointing to?
17 Line 19 of page 3?
18     MS. NORINS:  Yeah.
19     MR. WATKINS:  Is it only about that
20 statement?
21     MS. NORINS:  Yes.  I'm asking does that
22 statement communicate that Mr. Prospero's
23 purpose for calling the sheriff's office was to
24 get the shooting stopped.
25 A.   No.  I don't want contact.  I want the

1  shooting stopped.
2  Q.   (By Ms. Norins) Is that -- is that
3  communicating his purpose for calling?
4      MR. WATKINS:  Object to form.  It calls
5  for speculation.  You can answer as best you
6  can.
7  A.   I have no idea.
8  Q.   (By Ms. Norins) Reading those words
9  doesn't tell you anything about why he called?
10 A.   He's calling to complain about the noise
11 from the shooters.
12 Q.   And is his purpose as expressed that
13 statement that he wants the shooting stopped?
14 A.   Well, he's attempting to annoy and bully
15 the operators to basically get -- get -- get their
16 way would be my interpretation of it.
17 Q.   But in terms of his purpose for calling,
18 is it to get the shooting stopped?
19 A.   I'd say it's to harass the operators and
20 basically try to get -- if they bully enough, they'll
21 get what they want.
22 Q.   Is that how you interpret his statement, I
23 want the shooting stopped, that he's trying to
24 harass?
25 A.   That's how I interpret the phone call, the

1   contact with the 911 center. I can't pick apart
2   line-by-line what he's saying. It's the -- it's the
3   call itself.
4       Q.   So your -- your impression of the call is
5   that it's bullying or harassing; is that correct?
6       A.   Yes.
7       Q.   And I'm asking as far as what Mr. Prospero
8   is stating is his intent for calling, if he's stating
9   that he's calling to get the shooting stopped?
10       MR. WATKINS: You are referring to lines
11   18 and 19?
12       MS. NORINS: Well, specifically 19.
13       MR. WATKINS: Just that one sentence.
14       A.   And you want to know the intent behind
15   that sentence?
16       Q.   (By Ms. Norins) I want to know is that
17   communicating his reason for calling.
18       A.   That one sentence does not. Not in my
19   opinion.
20       Q.   Okay. So going on to the next call
21   between Officer Sullivan and Ms. Nikki Flowers. Do
22   you know who Officer Sullivan is? Ryan Sullivan?
23       A.   Yes, ma'am.
24       Q.   And do you know who Sergeant Susan Nikki
25   Flowers is?

1       A.   Yes, ma'am.
2       Q.   And here on page 5 at line 15 through 17,
3   Officer Sullivan said: "Yes, the Paulks back there
4   shooting on their private property." And based on
5   his statement there, would he have had to go to the
6   location to know that it was the Paulks shooting?
7       A.   I have no idea, ma'am.
8       Q.   You mentioned that there's also a
9   Scott Henning who owns some of the property in that
10   area?
11       MR. WATKINS: Object to form. You can
12   answer as best you can.
13       A.   Mr. Henning owns property in the area.
14       Q.   (By Ms. Norins) And so just based on the
15   description of where the shooting was coming from,
16   that the Prosperos provided, could it have been
17   Mr. Henning was shooting as opposed to the Paulks?
18       A.   I guess it could have been anybody. I
19   don't know.
20       Q.   And how would the officer assigned in this
21   case, Ryan Sullivan, have determined who was
22   shooting?
23       A.   I have no idea. You'd have to ask
24   Deputy Sullivan that question.
25       Q.   Would he have needed to go to the area to

1   see who was shooting?
2       A.   You'd have to ask Deputy Sullivan that
3   question.
4       Q.   Is there any way he could have determined
5   who was shooting other than going to the area?
6       A.   You'll have to ask Deputy Sullivan that
7   question.
8       Q.   I'm asking you based on your many years of
9   experience as sheriff and as a deputy before that,
10   how you would determine who was shooting?
11       A.   How would I determine? I wasn't assigned
12   to this call. Deputy Sullivan was. I don't know how
13   he did it.
14       Q.   But how would you go about determining it
15   if this was your assigned call?
16       A.   It depends.
17       Q.   Tell me what does it depend on.
18       A.   I could pick up the phone and call someone
19   and ask them, hey, are you out there shooting.
20       Q.   Okay.
21       A.   Or -- or I could go out there or I could
22   call a name.
23       Q.   Okay. So you've identified you could call
24   to ask them if they're shooting. You could go to the
25   area to see who was shooting. Are there any other

1   ways you can think of that you could identify who was
2   doing the shooting?
3       A.   Well, prior knowledge of what's going on.
4   They -- hell, we've got a drone. I could fly a drone
5   over it. I mean, the question you're asking I don't
6   know the answer to what -- you'd have to ask
7   Deputy Sullivan how he knew.
8       Q.   But I'm just asking you what were the
9   different ways to go about finding out who was
10   shooting. So you --
11       A.   And I've given you a number of ways.
12       Q.   Calling. Go to visit.
13       A.   Flying a drone over it.
14       Q.   Flying a drone.
15       A.   Prior knowledge.
16       Q.   Well, what does prior knowledge refer to?
17       A.   Incidents that have occurred prior that
18   you had knowledge of.
19       Q.   But that would be speculation of who was
20   shooting based on prior incidents?
21       A.   Possibly.
22       Q.   Do officers have drones that they can just
23   deploy at will?
24       A.   No. Not each officer has a drone.
25       Q.   Okay. Would a deputy such as

1  Ryan Sullivan have a drone with him that he could
2  deploy?
3      A.   I don't believe that Deputy Sullivan is
4  assigned a drone.
5      Q.   Okay.  So not all officers have access to
6  drones?
7      A.   I think they can certainly call someone
8  that has one and that's access.
9      Q.   Okay.  But as far as you know,
10 Deputy Sullivan does not have a drone of his own to
11 use?
12     A.   As far as I know, he does not.
13     Q.   And was that true in 2018 as well?
14     A.   That's true with what?
15     Q.   Was that true in 2018 as well, which was
16 the time of these events?
17     A.   That would be true.
18     Q.   Okay.  And then do you see on page 5 at
19 line 21 through 22, Officer Sullivan says:  "Yeah,
20 those mother fuckers.  I ain't going to -- I ain't
21 going out there talk to Robert about, hey, man, you
22 can't shoot on your private property because you're
23 disturbing people."
24          Do you see that?
25     A.   Yes, ma'am.

1  would need them to request contact before he could
2  contact them himself?
3          MR. WATKINS:  Object to form.  You can
4      answer it as best you can.
5      A.   You'd have to ask Deputy Sullivan that.
6      Q.   (By Ms. Norins) Do -- if a caller calls in
7  and reports something and says they don't want to be
8  contacted, they just want to make a report about
9  what's going on, is the assigned officer required to
10 contact the caller?
11     A.   Not always.
12     Q.   Is that up to the officer's discretion
13 whether they contact the caller?
14     A.   Yes, ma'am.
15     Q.   Is that true as well as the caller
16 contacts 911 and says I don't want contact.  I just
17 want to report this.  Then it's up to the assigned
18 officer to decide whether to contact them?
19     A.   Yes, ma'am.
20     Q.   And the officer's not required to contact
21 them?  It's just a judgment call on the officer's
22 part?
23     A.   Yes, ma'am.
24     Q.   Okay.  So go to page 8.  This is the call
25 that starts at 2:58 p.m.  This is Mrs. Prospero's

1      Q.   Of the conversation.  And then later on,
2  on page 6 at line 5 through 6, Officer Sullivan,
3  again, uses the term "stupid mother fuckers" in
4  reference to the complaints about the gunshots;
5  correct?
6      A.   Yes, ma'am.
7      Q.   And are officers in your department
8  trained to speak in that manner about members of the
9  community that they serve?
10     A.   First, it's an office, not a department.
11 And, no, they're not trained to speak like that to
12 people.
13     Q.   Okay.  How would you like your officers to
14 talk about members of the community when they're
15 discussing with their coworkers calls for service?
16          MR. WATKINS:  Object to form.
17     A.   I would hope they wouldn't use that type
18 of language.  I don't.
19     Q.   (By Ms. Norins) So then on page 6, lines
20 11 through 13, Officer Sullivan says:  "Let them
21 leave their fucking address or something or request
22 contact. I'll let them know how stupid they are."
23          Do you see that part of the conversation?
24     A.   Yes, ma'am.
25     Q.   And so is Officer Sullivan saying that he

1  call to 911.  If you can read over this conversation.
2  It goes on to the bottom of page 11.  And let me know
3  when you're done.
4          Have you had a chance to read that
5  transcript?
6      A.   Yes, ma'am.
7      Q.   Ms. Prospero starts out talking with the
8  operator, John Archibald, and she says at lines 4
9  through 6:  "There's tons of shots and they keep
10 going and going and going around the Chevron
11 station."
12          Is she -- is she communicating a noise
13 complaint there?
14     A.   Yes, ma'am.
15     Q.   And then at line 10 through 12, she says:
16 "It's too close to the neighborhood.  The shots are
17 coming too close."
18          And there is she communicating a safety
19 concern?
20     A.   No, ma'am.  I believe it's continuation of
21 the noise complaint.
22     Q.   The fact that when she says, "it's too
23 close to the neighborhood," that has no safety
24 implications in your view?
25     A.   In the context of the call, no, ma'am.

1    Q.    And a little bit further down, she says:
2  "But they're not, because of the noise ordinances,
3  they're not supposed to have that," referring to the
4  hunting club.
5        When she says "noise ordinances," would
6  she be referring to the Camden County nuisance
7  ordinance that we talked about before?
8    A.    No, ma'am.  I have no idea she's -- she's
9  talking about noise ordinance and the city has a
10  noise ordinance, but not the county.
11    Q.    But the county has a nuisance ordinance
12  that covers noise that we talked about earlier;
13  right?
14        MR. WATKINS:  We'll stipulate that the
15        county has the nuisance ordinance we talked
16        about earlier.
17        MS. NORINS:  Okay.
18    Q.    (By Ms. Norins) So isn't that what she
19  would be referring to there in that statement about
20  noise ordinances?
21        MR. WATKINS:  Object to form.  He's
22        already answered he thinks.  If you ask him to
23        speculate, which is what that question is asking
24        him to do, as to what your client is referring
25        to in a call, he gave his opinion that he

GILBERT & JONES

1        thought it was the city ordinance.  You didn't
2        like that answer.  So you've asked him now the
3        exact same question again.
4        The question's objectionable, Clare,
5        because it calls for sheer speculation on his
6        part as to what your client was referring to.
7        And beyond that, he's asked and answered it to
8        the best of his ability three hours into this
9        deposition.  But . . .
10    Q.    (By Ms. Norins) So when she says noise
11  ordinance, do you know what she means by that?
12    A.    It means a noise ordinance.  The county
13  does not have a noise ordinance.  The city does.  I
14  would assume she's referring to the city noise
15  ordinance.
16    Q.    Okay.  All right.  I think you had
17  testified earlier that the Chevron off of Exit 14 was
18  maybe a mile, mile and a half from Mrs. Prospero's
19  neighborhood; is that correct?
20        MR. WATKINS:  Object to form.
21    A.    I believe I testified that I wasn't sure.
22  I was guessing about a mile to a mile and a half.  I
23  didn't testify that that's how far it was.
24    Q.    (By Ms. Norins) Okay.  But that's your
25  estimate.  And from what we saw on the transcript

GILBERT & JONES

1  with Sullivan speaking to Nikki Flowers, he believes
2  the shots are coming from the Paulk's property; is
3  that correct?
4    A.    Yes, ma'am.  That's what the transcript
5  says.
6    Q.    Okay.  And in Officer Sullivan's
7  interrogatory responses in this case, he identified
8  the Paulk's property as consisting of parcel No.
9  077021, parcel No. 077021A and parcel No. 077021B.
10  Do you have any reason to dispute that those are the
11  parcel numbers that the Paulks own?
12    A.    No, ma'am.
13    Q.    And so I'm going to share with you an
14  aerial photo from the county tax assessors' office in
15  Camden County.  Do you see that?  And I can make it
16  larger, I think.  Hold on.  Sorry.  I'm trying to get
17  it to go into full screen here.
18        Okay.  Can you see that?
19    A.    Yes.
20    Q.    Okay.  So here we have in the aqua
21  highlighted rectangle, that's 84 Magna Carta Drive,
22  the Prospero's address.  Do you see it down here
23  where my cursor is?
24    A.    Yes, ma'am.
25    Q.    Okay.  And you've been to their house

GILBERT & JONES

1  before; correct?
2    A.    Yes, ma'am.
3    Q.    And so does this rectangle that shows 84
4  Magna Carta Drive, does that comport with your
5  recollection of where the house is located?
6    A.    Yes, ma'am.
7    Q.    And then we have the Paulk's property
8  parcels.  We have 077021.  Do you see where my cursor
9  is?
10    A.    Yes, ma'am.
11    Q.    And 077021A is another one that they own?
12    A.    Yes, ma'am.
13    Q.    And then 077021B is another piece of their
14  property.
15    A.    Yes, ma'am.
16    Q.    And so is it fair to say that these
17  properties that the Paulks own all border the lake
18  that's behind the Prospero's house?
19    A.    Parts of them, yes, ma'am.
20    Q.    Okay.  And so someone shooting on the
21  Paulk's property, could -- could they be shooting in
22  very close proximity to this lake behind the
23  Prospero's home?
24    A.    I don't know how to answer that.  They
25  could.

GILBERT & JONES

1    Q.   And because this is such a large area,

2  those three parcels that the Paulks own, would you

3  need to go -- would you need to go and actually see

4  where the shots were coming from to know if they were

5  close to the Prosperos or not?

6    A.   I don't know.

7    Q.   Well, would you be able to tell where on

8  these three parcels of property the shots were coming

9  from without going to see?

10    A.   I would want to go see.

11    Q.   All right. Let's stop sharing. Okay. So

12  turning back to this 911 call, the transcript, on

13  pages 8 through 11, referring to page 9 at line 7

14  through 8, Mrs. Prospero says -- she's been asked:

15  "Do you want to see a deputy?"

16         She says: "No, I don't. I just want it

17  stopped."

18         And what is she communicating there, to

19  your understanding?

20         MR. WATKINS: Object to form.

21    A.   She's -- she's complaining about the

22  noise.

23    Q.   (By Ms. Norins) She's saying she wants it

24  stopped; correct?

25         MR. WATKINS: Object to form.

1    A.   Yes. She wants the -- she wants the noise

2  to stop.

3    Q.   (By Ms. Norins) And then also on this same

4  page up at the very top in lines 1 through 2, she

5  says there: "We just want it stopped." Is that what

6  the transcript says?

7    A.   Yes, ma'am. That's what the transcript

8  says.

9    Q.   And so is she stating there that that's

10  what she's hoping to achieve with her call?

11    A.   The deputy and the judge determined that

12  the purpose was to disrupt the 911 center and her SM.

13    Q.   But Mrs. Prospero's own words, is she

14  stating her purpose for calling is that she just

15  wants it stopped, referring to the gunshots?

16    A.   I don't see the word "purpose" anywhere in

17  there.

18    Q.   Is that statement communicating her

19  purpose for calling?

20         MR. WATKINS: Object to form.

21    A.   I think that statement's a continuation of

22  the harassment.

23    Q.   (By Ms. Norins) So asking to have the

24  gunshots stopped, you're stating constitutes

25  harassment?

1    A.   It's the contact -- it's the call. You

2  can't nitpick the sentence in its entirety. The call

3  in its entirety is -- it's the third call. She's

4  trying to harass and disrupt the 911 center. She's

5  threatened to call the governor. She's threatened to

6  call TV stations. It's harassment.

7    Q.   So when she says that she is going to call

8  the TV station, that was in response to

9  Sergeant Flowers saying, "We've dispatched the deputy

10  to come to your residence"?

11         Do you see that on page 10? Page 10 at

12  line 23, Mrs. Prospero says: "Well, I don't want

13  anybody at our house here. It's Thanksgiving and we

14  don't -- we have -- we don't want anybody at our

15  house. We're not the ones doing anything wrong."

16         Do you see that? Sorry. I need you to

17  confirm that you saw that on the transcript.

18    A.   I see it, yes, ma'am.

19    Q.   And then she says: "But I can go to the

20  TV station." Is that what you're referring to when

21  you say she said she was going to call the TV

22  station?

23    A.   Well, it says it there, but it also says

24  it down at the bottom where she says: "Well, we'll

25  call the TV station."

1    Q.   Right. And that's also in response to

2  Sergeant Flowers saying he --

3         THE COURT REPORTER: I'm sorry,

4  Ms. Norins. Could you repeat that. You went in

5  and out.

6         MS. NORINS: So my question?

7         THE COURT REPORTER: Yes, ma'am.

8         MS. NORINS: What's the last thing that

9  you have, Annette?

10         THE COURT REPORTER: And that's also in

11  response to Sergeant Flowers saying.

12         MS. NORINS: That the deputy is on his way

13  to come and explain to you in person.

14         MR. WATKINS: So you want to skip from

15  there down to -- you want to skip those next

16  two -- you're skipping these next two

17  communications and then going to the TV and

18  asking if it's in response to something up

19  above?

20         MS. NORINS: Yes.

21    Q.   (By Ms. Norins) I mean, those next two

22  communications: "Well, I am not answering the door.

23  We're leaving. Good-bye." That's Mrs. Prospero.

24         And then Sergeant Flowers says: "Okay."

25         And Mrs. Prospero says: "We will call the

1 TV station"?

2     MR. WATKINS: Your question, for the

3 witness, your question is whether the last

4 Prospero comment is in response to the one up

5 above that starts okay.

6     Q. (By Ms. Norins) So my question is: For

7 both of these references that Mrs. Prospero made to

8 calling the TV station, were those in response to

9 Sergeant Flowers saying a deputy was coming to their

10 house?

11     A. I'm sorry. I don't believe so.

12     Q. Okay. Okay. So going ahead a couple of

13 pages in the transcript to page 16. This is a

14 conversation between Officer Sullivan and the part

15 I'm going to ask you about Mary Hess, who is a

16 dispatch operator. And if you could just read that

17 and let me know when you're finished.

18     MR. WATKINS: Pain 16, Clare?

19     MS. NORINS: Yes. 16.

20     MR. WATKINS: Okay. Okay.

21     Q. (By Ms. Norins) Okay. So on page 16,

22 lines 6 through 7, Officer Sullivan asks: "Did

23 Ms. Prospero curse at anybody or use offensive or

24 obscene language?"

25     And Mary Hess answers: "She didn't use

---

1 offensive language or curse." Do you see that?

2     A. Yes, ma'am.

3     Q. Okay. And then a little bit further down,

4 Mary Hess says: "She just was not a happy camper and

5 she wanted y'all to get it taken care of." Do you

6 see that?

7     A. Yes, ma'am.

8     Q. And in this statement, is Mary Hess

9 reporting to Officer Sullivan Mrs. Prospero's purpose

10 in calling?

11     MR. WATKINS: Object to form.

12     A. It appears to me that the deputy's trying

13 to get information from dispatch. He's in the

14 process of looking up a code section, I would assume,

15 and he's reading the code section. That's why he's

16 asking about the offensive or obscene language.

17     Q. Right.

18     A. But the deputy and the judge determined

19 the purpose of the call to be disruptive to the 911

20 center and harassment that violated -- it's a

21 misdemeanor violation of Georgia law.

22     Q. So, from looking at the transcript, is it

23 fair to say that Officer Sullivan was not a party to

24 any of the Prosperos' calls? He wasn't on the line

25 during the calls?

---

1     A. I would assume that to be correct.

2     Q. Okay. And so he's talking to the dispatch

3 operators to find out what was said on the calls; is

4 that fair to say?

5     A. Yes, ma'am.

6     Q. And so here Mary Hess, one of the

7 operators, is stating she, referring to Ms. Prospero,

8 just was not a happy camper and she wanted y'all to

9 get it taken care of.

10     And so my question is: Is Mary Hess

11 communicating what the dispatch officers understood

12 Mrs. Prospero's purpose to be in calling?

13     A. It doesn't say the word "purpose" in

14 there.

15     Q. You can use the word "purpose," "reason."

16 Are they communicating -- is Mary Hess communicating

17 to Officer Sullivan the reason that Mrs. Prospero was

18 calling as far as the dispatch operators can tell?

19     A. No. No, ma'am.

20     Q. I'm sorry. I didn't hear your answer.

21     A. No, ma'am.

22     Q. So what do you think Mary Hess is

23 communicating there to Officer Sullivan?

24     A. The complaint.

25     Q. That she wanted to get it taken care of;

---

1 correct?

2     A. She wanted the noise to stop.

3     Q. So, again, based on your years of

4 experience as sheriff and before that as deputy in

5 other positions in the sheriff's office, if you were

6 going to charge someone with unlawful conduct during

7 a 911 call, would you want to listen to the call

8 before you made the charge?

9     A. Not necessarily.

10     Q. You don't think it would be important to

11 hear what was actually said during the call before

12 you decided to charge?

13     A. He was talking to the 911 center. The

14 deputy was talking to the 911 center.

15     Q. Right. But he had the option to listen to

16 the recording of the call as well. That's been

17 established by prior testimony.

18     So if he has the option to listen, would

19 that not be preferable to actually hear the call as

20 opposed to relying on what the operator tells him

21 about the call?

22     A. I would imagine that Deputy Sullivan

23 trusted the operators telling him what would . . .

24     Q. And I'm just asking would it not be a more

25 direct source of information to just listen to the

1  recording of the call itself?
2      A.    I suppose he could have.
3      Q.    Would that have been a more direct way for
4  him to know what actually was said on the call and
5  how it was said?
6      A.    Sure.  He'd be able to listen to the voice
7  inflexion.
8      Q.    And would that be relevant to deciding
9  whether to seek a warrant for her arrest?
10     A.    Not necessarily.
11     Q.    So in your view, then, it was fine for
12 Officer Sullivan to just rely on what the dispatch
13 operators told him and not actually listen to the
14 call himself?
15     A.    Yes, ma'am.
16     Q.    So with respect to Mrs. Prospero's arrest,
17 which occurred in January of 2019, did you see her at
18 any time while she was in custody pursuant to her
19 arrest?
20     A.    No, ma'am.
21     Q.    She reports that while she was in the,
22 what Colonel Byerly called the makeshift courtroom
23 waiting to have her bond hearing with the judge, that
24 you walked by and saw her through the window in the
25 door.  Do you recall seeing her in that room?

GILBERT & JONES

1      A.    No, ma'am.
2      Q.    Were you aware that she was in custody in
3  January of 2019?
4      A.    After the fact.
5      Q.    While she was still in custody, were you
6  aware that she was there?
7      A.    No, ma'am.
8      Q.    With respect to her bond appearance, I'm
9  going to ask you to look at a document that we
10 previously marked.  Let me find that.
11           MR. WATKINS:  Can you give me one minute.
12 I need to step out for just one second.
13           MS. NORINS:  Yeah.  Sure.  That's fine.
14           (Recess from 1:18 p.m. to 1:26 p.m.)
15     Q.    (By Ms. Norins) Okay.  So earlier I had
16 you, sir, look at an aerial view photograph/map that
17 showed the 84 Magna Carta Drive property parcel and
18 then also the property parcels identified as
19 belonging to the Paulks.  Do you recall looking at
20 that map?
21     A.    Yes, ma'am.
22     Q.    Okay.  And so we're going to mark that map
23 as Plaintiff's Exhibit 37?  Is that what we're up to?
24           THE COURT REPORTER:  Yes, ma'am.
25           MS. NORINS:  37.  And Brad, can we

GILBERT & JONES

1  stipulate that that's the same map that we
2  looked at yesterday with Colonel Byerly as well?
3           MR. WATKINS:  It was one of the same ones.
4  I think we looked at a couple, didn't we?
5           MS. NORINS:  I think we only looked at one
6  that was the aerial view photo from the county
7  tax assessor's.
8           MR. WATKINS:  I don't remember.
9           (Plaintiff's Exhibit 37 was marked for
10 identification.)
11     Q.    (By Ms. Norins)  Okay.  So that map is now
12 Plaintiff's Exhibit No. 37.
13           All right.  So referring you to what was
14 previously marked as Plaintiff's Exhibit 16, this is
15 the Camden County Superior Court appearance bond for
16 Mrs. Prospero, and it's Bates No. P37.  Do you have
17 that in front of you?
18     A.    Yes, ma'am.
19     Q.    Okay.  And are you familiar with this kind
20 of documentation from a bond hearing?
21     A.    This wouldn't have come from the bond
22 hearing.  This would have been filled out by the jail
23 as a result of the bond hearing.
24     Q.    Okay.  Thank you for that clarification.
25 And is this a document that you're familiar with,

GILBERT & JONES

1  this type of document?
2      A.    Yes, ma'am.
3      Q.    And do you see where it says "Attested and
4  approved by" and then it has your signature and name?
5      A.    Yes, ma'am.  I see that.
6      Q.    Okay.  And was that a stamp that was used
7  to put your signature and name?
8      A.    Yes, ma'am.
9      Q.    Okay.  And did you personally stamp the
10 document or did someone do that for you?
11     A.    Someone else would have done that.
12     Q.    Okay.  Who would that have been?
13     A.    It could have been a number of people.
14     Q.    Okay.  What are the possibilities?  Not
15 their names but their positions.  Who would do that?
16     A.    My records clerk, my jail administrator,
17 my chief deputy, my executive assistant.  Those would
18 be the primary ones who would come to my mind.
19     Q.    Okay.  And they all have a stamp with your
20 signature and name?
21     A.    There's one stamp.  Actually, there's two.
22 My finance director has one also.
23     Q.    Okay.  And what does this mean where it
24 says attested and approved by, and then it has their
25 signature and name?

GILBERT & JONES

1     A.   If I approved the form of the bond.

2     Q.   By "form," what do you mean?

3     A.   Whether it's cash, property, bonding

4 agency.

5     Q.   Okay. So are you attesting and approving

6 the amount of the bond or just the --

7     A.   Not the amount, but that whoever signed it

8 over here, which is Okey Armitrout, that he has the

9 authority to bond this person out.

10     Q.   Okay. So you're attesting and approving

11 that it's okay for him to put up the bond for

12 Mrs. Prospero?

13     A.   Yes, ma'am.

14     Q.   And looking at this document, it has some

15 language about -- I'm looking kind of in the middle

16 of the document. It says: "Shall not depart thence

17 without leave of said court, then the above

18 obligation to be null and void." Do you see that

19 part of the sentence there?

20     MR. WATKINS: No, we have not found that.

21     Q.   (By Ms. Norins) Okay. It's right under

22 "to wit: Prospero Emma Jane. And then the next line

23 says: "And shall not depart thence without leave of

24 said court."

25     MR. WATKINS: It looks like it's a

1 continuation of a sentence. Would you like the

2 witness to read --

3     Q.   (By Ms. Norins) Yeah, read the whole

4 sentence, if you don't mind, and then I have a

5 question.

6     MR. WATKINS: Why don't we read it into

7 the record, if we could.

8     MS. NORINS: Okay. Here we go, Annette.

9     Q.   (By ms. Norins) "The condition of the

10 above obligation is such that the above bound

11 principle shall be and appear at the Superior Court

12 of said county at the time fixed by said court for

13 his or her arraignments. Notice of which said date

14 will be late furnished him or her by the clerk of

15 court and from day-to-day and term-to-term, then and

16 there to answer for the offenses of unlawful conduct

17 during 911 call, to wit: Prospero, Emma Jane, and

18 shall not depart thence without leave of said court,

19 then the above obligation to be null and void else to

20 remain in full force and in effect."

21     Did I read that correctly?

22     A.   Yes, ma'am.

23     Q.   Okay. And where it says, "shall not

24 depart thence," do you have an understanding of what

25 that means?

1     A.   That she's got to be present for her

2 arraignment.

3     Q.   Okay. So is this bond appearance

4 requiring Mrs. Prospero to appear at whatever time

5 the court gives her for her arraignment?

6     A.   Yes, ma'am.

7     Q.   And how -- how much advance notice does

8 the court typically give of arraignment dates?

9     A.   I have no idea.

10     Q.   Is it possible that the arraignment date

11 could be set just the day before it's happening?

12     A.   I guess anything's possible, but I

13 wouldn't believe that the court would typically act

14 that way.

15     Q.   Okay. In your experience, how much

16 advanced notice is given to defendants of their

17 arraignment date?

18     A.   I've seen it as far back as a month or

19 two.

20     Q.   And what's the shortest advanced notice

21 that you recall seeing?

22     MR. WATKINS: Are you talking about for

23 somebody that's been released on bond?

24     MS. NORINS: Yes.

25     MR. WATKINS: That's not in custody?

1     MS. NORINS: Right.

2     A.   I don't know of anything less than a

3 month.

4     Q.   (By Ms. Norins) Okay. And what happens if

5 you don't show up for your arraignment date?

6     A.   Normally you would be -- a bench warrant

7 would be issued for failure to appear.

8     Q.   And that would be a separate charge

9 against you?

10     A.   Yes, ma'am.

11     Q.   So it's pretty important to show up for

12 your arraignment?

13     A.   Absolutely.

14     Q.   So Mrs. Prospero was arrested on a Monday

15 night in January. And would a bond hearing normally

16 have been held on a Tuesday? Like are bond hearings

17 normally going on on Tuesdays?

18     A.   It depends on the magistrate.

19 Judge Lewis, I believe, set the bond on this?

20     Q.   Yes.

21     A.   It varies. Sometimes she'll do them in

22 the morning. Sometimes she'll do them in the

23 afternoon. Sometimes she'll do a Monday and then

24 Wednesday and Friday. It varies. There's no way to

25 predict how Judge Lewis is going to conduct her --

that's something you'd have to ask her.
Q. Okay. And is Judge Lewis the only magistrate judge that conducts bond hearings for Camden County Jail arrestees?
A. She's the chief magistrate, and then I don't know how many deputy magistrates she has.
Q. And do the deputy magistrates conduct bond hearings as well?
A. Yes, ma'am.
Q. Well, if it's a day that she's -- Magistrate Lewis is not hearing bonds, would one of the other judges typically be doing it?
A. If she asked them to, yes, ma'am.
Q. As far as you know, has Mrs. Prospero contacted the sheriff's office since her arrest in January of 2019?
A. I don't know.
Q. You're not aware of any contacts that she's made?
A. No, ma'am.
Q. So at any time either before or after Mrs. Prospero's arrest, did you have any conversations with her or -- sorry. Did you have any conversations about her with Ryan Sullivan?
A. Since her arrest?

Q. At any time either before or after her arrest, did you have any conversations about Mrs. Prospero with Ryan Sullivan?
A. Yesterday we passed in the front office and I told him I had a deposition today.
Q. And did you mention Mrs. Prospero?
A. Yes, ma'am.
THE COURT REPORTER: I'm sorry. What was the answer?
A. Yes, ma'am.
Q. (By Ms. Norins) And was anything else said during that conversation with Ryan Sullivan?
A. Not that I recollect. I was passing -- we were just literally passed in the office.
Q. Okay. And is that the only conversation you have ever had with Ryan Sullivan about Mrs. Prospero?
A. The best of my recollection.
Q. Okay. Have you had any conversations with Russell Prescott about Mrs. Prospero?
A. Not that I can recall.
Q. Have you had any conversations with John Archibald, who's a dispatch operator, about Mrs. Prospero?
A. Not that I can recall.

Q. Have you had any conversations with Susan Nikki Flowers about Mrs. Prospero?
A. Not that can I recall.
Q. Have you had any conversations with Mary Hess, who's also a dispatch operator, about Mrs. Prospero?
A. Not that I can recall.
Q. Do you know who Samantha Eason is? She used to work in the Camden County Jail.
A. No, ma'am. I'm sorry.
Q. You don't know who that is?
A. No, ma'am.
Q. Have you had any conversations about Mrs. Prospero with Rob Mastroianni?
A. Yes, ma'am. I told you about that earlier.
Q. Right. About the depositions?
A. Yes, ma'am.
Q. Okay. Other than those conversations, have you had any conversations with -- he's a major -- Major Mastroianni about Mrs. Prospero?
A. None that I can recall.
Q. And have you had any conversations with Chuck Byerly about Mrs. Prospero other than talking about the depositions?

A. Yes, ma'am. Remember, I assigned him to that case. We had discussed it and he had -- he already knew who the Prosperos were. I believe that they had, before I took office as sheriff, that they had been making calls to the office.
Q. Okay. And other than that conversation where you assigned Byerly to the Prospero's case, as you referred to it, have you had any other conversations with him about Mrs. Prospero?
A. I'm sure that she's come up in passing, but I -- I can't recall the content of conversations with him.
Q. How many conversations in total do you think you've had with Byerly about Mrs. Prospero?
A. I have no earthly idea.
Q. Did you speak to anyone from the district attorney's office about Mrs. Prospero at any time?
A. No. No, ma'am. Not that I can recall.
Q. Okay. Sorry. There's one thing I -- just give me a minute. There's a document that I wanted to ask you about I need to locate. If you need to take a break, you can. I'll be right back.
(Recess from 1:41 p.m. to 1:45 p.m.)
MS. NORINS: Brad, the document is defendant's production at page 45. It's part of

1    the Camden County sheriff's call log.
2        MR. WATKINS:  Okay.  Looks like the first
3    date is 8/3/09 and the last date is 12/17/2014?
4        MS. NORINS:  Page 45 it's about a 2011
5    call from the Prosperos.
6        MR. WATKINS:  Okay.  I got it.  He has the
7    document, Clare.
8        MS. NORINS:  Oh, I'm sorry.  I couldn't
9    hear you.
10   Q.  (By Ms. Norins) Okay.  So this is a
11   complaint from 2011 it looks like Mrs. Prospero made
12   about loud noise.  Is that what you see there?
13   A.    Yes, ma'am.
14   Q.    Okay.  And then down in like the last
15   third of the page, it says:  "Made contact with owner
16   of property (Jim Proctor) Will 1025 with the deputies
17   if they need a gate unlocked."
18        Is that you, the Jim Proctor referred to
19   there?
20   A.    I believe so, yes, ma'am.
21   Q.    And can you -- are you the property owner?
22   A.    We own some property in the area, yes,
23   ma'am.  My brother, my sister and myself.
24   Q.    Okay.  And where is that property in
25   relation to the Prospero's house?

GILBERT & JONES

1    A.    It would be east of there.
2    Q.    Okay.  Would it have been visible on the
3    map that we looked at with the property parcels?  You
4    can look at that again if you want.
5    A.    Yes, ma'am.
6    Q.    Yes, let's look at it?
7    A.    No.  Yes, it is visible on the map.
8    Q.    Okay.  Let's look at that then.  Okay.
9    Are you seeing the map?
10   A.    Yes, ma'am.
11   Q.    Okay.  So can you direct me where your
12   property is?
13   A.    A portion of it was where your cursor just
14   was.
15   Q.    On this area that's marked 090003?
16   A.    Yes, ma'am.  That's a portion of it.
17   Q.    Okay.  And so how many acres do you own in
18   that area with other family members?
19   A.    In that area?
20   Q.    Well, how large is the property that you
21   own that's in this area of 090003?
22   A.    The entire tract of land that is out there
23   is approximately 1500 acres.
24   Q.    And is that all owned by yourself and your
25   family members?

GILBERT & JONES

1    A.    Yes, ma'am.
2    Q.    Were you shooting any guns on Thanksgiving
3    Day of 2018?
4    A.    No, ma'am.
5    Q.    Do you have any kind of informal hunting
6    club that goes on on your property?
7    A.    I don't have a hunting club, but there is
8    a hunting club that uses that property.
9    Q.    And who comprises that hunting club?
10   A.    My contact with the club is Scott Henning.
11   Q.    And is he a joint property owner with you?
12   A.    No, ma'am.
13   Q.    He has his own property that he owns in
14   that area?
15   A.    Yes, ma'am.  Well, I say it's him.  I
16   believe it's possibly he and his siblings and mother.
17   I'm not sure who has title to the property.
18   Q.    But it's in their family, the Henning
19   family?
20   A.    Yes, ma'am.
21   Q.    I'm so sorry.  What acreage do you own
22   with your family members?
23   A.    That tract of land is approximately 1500
24   acres.
25   Q.    That's all owned by you and your family?

GILBERT & JONES

1    A.    Yes, ma'am.
2    Q.    Okay.  And so with respect to this 2011
3    complaint, do you have a recollection of being
4    contacted by the sheriff's deputies?
5    A.    No, ma'am.  I don't recall it.
6    Q.    In 2011, were you working with the
7    Brunswick Police Department?  No, you weren't, were
8    you?
9    A.    No, ma'am.  I went to Brunswick in March
10   of 2012.
11   Q.    Right.  Okay.  So in 2011, were you
12   working for the Camden County Sheriff's Office?
13   A.    Yes, ma'am.  I would have been working in
14   the courthouse.
15   Q.    Is that when you were a bailiff?
16   A.    Yes, ma'am.
17   Q.    Okay.  I'm just looking at the report.
18   Okay.  So where it says on this report -- and, again,
19   this is Bates No. 45.  And let's go ahead and mark
20   this as -- this one page as Plaintiff's Exhibit 38.
21   Is that where we're on?
22        THE COURT REPORTER:  Yes, ma'am.
23        (Plaintiff's Exhibit 38 was marked for
24   identification.)
25   Q.    (By Ms. Norins) You said you don't have a

GILBERT & JONES

1  recollection of being contacted by the deputies on
2  this date. The complaint or the report refers to
3  unable to get into the gates. They are locked.
4           Do you know what gates that would be
5  referring to?
6       A.    I'm assuming that since it has my name
7  adjoining to it, it would be one of three gates along
8  that dirt road, which would be Satilla Bluff Road
9  West.
10      Q.    Okay. And of those three gates, are you
11 the property owner of one set or all three sets of
12 gates?
13      A.    Well, it would be the three referred to,
14 where it says "made contact with property owner," and
15 has my name, there are three gates on that piece of
16 property.
17      Q.    Okay.
18      A.    In that area.
19      Q.    Okay. And do you allow people to come
20 onto your property for purposes of shooting or
21 hunting?
22      A.    Hunting club has access to it and they use
23 it.
24      Q.    Okay. And that's the hunting club that
25 involves Mr. Henning and, I'm sorry, Mr. Gentry, I

1  think you told me?
2       A.    Yes, ma'am.
3             THE COURT REPORTER: I'm sorry. Could you
4  repeat that. Involves Mr. Henning and?
5             MS. NORINS: Mr. Gentry and the Paulks.
6             THE COURT REPORTER: And your answer, sir?
7       A.    Henning and Gentry, but the Paulks aren't
8  part of that hunting club, I don't believe.
9       Q.    (By Ms. Norins) Okay. So the property
10 that you own that we saw in the map as part of parcel
11 090003 is used as a hunting club by at least
12 Mr. Henning and Mr. Gentry; is that fair to say?
13      A.    And others, yes, ma'am.
14      Q.    And others. Okay. And do they --
15      A.    I'm sorry. I was just going to say I
16 don't know who the members of the club are.
17      Q.    Do they have to get your permission to use
18 your land as a informal hunting club?
19      A.    Yes, ma'am. They -- they -- we have an
20 agreement with them that it is an annual agreement.
21      Q.    Is that a written agreement?
22      A.    Yes, ma'am.
23      Q.    And did you have such an agreement in
24 2018?
25      A.    Yes, ma'am.

1       Q.    And do you have an agreement now?
2       A.    Yes, ma'am.
3       Q.    Okay. So I know you said you don't have a
4  recollection of being contacted on this date, which
5  looks like April 1st of 2011. Do you recall any
6  other times that you were contacted in your capacity
7  as a property owner about the Prospero's complaints
8  of shooting?
9       A.    No.
10      Q.    Okay. And just so I understand, and sorry
11 if I'm repeating myself, but you are the owner of the
12 entire property parcel that's numbered 090003?
13      A.    Myself and my siblings.
14      Q.    Okay. Okay. Let's just take a
15 five-minute break and then I think we're done. I
16 just want to look over everything one last time.
17 Thank you for your patience.
18            (Recess from 1:57 p.m. to 2:04 p.m.)
19            (By Ms. Norins) Okay. Sheriff, just a few
20 more questions. You said you were not personally
21 shooting guns on your property on Thanksgiving Day
22 2018; is that correct?
23      A.    That's correct.
24      Q.    And was the informal hunting club that you
25 have a written agreement with to use your property,

1  were any of those folks shooting their guns on
2  Thanksgiving Day 2018 on your property?
3       A.    I have no idea.
4       Q.    Where were you on that day?
5       A.    I would have either been at my mother's
6  house or at my in-laws' house, one of the two.
7       Q.    And where's your mother's house, just
8  generally speaking?
9       A.    In Woodbine.
10      Q.    Okay. And where are your in-laws' house
11 or is your in-laws' house?
12      A.    I'm sorry. Deland, Florida.
13      Q.    Okay. So you would have either been in
14 Woodbine or Florida?
15      A.    Yes, ma'am.
16      Q.    The informal hunting club, do they have
17 permission to just come and go on your property as
18 they wish to? They don't have to notify you like,
19 hey, you're coming today?
20      A.    That would be correct.
21      Q.    So they just come and go at will?
22      A.    Yes, ma'am. There're two lots. A lot
23 that belongs to the family and then they have a lot
24 for their hunting club.
25      Q.    Okay. So is it possible that the informal

1 hunting club was using your property to shoot on
2 Thanksgiving Day 2018?
3     A.    Yes, ma'am. That's possible.
4     Q.    And they would not have notified you
5 either way if they were doing that?
6     A.    No, ma'am.
7     Q.    Is your residence on that property?
8     A.    No, ma'am.
9     Q.    Okay. And generally speaking, where is
10 your residence?
11     A.    It's in Woodbine.
12     Q.    In the city proper? Within the city
13 limits?
14     A.    Yes, ma'am.
15     Q.    So other than the 2011 complaint that we
16 looked at, which we marked as Plaintiff's Exhibit 48,
17 have you received any complaints at any time from
18 anybody about shooting on your property?
19     A.    No, ma'am. Not that I'm aware of.
20     Q.    And are you aware of any complaints, other
21 than from the Prosperos, about shooting on the
22 Paulk's property?
23     A.    No, ma'am. As far as I know, the
24 Prosperos are the only ones that have complained.
25     Q.    Is it known throughout the deputies in the

GILBERT & JONES

1 sheriff's office that you own the property out by the
2 Chevron off Exit 14?
3     A.    There are a few that may know, but as a
4 general rule, no, ma'am.
5     Q.    Does Rusty Prescott know that?
6 Russell Prescott?
7     A.    Rusty might know.
8     Q.    Would Ryan Sullivan know that?
9     A.    I doubt it.
10     Q.    Okay. Who else that you can think of on
11 the sheriff's office team would know that you own
12 that property?
13     A.    I would imagine that Major Chaney knows.
14 Major Mastroianni knows, and so would Chuck Byerly.
15     MS. NORINS: Okay. I don't think I have
16 any other questions. Do you have any, Brad?
17     MR. WATKINS: I do. Just a couple.
18 Annette, can you hear me okay?
19     THE COURT REPORTER: Yes, sir, I can.
20     MR. WATKINS: I always feel like I'm
21 screaming.
22               EXAMINATION
23 BY MR. WATKINS:
24     Q.    Let me ask you, Sheriff: You were asked
25 whether you would have gone out to investigate a

GILBERT & JONES

1 shooting or shots coming from property under certain
2 situations. And I think your answer was something to
3 the effect of I would want to see, but the transcript
4 will speak for itself. Do you recall that line of
5 questioning?
6     A.    Yes, sir.
7     Q.    Okay. Let me ask you if -- if the
8 complaint was a noise complaint, an annoyance based
9 on noise, and you had some information about the
10 nature of the shooting, would, in that circumstance,
11 you have necessarily gone out to the property?
12     MS. NORINS: Object to form. Go ahead.
13     A.    Not necessarily.
14     Q.    (By Mr. Watkins) Okay. Would your
15 decision be based on the circumstances presented to
16 you?
17     A.    Yes, sir.
18     MR. WATKINS: I don't have any other
19 questions.
20     MS. NORINS: Okay. Same order for the
21 transcript, please.
22     (Deposition concluded at 2:09 p.m.)
23     (Pursuant to Rule 30(e) of the Federal
24 Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
25 signature of the witness has been reserved.)

GILBERT & JONES

1
2          CERTIFICATE OF COURT REPORTER
3 STATE OF GEORGIA:
4 COUNTY OF CHATHAM:
5
6       I hereby certify that the foregoing
7 transcript was reported as stated in the caption and
the questions and answers thereto were reduced to
writing by me; that the foregoing 137 pages represent
8 a true, correct, and complete transcript of the
evidence given on Wednesday, March 10, 2021, by the
9 witness, SHERIFF JIM PROCTOR, who was first duly
sworn by me.
10
      I certify that I am not disqualified
11 for a relationship of interest under
O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
12 Reporter here as an employee of Gilbert & Jones, Inc.
who was contacted by Clare Norins, Esquire, to
13 provide court reporting services for the proceedings;
I will not be taking these proceedings under any
14 contract that is prohibited by O.C.G.A. 15-14-37(a)
and (b) or Article 7.C. of the Rules and Regulations
15 of the Board; and by the attached disclosure form I
confirm that neither I nor Gilbert & Jones, Inc. are
16 a party to a contract prohibited by
O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the
17 Rules and Regulations of the Board.
18       This 1st day of April, 2021.
19
20
21
22
23 _____
24     Annette Pacheco, CCR-B-2153
25

GILBERT & JONES

# DISCLOSURE OF NO CONTRACT

I, Debbie Gilbert, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Gilbert & Jones, Inc. was contacted by Clare Norins, Esquire, to provide court reporting services for these proceedings and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board for the taking of these proceedings.

There is no contract to provide reporting services between Gilbert & Jones, Inc. or any person with whom Gilbert & Jones, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 1st day of April, 2021.

_____
**Debbie Gilbert, FIRM REPRESENTATIVE**
**Gilbert & Jones, Inc.**

**GILBERT & JONES**

---

**DEPOSITION OF: SHERIFF JIM PROCTOR/AP**

I do hereby certify that I have read all questions propounded to me and all answers given by me on March 10, 2021, taken before Annette Pacheco, and that:

___ 1) There are no changes noted.
___ 2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ___ Line No. ___ should read:_____
_____

Page No. ___ Line No. ___ should read: _____
_____

Page No. ___ Line No. ___ should read: _____
_____

Page No. ___ Line No. ___ should read: _____
_____

Page No. ___ Line No. ___ should read: _____
_____

Page No. ___ Line No. ___ should read: _____
_____

Page No. ___ Line No. ___ should read: _____
_____

Page No. ___ Line No. ___ should read:_____
_____

Page No. ___ Line No. ___ should read:_____
_____

**GILBERT & JONES**

---

**DEPOSITION OF: SHERIFF JIM PROCTOR/AP**

Page No. ___ Line No. ___ should read:_____
_____

Page No. ___ Line No. ___ should read:_____
_____

Page No. ___ Line No. ___ should read:_____
_____

Page No. ___ Line No. ___ should read:_____
_____

Page No. ___ Line No. ___ should read:_____
_____

Page No. ___ Line No. ___ should read:_____
_____

Page No. ___ Line No. ___ should read:_____
_____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

_____
**SHERIFF JIM PROCTOR**

Sworn to and subscribed before me, This the ___ day of _____, 20__.

_____
**Notary Public**
My commission expires: _____

Please forward corrections to:

**Gilbert & Jones, Inc.**
**P. O. Box 14515**
**Savannah, GA 31416**
**(912) 355-0320**
**GILBERT & JONES**