# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

EMMA JANE PROSPERO,

    Plaintiff,

    v.                                          2:20-CV-110

DEPUTY RYAN SULLIVAN,
LT. RUSSELL PRESCOTT, and
SHERIFF JAMES PROCTOR,
in their individual
capacities,

    Defendants.

## ORDER

Before the Court is Plaintiff Emma Jane Prospero's motion for partial summary judgment as to her malicious prosecution claim and the issue of probable cause, dkt. no. 149, and Defendants Ryan Sullivan, Russell Prescott, and Jim Proctor's motion for summary judgment as to all Plaintiff's claims, dkt. no. 170. The motions have been extensively briefed and are ripe for review. Dkt. Nos. 149, 171, 174, 175, 179, 201, 204, 217, 223, 224, 229, 230. For the reasons stated below, Plaintiff's motion is **DENIED** and Defendants' motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

Plaintiff Emma Jane Prospero was arrested for calling 911. She brought this case alleging multiple violations of her

constitutional rights, namely a retaliation claim arising under the First Amendment and a malicious prosecution claim arising under the Fourth Amendment. She also alleges that one of the officers who obtained the warrant for her arrest was negligently hired and retained by the county sheriff.

This case involves a constellation of facts, which, when considering the various causes of action, do not fit neatly into a single narrative. With this in mind, the Court will first discuss the facts relevant to Plaintiff's First and Fourth Amendment claims. Next, the Court will discuss the facts relevant to Plaintiff's negligent hiring and retention claim.

**I.   Factual Background**

**1. Plaintiff's First and Fourth Amendment Claims**

      **a. Plaintiff's History with the Camden County Sheriff's Office**

Plaintiff is a serial 911 caller. After moving to Camden County in 2011, Plaintiff began regularly contacting the Camden County Sheriff's Office ("Sheriff's Office"). Dkt. No. 127 at 40:13-16. Plaintiff herself even admitted that she called the 911 Center operated by the Sheriff's Office "a gazillion times" before the incident on November 22, 2018. Id. at 176:1. Plaintiff estimated that she has called the Sheriff's Office hundreds of times. Id. at 33:16-18. The subjects of Plaintiff's calls vary from noise complaints about barking dogs to neighbors allegedly

poisoning Plaintiff's koi fish. Dkt. No. 127-6. Plaintiff's most common reason for calling the Sheriff's Office, however, was to report the sound of gunshots. Id.

From 2011 to 2018, Plaintiff regularly called the Sheriff's Office to report gunfire near her home. Id. The gunfire came from the same location, a property near Plaintiff's home located behind a Chevron gas station. Dkt. No. 127 at 222:10-14; Dkt. No. 127-6. The Sheriff's Office determined that this property was a hunting club. Id. at 33 (noting in 2015 that the property is a hunting club located near Plaintiff's neighborhood). Often the gunfire lasted for hours, and the dispatcher speaking with Plaintiff on the phone could hear the gunshots. Dkt. No. 127-6. The Sheriff's Office repeatedly investigated the gunfire and repeatedly came to the same conclusion that the gunfire was legal and safe. See id. at 17 (noting that the property owner is "allowed to shoot back there"); Id. at 18 (noting the "shooting appears to be [done in] a safe [manner] and is not done in the direction of any homes"); Id. at 26 (noting the shooters "have permission to shoot" in the area); Id. at 27 (noting the owner of the property has a permit to shoot on his property); Id. at 34 (noting the subject of Plaintiff's call "is legally and safely shooting" and that the responding officer "[advised subject] to continue shooting"); Dkt. No. 127-7 at 6 ("The complaint was in the county, where it is lawful to shoot firearms."); Id. at 12 ("I [Deputy Jerry Furr]

made contact with the residence owner . . . and advised him of the complaint. I observed the location of where [the owner] was shooting and deemed [the owner] to be shooting in a safe manner. I advised [the owner] that there were no laws being violated and that he may continue to shoot in a safe manner."). Plaintiff also consistently told the dispatcher that she did not want contact with a deputy and wanted the Sheriff's Office to stop the shooting. Dkt. No. 127-6.

Plaintiff claims that "[t]he sheriff's office told us to call any time we heard even one gunshot." Dkt. No. 126 at 9:4–5. Plaintiff also claims that Camden County Sheriff Jim Proctor and Major Charles Byerly visited her home regarding the gunshots and told her "[t]he squeaky wheel gets the oil," which Plaintiff interpreted to mean that she should "call any time we heard even one shot." Id. at 9:7–9. Sheriff Proctor denies this. He claims that his office did not tell Plaintiff that "the squeaky wheel gets the oil" and did not tell Plaintiff to call any time she heard a gunshot. Dkt. No. 133 at 31:21–25, 32:1–8; 47:1–4.

Sheriff Proctor eventually addressed Plaintiff's steady barrage of phone calls complaining of the shooting. Id. at 31–34. Sheriff Proctor explained that "[a]fter multiple phone calls to my office, the 911 center, the dispatch, multiple, multiple phone calls, . . . it always seemed as though they were targeting the neighbors for various things . . . a lot about the shooting." Id.

4

at 31:20-24. The Sheriff believed that Plaintiff "was trying to use [his] office to further her interests in the neighborhood. Such as the shooting, she was apparently very opposed to anybody shooting anywhere in the neighborhood, even in the adjoining wooded lands." Id. at 31:25, 32:1-5. On May 10, 2017, Sheriff Proctor sent Plaintiff a letter admonishing her behavior. Dkt. No. 133-2. Specifically, the Sheriff explained: "I've told you if you feel threatened to call 911 and a deputy will be dispatched to your location. I will not allow you, nor anyone else, to use my office to further your personal agendas. If you have an emergency call our 911 center or if you have a concern feel free to call the non-emergency number." Id.

Plaintiff disputes this. She claims that Sheriff Proctor's letter is inconsistent with what he told Plaintiff in a previous meeting. Dkt. No. 127 at 136-38. After receiving the letter, Plaintiff believed "[i]f something's a nonemergency, I'll call the nonemergency [number]. But if it's something that I feel is important, really important, I call 911." Id. at 137:1-3.

### b. Plaintiff's Initial Non-Emergency Phone Calls on November 22, 2018

Plaintiff and her husband called the Camden County Sheriff's Office non-emergency phone number twice on November 22, 2018, which was Thanksgiving Day. Dkt. No. 127-20. Plaintiff's first call began like countless other calls: "There's a ton of shots behind the

Chevron station over here . . . . Can you get somebody over there
to tell them to stop shooting?" Dkt. No. 149-5 at 2. Plaintiff
reiterated "I just want the shooting to stop. I'm trying to enjoy
my Thanksgiving." Id. The dispatcher taking the call, John
Archibald, told Plaintiff that someone would respond to the call.
Id. The call then ended amicably. Id.

Following Plaintiff's first call, Dispatch contacted Deputy
Ryan Sullivan. Dkt. No. 149-10 at 3. Dispatch told Deputy Sullivan,
"Caller is advising she's hearing shots coming from behind [the
Chevron station]. She wants it to stop so she can enjoy her
dinner." Id. Deputy Sullivan then responded that the area behind
the Chevron is private property, and he was "not going to go back
there and make somebody stop shooting." Id.

Four minutes after her first call, Plaintiff and her husband
called the Sheriff's Office non-emergency line again. Dkt. No.
149-18 at 2. This call was about the same gunshots from the same
location as the first call. Id. During this call, the dispatcher
repeatedly told Plaintiff and her husband that the property is a
hunting club on private property. Id. at 2–3. Plaintiff and her
husband emphasized that the Sheriff's Office "need[s] to tell them
to stop" the gunshots and that "they've always stopped it before."
Id. The dispatcher asked if the Prosperos wanted to speak to a
deputy, but Plaintiff's husband refused. Id. at 3. The call ended

with the dispatcher telling Plaintiff and her husband to enjoy the rest of their day. Id.

Shortly after this second phone call, Deputy Sullivan contacted the dispatch center and spoke to Sergeant Susan Flowers, the supervisor on duty. Dkt. No. 134-7 at 5. Deputy Sullivan began this conversation by saying: "Do people not have anything better to do than bitch about somebody shooting on private property?" Id. Sergeant Flowers responded that the dispatch center was familiar with the callers. Id. Deputy Sullivan told Sergeant Flowers that "[i]t's the [owners] back there shooting on their private property." Id. Sergeant Flowers agreed. Id. Deputy Sullivan then said: "Yeah, those motherfuckers. I ain't going out there [to] talk to [the property owner] about, 'Hey, man, you can't shoot on your private property because you're disturbing people.'" Id. Deputy Sullivan went on to say "yeah, let [the Prosperos] leave their fucking address or something or request contact. I'll let them know how stupid they are." Id. at 6.

### c. Plaintiff's 911 Call on November 22, 2018

Plaintiff called 911 after her two calls to the non-emergency line. Dkt. No. 149-20. Again, Plaintiff began her call by telling the dispatcher "[t]here's tons of shots and they keep going and going and going around the Chevron station over there." Id. at 2. The dispatcher, John Archibald, again told Plaintiff that the property is a hunting club. Id. Plaintiff responded by saying that

7

the shots were coming too close to her home. Id. Throughout this call, Plaintiff reiterated multiple times that she wanted the shooting stopped. See id. at 2 ("They need to stop it."); Id. ("We've already been through this before, and they've stopped it. So we want it stopped."); Id. at 3 ("I just want it stopped."). Dispatcher Archibald again offered to send a deputy to Plaintiff's home, which Plaintiff refused. Id. at 3. Dispatcher Archibald then transferred the call to his supervisor, Sergeant Flowers. Id.

Sergeant Flowers began by telling Plaintiff that the deputy looking into the incident, Deputy Sullivan, "advised that [the property] is private property. It is a hunting club. They are well within their rights to shoot on that property." Id. at 4. Plaintiff disputed this and said, "that's not what we've been told because of the noise ordinance." Id. Sergeant Flowers then told Plaintiff that a deputy was en route to her home to speak with her. Id. Plaintiff again refused to speak with a deputy. Id. Instead, Plaintiff threatened to speak to the "TV station" and ended the call by saying that she would be calling the TV station. Id. at 5. Plaintiff's 911 call lasted two-and-one-half minutes. Id. It was the only 911 call she made that day.

### d. The Investigation

Soon after Plaintiff's 911 call, Deputy Sullivan arrived at her home. Dkt. No. 136 at 105. The deputy knocked on the door, but received no answer. Id. He then had the dispatch center call the

Plaintiff's phone number, but she did not answer. Id at 107-09. While he was at Plaintiff's home, Deputy Sullivan did not hear gunfire. Id. at 103:3-5. After Plaintiff refused to speak with anyone, Deputy Sullivan began investigating Plaintiff's actions as a possible crime. Id. at 122:20-25, 123:1-6.

Deputy Sullivan began his investigation because "Ms. Prospero had contacted the dispatch center on multiple occasions. From the information that I had received at the time, I believed the intentions were to be disruptive to the dispatchers until she got the answer or got the services that she would like." Id. at 122:22-25, 123:1-2. As part of his investigation, Deputy Sullivan requested the Computer-Aided Dispatch ("CAD") reports of Plaintiff's phone calls. Id. at 123; Dkt. No. 136-6 at 4. He also requested the dispatch center "print and hold [Plaintiff's] information." Dkt. No. 136-6 at 4. Deputy Sullivan then spoke to Heather Sievers, another dispatcher, and asked her if Plaintiff "curse[d] at anybody or use[d] offensive or obscene language." Dkt. No. 136-7. Dispatcher Sievers said that Plaintiff "didn't use offensive language or curse," and that Plaintiff "just was not a happy camper and she wanted y'all to get [the gunshots] taken care of." Id. Deputy Sullivan did not listen to Plaintiff's phone calls as part of his investigation. Dkt No. 136 at 142.

Deputy Sullivan also went in person to the dispatch center where he believes he spoke to Sergeant Flowers and Dispatcher

Archibald.[1] Dkt. No. 136 at 125:20-25, 126:1-6. According to Deputy Sullivan, the dispatchers who spoke to Plaintiff told him that Plaintiff "was intentionally being disruptive to dispatch to get the services that she wanted in a faster response time." Id. at 125:24-25, 126:1-2. When deposed, Deputy Sullivan recalled: "My dispatchers told me they felt like they were disrupted, and that the purpose of [Plaintiff's] call was to interfere with their job duties in order to have the results she wanted at a faster pace than what she was getting." Id. at 192:25, 193:1-4.

The facts regarding this encounter are not clear at present. Dispatcher Archibald denied speaking to Deputy Sullivan following Plaintiff's 911 call. Dkt. No. 134 at 106. Specifically, Dispatcher Archibald said he was not privy to any conversations about Plaintiff after her 911 call, took no part in any conversations about whether to charge Plaintiff, and that no one asked him for information about what had happened during Plaintiff's phone calls. Id. at 106:5-16. Dispatcher Archibald, however, believes that Plaintiff's 911 call was disruptive and harassing. Id. at 103-04. He thought Plaintiff's goal in calling 911 was to disrupt the 911 center. Id. at 95:9-11. He also explained that, in his

---

[1] When deposed, Deputy Sullivan could not recall who told him that Plaintiff was being disruptive, but said he spoke to the dispatchers who took Plaintiff's calls. Dkt. No. 193:5-10. He believes these dispatchers were Susan Flowers and John Archibald. Id.

opinion, Plaintiff's two-and-one-half minute 911 call disrupted the 911 center. Id. at 104. As Dispatcher Archibald said, "[t]here's more to 911 than just 911." Id. at 104:24. The 911 center does more than "answer phones and talk to cops," but also does paperwork or reviews files. Id. at 104:9–25. While Dispatcher Archibald believes Plaintiff's call disrupted the 911 center, he could not recall "anything that [he] could not get done that day because Mrs. Prospero had called 911." Id. at 104:1–4.

When deposed, Sergeant Flowers did not remember Deputy Sullivan coming to the dispatch center at any point. Dkt. No. 137 at 145:17–21. She later said in her deposition: "I never said that he didn't come in. I just said I do not recall. It's been four years." Id. at 146:22–24. Sergeant Flowers clarified the conversation she had with Deputy Sullivan in a declaration filed after her deposition. Dkt. No. 228. According to Sergeant Flowers, "I specifically recall telling Deputy Sullivan during the course of his investigation of the calls on Thanksgiving Day that I believed Plaintiff's calls and communications with the 911 Center that day were purposefully disruptive." Id. ¶ 5. She went on to say, "I do not recall where or in what manner this conversation occurred, or whether it was in-person or by phone or radio. I just do not recall how I relayed that information to Sullivan, but I know that I did." Id. ¶ 6.

Similar to Dispatcher Archibald, Sergeant Flowers believes that Plaintiff's 911 call was disruptive and harassing. Dkt. No. 137 at 163. In her view, Plaintiff "was just harassing us to get [the gunfire] to stop, and we can't make it stop." Id. at 163:23–24. Sergeant Flowers explained that when Plaintiff called 911, her calling

> had become not only harassing but a nuisance in the fact that with her tying up a 911 line in the way that she did could have—regardless of whether or not we were busy at the time, regardless of whether or not it was stopping us from doing any work that we could have been doing or were not doing at the time, it takes seconds for something to happen and—for an emergency to happen. And in the time that she's tying up one line, five other lines can start ringing, and it would be someone who is in actual need of emergency services . . . . And if we have a nuisance caller on the line who has already repeatedly been told what is going on, and . . . she's not satisfied nor does she want the services that are being offered to her[,] at that point [she] is harassing the 911 center and potentially preventing us from helping someone else.

Id. at 164:4–25, 165:1–3. Like Dispatcher Archibald, Sergeant Flowers could not recall if Plaintiff's call prevented her from completing any work. Id. at 103:18–21.

Deputy Sullivan's supervisor, Lieutenant Russell Prescott, assisted in the investigation. Dkt. No. 136 at 128. Lieutenant Prescott was familiar with the property behind Plaintiff's home before November 22, 2018. Dkt. No. 135 at 143:8–16. Lieutenant Prescott also believed that Deputy Sullivan was familiar with the area, saying "[w]e've all hunted in this area and everything

between hunting and fishing and stuff like that—I would know generally what direction the shots would be coming from without even having to be on scene." Id. at 143:12–16.

Lieutenant Prescott also spoke to Dispatcher Sievers on November 22, 2018. Dkt. No. 149-26. He told the dispatcher that he and Deputy Sullivan were "trying to get our timeframe down so that we can actually charge [Plaintiff]." Id. at 3. During this conversation, Dispatcher Sievers told Lieutenant Prescott: "If y'all want to know something, come listen to the damn tape. That's what I was trying to tell [Deputy Sullivan] . . . . Tell him to come listen to the tape. He can hear." Id. at 2.

During his deposition, Lieutenant Prescott explained that it is not standard practice to listen to a 911 call even when charging an individual based on the contents of a 911 call. Dkt. No. 135 at 93:12–24. Instead, as Lieutenant Prescott noted, it is standard practice to receive the relevant information from the dispatch officers who are "sworn in by our sheriff just like we are." Id. at 93–94. He went on to say: "I rely on my dispatchers heavily. I have great relationships with them . . . . So if they tell me that this took place, then I trust them." Id. at 98:23–25, 99:1. With regard to Plaintiff's call, Lieutenant Prescott spoke to dispatchers about the 911 call, but he does not "remember which dispatch[er] may have advised [him and Deputy Sullivan] about the noise complaints." Id. at 93:9–11.

13

At the end of the investigation, Deputy Sullivan decided to charge Plaintiff. Id. at 106:16–18. Lt. Prescott agreed with this decision. Id. at 106:19–20. While he reviewed Deputy Sullivan's report, Lieutenant Prescott did not check the facts in the report for their accuracy. Id. at 115. This report served as the basis for Plaintiff's warrant. Dkt. No. 136 at 158–59.

### e. The Warrant

On November 22, 2018, Deputy Sullivan submitted an affidavit for a warrant charging Plaintiff with "unlawful conduct during a 911 call." Dkt. No. 149-30. Significant portions of this affidavit are disputed. It reads as follows:

> Personally came Ryan Sullivan, who on oath says that, to the best of his/her knowledge and belief Emma Jane Prospero did, commit the offense of, 16-11-39.2 Misdemeanor, Unlawful Conduct during 911 Call on November 22, 2018 at 02:58 PM to November 22, 2018 at 03:30 PM, in Camden County, Georgia; the place of occurrence of said offense being 84 Magna Carta Drive; and against the laws of the State of Georgia.
>
> Said offense being described as: 16-11-39.2 Misdemeanor, Unlawful Conduct during 911 Call[.]
>
> For the said Emma Jane Prospero did violate O.C.G.A. 16-11-39.2 when he/she unlawfully contacted 9-1-1, an emergency telephone service in reference to an incident that was not a true emergency for the purpose of interfering or disrupting an emergency telephone service.
>                          * * *
> On November 22nd, 2018 at approximately 1442 hours, the Camden County Public Safety Complex received a call for alleged emergency service in reference to shots being fired in the area of 84 Magna Carta Drive. The call was taken by correctional staff and forwarded the call to the Camden County Emergency Dispatch Center. The caller,

14

later identified as Ms. Emma J. Prospero, advised the
Camden County Emergency Dispatch Center that she heard
shots being fired from behind her residence in the area
of the hunting club behind the Chevron Truck Stop. Ms.
Prospero advised dispatchers that she did not want
contact from law enforcement but she wanted the shooting
to be stopped. She stated the shooting needed to be
stopped so she could enjoy her Thanksgiving dinner.

Ms. Prospero ended the phone call by hanging up after
refusing to give any further information. Being from the
immediate area, I knew the shots were being fired from
private property in which the individuals shooting were
well in their rights to be shooting. After receiving the
call for service, I advised the Camden County Dispatch
Center that the subjects allegedly shooting had every
right to do so on the private property of a hunting club
which is the location Ms. Prospero stated the shots were
coming from. Ms. Prospero's husband contacted the Camden
County Emergency Dispatch Center by using the non-
emergency phone number at approximately 1452 hours and
stated the same information that was given to dispatcher
before by Ms. Prospero and still refused to speak to law
enforcement.

Dispatchers relayed the information given by me stating
that the subjects shooting were within their rights to
do so but Ms. Prospero's husband did not agree with the
answer and hung up the phone. At 1458 hours, Ms. Prospero
contacted 9-1-1, stating that she wanted the shooting
from the hunting club to stop. She was given the same
information that was given to husband in reference to
the subjects being within their rights to be shooting
firearms on private property. Ms. Prospero began arguing
with Emergency Dispatcher by stating the gun shots were
in violation of noise ordinances and that it needed to
be stopped so she could enjoy her dinner. After being
advised that a Deputy would be en route to her residence
to speak with her, Ms. Prospero repeatedly stated that
she would not answer her door or she would leave the
residence if law enforcement responded to speak with
her. She then stated she would be contacting the local
new stations if a deputy responded to her residence.

Due to Ms. Prospero calling 9-1-1 which is an emergency
telephone service used for emergency phone calls and for
individuals needing emergency service, deputies with the
Camden County Sheriff's Office are required to respond

15

to the residence or location the call is made from if
that information is known. I arrived at 84 Magna Carta
Drive at approximately 1515 hours and stood in the
driveway for several moments without hearing any
gunshots in the area. I knocked on the front door of the
residence in an attempt to make contact with Ms. Prospero
but met negative results two separate times. I asked the
Camden County Emergency Dispatch Center to contact Ms.
Prospero's phone number that was used to call 9-1-1 but
they stated the phone went to voicemail both times they
attempted calling. Contact was never made with Ms.
Prospero while on scene at her residence. I did not hear
any gun shots in the area while on scene at Ms.
Prospero's residence. Ms. Prospero contacted 9-1-1 (an
emergency telephone service) after first contacting the
non-emergency number twice and refused to make contact
with law enforcement. Ms. Prospero disrupted an
emergency telephone service for service that was not an
emergency.

Id.

Deputy Sullivan himself acknowledged that he made assumptions
in the affidavit about where the shots were coming from and that
the property behind Plaintiff's home was a hunting club. Dkt. No.
136 at 65–66. As to the length of the call, Lieutenant Prescott
explained why the affidavit said the call lasted thirty-two minutes
instead of two-and-one-half minutes. Dkt. No. 135 at 127–28. As he
understood, the affidavit is "not referring to the phone call being
32 minutes" long but instead "referring to the duration of the
amount of manpower utilized towards that call." Id. at 127:24–25,
128:1. In other words, Lieutenant Prescott believes that the
affidavit was not stating that the 911 call itself lasted thirty-
two minutes, but that the total time spent on the incident lasted

thirty-two minutes. Id. Plaintiff disputes this fact as well. Dkt. No. 149 at 5.

### f. The Arrest and Detention

Plaintiff was arrested in a Walmart parking lot on January 28, 2019. Dkt. No. 149-1 ¶ 216. She was detained at the Camden County Jail. Id. Plaintiff claims that the Sheriff's Office poisoned her while she was detained. Dkt. No. 127 at 259:12-15. Plaintiff alleges she was poisoned in two ways. First, Plaintiff claims that "the first thing [she] saw [in the jail cell] . . . was liquid all around and just covered the room. The room was covered with liquid . . . it was such a strong, strong smell." Id. at 260:9-17. Plaintiff said the liquid "smelled kind of like a bleach or a chemical smell or ammonia smell. Just like . . . very strong chemicals. And . . . from the top to the bottom, [the room] was just covered. And then it was like they were trying to take the rest of my little air at the door." Id. at 262:9-14. Second, Plaintiff claims that a member of the jail staff sprayed chemicals on the door of her cell and into the cell itself. Id. at 259-60; Dkt. No. 129 at 330-32. Plaintiff claims she now has a "persistent respiratory illness" due to the chemical exposure. Dkt. No. 110 ¶ 144. Plaintiff spent thirty-five hours in the jail. Dkt. No. 149-35 at 2.

The Camden County District Attorney's Office dismissed the charge against Plaintiff on November 12, 2019. Dkt. No. 149-26 at

2. No charges remain pending against Plaintiff.

**2. Plaintiff's Negligent Hiring and Retention Claims**

    **a. Deputy Ryan Sullivan's Employment with Brunswick Police Department**

Before working with the Camden County Sheriff's Office, Ryan Sullivan worked for the Police Department in Brunswick, Georgia. Dkt. No. 136 at 12:12–15. His job duties as a police officer were very similar to his job duties as a deputy. Id. at 15:7–10. Deputy Sullivan left the Brunswick Police Department because he was terminated. Id. at 13:2–4.

Deputy Sullivan had a significant disciplinary record as a police officer. Dkt. No. 163-2. During his two-year stint as a city police officer, Deputy Sullivan was reprimanded and disciplined for the following: not reporting to work on time, not completing reports, not turning in vehicle inspections, failing uniform inspections, leaving assigned patrol zones, insubordination, and disrespecting superiors. Id.

Deputy Sullivan was terminated from the Brunswick Police Department specifically for insubordination, disrespecting his superiors, and failing to report for duty. Id. at 37, 39. His Georgia Peace Officer Standards and Training Council ("POST")[2]

---

[2] POST determines eligibility for law enforcement positions and issues certifications allowing individuals to become peace officers in the state. O.C.G.A. § 35-8-7.

records reflect the same reasons for termination. Dkt. No. 163-6 at 8.

One incident that occurred while Deputy Sullivan worked at the Brunswick Police Department deserves mention. In 2014, then-Officer Sullivan's supervisor believed that Sullivan made an arrest without probable cause. Dkt. No. 163-2 at 19. During the incident, Officer Sullivan twice noticed a black male standing on a street corner. Id. He initiated contact with the man and told the man to stand in front of Officer Sullivan's patrol car. Id. The man fled, Officer Sullivan gave chase, tased the man, and arrested him for loitering and prowling, obstruction, and possession of marijuana and drug scales. Id. His supervisors spoke with him about the incident and advised him on how he should behave in the future. Id. His supervisor noted in a memo: "This is not the first encounter like this that Officer Sullivan has had with encounters with black males who he stops. His reason for the stop is often very borderline. He confuses [consensual] encounter and reasonable articulable suspicion." Id. The supervisor then cited, as examples, four other case numbers, but provided no further information. Id. The supervisor concluded her memo, saying "[i]f Officer Sullivan continues to make borderline cases, or cases that are clear violations of a person's rights, I will recommend remedial training for Officer Sullivan for [consensual] encounter stops and reasonable articulable suspicion and probable cause."

Id. Deputy Sullivan did not receive formal discipline for his actions, and this incident was not listed as a reason for Deputy Sullivan's termination. Id. at 20, 37, 39.

> **b. Deputy Sullivan's Employment with Camden County Sheriff's Office**

Ryan Sullivan applied for a deputy position with the Camden County Sheriff's Office in April 2016. Dkt. No. 136 at 255. Sheriff Proctor made the final decision to hire Deputy Sullivan in 2016. Dkt. No. 163 at 7:14–18. As part of the hiring process for any deputy, the applicant must pass a physical agility test, pass a background inspection by the Sheriff's Office, and complete an interview with a hiring board. Id. at 8–9.

In 2016, the background investigations at the Sheriff's Office, including Deputy Sullivan's, were conducted by Major Scott Byerly. Id. at 11:16–21. The background investigation examined the applicant's criminal history, driver history, POST records, law enforcement database profiles (Linx, Accurint, N-Dex), and any agencies where the applicant previously worked. Dkt. No. 164 at 14–15. Major Byerly also spoke to former supervisors about the applicant. Id. He would also request the applicant's employment records if he felt that he needed more information. Id. at 15. He noted, however, that he rarely asked for employment records because he assumed the information given by an applicant's supervisor was "reliable and valid." Id. at 15:14–16.

During Applicant Sullivan's background investigation, Major Byerly and Sheriff Proctor became aware that Sullivan had been fired from the Brunswick Police Department. 163:10–13; Dkt. No. 164 at 18:3–6. Where an applicant has previously been fired by a law enforcement agency, Major Byerly explained that he would determine the reasons for termination by speaking to the applicant's supervisor or looking into the applicant's records. Dkt. No. 164 at 18:7–19. He further noted that if the applicant had been terminated from a large, metropolitan law enforcement agency, such as "New York or Chicago, I need to see [the employment records]. But as small agencies, the training officer or chief or [supervisor] would have good knowledge of what happened, why it happened and . . . why he was terminated." Id. at 18:19–23.

Major Byerly did not request or view Sullivan's Brunswick Police Department records. Id. at 31–32. During the background investigation, Major Byerly did not see the Brunswick Police Department's memo by Sullivan's supervisor regarding his performing an arrest that lacked probable cause. Id. at 35:15–20. Major Byerly, however, explained that even if he had seen the memo, this would not have raised any concern about hiring Deputy Sullivan. Id. at 42:4–11. This was because the memo was not a formal record and Deputy Sullivan was not disciplined for the incident. Id. at 42.

Major Byerly relied significantly on POST records when making

hiring recommendations. Id. at 82–84. He believed that if there were any concerning reasons why Deputy Sullivan should not have been hired, such as making arrests without probable cause, POST would have voiced those reasons. Id. The POST records, however, did not indicate any reason why Deputy Sullivan should not be hired. Id. at 67:12–14. POST investigated Deputy Sullivan's Brunswick Police Department's employment records. Id. at 83:3–7. In Major Byerly's words, POST "looked at [the employment records, including the 2014 arrest incident]. They made a final decision on January 8th, 2016. There was nothing further needed to be done. They were happy with it. They didn't sanction him, suspend him or anything. And that was sufficient and he could go apply elsewhere." Id. at 83:15–20.

After completing the background investigation and interviewing Deputy Sullivan, Major Byerly recommended Sheriff Proctor hire him. Dkt. No. 163-3. Sheriff Proctor approved this recommendation. Dkt. No. 163-5.

## II.  Procedural Background

Plaintiff filed her initial complaint in October 2020. Dkt. No. 1. Plaintiff has since amended her complaint multiple times. Dkt. Nos. 18, 53. Additionally, Plaintiff and Defendants have filed myriad motions in this case. Of note, Defendants moved to dismiss Plaintiff's second amended complaint in October 2021. Dkt. No. 54. The Court granted this motion in part and denied it in part. Dkt.

No. 66. Plaintiff's third amended complaint, filed November 1, 2022, is currently the operative pleading. Dkt. No. 110. In this complaint, Plaintiff brings four claims for relief against the Defendants: (1) a First Amendment retaliation claim against Deputy Sullivan and Lieutenant Prescott, (2) a Fourth Amendment malicious prosecution clam against Deputy Sullivan and Lieutenant Prescott, (3) a Fourth Amendment unlawful seizure/arrest claim against Deputy Sullivan and Lieutenant Prescott, and (4) a negligent hiring and retention claim against Sheriff Proctor. Id.

Now before the Court are two motions for summary judgment. Plaintiff moves for partial summary judgment as to her malicious prosecution claim and the issue of probable cause. Dkt. No. 149. Defendants move for summary judgment as to all Plaintiff's claims. Dkt. No. 170.

## LEGAL AUTHORITY

### I.  Summary Judgment

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of

a genuine issue of material fact." Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the
suit under the governing substantive law. Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material
facts "is 'genuine' . . . if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party." Id. "The
mere existence of a scintilla of evidence in support of the
[nonmovant's] position will be insufficient" for a jury to return
a verdict for the nonmoving party. Id. at 252. Additionally, the
party opposing summary judgment "may not rest upon the mere
allegations or denials in [her] pleadings. Rather, [her] responses
. . . must set forth specific facts showing that there is a genuine
issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th
Cir. 1990).

The Court views the record evidence "in the light most
favorable to the [nonmovant]," Matsushita Electric Industrial Co.
v. Zenith Radio Corp., 475 U.S. 574, 587, (1986), and will draw
all justifiable inferences in the nonmovant's favor, Anderson, 477
U.S. at 255.

## II.   Cross Motions for Summary Judgment

The filing of cross motions for summary judgment does not
change the Rule 56 standard. See 3D Medical Imaging, Sys., LLC v.
Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017);

24

Westport Ins. Corp. v. VN Hotel Grp., LLC, 761 F. Supp. 2d 1337, 1341 (M.D. Fla. 2010) (citing Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007)). The same standard applies to cross motions for summary judgment just as if only one party had moved for summary judgment and "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Yager v. Lockheed Martin Corp., No. 1:14-CV-1548, 2016 WL 319858, at *3 (N.D. Ga. Jan. 26, 2016). "Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004).

## DISCUSSION

### I.  Applicable Law

### 1. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code ("§ 1983") provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding

for redress." 42 U.S.C. § 1983. Section 1983 creates a right of action for vindicating federal rights guaranteed by the Constitution and federal statutes. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). It is not a source of substantive rights. Id.

To prevail in a § 1983 claim, a plaintiff must establish that "the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156–57 (1978)).

**2. Qualified Immunity, Generally**

Even when a plaintiff can prove the elements of a § 1983 claim, official immunity may nevertheless block recovery of damages. Michael L. Wells, *Absolute Official Immunity in Constitutional Litigation*, 57 GA. L. REV. 919, 922 (2023). Official immunity is divided into two categories: absolute immunity and qualified immunity. Id.; see also Pierson v. Ray, 386 U.S. 547, 555–57 (1967). As law enforcement officials are protected under the doctrine of qualified immunity, Hunter v. Bryant, 502 U.S. 224, 227 (1991), the Court need not address the doctrine of absolute immunity.

Qualified immunity is an affirmative defense. Ledea v. Metro-Dade Cnty. Police Dep't, 681 F. App'x 728, 729 (11th Cir. 2017)

(citing Skritch v. Thornton, 280 F.3d 1295, 1306 (11th Cir. 2002)).
When successfully invoked, qualified immunity shields from civil
liability government officials who perform discretionary
functions. Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000)
(citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified
immunity allows "government officials to carry out their
discretionary duties without the fear of personal liability or
harassing litigation." Durruthy v. Pastor, 351 F.3d 1080, 1087
(11th Cir. 2003) (citation omitted). It shields "all but the
plainly incompetent or one who is knowingly violating the federal
law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)
(citation omitted).

    "An official asserting the affirmative defense of qualified
immunity must initially establish that he was acting within the
scope of his discretionary authority, and the burden then shifts
to the plaintiff to show that the official is not entitled to
qualified immunity." Ledea, 681 F. App'x at 729 (citing Skop v.
City of Atlanta, 485 F.3d 1130, 1136-37 (11th Cir. 2007)). An
official acts within the scope of his discretionary authority if
he performs a legitimate job-related function through means that
were within his power to utilize. Holloman ex rel. Holloman v.
Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (citing Hill v.
Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir.
1994) ("A government official acts within his or her discretionary

authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority.")).

If the defendant official establishes that his relevant conduct fell within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity does not apply under the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). Under this test, the Court must determine whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (citing Scott v. Harris, 550 U.S. 372, 377 (2007)). Second, the Court must determine whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct." (internal quotation marks

28

omitted)). The Court may analyze these two prongs in any order. Pearson v. Callahan, 555 U.S. 223, 242 (2009); Underwood, 11 F.4th at 1328. Qualified immunity will shield the defendant official from civil liability if a plaintiff fails either prong of the analysis. Id.

The "clearly established" prong merits further discussion. "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted). "[E]xisting law must have placed the constitutionality of the officer's conduct 'beyond debate.'" Id. In other words, a legal principle must be "settled law" that is dictated by controlling authority or a robust consensus of cases of persuasive authority. Id. (citing al-Kidd, 563 U.S. at 741–42).

In the Eleventh Circuit, there are three ways to show that a law is clearly established. Edger v. McCabe, 83 F.4th 858, 864 (11th Cir. 2023). They are as follows:

> First, a plaintiff may show that a "materially similar case has already been decided," whose facts are similar enough to give the police notice. See Keating v. City of Miami, 598 F.3d 753, 766 (11th Cir. 2010). Second, he may show that a "broader, clearly established principle should control the novel facts" of his case. Id. This "broader" principle may be derived from "general statements of the law contained within the Constitution, statute, or caselaw." Mercado v. City of

> *Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)
> (alteration adopted) (quoting *Willingham v. Loughnan*,
> 321 F.3d 1299, 1301 (11th Cir. 2003)). Finally, a
> plaintiff may show that the officer's conduct "so
> obviously violates [the] constitution that prior case
> law is unnecessary." *Keating*, 598 F.3d at 766 (quoting
> *Mercado*, 407 F.3d at 1159).

*Id.* There is no requirement that a case be directly on point for a right to be clearly established, but the Court must be mindful of the specific context of the case. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7–8 (2021) (citing *White v. Pauly*, 580 U.S. 73, 79 (2017)).

"Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (quoting *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted)). The Court "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Id.*

When analyzing the complex issues that arise in § 1983 litigation where defendants have asserted qualified immunity defenses at the summary judgment stage, it is critical to reiterate that the Rule 56 standard still governs. If genuine disputes of material fact exist, the Court cannot grant summary judgment. Fed.

R. Civ. P. 56. In this case, genuine disputes of material fact abound for some claims and not for others. There is no dispute, however, that Defendants have established they were acting within the scope of their discretionary duties at all relevant times. Plaintiff, therefore, must establish that Defendants are not entitled to qualified immunity. Ledea, 681 F. App'x at 729. The Court now turns to Plaintiff's claims.

## II. First Amendment Retaliation

### 1. Overview

The freedom to speak without risking arrest is the cornerstone of a free nation. See Houston v. Hill, 482 U.S. 451, 462–63 (1987). "If the state could use [criminal] laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age." Nieves v. Bartlett, 139 S. Ct. 1715, 1730 (2019) (Gorsuch, J., concurring in part and dissenting in part). "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. 250, 256 (2006) (citations omitted).

The freedom to petition the government is another right implied by the "very idea of a government republican in form."

United States v. Cruikshank, 92 U.S. 542, 542 (1875). The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend I. The right to petition is one of "the most precious of the liberties safeguarded by the Bill of Rights." United Mine Workers v. Ill. Bar Ass'n, 389 U.S. 217, 222 (1967). The First Amendment prohibits government officials from retaliating against individuals for exercising this right. DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1288-89 (11th Cir. 2019).

When government officials subject an individual to retaliatory actions, such as arrest, for exercising the right to speak or petition, there may be grounds for a First Amendment retaliation claim under 42 U.S.C. § 1983. Nieves, 139 S. Ct. at 1722 (citations omitted). To state a First Amendment retaliation claim, a plaintiff must establish: (1) he engaged in constitutionally protected speech, including the right to petition the government; (2) the defendant official's retaliatory conduct adversely affected the plaintiff's protected speech and right to petition; and (3) "a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech and right to petition." DeMartini, 942 F.3d at 1289 (citing Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005)); see also Zen Grp., Inc. v. Fla. Agency for Health Care

32

Admin., 80 F.4th 1319, 1329 (11th Cir. 2023).

> **a. Element One: Did the Plaintiff Engage in Constitutionally Protected Speech?**

The first requirement of a First Amendment retaliation claim is that the plaintiff engaged in constitutionally protected speech. "All manner of speech—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections." 303 Creative LLC v. Elenis, 143 S. Ct. 2298, 2312 (2023) (quoting Kaplan v. California, 413 U.S. 115, 119–20 (1973)). "[T]he First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided, and likely to cause anguish or incalculable grief." Id. (internal quotation marks omitted) (citations omitted). Pure speech,[3] which encompasses spoken words, is "entitled to comprehensive protection under the First Amendment." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 505 (1969) (citations omitted). "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." Wollschlaeger v. Governor, 848 F.3d 1293, 1307 (11th Cir. 2017)

---

[3] See Pure Speech, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "pure speech" as "[w]ords or conduct limited in form to what is necessary to convey the idea").

(internal quotation marks omitted) (quoting <u>King v. Governor of New Jersey</u>, 767 F.3d 216, 229 (3d Cir. 2014)).

The First Amendment's speech protections are broad, but they are not absolute. Limited categories of speech are not protected or protected less by the First Amendment. <u>Counterman v. Colorado</u>, 143 S. Ct. 2106, 2113–14 (2023). These categories include incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and "speech presenting some grave and imminent threat the government has the power to prevent." <u>United States v. Alvarez</u>, 567 U.S. 709, 717 (2012) (collecting cases). Speech that falls outside the bounds of First Amendment protection may be restricted or even punished as crimes. <u>See</u> <u>Counterman</u>, 143 S. Ct. at 2111.

Prohibitions on speech, however, pose a risk of chilling or deterring legal speech. <u>Counterman</u>, 143 S. Ct. at 2114. "A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system." <u>Id.</u> at 2114–15 (citation omitted). As a result, a speaker may self-censor his speech that would otherwise be protected by the First Amendment. <u>Id.</u>; <u>see also</u> <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 340–41 (1974) (emphasizing the need to avoid self-censorship). To prevent self-censorship, the Supreme Court

requires the government to prove a culpable mental state to punish an individual for his unprotected speech. Speiser v. Randall, 357 U.S. 513, 526 (1958). *Mens rea* requirements "provide 'breathing room' for more valuable speech by reducing an honest speaker's fear that he may accidentally incur liability for speaking." Alvarez, 567 U.S. at 733 (Breyer, J., concurring in judgment).

Using a phone call for the purpose of harassment is not constitutionally protected. United States v. Eckhardt, 466 F.3d 938, 944 (11th Cir. 2006). Misuse or unlawful conduct during a 911 call may also be punished by criminal laws. O.C.G.A. § 16-11-39.2; see also, e.g., N.C. Gen. Stat. § 14-111.4 (criminalizing misuse of 911 system); Mo. Rev. Stat. § 190.308 (same); Cal. Pen. Code § 653y (same). Consistent with First Amendment jurisprudence, these statutes require the state to prove a culpable mental state to convict an individual. Id.

### b. Element Two: Did the Defendant's Conduct Constitute an Adverse Effect?

The second requirement of a First Amendment retaliation claim is that the defendant's retaliation injured the plaintiff. "A plaintiff suffers adverse action [i.e., injury] if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Bennett, 423 F.3d at 1254. "Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is

a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Id. at 1252 (internal quotation marks omitted) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2002)).

While this is an objective standard, whether the plaintiff himself was deterred by the retaliatory conduct may be evidence of whether a reasonable person would be deterred. Id. at 1255 (first citing Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) ("The test is an objective one, not subjective. The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done."); and then citing Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) ("While the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive.")).

A plaintiff is not required to prove actual, current chilling of speech to satisfy the injury requirement. Bennett, 423 F.3d at 1254 (citations omitted) (explaining that courts do not "focus on the plaintiff's subjective, actual chilling" and that "an actual chill is not necessary to state a First Amendment violation"). The adverse consequences for the plaintiff's speech need not be severe to deter a person of ordinary firmness. See Garcia, 348 F.3d at

36

729 (finding that a jury could conclude that the retaliatory issuance of parking tickets totaling $35 could deter a person of ordinary firmness); Moon v. Brown, 939 F. Supp. 2d 1329, 1349 (M.D. Ga. 2013) (concluding that "a person of ordinary firmness would likely refrain from placing political speech on their vehicle if they believed their car would be towed at the direction of a city mayor as a result"). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982). To constitute an adverse effect, however, the retaliatory conduct must be more than a mere inconvenience to the plaintiff's exercise of First Amendment rights. See Bethel v. Town of Loxley, 221 F. App'x 812, 813 ("[T]o recover for retaliation, the [Plaintiffs] must show that the defendants' conduct resulted in something more than a 'de minimis inconvenience' to the exercise of their First Amendment rights.").

### c. Element Three: Is There a Causal Connection Between the Retaliation and the Protected Speech?

The third requirement of a First Amendment retaliation claim is that there must be a causal connection between the defendant's retaliatory conduct and the plaintiff's protected speech. "The causal-connection inquiry asks whether the defendants were subjectively motivated to retaliate because the plaintiffs engaged

in protected speech." Indigo Room, Inc. v. City of Fort Myers, 589
F. App'x 938, 947 (11th Cir. 2014) (citing O'Bryant v. Finch, 637
F.3d 1207, 1217 (11th Cir. 2011)). "It is not enough to show that
an official acted with a retaliatory motive and that the plaintiff
was injured—the motive must cause the injury." Nieves, 139 S. Ct.
at 1722. Further, the causation inquiry is complex "because
protected speech is often a 'wholly legitimate consideration' for
officers when deciding whether to make an arrest." Id. at 1718
(quoting Reichle v. Howards, 566 U.S. 658, 668 (2012)).

The causal connection is determined using a "but-for" test.
Id. at 1722. To prevail, the plaintiff must prove that the adverse
action would not have been taken absent the defendant's retaliatory
motive. Id. (citing Hartman, 547 U.S. at 260). The plaintiff "must
prove the elements of retaliatory animus as the cause of injury,
and the defendant will have the same opportunity to respond to a
prima facie case by showing that the action would have been taken
anyway, independently of any retaliatory animus." Hartman, 547
U.S. at 260-61.

Evidence of the defendant's animus, while required, is not
sufficient to establish a causal connection. See id. at 263
(explaining that "[e]vidence of an inspector's animus does not"
meet the causal connection requirement). There must be some
connection between the retaliatory animus and the plaintiff's
injury. "The connection, to be alleged and shown, is the absence

of probable cause." Id. When the defendant official has utilized the legal system to arrest or prosecute the plaintiff, the plaintiff is required to "plead and prove an absence of probable cause as to the challenged retaliatory arrest or prosecution in order to establish the causation link between the defendant's retaliatory animus and the plaintiff's injury." DeMartini, 942 F.3d at 1289 (citations omitted).

### d. Element Four: Was Probable Cause Present?

"The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim." Nieves, 139 S. Ct. at 1726 (citation omitted). "[B]ecause probable cause speaks to the objective reasonableness of an arrest . . . its absence will . . . generally provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite." Id. at 1724 (citing al-Kidd, 563 U.S. at 731). Requiring the plaintiff to plead and prove the absence of probable cause for the arrest allows the factfinder to determine "whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct." Id. (citation omitted).

If the plaintiff establishes the absence of probable cause, he must next satisfy the Mt. Healthy test. Id. at 1725 (citing Lozman v. City of Riviera Beach, 138 S. Ct. 1945, 1947 (2018)). "The plaintiff must show that the retaliation was a substantial or

motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation." Id. (alteration in original) (internal quotation marks omitted) (quoting Lozman, 138 S. Ct. at 1725).

The presence of probable cause may not defeat a First Amendment retaliation claim when either of two exceptions apply. DeMartini, 942 F.3d at 1297. The first exception applies "where the plaintiff establishes retaliation animus and presents 'objective evidence' that he was arrested for certain conduct when otherwise similarly situated individuals (committing the same conduct) had not engaged in the same sort of protected speech and had not been arrested." Id. (citing Nieves, 139 S. Ct. at 1727). "Because this inquiry is objective, the statements and motivations of the particular arresting officer are 'irrelevant' at this stage." Nieves, 139 S. Ct. at 1727 (quoting Devenpeck v. Alford, 543 U.S. 146, 153 (2004)). If the plaintiff makes this showing, his claim "may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause." Id. (citation omitted).

The second exception applies when five "unique" factual circumstances exist together. DeMartini, 942 F.3d at 1297. These five considerations originated in Lozman. 138 S. Ct. at 1949, 1954–55. In Lozman, the plaintiff was arrested for interrupting a city

council meeting. Id. at 1949-50. After his arrest, the plaintiff filed a First Amendment retaliation claim, alleging that the city council devised a retaliatory plan against him because he had previously sued the city. Id. Even though there was probable cause for his arrest, the Supreme Court allowed the plaintiff's First Amendment retaliation claim to proceed because of five factual circumstances. Id. at 1949, 1954-55. The five relevant considerations, as explained by the Eleventh Circuit, are:

> (1) plaintiff Lozman had alleged "more governmental action than simply an [officer's] arrest" because he claimed that the City "itself retaliated against him pursuant to an 'official municipal policy' of intimidation"; (2) the plaintiff had alleged that the City's retaliation plan was "premeditated" and formed months earlier (before the arrest); (3) the plaintiff had "objective evidence" of a policy motivated by retaliation, as he had a transcript of a closed-door meeting where a Councilmember stated that the City should use its resources to "intimidate" Lozman and others who filed lawsuits against the City; (4) there was less of a concern about the causation problem and opening the floodgates of frivolous retaliation claims because the City's official policy of retaliation was formed months earlier, there was little relation between the "protected speech that prompted the retaliatory policy and the criminal offense (public disturbance) for which the arrest was made," and "it was unlikely that the connection between the alleged animus and injury will be weakened by an official's legitimate consideration of speech"; and (5) the plaintiff's speech—the right to petition—was "one of the most precious of the liberties safeguarded by the Bill of Rights" and was "high in the hierarchy of First Amendment values."

DeMartini, 942 F.3d at 1294 (quoting Lozman, 138 S. Ct. at 1949, 1954-55). This exception is limited to Lozman's five factual considerations. Id.

In short, to survive summary judgment on a First Amendment retaliation claim, the plaintiff must show: (1) animus on the part of the defendant officer, (2) injury, and (3) the absence of probable cause which establishes a causal connection between the defendant's animus and the plaintiff's injury. The presence of probable cause will typically defeat the plaintiff's First Amendment retaliation claim unless one of two narrow exceptions apply.

**2. Analysis**

Here, to survive summary judgment, Plaintiff must first establish: (1) she engaged in constitutionally protected speech; (2) Deputy Sullivan and Lt. Prescott's retaliatory conduct adversely affected her protected speech and right to petition; and (3) a causal connection exists between Defendants' retaliatory conduct and the adverse effect on Plaintiff's speech and right to petition. DeMartini, 942 F.3d at 1289.

**a. Element One: Did Plaintiff Engage in Constitutionally Protected Speech?**

The Court finds that there is a dispute of material fact as to whether Plaintiff engaged in protected speech. The parties dispute whether Plaintiff's phone calls to the Camden County

Sheriff's Office on November 22, 2018, constitute protected speech under the First Amendment. Dkt. No. 204 at 1; Dkt. No. 171 at 35–36. Plaintiff contends that she exercised her rights to speech and petition by calling 911 and reporting the gunfire. Dkt. No. 204 at 1. Defendants argue that Plaintiff's call was not protected by the First Amendment. Dkt. No. 171 at 36.

A broad factual dispute exists surrounding Plaintiff's 911 call. The dispatchers who spoke to Plaintiff during the call, Dispatcher Archibald and Sergeant Flowers, believe her call was disruptive, but it is unclear how they communicated this to Defendants. Further, the dispatchers share the belief that Plaintiff was not calling because of a genuine emergency that threatened her safety. Dkt. No. 134 at 104–05; Dkt. No. 137 at 163–64. Plaintiff, however, has submitted deposition evidence in which Dispatcher Archibald and Sergeant Flowers conceded that Plaintiff may have called 911 that day over the safety risk posed by nearby gunfire. Dkt. No. 134 at 37, 93, 95; Dkt. No. 137 at 101–03; see also Dkt. No. 204 at 6–7. Dispatcher Archibald himself admitted "[a]ny bullet fired is a safety concern." Dkt. No. 134 at 37:2. The Court cannot sift through this conflicting evidence and arrive at a factual conclusion. Only a jury can weigh the dispatchers' testimony to determine whether Plaintiff was calling solely to harass or disrupt the 911 center—making her speech unprotected—or whether Plaintiff was calling because she felt her

safety was in jeopardy—making her speech protected.

Another dispute of material fact exists as to whether Plaintiff had permission to call the Sheriff's Office "any time [she] heard even one gunshot." Dkt. No. 126 at 9:4–5. Plaintiff claims she was instructed to call by the Sheriff's Office itself. Id. Sheriff Proctor claims this never happened. Dkt. No. 133 at 31:21–25, 32:1–8; 47:1–4.

For Plaintiff's speech to lack protection under the First Amendment and constitute a crime—here, the crime of unlawful behavior during a 911 call—Plaintiff must have called 911 "for the purpose of annoying, harassing, or molesting a 9-1-1 communications officer or for the purpose of interfering with or disrupting emergency telephone service." O.C.G.A. § 16-11-39.2(b)(2). If Plaintiff had permission from the Sheriff's Office to call 911 every time she heard a gunshot near her home, it could hardly be said that her call on November 22, 2018, was made for the purpose of harassment or disruption. Instead, Plaintiff could have been following the instructions she received from the Sheriff's Office to report gunfire. Plaintiff's speech might then be protected under the First Amendment. On the other hand, if the Sheriff's Office never told Plaintiff to call 911 whenever she heard gunfire, Plaintiff's November 2018 call may have been made to harass or disrupt the Sheriff's Office until the office gave Plaintiff the result she sought. Plaintiff's speech might then not

be protected under the First Amendment.

The Court cannot and will not determine which set of facts is to be believed. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson, 477 U.S. at 255. Determining whether Plaintiff's speech was protected and whether she had permission to call every time she heard a gunshot will require evaluating the credibility of witnesses, weighing evidence, and drawing factual inferences. This determination must be made by a jury, not by the Court.

For purposes of summary judgment, the Court cannot determine as a matter of law whether Plaintiff engaged in constitutionally protected speech when she called 911 on November 22, 2018.

### b. Element Two: Did Defendants' Conduct Constitute an Adverse Effect?

To succeed on this element, Plaintiff must prove that Defendants' "allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Bennett, 423 F.3d at 1254. The Court finds that there is no dispute of material fact as to whether Defendants' conduct— seeking a warrant for Plaintiff's arrest—is an adverse effect.

First, there is no dispute that Plaintiff was arrested because of the 911 call she made on November 22, 2018. An arrest is

undoubtedly retaliatory conduct that would deter a person of ordinary firmness from the exercise of First Amendment rights. See, e.g., Johnson v. DeKalb Cnty., 391 F. Supp. 3d 1224, 1249 (N.D. Ga. 2019) ("An arrest for engaging in protected speech would certainly deter a person of ordinary firmness from exercising his or her First Amendment rights."); Buress v. City of Miami, No. 20-23078, 2023 WL 5608061, at *7 (S.D. Fla. Aug. 30, 2023) ("[A]n arrest would certainly deter the vast majority of people from exercising their First Amendment rights, especially with respect to criticisms of police conduct."); Merenda v. Tabor, No. 5:10-CV-493, 2012 WL 1598134, at *11 (M.D. Ga. May 7, 2012) ("An arrest would deter a person of ordinary firmness from exercising his First Amendment rights."). The Eleventh Circuit has explained that even "[t]he threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment rights." Turner v. Williams, 65 F.4th 564, 580 (11th Cir. 2023). For purposes of Plaintiff's retaliation claim, there is no dispute that she was arrested for her speech and that this arrest constituted an adverse effect that could chill speech.

### c. Element Three: Is There a Causal Connection Between the Retaliation and the Protected Speech?

The Court finds that there is a dispute of material fact as to the causation element of Plaintiff's retaliation claim, but

that this dispute extends only to Deputy Sullivan. There is no dispute of material fact as to Lieutenant Prescott, and judgment as a matter of law is warranted in his favor.

There must be a causal connection between the retaliatory arrest of Plaintiff and the adverse effect on speech. Bennett, 423 F.3d at 1250. At this stage of the inquiry, the evidence must show that Defendants were "subjectively motivated" to arrest Plaintiff because she engaged in protected speech. Indigo Room, 589 F. App'x at 947.

Beginning with Lieutenant Prescott, there is no dispute of material fact as to whether he had a subjective motivation to arrest Plaintiff because of her speech. Not a single piece of evidence has been offered to suggest that Lieutenant Prescott acted with a retaliatory motive. While evidence of a defendant's animus alone is not sufficient to establish the causal connection, evidence of animus itself is required. Hartman, 547 U.S. at 260–61. Plaintiff's third amended complaint and briefing consistently treat Lieutenant Prescott and Deputy Sullivan as one-in-the same. See, e.g., Dkt. No. 110 ¶ 4 ("Defendants Sullivan and Prescott displayed malice and reckless disregard for her constitutional rights by subjecting her to unlawful seizure and initiation of criminal charges without probable cause . . . all in retaliation for her having exercised her First Amendment right to make a good-faith call for assistance and petition the government for

47

grievances."). Plaintiff also consistently attempts to impute Deputy Sullivan's alleged subjective motivations to Lieutenant Prescott. See Dkt. No. 230 at 18, 23 (arguing that Deputy Sullivan's bias towards Plaintiff strips both Deputy Sullivan and Lieutenant Prescott of qualified immunity). This is flawed. For purposes of liability for constitutional violations and qualified immunity, multiple defendant officers cannot simply be lumped together as one entity. See Alocer, 906 F.3d at 951; Zatler, 802 F.2d at 401. Each must be given an independent evaluation by the Court. Alocer, 906 F.3d at 951. In Lieutenant Prescott's case, there is no genuine factual dispute as to his subjective motivations. Plaintiff has failed to establish a causal connection between his actions and the adverse effect on Plaintiff's speech. Plaintiff's First Amendment retaliation claim against Lieutenant Prescott fails as a result, and summary judgment is **GRANTED** as to this claim.

Turning now to Deputy Sullivan, there is a dispute of material fact as to whether Deputy Sullivan had a subjective motivation to arrest Plaintiff because of her speech. Deputy Sullivan's statements during his conversation with the dispatch center speak for themselves. Referring to Plaintiff and her husband, Deputy Sullivan said: "Do people not have anything better to do than bitch about somebody shooting on private property?" Dkt. No. 134-7 at 5. Deputy Sullivan next referred to Plaintiff and her husband as

"motherfuckers." Id. Finally, he ended his conversation by saying, "yeah, let [Plaintiff and her husband] leave their fucking address or something or request contact. I'll let them know how stupid they are." Id. at 6. After saying he would let Plaintiff and her husband know "how stupid they are," Deputy Sullivan sought and obtained a warrant for Plaintiff's arrest. Looking at these facts, a reasonable jury could find that Deputy Sullivan was subjectively motivated to retaliate against Plaintiff because of her speech. Put another way, a jury could find that Plaintiff's arrest would not have occurred absent Deputy Sullivan's alleged retaliatory motive. Nieves, 139 S. Ct. at 1722.

At trial, Deputy Sullivan will be given the opportunity to respond to this evidence "by showing that the action [against Plaintiff] would have been taken anyway, independently of any retaliatory animus." Hartman, 547 U.S. at 260-61. A jury must decide whether Plaintiff or Defendant Sullivan prevails on the causal connection element as this determination will require weighing evidence, assessing credibility, and drawing factual inferences. As addressed below, a jury must also decide whether there was an absence of probable cause for Plaintiff's arrest.

### d. Element Four: Did Deputy Sullivan have Probable Cause to Arrest Plaintiff?

This element applies only to Deputy Sullivan's actions because Plaintiff's First Amendment retaliation claim against

Lieutenant Prescott failed under the third element. Considering only Deputy Sullivan, there is a dispute of material fact as to whether he had probable cause to arrest Plaintiff.

If Deputy Sullivan had probable cause to arrest Plaintiff, this would suggest a lack of retaliatory animus and Plaintiff's claim would fail as a result. Nieves, 139 S. Ct. at 1724, 1726. If, however, Deputy Sullivan lacked probable cause to arrest Plaintiff, this would "generally provide weighty evidence that the officer's animus caused the arrest." Id. at 1724.

A jury must decide whether Deputy Sullivan had probable cause or arguable probable cause to arrest Plaintiff. Probable cause is a factual determination. United States v. Espinoa-Orlando, 704 F.2d 507, 511 (11th Cir. 1983) (citing United States v. Clark, 559 F.2d 420 (5th Cir. 1977)). In this case, significant factual disputes exist that prevent the Court from deciding whether Deputy Sullivan had probable cause. First, there is a dispute as to whether Deputy Sullivan actually knew that the property behind Plaintiff's home was a hunting club where shooting was legal and safe, or whether Deputy Sullivan simply assumed this fact without verification. Dkt. No. 204 at 20; Dkt. No. 171 at 15.

Second, there is a dispute as to how Deputy Sullivan learned that Plaintiff was allegedly being disruptive or harassing. Deputy Sullivan's recorded conversations with the dispatchers offer nothing to indicate that Plaintiff was being intentionally

disruptive or harassing. Dispatcher Archibald relayed to Deputy
Sullivan that "[Plaintiff] wants [the shooting] to stop so she can
enjoy her dinner." Dkt. No. 149-10 at 3. Dispatcher Sievers told
Deputy Sullivan that Plaintiff "just was not a happy camper and
she wanted y'all to get [the gunshots] taken care of." Dkt. No.
136-7. The conversations do not indicate any intent to disrupt or
harass. Deputy Sullivan claims Dispatcher Archibald and Sergeant
Flowers told him in-person that Plaintiff was intentionally being
disruptive or harassing. Dkt. No. 136 at 125:20-25, 126:1-6.
Dispatcher Archibald denies ever having this conversation. Dkt.
No. 134 at 106. Sergeant Flowers could not remember any in-person
conversation with Deputy Sullivan, but believes she told Deputy
Sullivan that Plaintiff was being disruptive. Dkt. No. 137 at
145:17-21; Dkt. No. 228.

Third, there is a dispute whether Deputy Sullivan included
material misstatements in his warrant affidavit and whether such
misstatements were reckless or intentional. Plaintiff claims one
misstatement was that Deputy Sullivan wrote Plaintiff's call
lasted thirty-two minutes. Dkt. No. 230 at 4. Deputy Sullivan wrote
in the affidavit that Plaintiff committed "Unlawful Conduct during
[a] 911 Call on November 22, 2018 at 02:58 PM to November 22, 2018
at 03:30 PM." Dkt. No. 149-30. This is a time span of thirty-two
minutes. During his deposition, however, Deputy Sullivan
testified: "That time would reflect the time that I received the

51

call for service for the 911 call and responded to her residence
. . . it's not showing that she was on the phone at 2:58 until
3:30." Dkt. No. 136 at 182:15–19. Deputy Sullivan's deposition
testimony and warrant affidavit are in conflict. Compare Dkt. No.
149-30 with Dkt. No. 136 at 182:15–19. Evidence in the record also
shows that there are multiple ways to write time durations in an
affidavit. Lieutenant Prescott explained that "[s]ome deputies
will write their narratives in the form of . . . whenever [they
are] dispatched." Dkt. No. 135 at 127:9–11. Other deputies try "to
put when the call started to when the call ended." Id. at 127:16–
18.

Plaintiff claims another misstatement was that Deputy
Sullivan portrayed Plaintiff as "unreasonable, uncooperative, and
disruptive" while speaking to the dispatchers. Dkt. No. 230 at 4.
Deputy Sullivan wrote in the affidavit that Plaintiff hung up the
phone and refused to give the dispatchers further information.
Dkt. No. 149-30. Plaintiff contends this characterization of
Plaintiff's demeanor on the call is misleading. Dkt. No. 230 at 4.

Plaintiff also claims that Deputy Sullivan included a
misstatement by characterizing Plaintiff as if she knew the
shooting came from a hunting club. Id. at 4–5. In the affidavit,
Deputy Sullivan writes that Plaintiff told the dispatchers "she
heard shots being fired from behind her residence in the area of
the hunting club." Dkt. No. 149-30. He also wrote, "I advised the

Camden County Dispatch Center that the subjects allegedly shooting had every right to do so on the private property of a hunting club which is the location Ms. Prospero stated the shots were coming from." Id. These statements could be interpreted in two ways. First, they could be interpreted to mean that Plaintiff knew that the area was a hunting club where shooting was allowed, but that she called 911 anyway. Second, the statements could be interpreted to mean that Deputy Sullivan was simply describing the area. Determining which characterization is correct will require weighing evidence and drawing factual inferences.

Finally, Plaintiff claims that Deputy Sullivan included a misstatement by "falsely equating calling for a 'non-emergency' reason to calling for the purpose of interfering with or disrupting 911." Dkt. No. 230 at 4–5. Again, there is a factual dispute between what Deputy Sullivan wrote in the affidavit and his deposition testimony. The affidavit alleges that Plaintiff called 911 "in reference to an incident that was not a true emergency for the purpose of interfering or disrupting an emergency telephone service." Dkt. No. 149-30. Deputy Sullivan claims that after speaking to the dispatchers, Plaintiff was not calling 911 because of an emergency, but to harass or disrupt the 911 center until the Sheriff's Office stopped the shooting. Dkt. No. 136 at 191–94.

There is also a dispute whether Deputy Sullivan made material omissions in his warrant affidavit. Plaintiff claims Deputy

Sullivan omitted exculpatory information that Plaintiff told the dispatchers that the shooting was too close to the homes in her neighborhood and that law enforcement had previously stopped the shooting. Dkt. No. 230 at 5. Deputy Sullivan interpreted this "as a ploy to continue to harass dispatch enough until [deputies] responded out there in a quicker manner." Dkt. No. 136 at 221:6–20.

Each of these factual disputes regarding misstatements and omissions is material. The presence or absence of any misstatements or omissions in the warrant affidavit could have negated probable cause. A jury must determine whether Deputy Sullivan included any alleged misstatements or made omissions. Only a jury can assess Deputy Sullivan's credibility, sift through conflicting evidence, and weigh the evidence.

Pursuant to the <u>Mt. Healthy</u> test, if Plaintiff can establish the absence of probable cause, she must then "show that the retaliation was a substantial or motivating factor behind [her arrest]." <u>Nieves</u>, 139 S. Ct. at 1725. If she proves this as well, Deputy Sullivan must then show that Plaintiff's arrest "would have been initiated without respect to retaliation." <u>Id.</u> Given the many factual disputes in this case, a jury must make these decisions.

The two exceptions explained in <u>DeMartini</u> are inapplicable here. <u>See</u> 942 F.3d at 1297. First, Plaintiff has submitted no objective evidence that she "was arrested for certain conduct when

otherwise similarly situated individuals (committing the same conduct) had not engaged in the same sort of protected speech and had not been arrested." Id. Second, Plaintiff has not alleged or submitted evidence showing that the five "unique" factual considerations of Lozman apply. See id.

As a conclusory matter, the findings above impact Deputy Sullivan's qualified immunity defense. The law was clearly established in the Eleventh Circuit at the time of the alleged misconduct "that law enforcement officers cannot punish or retaliate against individuals for expressing their First Amendment rights." Toole v. City of Atlanta, 798 F. App'x 381, 388 (11th Cir. 2019); see also Bennett, 423 F.3d at 1255–56 (collecting cases). If a jury finds that Deputy Sullivan violated this clearly established law, he would not be entitled to qualified immunity. For all of these reasons, Defendant Sullivan's motion for summary judgment is **DENIED** as to Plaintiff's First Amendment retaliation claim, and Plaintiff's partial motion for summary judgment is **DENIED** as to the issue of probable cause.

## III. Malicious Prosecution

### 1. Overview

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The quintessential seizure of a person under the Fourth Amendment is

an arrest. Torres v. Madrid, 141 S. Ct. 989, 995 (2021) (citing California v. Hodari D., 499 U.S. 621, 624 (1991)). The Fourth Amendment prohibits government officials from seizing or detaining an individual in the absence of probable cause. Manuel v. City of Joliet, 580 U.S. 357, 367 (2017).

When government officials unreasonably "seize" an individual pursuant to legal process, there may be grounds for a Fourth Amendment malicious prosecution claim under 42 U.S.C. § 1983. Thompson v. Clark, 142 S. Ct. 1332, 1337 (2022) (explaining that the Supreme Court recognizes a claim for malicious prosecution, "sometimes referred to as a claim for unreasonable seizure pursuant to legal process"). A malicious prosecution claim requires a seizure "pursuant to legal process." Black v. Wigington, 811 F.3d 1259, 1267 (11th Cir. 2016) (citation omitted).

"A malicious prosecution occurs 'when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements.'" Goldring v. Henry, No. 19-13820, 2021 WL 5274721, at *3 (11th Cir. Nov. 12, 2021) (quoting Manuel, 580 U.S. at 367). If this occurs, the individual is seized "without constitutionally adequate justification. Legal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement. And for that reason, it cannot extinguish the [arrestee's] Fourth Amendment claim." Manuel, 680 U.S. at 367. The

issuance of a warrant—even an invalid one—constitutes legal process. Carter v. Gore, 557 F. App'x 904, 906 (2014) (citations omitted). "[W]here an individual has been arrested pursuant to a warrant, his claim is for malicious prosecution rather than false arrest." Id.

To state a malicious prosecution claim, a plaintiff must prove: (1) the elements of the common law tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. Butler v. Smith, 85 F.4th 1102, 1111 (11th Cir. 2023) (quoting Blue v. Lopez, 901 F.3d 1352, 1357 (11th Cir. 2018)).

The Eleventh Circuit has distilled malicious prosecution into seven elements. Id. If all elements are met, the plaintiff proves the common law tort of malicious prosecution and proves a violation of her Fourth Amendment right to be free from unreasonable seizures. The elements of malicious prosecution are: (1) a criminal prosecution instituted or continued by the defendant official; (2) with malice and without probable cause; (3) that terminated in the plaintiff's favor; and (4) injured the plaintiff. Id. (quoting Paez v. Mulvey, 915 F.3d 1276, 1285 (11th Cir. 2019)). Additionally, the plaintiff must prove: (5) "that the legal process justifying his seizure was constitutionally infirm" and (6) "that his seizure would not otherwise be justified without legal process." Williams v. Aguirre, 965 F.3d 1147, 1165 (11th Cir.

2020); *see also Butler*, 85 F.4th at 1111–12. "Qualified immunity, in effect, adds yet another element—namely, (7) that that the law was 'clearly established.'" *Butler*, 85 F.4th at 1112 (citing *Williams*, 965 F.3d at 1168).

a. **Element One: Did the Defendant Institute or Continue a Criminal Prosecution?**

"[A]n officer's liability for malicious prosecution flows from initially securing an invalid warrant." *Carter*, 557 F. App'x at 907. The issuance of a warrant against the plaintiff is when the criminal prosecution is instituted against him for purposes of the plaintiff's malicious prosecution claim. See *Goldring*, 2021 WL 5274721, at *5 (citation omitted); *see also Vistein v. Henson*, No. 2:16-CV-257, 2018 WL 10733023, at *4 (N.D. Ga. Mar. 20, 2018) ("Naturally then, the procuring of the warrant may qualify as instituting a criminal prosecution under the first prong of the common law portion of a malicious prosecution claim.").[4]

b. **Element Two: Did the Defendant Act with Malice and Without Probable Cause?**

Because there is "'significant overlap' between a malicious-prosecution claim's common-law and constitutional components," the Eleventh Circuit has merged the second element into the fifth

---

[4] As there is no allegation that the Defendants *continued* a criminal prosecution in this case, the Court need not discuss those parameters.

element. Butler, 85 F.4th at 1112 (citing Luke v. Gulley, 975 F.3d 1140, 1144 (11th Cir. 2020) ("If a plaintiff establishes that a defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process, he has also established that the defendant instituted criminal process against him with malice and without probable cause.")). And so, the Court focuses on the fifth element: whether "the legal process justifying [the plaintiff's] seizure was constitutionally infirm." Butler, 85 F.4th at 1112 (citing Williams, 965 F.3d at 1168).

### c. Element Three: Did the Criminal Prosecution Terminate in the Plaintiff's Favor?

"[T]he favorable-termination requirement functions as a rule of accrual, not as a criterion for determining whether a constitutional violation occurred." Laskar v. Hurd, 972 F.3d 1278, 1292 (11th Cir. 2020) (citations omitted); see also Williams v. City of Birmingham, No. 2:16-CV-650, 2017 WL 9487213, at *3 (N.D. Ala. Sept. 6, 2017) ("It is true that claims for malicious prosecution would not be ripe unless and until the criminal case against Plaintiff terminated in his favor."). The favorable-termination requirement bars the plaintiff's malicious prosecution claim "only when the prosecution remains ongoing or terminates in a way that precludes any finding that the plaintiff was innocent of the charges that justified his seizure—that is, when the prosecution ends in the plaintiff's conviction on or

admission of guilt to each charge that justified his seizure." Laskar, 972 F.3d at 1293 (citations omitted). A plaintiff satisfies the favorable-termination requirement if he proves that the criminal prosecution against him "formally ended in a manner not inconsistent with his innocence on at least one charge that authorized his confinement." Id. Examples of favorable terminations include acquittal, dismissal reflecting an affirmative decision not to prosecute, dismissal due to the running of the statute of limitations, a nolle prosequi entry, and, in some cases, a granted writ of habeas corpus. Uboh v. Reno, 141 F.3d 1000, 1005 (11th Cir. 1998).

### d. Element Four: Was the Plaintiff Injured?

"A § 1983 malicious-prosecution plaintiff's injuries 'may include those associated with the prosecution,' but regardless, they must be caused by the unlawful seizure." Eloy v. Guillot, 289 F. App'x 339, 346 (11th Cir. 2008) (quoting Whiting v. Taylor, 85 F.3d 581, 586 (11th Cir. 1996)). The plaintiff's injuries must be caused by the named defendants. Id.; see also Whiting, 85 F.3d at 586 n.10 ("Recovery of damages is limited to those injuries proved to be caused by the defendants."). A defendant officer's liability for malicious prosecution "extends to foreseeable injuries related to subsequent seizure, detention, and prosecution." Carter, 557 F. App'x at 907.

Types of injuries that satisfy this requirement include: physical pain and suffering, monetary loss, mental and emotional distress, reputational damage, and personal humiliation. See Slicker v. Jackson, 215 F.3d 1225, 1231 (11th Cir. 2000) (collecting cases). Even a short stay in jail constitutes an injury for purposes of malicious prosecution. Butler, 85 F.4th at 1112 ("[T]he prosecution caused [the plaintiff] damage by landing her in jail for four days."). A plaintiff who proves these injuries may be entitled to compensatory damages. Slicker, 215 F.3d at 1231.

A malicious prosecution claim does not fail if the plaintiff cannot prove actual injury. Eloy, 289 F. App'x at 346. If the plaintiff shows that the malicious prosecution violated his constitutional rights, he may still be entitled to nominal damages despite suffering no compensable injury. Id. (citing Kelly v. Curtis, 21 F.3d 1544, 1557 (11th Cir. 1994) ("When constitutional rights are violated, a plaintiff may recover nominal damages even though he suffers no compensable injury.")).

### e. Element Five: Was the Legal Process Justifying the Plaintiff's Seizure Constitutionally Infirm?

A plaintiff's arrest warrant is constitutionally infirm when either "the officer who applied for the warrant should have known that his application failed to establish probable cause or that an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or

omissions necessary to support the warrant." <u>Williams</u>, 965 F.3d at 1165 (citations omitted). Undergirding both factors is the same requirement: the plaintiff must prove her arrest warrant lacked even arguable probable cause.

Before entering the realm of probable cause, however, the Court must first clarify what information may be considered in evaluating the constitutionally infirm warrant requirement. The Court must consider only (1) the information before the magistrate judge who issued the warrant, minus (2) any material misstatements the officer might have made, plus (3) any material information that the officer omitted from the warrant affidavit. <u>Butler</u>, 85 F.4th at 1113 (citing <u>Paez</u>, 915 F.3d at 1287). The Court will not rely on "information in an officer's investigative file or mind absent a 'record . . . that he submitted the file to or explained his thought processes to the magistrate judge.'" <u>Id.</u> (quoting <u>Luke v. Gulley</u>, 50 F.4th 90, 96 (11th Cir. 2022)).

### i. Probable Cause

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. CONST. amend. IV. "[B]efore a warrant for . . . arrest . . . can issue . . . the judicial officer issuing such a warrant [must] be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." <u>Luke</u>, 50 F.4th at 95 (alteration in original) (internal quotation marks

omitted) (quoting Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 564 (1971)). The determination of probable cause depends on "what the affidavit charging the plaintiff stated." Williams, 965 F.3d at 1163 (internal quotation marks omitted) (alteration adopted). The "warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause." Franks v. Delaware, 438 U.S. 154, 165 (1978).

Probable cause exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Paez, 915 F.3d at 1285 (internal quotation marks omitted). "Probable cause to arrest is not a high bar." Wesby, 583 U.S. at 57 (internal quotation marks omitted) (quoting Kaley v. United States, 571 U.S. 320, 338 (2014)). "Because probable cause deals with probabilities and depends on the totality of the circumstances, . . . it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." Id. (internal quotation marks omitted) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. "So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence

or a possible defense will not vitiate a finding of probable cause." Paez, 915 F.3d at 1286. In sum, the court must "ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity." Washington v. Howard, 25 F.4th 891, 899–902 (11th Cir. 2022) (quoting Wesby, 583 U.S. at 57).

Qualified immunity adds yet another hurdle for plaintiffs. For qualified immunity to apply, the defendant officer need not have actual probable cause, but only arguable probable cause. Garcia v. Casey, 75 F.4th 1176, 1186 (11th Cir. 2023) (citation omitted). An officer has arguable probable cause if "'a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests.'" Id. (internal quotation marks omitted) (quoting Wesby, 583 U.S. at 50). In other words, if a reasonable officer in the same circumstances and possessing the same information as the defendant officer could have believed that probable cause existed, there is arguable probable cause. Butler, 85 F.4th at 1116 (citing Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004)). Even officers who "reasonably but mistakenly conclude that probable cause is present" are protected under the arguable probable cause standard. Id. (internal quotation marks omitted) (quoting Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003)).

"To assess probable cause, we look to the elements of the underlying crime—and in particular, in a malicious-prosecution case . . . to the elements of the charged crime." Id. (citation omitted). An officer does not need to prove every element of the charged crime, but his "knowledge that an element isn't met—or is exceedingly unlikely to be met—will preclude a finding of probable cause." Id. (citations omitted).

### ii. Misstatements or Omissions

The Court applies a two-part test to determine whether misstatements or omissions in the defendant officer's warrant affidavit amount to a Fourth Amendment violation. Mathis v. Eslinger, No. 20-13761, 2022 WL 16849124, at *9 (11th Cir. Nov. 10, 2022) (citing Paez, 915 F.3d at 1287). "First, we ask whether there was an intentional or reckless misstatement or omission. Then, we examine the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included." Paez, 915 F.3d at 1287 (citations omitted). If the officer's warrant affidavit (including the omitted information or correcting the misstated information) "would have demonstrated even arguable probable cause—that a reasonable officer could have believed an offense was committed—then the officers are entitled to qualified immunity." Id. at 1288.

**f. Element Six: Would the Plaintiff's Seizure be Justified Without Legal Process?**

This element requires the plaintiff to prove that in the absence of legal process, such as a warrant, his seizure would still be unreasonable. "[T]he lawfulness of a warrantless arrest turns on whether the arresting officer had probable cause." Williams, 965 F.3d at 1162 (citation omitted). Even if the arresting officer had probable cause, a seizure that lasts more than forty-eight hours without a probable cause determination is presumptively unconstitutional. Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 57 (1991).

**g. Element Seven: Was the Law Clearly Established?**

The contours of clearly established law are explained in detail above. As a summation, the plaintiff must prove that the defendant officer violated a constitutional right that was clearly established when the Fourth Amendment violation allegedly occurred. Williams, 965 F.3d at 1168 (citation omitted).

**2. Analysis**

Again, to prevail on her Fourth Amendment malicious prosecution claim, Plaintiff must establish seven elements. Butler, 85 F.4th at 1111-12. Specifically, Plaintiff must prove: (1) Defendants instituted or continued a criminal prosecution against her; (2) Defendants acted with malice and without probable cause; (3) the criminal prosecution terminated in Plaintiff's

66

favor; (4) the criminal prosecution injured Plaintiff; (5) the legal process justifying Plaintiff's seizure—her arrest—was constitutionally infirm; (6) Plaintiff's seizure would not otherwise be justified without legal process; and (7) the law was clearly established that Plaintiff's seizure was unconstitutional. Id.

### 1. Element One: Did Defendants Institute or Continue a Criminal Prosecution?

There is no dispute that element one is satisfied. Defendants instituted a criminal prosecution against Plaintiff when they procured her arrest warrant. Goldring, 2021 WL 5274721, at *5. Deputy Sullivan instigated the criminal prosecution by preparing the warrant affidavit and securing the arrest warrant itself. See Carter, 557 F. App'x at 907. Lieutenant Prescott instigated the criminal prosecution by actively assisting Deputy Sullivan in obtaining the warrant. See Shipp v. United States, 212 F. App'x 393, 398 (6th Cir. 2000) (explaining that a defendant may be liable for a malicious prosecution claim if he actively takes part in instigating or encouraging the prosecution by advising or assisting another person to begin the prosecution, ratifying the decision to begin the prosecution, or taking any active role that aides the prosecution (citations omitted)). Deputy Sullivan and Lieutenant Prescott instituted Plaintiff's criminal prosecution.

### 2. Element Two: Did Defendants Act with Malice and without Probable Cause?

As stated above, the Eleventh Circuit has merged element two of malicious prosecution with element five. <u>Butler</u>, 85 F.4th at 1112. If Plaintiff establishes that the legal process justifying her arrest was constitutionally infirm (element five), she also establishes that Defendants acted with malice and without probable cause (element two). <u>Luke</u>, 975 F.3d at 1144.

### 3. Element Three: Did the Criminal Prosecution Terminate in Plaintiff's Favor?

There is no dispute that element three is satisfied. The dismissal of criminal charges satisfies the favorable-termination requirement. <u>Uboh</u>, 141 F.3d at 1005. Plaintiff's criminal prosecution ended in her favor when the Camden County District Attorney dismissed the charge against her on November 12, 2019. Dkt. No. 149-26 at 2. Plaintiff, therefore, meets the third element.

### 4. Element Four: Was Plaintiff Injured?

While the parties dispute Plaintiff's alleged injuries, this element is satisfied.[5] There is no dispute that Plaintiff spent a night in jail. Dkt. No. 15 ¶ 2. Plaintiff's time in jail alone

---

[5] Even if Plaintiff failed to prove compensatory damages, she would still be entitled to nominal damages if she proves the alleged constitutional violation. <u>Kelly</u>, 21 F.3d at 1557.

meets the injury requirement for malicious prosecution. Butler, 85 F.4th at 1112. Plaintiff's mental and emotional distress, reputational damage, and personal humiliation also satisfy the injury requirement. See Slicker, 215 F.3d at 1231. The heart of the parties' injury dispute, however, is over Plaintiff's alleged injuries caused by the conditions of her confinement in the Camden County jail. Dkt. Nos. 171 at 38-40, 204 at 25-28.

Plaintiff's alleged physical injuries from her detention—"persistent respiratory illness"—are not cognizable injuries for her malicious prosecution claim. For these injuries to be valid, Plaintiff must prove that Defendants *caused* her respiratory illness. Eloy, 289 F. App'x at 346; Whiting, 85 F.3d at 586. Plaintiff's respiratory illness due to chemical exposure must have been a foreseeable injury related to her seizure and detention. Id. Such an injury was not foreseeable. The independent actions of the jail staff and the lack of any evidence that Defendants were aware of the conditions of Plaintiff's confinement break any causal chain between the arrest and those conditions. Wright v. City of Savannah, No. 4:17-CV-195, 2021 WL 1603612, at *4 (S.D. Ga. Feb. 24, 2021) ("The independent actions of jail staff, and the lack of any evidence that [the defendant] was aware of either [the plaintiff's] mental illness or the consequences of that illness upon the conditions he would be subjected to upon detention, break any causal chain between the arrest and those

conditions."), report and recommendation adopted (Mar. 26, 2021).

Plaintiff's exposure to a jail cell covered in an unidentifiable,

noxious chemical was not foreseeable. Plaintiff's claim that a

member of the jail staff sprayed these same toxic chemicals on her

door and into her cell is also not a foreseeable injury. Defendants

did not cause these injuries. Defendants did not cause Plaintiff's

jail cell to be doused in chemicals or cause the jail staff to

spray even more chemicals.

While Plaintiff's jail-related injuries are not valid

injuries for purposes of element four, her jail time is a valid

injury under this element.

### 5. Element Five: Was the Legal Process Justifying Plaintiff's Arrest Constitutionally Infirm?

Genuine disputes of material fact exist as to whether

Plaintiff satisfies element five. To meet this element, Plaintiff

must show that Defendants should have known the warrant application

failed to establish probable cause or Defendants intentionally or

recklessly made material misstatements or omissions. Williams, 965

F.3d at 1165.

For the same reasons set forth above, see supra Section

II.2.d. the Court finds that there are disputed issues of material

fact as to arguable probable cause—namely, whether a reasonable

officer in the same circumstances and possessing the same

information as Defendants could believe there was probable cause

to arrest Plaintiff. Wesby, 583 U.S. at 50. For the Court to make a definitive finding on this issue, it would first have to determine whether Deputy Sullivan made intentional or reckless misstatements or omissions. Paez, 915 F.3d at 1287. To do so here would require the Court to weigh evidence, make honesty and credibility determinations, and draw factual inferences. At this juncture, the Court cannot conclude whether Deputy Sullivan intentionally or recklessly made material misstatements and omissions in his warrant affidavit. Further, if the Court corrected all the alleged material misstatements and omissions, a reasonable jury could conclude that the offending information was material in that probable cause could be negated if the offending statements were removed or the omitted information included. Paez, 915 F.3d at 1287.

As to Lieutenant Prescott, Plaintiff must show "'proof of an affirmative causal connection' between [his] acts or omissions and the alleged constitutional violation, which 'may be established by proving that [Lieutenant Prescott] was personally involved in the acts that resulted in the constitutional deprivation.'" Brown v. City of Huntsville, 608 F.3d 724, 737 (11th Cir. 2010) (quoting Zatler, 802 F.2d at 401). In Brown, for example, qualified immunity applied to an assisting officer because "[t]here was no active personal participation by [the assisting officer] in [the plaintiff's] arrest, much less an opportunity to intervene in [the

primary officer's] arrest at the scene." Id. Further, qualified immunity was warranted because the assisting officer "had no supervisory control over the officer who did" make the arrest. Id. In another case, Govan v. City of McIntyre, the court extended qualified immunity to an assisting officer who was not the primary officer's supervisor and not in the primary officer's chain of command. No. 5:16-CV-503, 2018 WL 3762997, at *14 (M.D. Ga. Aug. 8, 2018). The same rationale does not apply to Lieutenant Prescott. Prescott was Deputy Sullivan's supervisor and was in Deputy Sullivan's chain of command. Further, Lieutenant Prescott actively participated in the investigation that concluded with Plaintiff's arrest warrant. Lieutenant Prescott spoke to the same dispatchers as Deputy Sullivan and even sat next to Deputy Sullivan while investigating Plaintiff. Dkt. No. 135 at 81–82. Lieutenant Prescott was not simply observing Deputy Sullivan but assisting him. See id. at 82:11–13 ("[W]e're trying to get our time frame down so that we can actually charge [Plaintiff].")

With regard to element five, Lieutenant Prescott had an opportunity to intervene in Deputy Sullivan's effort to secure a warrant for Plaintiff's arrest. Due to his active role, if a jury concludes that the warrant affidavit included material misstatements or omissions, a jury could also conclude that Lieutenant Prescott should have known that the warrant application failed to establish probable cause.

In brief, multiple disputes of material fact exist as to element five. This question of whether the legal process justifying Plaintiff's seizure was constitutionally infirm cannot be answered in the affirmative or negative without a jury resolving these disputes.

### 6. Element Six: Would the Plaintiff's Arrest be Justified without Legal Process?

Genuine disputes of material fact exist as to whether Plaintiff satisfies element six. For Plaintiff to succeed on this element, she must prove that in the absence of her arrest warrant, her seizure would still have been unreasonable. Put another way, Plaintiff must again prove the absence of probable cause. Williams, 965 F.3d at 1162. And again, due to the factual disputes in this case, a jury must determine whether probable cause or arguable probable cause existed.

Plaintiff's length of detention is also relevant to this element. Plaintiff was booked at the Camden County Jail at 12:43 AM on January 29, 2019. Dkt. No. 149-34 at 2. Plaintiff was released from the jail at 11:57 AM on January 30, 2019. Dkt. No. 149-35 at 2. Plaintiff spent thirty-five hours in the jail. Even if Plaintiff had been arrested without a warrant, her seizure would not have lasted more than forty-eight hours without a probable cause determination, which means her seizure was not presumptively unconstitutional under the McLaughlin holding. 500 U.S. at 57.

73

Despite this, a jury must determine whether Plaintiff's arrest would have been justified without legal process.

### 7. Was the Law Clearly Established?

The law prohibiting the alleged constitutional violation was clearly established at the time of Plaintiff's arrest. Plaintiff has successfully shown that at the time of the alleged constitutional violation, existing law placed the constitutionality of Defendants' alleged conduct beyond debate. Wesby, 583 U.S. at 63. As a general premise, it is clearly established that "an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." Durruthy v. Pastor, 351 F.3d 1080, 1088 (11th Cir. 2003) (citing Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998)).

It is clearly established that intentional, material misstatements in a warrant application violate the Constitution. United States v. Kirk, 781 F.2d 1498, 1502 (11th Cir. 1986); Williams, 965 F.3d at 1169 (explaining that the Eleventh Circuit has "never wavered about the prohibition of misstatements in warrant applications," and that this principle was clearly established in 2014 when the plaintiff was arrested). It is also clearly established that a recklessly false statement in a warrant application violates the Constitution. Kelly, 21 F.3d at 1554 (citing Franks, 438 U.S. at 156, 165–71) ("The Supreme Court has

also held that the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant."). Further, the law is clearly established that intentional or reckless "omissions made by a police officer in support of a warrant" violate the Constitution. Id. This rule does not apply to negligent misrepresentations or omissions, only intentional or reckless ones. Id.

Here is how Defendants' qualified immunity defense interacts with Plaintiff's malicious prosecution claim. When Defendants secured Plaintiff's arrest warrant in 2018 and when Plaintiff was arrested in 2019, the law was clearly established that intentional or reckless misstatements or omissions in a warrant application violate the Constitution. These principles were settled law and "dictated by controlling authority or a robust consensus of cases of persuasive authority." Wesby, 583 U.S. at 63. Because Plaintiff presents a genuine dispute of fact as to whether Defendants "intentionally or recklessly made misstatements" in the warrant application, whether such misstatements were necessary to establish probable cause, and whether Plaintiff's detention was "justified as a warrantless arrest," Plaintiff has "established a genuine dispute over whether the officers violated [her] clearly established rights under the Fourth Amendment." Williams, 965 F.3d at 1165, 1167, 1169. Accordingly, Defendants' motion for summary judgment as to this claim, and Plaintiff's motion for

summary judgment as to this claim, are **DENIED**.

## IV.   Unlawful Seizure/Arrest

A claim for unlawful seizure/arrest made pursuant to a warrant is identical to a claim for malicious prosecution under 42 U.S.C. § 1983. "Under Eleventh Circuit precedent, the issuance of a warrant constitutes legal process, and so a plaintiff who claims false arrest pursuant to a warrant is making a claim of malicious prosecution rather than false arrest."[6] Giles v. Manser, 757 F. App'x 891, 895 (11th Cir. 2018) (citation omitted); see also Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 4 (1st Cir. 1995) (holding adopted by the Eleventh Circuit in Whiting, 85 F.3d at 585) ("As a general rule, an unlawful arrest pursuant to a warrant will be more closely analogous to the common law tort of malicious prosecution . . . . On the other hand, wrongful warrantless arrests typically resemble the tort of false arrest."). If a plaintiff brings a claim for an unlawful seizure or unlawful arrest made pursuant to a warrant, the Court construes the claim as one for malicious prosecution and will apply the seven elements of a malicious prosecution outlined in Butler, 85 F.4th

---

[6] A claim for unlawful arrest in this context is synonymous with a claim for false arrest. See Williams v. Matthew Sirmons, 307 F. App'x 354, 360 (11th Cir. 2009) (treating "unlawful arrest" and "false arrest" as the same for purposes of damages); Johnson v. City of Warner Robins, No. 5:15-CV-419, 2018 WL 1095563, at *9 (M.D. Ga. Feb. 28, 2018) (treating an unlawful arrest claim as a false arrest claim under the statute of limitations).

at 1111.

The Court can make short work of Plaintiff's claim for unlawful seizure/arrest. Plaintiff's arrest was made pursuant to a warrant, which constituted legal process. See Giles, 757 F. App'x at 895. As such, Plaintiff's claim for unlawful seizure/arrest is a claim for malicious prosecution. See id. Because the unlawful seizure/arrest claim has been subsumed by the malicious prosecution claim, the Court **GRANTS** summary judgment for Defendants on Plaintiff's unlawful seizure/arrest claim.

## V.   Negligent Hiring and Retention

### 1. Overview

Government officials may not be held liable for constitutional violations committed by their subordinates under a theory of respondeat superior. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Because vicarious liability is inapplicable to § 1983 claims, a plaintiff must prove that the supervisor defendant violated the Constitution through his own actions. Id. When a supervisor does not directly participate in a constitutional violation, the plaintiff must establish a causal connection between the supervisor's actions or inactions and the alleged misconduct. Id.; Ingram v. Kubrik, 30 F.4th 1241, 1254 (11th Cir. 2022); Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). This is an "extremely rigorous" standard. See Piazza v. Jefferson Cnty., 923 F.3d 947, 957 (11th Cir. 2019) ("The standard by which

a supervisor can be held liable for the actions of a subordinate is 'extremely rigorous.'" (quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003))).

The *sine qua non* of a negligent hiring or retention claim is an underlying constitutional violation. Knight through Kerr v. Miami-Dade Cnty., 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation." (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986))).

### a. Proving Causation

A plaintiff may establish a causal connection in three ways: "1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (quoting Cottone, 326 F.3d at 1360). The Court will address the issue of deliberate indifference in greater detail below.

"[T]o prove that a policy or its absence caused a constitutional harm, a plaintiff must point to multiple incidents, or multiple reports of prior misconduct by a particular employee."

Piazza, 923 F.3d at 957 (citations omitted). "A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several [subordinates]." Craig v. Floyd Cnty., 643 F.3d 1306, 1312 (11th Cir. 2001).

### b. Deliberate Indifference

Deliberate indifference to constitutional rights may give rise to supervisory liability in hiring or retaining an employee. Deliberate indifference, however, "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997).

"To impose § 1983 liability based on a hiring decision," a plaintiff must show that the defendant's hiring decision reflects deliberate indifference to a known and obvious risk that "a violation of a particular constitutional or statutory right will follow the decision." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1313 (11th Cir. 2001); see also Bryan Cnty., 520 U.S. at 411 ("Only where adequate scrutiny of an applicant's background would lead a reasonable [official] to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'").

"A showing of simple or heightened negligence will not suffice" to show deliberate indifference. Bryan Cnty., 520 U.S. at 407. "It is not sufficient under this standard that [an official's] inadequate screening of an applicant's record reflects an 'indifference' to the applicant's background." Griffin, 261 F.3d at 1313 (citation omitted).

A supervisor may also be held liable under the deliberate indifference standard if the plaintiff "show[s] that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations" and failed to stop it. Goebert v. Lee Cnty., 510 F.3d 1312, 1332 (11th Cir. 2007) (citation omitted). In the context of retention, a supervisor is deliberately indifferent if he knew or should have known that his subordinates engaged in a history of widespread constitutional violations but failed to stop them. See Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) ("A causal connection can also be established by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."); Mathews, 480 F.3d at 1275 ("[A supervisor] could face liability under § 1983 predicated on his failure to take reasonable steps in the face of a history of widespread abuse [by his subordinates] . . . which resulted in deliberate indifference.").

**2. Analysis**

Plaintiff argues there is a question of fact whether Sheriff Proctor violated the Constitution because he was deliberately indifferent in hiring Deputy Sullivan. Dkt. No. 204 at 3. The Court does not find any genuine disputes of material fact regarding Plaintiff's negligent hiring and retention claim. The facts, viewed in the light most favorable to Plaintiff, warrant summary judgment for Sheriff Proctor.

Because Sheriff Proctor did not directly participate in the alleged constitutional violation—the warrant application and Plaintiff's arrest—Plaintiff must establish a causal connection between the Sheriff's actions or inactions and the alleged misconduct. Ashcroft, 556 U.S. at 676. Plaintiff alleges that she satisfies this causal connection because Sheriff Proctor was deliberately indifferent to her constitutional rights by hiring and retaining Deputy Sullivan. Dkt. No. 110 ¶ 207. Apart from this allegation in the third amended complaint, Plaintiff makes no specific argument and has not brought evidence to show that Sheriff Proctor was negligent in retaining Deputy Sullivan. The sole focus of her allegations and arguments is on the hiring of Deputy Sullivan. As such, summary judgment is **GRANTED** to Sheriff Proctor on the negligent retention aspect of this claim.

Regarding the negligent hiring aspect of the claim, Plaintiff argues that the decision in Griffin "clearly established that

81

liability for deliberate indifference in hiring arises when a hiring authority, having been put on notice of a potential performance issue with a job candidate, neither speaks to, nor obtains the candidate's personnel file from, their prior employer." Dkt. No. 204 at 28 (citing 261 F.3d at 1314). Plaintiff is incorrect. Plaintiff cherry picked the holding from Griffin and argues that it created an entire doctrine of law at odds with Supreme Court precedent and Eleventh Circuit precedent.

Supreme Court precedent is clear: an official's failure to adequately scrutinize an applicant's background constitutes deliberate indifference "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable [official] to conclude that the *plainly obvious consequence* of the decision to hire the applicant would be the deprivation of a third party's federally protected right." Bryan Cnty., 520 U.S. at 411 (emphasis added). Eleventh Circuit precedent is clear: the official's hiring decision must be deliberately indifferent to a known and obvious risk that a violation of a specific constitutional right "*will* follow the decision." Griffin, 261 F.3d at 1313 (emphasis added). In this case, Plaintiff can only satisfy the stringent standard of deliberate indifference if she proves that Sheriff Proctor's adequate scrutiny of Deputy Sullivan's background would have led to the conclusion that the plainly obvious consequence of hiring Deputy Sullivan would be Plaintiff's alleged constitutional

violation. Bryan Cnty., 520 U.S. at 411. There must have been a known and obvious risk that Plaintiff's specific constitutional violation would follow the decision to hire Sullivan. Griffin, 261 F.3d at 1313.

Plaintiff correctly cites the holding from Griffin. But the reasoning provided by the Eleventh Circuit in Griffin explains why qualified immunity is warranted for the Sheriff here. In Griffin, the City of Opa-Lacka hired a new city manager. Id. at 1298-99. The city hired this individual "without a resume, interview, background check, or any discussion of his qualifications." Id. at 1313. At the time when the city was considering hiring the individual, it was "inundated" with information warning of the individual's sexual harassment of women. Id. at 1314. This information included a list of prior sexual harassment charges, warnings from citizens, city officials' knowledge of the individual's history, and the individual's employment records. Id. The city ignored this information and hired the individual, who then sexually harassed the plaintiff. Id. at 1299-1300. The Eleventh Circuit found that the city was deliberately indifferent to the high risk that a violation of the plaintiff's right to be free of sexual harassment would follow the decision to hire the city manager. Id. at 1313-14. The court held that "the City ignored a known or obvious risk that [the individual] was highly likely to engage in sexual harassment if hired as the City's permanent City

Manager." Id. at 1314.

This case is not similar to Griffin. Sheriff Proctor hired Deputy Sullivan after his staff completed a background investigation that looked into his criminal history, driver history, POST records, and law enforcement database profile. Dkt. No. 164 at 14–15. These records do not establish a known or obvious risk that Deputy Sullivan would be highly likely to seek an arrest warrant without probable cause against Plaintiff or retaliate against her for exercising First Amendment rights. Deputy Sullivan's POST records are telling. Despite investigating Deputy Sullivan, POST—which determines fitness for law enforcement officers in the state—did not mention any history or propensity of making arrests without probable cause. Dkt. No. 163-6. Deputy Sullivan's POST records show a history of insubordination that led to his termination from the Brunswick Police Department. Id. These records, however, would not lead a reasonable official to conclude that the plainly obvious consequence of hiring Deputy Sullivan would be the specific alleged constitutional violations suffered by Plaintiff. After the investigation of Deputy Sullivan, POST concluded that he was "In Good Standing" as an officer. Id. at 1.

Plaintiff further claims that Sheriff Proctor was deliberately indifferent by failing to review Deputy Sullivan's Brunswick Police Department employment records. Dkt. No. 204 at 28–29. A review of these employment records would have shown one

84

specific incident involving an arrest possibly made without probable cause. Dkt. No. 163-2 at 19. The memo describing this incident was not a formal disciplinary allegation, only the observations of Deputy Sullivan's supervisor. Id. Plaintiff also points out that this memo included four other case numbers where Deputy Sullivan's supervisors felt probable cause was questionable. Id. at 20. The memo includes no information whatsoever about these incidents. Id. Deputy Sullivan's employment records do not provide evidence of a series of constitutional violations from which deliberate indifference could result. At most, Plaintiff has provided evidence of a single incident of possible unconstitutional activity. That evidence is not sufficient to impose liability here. See Craig, 643 F.3d at 1312 (finding that a single incident of unconstitutional activity did not prove deliberate indifference); see also Perez v. Sch. Bd., 917 F. Supp. 2d 1261, 1269 (S.D. Fla. 2013) ("It is not plausible to infer, on the basis of one incident, that the municipal Defendants knew or should have known that the officers they employed presented a danger to the public."). Aside from the personal observations of Deputy Sullivan's supervisors, Plaintiff does not demonstrate that these informal allegations of misconduct had any merit. See Brooks v. Sheib, 813 F.2d 1191, 1193 (11th Cir. 1987) (explaining that the defendant was not on notice of any prior misconduct because the plaintiff did not demonstrate that the past

complaints of police misconduct had any merit).

A review of Deputy Sullivan's Brunswick Police Department records would not lead a reasonable official to conclude that the plain and obvious consequence of hiring Deputy Sullivan would be the specific alleged violations of Plaintiff's constitutional rights. These records do not show a history of similar constitutional violations by Deputy Sullivan. The arrest incident described by Deputy Sullivan's supervisor, while troubling, is not sufficient to impart liability on Sheriff Proctor for negligent hiring. At most, the Sheriff's failure to screen Deputy Sullivan amounted to ordinary or even heightened negligence. This is insufficient to establish deliberate indifference.

Plaintiff has failed to establish that Sheriff Proctor was deliberately indifferent to a known and obvious risk that hiring Deputy Sullivan would result in a violation of her specific constitutional rights. <u>Griffin</u>, 261 F.3d at 1313. Therefore, Sheriff Proctor's motion for summary judgment as to Plaintiff's negligent hiring and retention claim is **GRANTED**.

<u>**CONCLUSION**</u>

For these reasons, the Court rules as follows:

- Plaintiff's motion for partial summary judgment, dkt. no. 149, is **DENIED;**

- Defendants' motion for summary judgment, dkt. no. 170, is **GRANTED** as to Plaintiff's First Amendment retaliation claim

(Count I) against Lieutenant Prescott;

- Defendants' motion for summary judgment, dkt. no. 170, is **DENIED** as to Plaintiff's First Amendment retaliation claim (Count I) against Deputy Sullivan;

- Defendants' motion for summary judgment, dkt. no. 170, is **GRANTED** as to Plaintiff's Fourth Amendment unlawful seizure/arrest claim (Count II);

- Defendants' motion for summary judgment, dkt. no. 170, is **DENIED** as to Plaintiff's Fourth Amendment malicious prosecution claim (Count III) against Deputy Sullivan and Lieutenant Prescott;

- Defendants' motion for summary judgment, dkt. no. 170, is **GRANTED** as to Plaintiff's negligent hiring or retention claim (Count IV) against Sheriff Proctor.

The remaining claims in this case are Count I, Plaintiff's First Amendment retaliation claim against only Deputy Sullivan, and Count III, Plaintiff's Fourth Amendment malicious prosecution claim against Deputy Sullivan and Lieutenant Prescott. Defendants are entitled to qualified immunity on all other claims. The Parties are **ORDERED** to file their proposed consolidated pretrial order by Monday, January 15, 2024.

**SO ORDERED** this 29th day of December, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA